UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

—————————————————————

| | | |
|---|---|---|
| RHONDA HALL, | ) | |
| | ) | |
| | ) | CIVIL ACTION NO. 05-30002-MAP |
| Plaintiff, | ) | |
| v. | ) | |
| | ) | |
| VERIZON COMMUNICATIONS, INC. and | ) | |
| VERIZON NEW ENGLAND, INC. | ) | |
| | ) | |
| Defendants. | ) | AUGUST 18, 2006 |
| | ) | |

—————————————————————

**DEFENDANTS' MEMORANDUM OF LAW
IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

Pursuant to Federal Rule of Civil Procedure 56(c), Defendants, Verizon

Communications, Inc. and Verizon New England, Inc. ("Verizon"), respectfully seek the entry of

summary judgment on Plaintiff's complaint in its entirety because (1) Plaintiff has not adduced

evidence from which a reasonable fact-finder could infer that Verizon subjected her to a hostile

work environment, and in any event, the undisputed facts reveal that Verizon investigated and

remedied the workplace conduct about which Plaintiff complained; (2) Plaintiff cannot point to

any evidence to support her claim of retaliation; (3) Plaintiff does not satisfy the definition of an

individual with a disability under state or federal law; and (4) Plaintiff rejected Verizon's offer of

reasonable accommodation of her alleged disability. Accordingly, Plaintiff cannot, as a matter of

law, prevail on any of her claims, and summary judgment should enter in favor of Verizon.

I.    **Factual Background[1]**

Despite the fact that Plaintiff's health care providers cleared her to return to work from

medical leave on January 13, 2003, Plaintiff refused for months thereafter to return to work, and,

—————————————

[1] For purposes of this motion only, Verizon takes Plaintiff's allegations as true.

eventually, on May 27, 2003, after several warnings that a failure to return to work would lead to termination, Verizon terminated her employment. Plaintiff now contends that, rather than her own refusal to return to work, it was either race, gender, or disability discrimination, or retaliation that motivated Verizon to terminate her employment.

Plaintiff began her employment at Verizon in March, 1989, and held various positions until, in January 2000, she was assigned as a Central Office Technician ("CO Tech") to Verizon's Holyoke Central Office ("CO"). (Defendant's Statement of Undisputed Material Facts ("SOF") ¶ 2.) Also assigned to the Holyoke CO were two other CO Techs, Eugene "Skip" Pula and Michael Stawacz. (SOF ¶ 3.) As a CO Tech, Plaintiff was a member of the IBEW. (SOF ¶ 4.) Her responsibilities included responding to calls and questions from "outside technicians," who would seek assistance from CO Techs on the phone or in person regarding customers' service in the field. (SOF ¶ 5.)

As a CO Tech, Plaintiff reported to Jack Lynch, the first level supervisor or "turf team leader," who in turn reported to George Savaria, the second level manager. (SOF ¶ 6.) Lynch's office was at Verizon's Central Office on Worthington Street in Springfield, and he visited the Holyoke CO a few times each month. (SOF ¶ 7.)

In August 2002, a steward of Plaintiff's union, Julie Kilbride, advised Plaintiff that outside technicians had complained about her failure to answer the phone at the Holyoke CO when they called for assistance. (SOF ¶ 8.) As a result of this conversation with Kilbride, Plaintiff complained to Lynch that outside technicians visiting the Holyoke CO had used race-related and other inappropriate language and had left her workspace in disarray. (SOF ¶ 9.) Verizon immediately convened a meeting to discuss Plaintiff's concerns, which Plaintiff, her union president, Lynch, and Savaria attended. (SOF ¶ 10.) At that meeting, Plaintiff reported,

for example, that an outside technician had asked her, "Why do you guys get mad when we say "nigger" when you say it all the time?" (SOF ¶ 12.) Because Plaintiff's report was that only outside technicians had engaged in inappropriate language and conduct, Lynch and Savaria limited outside technicians' visits to the Holyoke CO. (SOF ¶ 13.) Moreover, Verizon issued verbal reprimands to outside technicians as a result of Plaintiff's complaints. (SOF ¶ 15.) During the August 2002 meeting, Plaintiff never complained about Pula or Stawacz, her co-workers in the Holyoke CO. (SOF ¶ 14.) After the August 2002 meeting, Plaintiff confirmed for Lynch that she no longer had any problems at the Holyoke CO and told him that the outside technicians no longer spent time there. (SOF ¶ 16.)

On September 5, 2002, while Pula and Plaintiff were in the Holyoke CO, Pula cut a lock of Plaintiff's hair with pliers, just as Plaintiff was saying she could not find her pliers. (SOF ¶ 17.) Plaintiff did not report this conduct to Lynch or any other manager immediately; rather, she mentioned the event to a fellow CO Tech who was also the union steward, Kathy Collins, when Collins called Plaintiff for an unrelated reason that day. (SOF ¶ 18.) Collins then told Lynch what Plaintiff had reported to her. (SOF ¶ 19.)

Lynch immediately went to the Holyoke CO and spoke to Plaintiff and to Pula about what had happened. (SOF ¶ 20.) After Lynch left the Holyoke CO that day, Plaintiff called him, and stated that she was not happy with her treatment at the Holyoke CO. (SOF ¶ 21.) As a result of this call, Lynch planned to meet the next day with the three CO Techs assigned to the Holyoke CO: Plaintiff, Pula, and Stawacz. (SOF ¶ 22.)

However, Plaintiff never reported to work at Verizon again after September 5, 2002. (SOF ¶ 23.) On Friday, September 6, 2002, she called Lynch and informed him that she was taking a sick day. (SOF ¶ 24.) Lynch advised Plaintiff that he had planned a meeting of the

Holyoke CO Techs that very morning, and told her that they could do it on Monday, September

9, 2002, at which point Plaintiff said she would not be at work on Monday, either.  (SOF ¶ 25.)

Plaintiff also requested to meet with Savaria.  (SOF ¶ 26.)

      At Plaintiff's request, Lynch arranged for a meeting to take place on Tuesday, September

10, 2002, with Plaintiff, Lynch, Savaria, Collins, and the union president.  (SOF ¶ 27.)  This

meeting took place at Verizon's Worthington Street facility.  (SOF ¶ 28.)  At this meeting,

Plaintiff expressed concerns about Pula's treatment of her, including but not limited to the pliers

incident, and she also complained for the first time about conduct by Lynch.  (SOF ¶ 29.)  As a

result of this meeting, Plaintiff was referred to Verizon's EEO department, and Paul McGovern

of that department investigated her concerns.  (SOF ¶ 32.)  After his investigation, which

included interviews of Plaintiff, Pula, and Lynch, among others, McGovern concluded that no

unlawful conduct had occurred.  (SOF ¶ 33.)  McGovern nonetheless recommended that Pula

receive a written warning, because some of his conduct had violated Verizon policy; Pula was so

disciplined.  (SOF ¶ 34.)

      Beginning in September 2002, Plaintiff sought treatment from a mental health care

provider, and she was approved for short term disability benefits.  (SOF ¶ 35.)  Plaintiff's

treatment providers and the short term disability carrier cleared her to return to work on January

13, 2003, at which point her disability benefits ceased.  (SOF ¶ 36.)  Because Plaintiff's mental

health care providers requested that Plaintiff be given a different working environment, Verizon

offered Plaintiff a CO Tech position in the Worthington Street facility.  (SOF ¶ 37.)  At the

Worthington Street facility, Plaintiff would not have had regular contact with those employees

whom she had accused of harassment.  (SOF ¶ 38.)  Plaintiff refused this transfer.  (SOF ¶ 39.)

Verizon advised Plaintiff to return to work by May 27, 2003, and, when she did not do so,

Savaria and Paul LaBonte, Savaria's supervisor, terminated her employment. (SOF ¶ 40.) Verizon sent a written notice of termination, citing Plaintiff's failure to return to work as the reason for termination. (SOF ¶ 41.)

A few months after her termination from employment with Verizon, in August 2003, Plaintiff began work at a child care center. (SOF ¶ 42.) At that time, she also cared for her young son, participated in PTA meetings at her son's school, served on the advisory board of a non-profit organization, attended church twice a week, taught children's church school, and cared for her grandmother who lived in Plaintiff's home. (SOF ¶ 43.)

Plaintiff filed a charge with MCAD on October 7, 2002, and she commenced this lawsuit on or about January 10, 2005. (SOF ¶ 44.)

## II.    Legal Standard

Summary judgment is appropriate where there is "no genuine issue as to any material fact and . . . the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); Brown v. F.L. Roberts & Co., 419 F. Supp. 2d 7, 11 (D. Mass. 2006). When the moving party has properly demonstrated the absence of evidence to support the nonmoving party's case, the "burden shifts to the nonmoving party, with respect to each issue on which he has the burden of proof, to demonstrate that a trier of fact reasonably could find in his favor." Sands v. Ridefilm Corp., 212 F.3d 657, 661 (1st Cir. 2001) (quoting DeNovellis v. Shalala, 124 F.3d 298, 306 (1st Cir. 1997)). An issue is "genuine" where the evidence is "sufficiently open-ended to permit a rational fact finder to resolve the issue in favor of either side." Nat'l Amusements, Inc. v. Town of Dedham, 43 F.3d 731, 735 (1st Cir. 1995). A "material" fact is one that "has the potential to alter the outcome of the suit under the governing law if the dispute over it is resolved favorably to the nonmovant." Smith v. F.W. Morse & Co., 76 F.3d 413, 428 (1st Cir. 1996).

III.     <u>Argument</u>

    A.     **Counts One and Three, Alleging Sexual Harassment and Race Discrimination, Fail as a Matter of Law.[2]**

An employee claiming sex- or race-based harassment must prove that she was subjected to a hostile work environment and that the hostile conduct should be imputed to her employer. <u>See, e.g.</u>, <u>Garcia v. V. Suarez & Co.</u>, 288 F. Supp. 2d 148, 157 (D.P.R. 2003). A "hostile work environment" occurs when sexual or racial conduct imputed to the employer has the purpose or effect of unreasonably interfering with the employee's work or creating an intimidating, offensive, or hostile work environment because of sex or race. <u>Id.</u>; <u>Acevedo Vargas v. Colon</u>, 68 F. Supp. 2d 80, 87 (D.P.R. 1999); <u>see also</u> <u>Higgins v. New Balance Athletic Shoe, Inc.</u>, 194 F.3d 252, 258 (1st Cir. 1999).

    *1.     Verizon Is Not Vicariously Liable for Plaintiff's Co-workers' Allegedly Discriminatory Conduct Because Verizon Took Prompt, Remedial Action Immediately After Plaintiff Complained.*

Here, even assuming, for purposes of this motion only, that Plaintiff can create a genuine issue of material as to the existence of a hostile work environment,[3] she cannot prevail on her claims of co-worker harassment because the allegedly harassing conduct of her co-workers cannot be imputed to Verizon. Indeed, the undisputed evidence shows that Verizon took prompt, remedial action as soon as it learned, through Plaintiff's complaints, about the alleged conduct.

When a co-worker of the plaintiff allegedly creates a hostile work environment, "an employer can <u>only</u> be liable if the harassment is causally connected to some negligence on the

---

[2] As to Plaintiff's state law gender and race discrimination claims, which mirror her federal claims, Massachusetts state law follows federal precedent under Title VII. <u>See</u> <u>Abramian v. President & Fellows of Harvard College</u>, 432 Mass. 107, 116 (2000).

[3] Verizon makes this assumption for purposes of this motion only, despite the indisputable fact that some of the allegedly harassing conduct—for example, a co-worker stepping on Plaintiff's shoes—is not race- or sex-related.

employer's part." <u>Noviello v. City of Boston</u>, 398 F.3d 76, 95 (1st Cir. 2005) (emphasis added).

In other words, the plaintiff must show that the employer "knew or should have known about the

harassment, yet failed to take prompt action to stop it." <u>Crowley v. L.L. Bean, Inc.</u>, 303 F.3d

387, 401 (1st Cir. 2002); <u>see</u> <u>Fontanez-Nunez v. Janssen Ortho LLC</u>, 447 F.3d 50, 56 (1st Cir.

2006) ("[w]here the harassment is by a non-supervisory co-worker, the employer is liable only if

the plaintiff can show that the employer knew or should have known of the charged . . .

harassment and failed to implement prompt and appropriate action." ) (quoting <u>Arrieta-Colon v.</u>

<u>Wal-Mart Puerto Rico, Inc.</u>, 434 F.3d 75, 85-86 (1st Cir. 2006)).

     Here, Plaintiff complained about allegedly discriminatory conduct by co-workers in

August 2002, immediately following her union steward's notice to Plaintiff that the outside

technicians had complained about her not answering the phone when they called the Holyoke

CO.  (SOF ¶ 8.)[4]  At that time, Plaintiff in turn told Lynch that the outside technicians, who were

fellow union members, had used race-related language. (SOF ¶ 9.)  Specifically, Plaintiff

reported that a fellow union employee had asked her, "Why do you guys get mad when we say

---

     [44]  To the extent Plaintiff seeks to rest her harassment claim on alleged actions by co-
workers in 2000 and 2001, she is barred from doing so, as her MCAD complaint filed on
October 7, 2002 (SOF ¶ 44) would be untimely as to such remote occurrences.  <u>See</u> 42 U.S.C. §
2000e-5(e)(1) (administrative charge alleging Title VII violation must be filed within 300 days
of allegedly discriminatory occurrence); Mass. Gen. Laws ch. 151B, § 5 (same for charges
alleging ch. 151B violation).  Moreover, Plaintiff cannot create an issue of fact as to when
certain events occurred, simply by giving deposition testimony that is contrary to an earlier
sworn statement.  For example, in her sworn MCAD charge dated October 7, 2002, Plaintiff
alleges that, between January and March 2000, a co-worker had screamed at her in what she
claimed was an act of harassment or discrimination; Plaintiff testified in her deposition that she
could not identify the date of such event.  (Hall Dep. 43, 136, 157; <u>see</u> pages attached at Exhibit
B to Defendant's Statement of Facts, filed herewith.)

"nigger" when you say it all the time?"[5]  (SOF ¶ 12.)  She also reported that other fellow union employees had told jokes and made comments regarding various racial or ethnic groups and had made statements such as "your job is to serve us [outside technicians]."  (SOF ¶ 11.)

On August 5, 2002, as a result of these complaints, Verizon convened a meeting with Plaintiff, the Union President, Lynch, and Savaria.  (SOF ¶ 10.)  During this meeting, Plaintiff raised her complaints about the outside technicians; she did not complain about any of her coworkers at the Holyoke CO.  (SOF ¶¶ 11-12, 14.)  As a result of this meeting, Verizon decided to bar outside technicians from Plaintiff's worksite—the Holyoke CO—thus physically removing them from her presence at work.  (SOF ¶ 13.)  Plaintiff subsequently confirmed to Lynch that she no longer had any problems at her worksite and that the outside technicians no longer spent time there.  (SOF ¶ 16.)

Verizon's response to Plaintiff's complaint of her co-workers' alleged remarks was immediate and effective, as it eliminated the source of her concern by physically separating the outside technicians from her.  The company's actions were, therefore, "prompt and appropriate" as a matter of law.  See Fontanez-Nunez v. Janssen Ortho LLC, 447 F.3d 50, 56 (1st Cir. 2006). Verizon's response was also "reasonably calculated to prevent further harassment under the particular facts and circumstances of the case at the time the allegations [were] made" and did indeed, as confirmed by Plaintiff, succeed in preventing continuation of the alleged conduct.  See Newell v. Celadon Sec. Servs., 417 F. Supp. 2d 85, 96-97 (D. Mass. 2006).  Accordingly, Verizon's immediate and effective response to Plaintiff's complaints of co-worker harassment prevents, as matter of law, imposition of liability on Verizon.

---

[5] Title VII is not violated by "mere utterance of an ethnic or racial epithet which engenders offensive feelings in an employee."  Meritor Sav. Bank, FSB v. Vinson, 477 U.S. 57, 67 (1986).

Plaintiff also complains about allegedly harassing conduct by her co-worker at the Holyoke CO, Skip Pula, including an incident that occurred on September 5, 2002. Plaintiff contends that, on that day, Pula cut a portion of her hair with pliers. (SOF ¶ 17.) Although Plaintiff did not immediately inform management of this alleged incident, she did mention it to Kathy Collins, a union steward and a fellow CO Tech, who in turn reported it to Lynch. (SOF ¶ 18-19.)

Again, Verizon's response was swift and appropriate. Upon receiving notice from Collins on September 5, Lynch immediately went to the Holyoke CO that day to talk to Plaintiff and Pula. (SOF ¶ 20.) Plaintiff subsequently called Lynch and expressed unhappiness with her treatment at the Holyoke CO (SOF ¶ 21.), leading Lynch to schedule a meeting that occurred on September 10, with Plaintiff, Lynch, Savaria, Collins, and the union president in attendance. (SOF ¶¶ 27-28.) As a result of that meeting, Plaintiff was referred to Verizon's EEO department, and Paul McGovern of that department conducted an investigation of Plaintiff's concerns, including but not limited to the pliers incident. (SOF ¶ 32.) McGovern concluded that no unlawful conduct had occurred, but he nonetheless recommended that Pula receive a written warning because some of his conduct violated Verizon policy. (SOF ¶¶ 33-34.)

Courts in this district have held that an employer's immediate commencement of an investigation of allegedly discriminatory conduct is evidence that the company took prompt remedial action that permits the company to avoid liability for the underlying conduct. See, e.g., Cerqueira v. Corning Net Optix, No. 03-10306, 2004 U.S. Dist. LEXIS 17308, at *17-19 (D. Mass. August 13, 2004)[6]; Saad v. Stanley St. Treatment and Res., No. 92-11434, 1994 U.S. Dist. LEXIS 20728, at *9 (D. Mass. May 20, 1994). Moreover, courts have recognized that a

---

[6] Copies of all unreported decisions are attached hereto as Exhibit A.

company's imposition of discipline on the allegedly discriminating co-worker is an appropriate and adequate response, as a matter of law. Id. at *31. Here, not only was Pula given a written warning about his conduct as a result of Plaintiff's complaints, verbal reprimands and discussions were had with outside technicians as a result of Plaintiff's allegations about their inappropriate conduct. (SOF ¶ 15, 34.) Moreover, there is no evidence that, following Verizon's imposition of discipline on Pula and the outside technicians, Plaintiff complained about further inappropriate conduct by them. Accordingly, Verizon bears no liability because it acted immediately and effectively to remedy the alleged harassment.

### 2. No Reasonable Fact-Finder Could Conclude That Alleged Harassment by Plaintiff's Supervisor, Jack Lynch, Was Severe or Pervasive.

Plaintiff's claims of alleged harassment by her supervisor, Jack Lynch, must fail as well because his alleged conduct, even if assumed to be race- or sex-related, was neither severe nor pervasive. A plaintiff can recover under Title VII for workplace harassment only if the "workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." Harris v. Forklift Sys., 510 U.S. 17, 21 (1993) (emphasis added). Indeed, Title VII is also not "a general civility code for the American workplace [and] does not reach genuine but innocuous differences in the ways men and women routinely interact with members of the same, and the opposite, sex." Oncale v. Sundowner Offshore Servs., 523 U.S. 75, 81 (1998).

"When a supervisor's harassment d[oes] not result in a tangible employment action against an employee, then the employee must show that the harassment was so severe or pervasive that, in essence, it altered the terms or conditions of her [or his] employment." Lee-Crespo v. Schering-Plough Del Caribe Inc., 354 F.3d 34, 46 (1st Cir. 2003) (internal quotations

omitted) (<u>quoted</u> by <u>Fontanez-Nunez v. Janssen Ortho LLC</u>, 447 F.3d 50, 56 (1st Cir. 2006)).  In determining whether a work environment is sufficiently hostile or abusive to be actionable, courts consider "the frequency of the discriminatory conduct; its severity; whether it was physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." <u>Lee-Crespo v. Schering-Plough Del Caribe, Inc.</u>, 354 F.3d 34, 46 (1st Cir. 2003).  Additionally, "a supervisor's unprofessional managerial approach… [is] not the focus of the discrimination laws." <u>See id.</u>  Indeed, the First Circuit has declined to hold simple vulgar language as sufficiently severe and pervasive to hold an employer liable.  <u>See, e.g.</u>, <u>Fontanez-Nunez</u>, 447 F.3d at 57 ("While the vulgar language was inappropriate to the workplace and completely unprofessional, mere offensive utterances that did not unreasonably interfere with the employee's work performance do not amount to harassment that in essence altered the terms or conditions of employment.").

Here, Plaintiff contends that Lynch engaged in harassment on two occasions: (1) he told her, in the presence of her co-workers, that she was acting like a "bitch"; and (2) after she started in January 2000 as a CO Tech in Holyoke, Lynch asked her if she would be able to do her job with long fingernails.  (SOF ¶ 30.)  These alleged comments by Lynch are not sufficiently severe or pervasive to alter her working conditions and fail, as a matter of law, to support her claim of harassment by Lynch.

As an initial matter, Plaintiff unequivocally testified in her deposition that the <u>only</u> occasion on which she observed Lynch engaging in any inappropriate conversations about women was the one occasion where he allegedly referred to her as a bitch.  (SOF ¶ 31.)  This concededly one-time use of the word "bitch" in reference to Plaintiff, even if taken as true, could not possibly permit a jury to conclude that Plaintiff's workplace—which Lynch visited only a

few times a month and where she had worked for nearly two years—was pervaded by
intimidation or hostility toward women such that Plaintiff was inhibited from performing her job.
See Sandvik v. Secretary of HHS, No. 99-35824, 2000 U.S. App. LEXIS 33681 at *4-5 (9th Cir.
Dec.5, 2000) (where supervisor used the word "bitch" to describe female employees this
allegation was "not sufficiently severe or pervasive to alter her conditions of [plaintiff's]
employment"). Second, Lynch's alleged question in or around February 2000 about Plaintiff's
fingernails is, as a matter of law, so innocuous that it could not possibly be a sufficient
evidentiary basis for a finding of severe or pervasive harassment. See Tuggle v. Mangan, 348
F.3d 714, 722 (8th Cir. 2003) (supervisor's comments regarding plaintiff's clothing, makeup,
hair, and fingernails, her need for exercise, and the possibility that she was pregnant was not
severe or pervasive).[7]

Given Plaintiff's limited allegations of harassing language by her manager, Lynch, and
given the isolated and relatively mild nature of the language, that portion of her race and sex
discrimination claims that depends on Lynch's alleged comments must be rejected under both
federal and state law.

---

[7] In any event, given that the fingernails comment was made, if at all, in or around
February 2000 and the "bitch" comment was made, if at all, in 2001 (Hall Dep. 201; see pages
attached at Exhibit B to Defendant's Statement of Facts, filed herewith), it is far too late for
Plaintiff to complain about them as actionable events of harassment. Plaintiff first filed her
MCAD charge in October 2002, rendering any claim that relies on these comments untimely. 42
U.S.C. § 2000e-5(e)(1); Mass. Gen. Stat. ch. 151B, § 5.

**3.      *In Any Case, There Is No Basis for Imposing Vicarious Liability For Lynch's Alleged Comments, Because Verizon Can Establish the <u>Faragher/Ellerth</u> Affirmative Defense.*[8]**

Even if this Court were to find that Lynch's actions were severe and pervasive and, therefore, that such actions created a hostile working environment, Verizon can establish the <u>Faragher</u>/<u>Ellerth</u> affirmative defense, and, therefore, there is no basis for imposing liability on Verizon.  Generally, when a supervisor creates a hostile working environment, the employer is vicariously liable unless it can establish its affirmative defense.  <u>Burlington Indus. v. Ellerth</u>, 524 U.S. 742, 765 (1998); <u>Faragher v. City of Boca Raton</u>, 524 U.S. 775, 807-08 (1998).  This defense consists of two elements that, if proven, permits the employer to avoid liability. <u>Noviello v. City of Boston</u>, 398 F.3d 76, 94-95 (1st Cir. 2005).  The <u>Faragher</u>/<u>Ellerth</u> defense requires that an employer prove by a preponderance of the evidence that: (a) it exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and (b) the plaintiff unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise.  <u>See</u> <u>Ellerth,</u> 524 U.S. at 765; <u>Faragher,</u> 524 U.S. at 807.

No reasonable fact-finder could conclude that Verizon failed to take steps to prevent any harassing behavior.  It is undisputed that Verizon had an anti-harassment policy in place at the time of these allegations. (SOF ¶ 1.)  Courts have held that such policies are one way an employer can demonstrate that they exercised reasonable care.  <u>Finnerty v. William H. Sadlier, Inc.</u>, No. 05-4494-cv, 2006 U.S. App. LEXIS 8620 at *14 (2d Cir. April 7, 2006).

---

[8] Verizon makes this argument only under Title VII, given the Supreme Judicial Court's holding in <u>College-Town, Div. of Interco. Inc. v. MCAD</u>, 400 Mass. 156, 162-69 (1987).

-13-

Moreover, no reasonable fact-finder could conclude that Plaintiff took advantage of the preventive or corrective opportunities at Verizon, in light of the undisputed evidence that she did not report Lynch's alleged language to anyone at Verizon until September 10, 2002 (SOF ¶ 29), which was approximately one year after the most recent alleged comment. See Finnerty, 2006 U.S. App. LEXIS 8620 at *10 (affirming grant of summary judgment in favor of defendant because the plaintiff's delay in reporting harassment was unreasonable). The fact that, by September 10, 2002, Plaintiff had already commenced a medical leave of absence from which she never returned only underscores the unreasonableness of her delay in reporting Lynch's alleged comments.

For these reasons, Plaintiff's claims regarding hostile work environment based on alleged comments by Jack Lynch must fail.

**B.    Count Two, Count Four, And Count Seven of Plaintiff's Complaint Must Be Dismissed Because No Reasonable Fact-Finder Could Conclude That Plaintiff's Termination Was Motivated By Her Participation In Protected Activity.**

No reasonable fact-finder could conclude that Verizon retaliated against Plaintiff, as there is no evidence whatsoever of a causal connection between Plaintiff's termination and her complaints about discrimination. To establish a claim of retaliation, a plaintiff must show: (1) she engaged in protected activity; (2) she suffered a "materially adverse" action that "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination"; and (3) there is a causal connection between the protected activity and the adverse action. Burlington Northern and Santa Fe Rwy. Co. v. White, __ U.S. __, 126 S. Ct. 2405, 2415 (2006).[9] Once the plaintiff establishes a prima facie case of retaliation under

---

[9] Although the Supreme Judicial Court has held that Chapter 151B requires a showing of "adverse action" as part of a retaliation claim, Mole v. Univ. of Mass., 442 Mass. 582, 591-92

Massachusetts or federal law, the defendant must articulate a legitimate, non-retaliatory reason for the alleged adverse action; after the defendant does so, the plaintiff must show that the stated reason was a pretext for retaliation. <u>Billings v. Town of Grafton</u>, No. 02-40248, 2006 U.S. Dist. LEXIS 47270, *27-28 (D. Mass. July 5, 2006). Here, even assuming Plaintiff could establish the first two elements of her prima facie case, her claim fails in the lack of any evidence to support the third element. <u>Id.</u>; <u>Cathey v. Fallon Clinic</u>, 13 Mass. L. Rep. 325 (Mass. Super. Ct. 2001).

To the extent that Plaintiff will rely on the timing of her employment termination as alleged evidence of causation, her argument will fail. When there is no other evidence that suggests the retaliation is connected to the protected activity, cases "uniformly hold that the temporal proximity must be very close." <u>Clark County Sch. Dist. v. Breeden</u>, 532 U.S. 268, 273-74 (2001) (internal quotes omitted); <u>see also</u> <u>Mesnick v. General Electric Co.</u>, 950 F.2d 816, 828 (1st Cir. 1991) (granting summary judgment for defendant where nine months elapsed between adverse action and protected activity); <u>Mole v. Univ. of Mass.</u>, 442 Mass. 582, 591-92 (2004) ("the mere fact that one event followed another is not sufficient to make out a causal link" for purposes of retaliation claim).

The undisputed evidence shows that Plaintiff's employment was terminated on May 27, 2003 when she failed to heed warnings to return to work after obtaining medical clearance from her doctor following a medical leave. (SOF ¶¶ 37-40.) Verizon advised Plaintiff in writing that her employment would be terminated, pursuant to company policy, if she failed to return to work (SOF ¶ 40), and there is no evidence that other employees, who had not engaged in protected activity, were not terminated after failing to return to work from medical leave.

---

(2004), the record in this case does not require an analysis of any difference between the requirements of Chapter 151B and Title VII on this issue.

Moreover, Plaintiff's alleged protected activity had occurred in August, September, and October 2002:  in August, Plaintiff had complained internally about allegedly discriminatory conduct by co-workers (SOF ¶¶ 11-12); in September, she had made further internal complaints about co-workers and also about Lynch (SOF ¶ 29); and, in October, she had initiated her MCAD charge (SOF ¶ 44).  Plaintiff has adduced no evidence from which a reasonable fact-finder could infer that either George Savaria or Paul LaBonte, who together made the decision to terminate Plaintiff's employment eight months later in May 2003 (SOF ¶ 40), was motivated by her complaints of discrimination, rather than by her failure to return to work from medical leave (SOF ¶¶ 40-41).  Accordingly, Plaintiff's retaliation claim fails.

### C.    Counts Five And Six of Plaintiff's Complaint Must Be Dismissed Because She Is Not "Disabled."

#### 1.    *Plaintiff Is Not A Qualified Individual With a Disability.*

Plaintiff is not a qualified individual with a disability under federal or Massachusetts law, both of which require a plaintiff to establish: (1) she has a disability (under the ADA) or handicap (under Ch. 151B); (2) she is able to perform the essential functions of the job with or without reasonable accommodation; and (3) she was discharged because of the disability or handicap. Ward v. Mass. Health Research Inst., Inc., 209 F.3d 29, 32-33 (1st Cir. 2000); Russell v. Cooley Dickinson Hosp., Inc., 437 Mass. 443, 449 (2002).[10]  To prove the first element, a plaintiff must show that she has a physical or mental impairment that substantially limits one or

---

[10] Massachusetts looks to the federal cases decided under the ADA as a guide to the interpretation of G. L. c. 151B. Russell v. Cooley Dickinson Hosp., Inc., 437 Mass. 443, 452 (2002).

more major life activities. Gelabert-Ladenheim v. Am. Airlines, Inc., 252 F.3d 54, 58 (1st Cir. 2001).[11]

Here, Plaintiff has no evidence that she was substantially limited in the alleged major life activities of eating, sleeping, working, thinking or concentrating.[12]  (Complaint, ¶ 49.)   Aside from Plaintiff's conclusory allegations that she had trouble functioning, there is no evidence from which a reasonable fact-finder could conclude that she was substantially limited in any of these activities.  As she testified, Plaintiff took a job at a child care facility in August 2003, just over two months after Verizon terminated her employment.  (SOF ¶ 42.)  Plaintiff also admitted that, during the time she was allegedly "disabled," she took care of her young son, participated in PTA meetings at her son's school, served on the advisory board of a nonprofit organization, attended church twice a week, taught children's church school, and cared for her grandmother who lives in her home.  (SOF ¶ 43.)  As a matter of these facts, which Plaintiff has conceded, she

----

[11] Some courts have held that a plaintiff may establish that she is a member of the class protected by Ch. 151B against disability discrimination by showing that she sustained a work-related injury within the meaning of Ch. 152, § 75B(1), even if such employee cannot show that she is substantially limited in a major life activity as a result of the workplace injury. See, e.g., Gilman v. C&S Wholesale Grocers, Inc., 170 F. Supp. 2d 77, 83-84 (D. Mass. 2001); Courtois v. Legal Seafoods, Inc., No. 03-2752, 2004 Mass. Super. LEXIS 26, *28-31, 17 Mass. L. Rep. 296 (Feb. 6, 2004).  This standard would not apply in this case because Plaintiff's alleged workplace injury is a mental injury, which is expressly excluded from coverage by worker's compensation. Ch. 152, § 1(7A).  Accordingly, the "workplace injury" to which § 75B(1) refers cannot be read to include an alleged mental health injury.

Even if this standard were applied, however, Plaintiff still could not establish that she is a member of the protected class; indeed, at the time of her employment termination in May 2003, her own doctors had certified her as able to return to work.  There is no evidence, therefore, that, at the time of the allegedly discriminatory act, she was still affected by the alleged workplace injury.  See Courtois, 2004 Mass. Super. LEXIS at *28-31 (limiting interpretation of "workplace injury" as used in § 75B(1) to those injuries that still exist at the time of the alleged adverse action).

[12] For purposes of this motion only, Verizon assumes without conceding that all of these activities would be deemed "major life activities" within the meaning of the ADA.

cannot be considered disabled under the ADA or Massachusetts law. See Gelabert-Ladenheim, 252 F.3d at 58; Gilman v. C&S Wholesale Grocers, Inc., 170 F. Supp. 2d 77, 82-83 (D. Mass. 2001).

> **2.    *Even If The Court Were To Conclude That Plaintiff Had Adduced Evidence That She Was Disabled, Verizon Offered Her A Reasonable Accommodation.***

Even if Plaintiff were deemed to be an individual with a disability or handicap who can perform the essential functions of the job with or without reasonable accommodation, Plaintiff cannot establish that Verizon failed to provide a reasonable accommodation. Indeed, it is undisputed that Verizon offered Plaintiff a transfer to a different location—Verizon's Worthington Street facility—than that at which she claimed to have been harassed—the Holyoke CO. (SOF ¶¶ 37-38.) Her doctors advised that such a transfer was required, and Verizon complied. (SOF ¶¶ 37-38.)

To the extent Plaintiff claims that Verizon should have provided an alternate accommodation by extending her medical leave beyond the date stated by her doctors, such alternative was not legally required. A leave of absence that is lengthy or open-ended is generally not considered a reasonable accommodation. See Garcia-Ayala v. Lederle Parenterals, Inc., 212 F.3d 638, 648 (1st Cir. 2000); Gantt v. Wilson Sporting Goods Co., 143 F.3d 1042, 1047 (6th Cir. 1998); Hudson v. MCI Telecomms. Corp., 87 F.3d 1167, 1169 (10th Cir. 1996).

Moreover, courts have routinely upheld employer policies that provide for termination of an individual upon expiration of that employee's disability leave, where that employee fails to return to work. See, e.g., Balek v. Hobart Corp., No. 97 C 8130, 1999 U.S. Dist. LEXIS 12938, at *4-7 (N.D. Ill. Aug. 16,1999) (upholding neutrally-applied company policy that provides for employee discharge at end of six-month medical leave); Gantt v. Wilson Sporting Goods Co.,

143 F.3d 1042, 1046 (6th Cir. 1998) (uniform company policy that requires termination of any employee who does not return to work at expiration of leave period does not violate ADA). As in <u>Balek</u> and <u>Gantt</u>, Plaintiff's employment was terminated pursuant to company policy for job abandonment when she refused to return to work after being medically cleared to do so. There is no evidence that Verizon terminated Plaintiff's employment because she was disabled. To the contrary, there is undisputed evidence that Verizon sought to transfer Plaintiff to a position in a different office to address her alleged concerns and to allow her to continue working, but she flatly refused that offer. (SOF ¶¶ 37-39.)

Moreover, Plaintiff's disability discrimination claim fails because she refused to accept the reasonable accommodation that Verizon offered. See, e.g., <u>Phelps v. Optima Health, Inc.</u>, 251 F.3d 21, 28 (1st Cir. 2001) (holding that, where employee turned down several job opportunities offered by employer and placed significant conditions on her reassignment, employer was not liable for failure to provide reasonable accommodation); <u>see also</u> <u>Bryant v. Caritas Norwood Hosp.</u>, 345 F. Supp. 2d 155, 169 (D. Mass. 2004) (granting summary judgment to defendant on ADA claim because plaintiff failed to respond to the employer's offer of accommodation); <u>Gile v. United Airlines, Inc.</u>, 95 F.3d 492, 499 (7th Cir. 1996) (holding that when employee demands a particular accommodation and employer offers some other reasonable accommodation, which employee rejects, employer cannot be found liable for failing to reasonably accommodate the employee).

It is undisputed that Verizon offered Plaintiff an equivalent CO Tech job at the Worthington Street facility in Springfield, where she would not have regular contact with those employees whom she had accused of harassment. (SOF ¶ 37-38.) Plaintiff refused to accept the position at a different Verizon facility, and did not report to work at the new facility as

-19-

instructed.  (SOF ¶ 39.)  She further failed to suggest another alternative as a reasonable

accommodation.  (SOF ¶ 39.)  In light of Plaintiff's refusal to cooperate with Verizon's attempt

to provide reasonable accommodation, and in light of her rejection of the reasonable

accommodation offered, Plaintiff's disability discrimination claims should be rejected.  See, e.g.,

Phelps, 251 F.3d at 28; Bryant, 345 F. Supp. 2d at 169.

## IV.  Conclusion

For all the foregoing reasons, Verizon respectfully requests that this Court grant summary

judgment and dismiss Plaintiff's Complaint in its entirety.

Respectfully submitted,

DEFENDANTS, VERIZON
COMMUNICATIONS, INC. AND
VERIZON NEW ENGLAND, INC.


_____/s/ Stacy Smith Walsh_____
Victoria Woodin Chavey (*pro hac vice*)
Stacy Smith Walsh (BBO No. 647420)
Day, Berry & Howard LLP
CityPlace I
Hartford, Connecticut 06103-3499
(860) 275-0100
(860) 275-0343 (fax)
vwchavey@dbh.com
sswalsh@dbh.com
Their Attorneys

## CERTIFICATE OF SERVICE

I hereby certify that on, a copy of foregoing **Defendants' Memorandum of Law in
Support of Motion for Summary Judgment** was filed electronically and served by mail on
anyone unable to accept electronic filing.  Notice of this filing will be sent by e-mail to all parties
by operation of the Court's electronic filing system or by mail to anyone unable to accept
electronic filing as indicated on the Notice of Electronic Filing.  Parties may access this filing
through the Court's CM/ECF System.

/s/ Stacy Smith Walsh_____
Stacy Smith Walsh

<u>Courtois v. Legal Seafoods, Inc., et al.,</u> 2004 Mass. Super. LEXIS 26

<u>Cerqueira, et al. v. Corning Net Optix</u>, 2004 U.S. Dist. LEXIS 17308

<u>Saad v. Stanley Street Treatment and Resources, Inc. et al.,</u> 1994 U.S. Dist. LEXIS 20728

<u>Sandvik v. Secretary of Health and Human Services</u>, 2000 U.S. App. LEXIS 33681

<u>Finnerty v. William H. Sadlier, Inc. et al.,</u> 2006 U.S. App. LEXIS 8620

<u>Balek v. Hobart Corporation</u>, 1999 U.S. Dist. LEXIS 12938

<u>Billings v. Town of Grafton, et al.,</u> 2006 U.S. Dist. LEXIS 47270

LEXSEE 2004 MASS. SUPER. LEXIS 26

**Charles J. Courtois v. Legal Seafoods, Inc. et al.**

**03-2752**

**SUPERIOR COURT OF MASSACHUSETTS, AT MIDDLESEX**

**17 Mass. L. Rep. 296; 2004 Mass. Super. LEXIS 26**

**February 6, 2004, Filed**

**DISPOSITION:** Defendants' motion for summary judgment allowed, and plaintiff's motion to strike denied.

**JUDGES:** [*1] Judith Fabricant, Justice of the Superior Court.

**OPINIONBY:** Judith Fabricant

**OPINION:** MEMORANDUM OF DECISION AND ORDER ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

INTRODUCTION

This action arises from the termination of the plaintiff's employment with the defendant Legal Seafoods, Inc. The plaintiff alleges that his termination was caused by discrimination on the basis of age and handicap, and retaliation for the exercise of his right to claim workers' compensation benefits for workplace injuries. Presently before the Court is the defendants' motion for summary judgment as to all counts of the complaint. For the reasons that will be explained, the motion will be allowed.

BACKGROUND n1

n1 The facts presented derive primarily, although not exclusively, from the parties' statements pursuant to Superior Court Rule 9A(b)(5). The plaintiff has moved to strike the defendants' statement, contending that it does not accurately reflect the evidentiary material offered in support of it, and also raising certain evidentiary objections to certain materials offered. The Court finds the evidentiary objections raised without merit. The Court has examined the entire record, and concludes that the evidentiary material submitted does support the defendants' factual assertions, although in

some instances the particular citations provided are not precisely accurate. For those reasons, the motion to strike is denied. The plaintiff's response to the defendants' Rule 9A(b)(5) statement does not identify any evidentiary material contradicting the defendants' assertions of fact. The plaintiff does present certain additional facts on which he relies, although he does not do so in the manner prescribed by the Rule. The facts presented here include those supported by the evidentiary material submitted that the Court deems pertinent to the issues presented by the motion.

[*2]

The record, considered in the light most favorable to the plaintiff, provides the following factual background. The plaintiff, whose date of birth is March 17, 1958, worked for Legal Seafoods, in its Seafood Operations Department, from 1987 until his termination on June 30, 2000, at age 42. He held various positions over the years; at the time of his termination he was a Fish Department Manager.

Until early 2000, the Seafood Operations Department had responsibility for both purchasing and processing fish, lobster, and other seafood products. The department was headed by the plaintiff's brother-in-law, Arthur Kloack, who held the title of Vice President of Seafood Operations. n2 Kloack reported directly to the president of the company, Roger Berkowitz. Kloack supervised three managers: the plaintiff; Noel James, whose date of birth is September 7, 1959; and Bill Holler, whose date of birth is September 17, 1963.

n2 Kloack's age does not appear in the record. He testified in his deposition that he graduated from high school in 1974, suggesting that he is approximately two years older than the

plaintiff, who graduated from high school in 1976.

[*3]

The record includes somewhat varying versions of the distribution of responsibilities among the plaintiff, James and Holler, and of their skills and performance. Kloack's affidavit gives this version as to the plaintiff:

Chuck primarily handled the office, taking orders from the restaurants, handling the telephones, and doing other paperwork. Chuck also attended seafood auctions once or twice a week over the last year since another employee retired, and he did some buying under my guidance. Chuck also occasionally supervised the production line when Bill Holler was not in. Chuck's performance on office duties was excellent, but he did not have strong leadership skills, needed to improve on decision-making, planning and follow-through, and he had some trouble dealing with managers outside the department. Chuck had opportunities to go to the next level as a manager in terms of handling employees, other managers and business decisions, but did not carry himself well.

Kloack conducted performance evaluations of the plaintiff in March of 1997, 1998, and 1999. He gave the plaintiff ratings rather more generous than the evaluation reflected in his affidavit; in 1997, Kloack rated the plaintiff [*4] "excellent" in five performance categories, and "outstanding" in attendance; in the latter two years Kloack rated the plaintiff "outstanding" in all six categories. n3

n3 The categories rated on the evaluation form are attendance, job knowledge and performance, teamwork, cost control, hygiene/sanitation, and growth potential.

Regarding Noel James, Kloack's affidavit indicates that he "ran the operation on weekends, and supervised seafood transport and receiving, and the production line on the days he worked during the week. Noel . . . has excellent people management skills. He shows particular strength in production and is the best manager to work on weekends given his knowledge of the buildings and systems from having worked in other departments." Bill Holler, according to Kloack's affidavit, "came to the company after five years running his own fish processing business and several years managing the daily operations of another wholesale fish processing business. Bill had primary responsibility to oversee receiving [*5] and production . . . Bill was self-sufficient in performing his duties and showed leadership qualities."

The plaintiff's deposition testimony casts the roles and qualities of the three in a slightly different light. According to the plaintiff, before James and Holler joined the department, he and Kloack shared functions. The plaintiff testified,

I was still taking in, receiving lobsters, getting lobster prices, doing a little buying through Bill Conte. If he saw that he wanted something, I would make a phone call and purchase them. I would run the guys on the floor. I would run the guys in the office. Basically, me and Arthur kind of intertwined each other because Arthur was sometimes pulled into the fish pier in the morning, so I would be the guy in charge of the operation while he wasn't there. When he was there, we kind of took on the responsibilities together with Arthur being the lead person.

Later, according to the plaintiff, various other people were hired into the department. The plaintiff's role was "training the new guys that came on and taking care of the daily operation." When Bill Holler was hired, the plaintiff testified, "I had trained Billy to do some of [*6] the office paperwork, to do the purchase orders, to answer the phones for the restaurants, write some of the sheets that are filled out for product going to the restaurants. It was a big training procedure . . . I was training him and running the daily operation . . . After Bill was trained, I went back up to Gloucester and started buying fish again . . . and Noel James also worked on the floor. They would both kind of bounce from receiving product and running the floor and the office paperwork."

Kloack's deposition testimony confirms some aspects of the plaintiff's version; Kloack testified that the work involved a lot of "teamwork," that various duties were shared, that the plaintiff had "somewhat" of a role in instructing new employees in the department, and that the plaintiff was capable of performing the tasks that Holler and James performed. The plaintiff, according to Kloack's deposition testimony, did more paperwork than the others "Because Chuck worked primarily in the office . . . He was the senior man . . . in the management side of it." n4

n4 James, it appears, had been with the company longer than the plaintiff, having worked in other departments, but had shorter tenure in the Seafood Department.

[*7]

The plaintiff experienced certain work-related injuries during his employment with Legal Seafoods, according to his deposition testimony. Sometime early in

Case 3:05-cv-30002-MAP    Document 21-3    Filed 08/18/2006    Page 3 of 9

Page 3

17 Mass. L. Rep. 296; 2004 Mass. Super. LEXIS 26, *

his years with the company, he had a back injury that kept him out of work for four months. When he returned, Kloack and various co-workers made comments about the burden on others resulting from his absence. From then on, according to the plaintiff's deposition testimony, his co-workers made comments such as " 'Watch out. Don't hurt your back' or 'Watch out. He is going to go out for another couple of months.' " When asked at his deposition whether he suffered any adverse consequences in his employment as a result of the injury, the plaintiff cited only these comments from co-workers. The record provides no documents regarding this injury, or any claim for benefits of any kind arising from it, nor did the plaintiff testify regarding any claim for benefits.

The plaintiff had a second back injury in 1997. He testified that he did not recall whether he lost any time from work. Asked whether he suffered any adverse consequences in his job because of the injury, he responded "no, not really, no." A third back injury occurred in 1998. [*8] The plaintiff testified that he did not lose any time from work after the 1998 injury, and did not recall any adverse consequences in the job in connection with that injury. In January 1999, the plaintiff suffered a cut finger at work. He testified that did not lose any time from work, and he did not recall suffering any adverse consequences in his job. He offers documents that appear to reflect workers' compensation claims for these three injuries. n5

n5 The documents are less than self explanatory, and are not accompanied by any affidavit.

In his deposition testimony the plaintiff recalled two other work-related injuries, one to his rotator cuff and one to the back of his foot. He did not identify the timing of either. He did not lose any work time in connection with either of those injuries. Asked whether he suffered any adverse consequences in the job from the rotator cuff injury, the plaintiff answered "yes," but did not elaborate. As to the foot injury, the plaintiff recounted that his complaints to the [*9] effect that the injury had been caused by a lack of training of employees elicited "a little bit of irritability in the management." He offers no documents regarding these injuries, or any claim for benefits arising from them. The plaintiff does not contend, and has not offered any evidence to indicate, that any of his injuries resulted in impairment of any major life activity.

In 1999, the company's independent auditor, Deloitte & Touche, conducted an examination of the company's purchasing and processing operations. The auditor presented the results of its examination in a report dated

February 2000 entitled "Procurement Process Controls Review." The auditor recommended, among other changes, that the company "Segregate purchasing and receiving/operational responsibilities for control purposes." n6

n6 The plaintiff has moved to strike this document on hearsay grounds. The document is not hearsay, as it is not offered to prove the truth of any matter asserted. Rather, it is offered, and considered, merely to show that the recommendation was made by the outside auditor. The plaintiff also objects to the defendants having submitted a redacted copy of the document. In response, the defendants have now submitted an unredacted copy. Comparison of the two reveals nothing pertinent to the issues presented by this motion that is excluded from the redacted version.

[*10]

The company adopted the auditor's recommendation. In April of 2000, Berkowitz informed Kloack that he would no longer have responsibility for processing, but would be responsible only for purchasing. Kloack's title changed to Vice President of Seafood Buying, and he no longer supervised any employees. He assumed responsibility for paperwork related to the purchasing function himself. At about the same time, the company hired William Struzziery as Executive Director of Seafood Production. n7 Struzziery was placed in charge of the processing functions, and assigned the role of supervising the three managers who had previously reported to Kloack: the plaintiff, James and Holler. Struzziery reported to Chief Financial Officer Bruce Cartwright, as well as to Roger Berkowitz.

n7 The record does not indicate Struzziery's date of birth. He testified at his deposition that he graduated from high school in 1973, suggesting that he is about three years older than the plaintiff.

Soon after assuming his position, Struzziery [*11] promoted Bill Holler to the newly created position of Director of Seafood Production. James and the plaintiff remained in their positions as Fish Department Managers, reporting to Struzziery. At some point during this period, according to the plaintiff's deposition testimony, Struzziery inquired about the plaintiff's back, asking "how are you going to check the fish in Gloucester." The plaintiff responded that "they had a

Case 3:05-cv-30002-MAP     Document 21-3     Filed 08/18/2006     Page 4 of 9

Page 4

17 Mass. L. Rep. 296; 2004 Mass. Super. LEXIS 26, *

driver with me for a while, a driver and a helper." Other than this exchange, the plaintiff testified, no one with supervisory responsibility over the plaintiff made any comments about the plaintiff's back injury.

Struzziery used his first weeks on the job to form impressions of his department and its personnel. He recites in his affidavit:

Upon observing the seafood processing operations for several weeks during the reorganization, it became apparent to me that the Seafood Production Department did not need a separate employee, and certainly not a highly-paid Fish Department Manager, to handle the office duties. I recommended that we eliminate one of the two Fish Department Manager positions. I had observed Noel James performing his duties in supervising transport, [*12] receiving, and the production line, and I concluded that he has strong leadership skills and a good relationship with the employees on the production line, has good knowledge of the seafood operations and other departments, is efficient and results-oriented. I had observed that Chuck Courtois did not have these same qualifications, and he avoided independent decision making responsibilities, and did not have a good relationship with subordinates or other managers in the Company. I therefore recommended that Noel James be retained and that Chuck Courtois, who had been performing the office duties, be laid off as a result of the reorganization.

Struzziery's deposition testimony is generally consistent with this recitation, although less definitive. He testified that "I felt we were administratively heavy. The duties being handled at that time were more useful to be done out on production floor; and that for the administrative duties a manager may not be necessary to handle whatever administrative duties were inside the operation." In observing the three managers, Struzziery testified, he determined that Holler was "technically as far as dealing with fish, very strong. Results oriented, [*13] that he could see fish, know fish, and make a quick, honest decision type of evaluation of what needed to be done next." The plaintiff, in Struzziery's opinion did not "see fish and know fish as well." Holler, according to Struzziery, was an "independent thinker, would make a decision on his own." James, in Struzziery's view, had "overall knowledge of the company and production areas and employees, seemed to have a great rapport with all the employees and a good knowledge of what everything was." The plaintiff's strength, according to Struzziery, was "knowledge of the inside workings of the office, dealing with the restaurants." He also had knowledge of "the work on the floor" and of the fish products, but he had weakness with respect to "independent thinking," in that he "would want

to consult with people on certain issues, want to talk it out type of thing."

On Saturday, April 29, 2000, the plaintiff began to experience symptoms of illness. On Monday, May 1, 2000, he was diagnosed with campylobacter J infection, described by Legal Seafood's Director of Quality Control as "a common food-borne illness." The plaintiff remained out of work until Wednesday, June 28, 2000. He applied [*14] for and was granted benefits through the company's short-term disability insurance. On the application form, he and his physician checked boxes indicating that the disability arose from "an illness," and did not check boxes indicating that it was work-related. The hospital's billing department, however, attempted to collect from Legal Seafoods, apparently based on information provided by the plaintiff to the effect that his condition was work-related. The company rejected the claim, responding that the condition was "not work related." The plaintiff did not file a workers' compensation claim in connection with the illness.

The plaintiff now takes the position that he contracted the infection from chicken consumed at the company's commissary at lunch on the Friday before his symptoms appeared. His support for this contention is that he ate breakfast and lunch at the cafeteria during the week; although he had dinner at home, no one else in his family became ill; he had pizza out on Saturday, before his illness appeared, but his doctor said pizza could not have been the cause because pizza is cooked at high temperature; and "it is very, I guess known, that chicken product is a cause [*15] of campylobacter J." n8 The defendant denies this contention, and offers the opinion of its Director of Quality Control, trained in "Food Science," that the plaintiff could not have contracted the illness at work because other employees ate the some food and no others became ill.

n8 The plaintiff does not indicate the basis of this belief, which obviously is not competent evidence. The plaintiff's recitation of his doctor's opinion regarding pizza is similarly inadmissible.

Struzziery gave his evaluation of the three managers to Cartwright, along with the recommendation "that we were top-heavy in the department." Struzziery expressed to Cartwright his opinion that the plaintiff's duties could be reassigned without difficulty. When asked by Cartwright who would assume those duties, Struzziery testified, he responded that they would be shared or, if necessary, a part-time administrative person would be hired. According to the deposition testimony of both Cartwright and Struzziery, their conversations about the [*16] decision included no reference to the ages of any

17 Mass. L. Rep. 296; 2004 Mass. Super. LEXIS 26, *

of the three, or to any injuries or illnesses. n9 Kloack was not consulted about the decision to terminate the plaintiff. The decision was, however, consistent with his views of the relative merits of the three managers; he states in his affidavit: "If I were to choose between Chuck, Noel and Bill to run my business, I would choose Bill Holler."

n9 Nothing in the evidence indicates that Cartwright had any knowledge of the plaintiff's injuries or illness.

When the plaintiff returned to work after his illness on June 28, 2000, he found that Struzziery had become a vice president, and that Bill Holler had become a director. According to the plaintiff's deposition testimony, he asked Struzziery if he still had a job. Struzziery replied "yes, you do have a job, and I will just tell you one thing right now, if you fuck with me once, that will be the last time that you ever fuck with me because you won't be there." The plaintiff understood this statement to indicate [*17] that Struzziery "was fearful for me, 13 years at Legal, and I'm training him." The plaintiff testified that he was upset that Struzziery had been hired "over" him, in light of his seniority and hard work for the company.

Cartwright informed the plaintiff of his termination on Friday, June 30, 2000, two days after his return to work. The termination took effect that day, although the plaintiff was provided with a severance package, the details of which do not appear in the record. Since the plaintiff's termination, the company has not hired anyone to perform the administrative tasks he previously performed; those duties have been divided among Holler, James, and Struzziery.

At the time of the termination, according to the plaintiff's deposition testimony, Cartwright commented, "At your age you are still very marketable." n10 The plaintiff disagrees; his view, as expressed at his deposition, is that "at 43 years old I was all used up n11 . . . I mean, if I had to show all these records to a new employer, do you think they were going to hire me . . . All these injuries happened at Legal, and the amount of time that I was out while I was trying to do my job, I was all used up." No evidence [*18] indicates that anyone at the company ever said that the plaintiff was "all used up"; as far as the evidence discloses, that phrase is his alone.

n10 Cartwright's age does not appear in the record. He testified at his deposition that he

graduated from high school in 1966, suggesting that he is about ten years older than the plaintiff.

n11 The plaintiff was 42 at the time of his termination.

The plaintiff filed a charge with the Massachusetts Commission Against Discrimination on October 19, 2000, naming both the company and Cartwright. He alleged that his termination resulted from discrimination on the basis of disability and age, in violation of G.L.c. 151B, § § 4(16) and 4.1B, and retaliation. His charge did not specify the conduct for which he alleged the employer had retaliated. The plaintiff brought this action on June 30, 2003, again naming both the company and Cartwright. His complaint alleges age discrimination (count I), "Knowing Violation of the Age [*19] Discrimination Act" (count II), disability discrimination (count III), and "Unlawful Retaliation" (count IV), as to both defendants, and malicious interference with advantageous relations against Cartwright alone. Defendants have moved for summary judgment on all counts of the complaint.

DISCUSSION

This Court grants summary judgment where there are no genuine issues of material fact and the record entitles the moving party to judgment as a matter of law. See Mass.R.Civ.P. 56(c); *Cassesso v. Commissioner of Correction*, 390 Mass. 419, 422, 456 N.E.2d 1123 (1983); *Community National Bank v. Dawes*, 369 Mass. 550, 553, 340 N.E.2d 877 (1976). The moving party bears the burden of establishing that there is no dispute of material fact on every relevant issue. See *Pederson v. Time, Inc.*, 404 Mass. 14, 16-17, 532 N.E.2d 1211 (1989). A party moving for summary judgment who does not bear the burden of proof at trial may demonstrate the absence of a genuine dispute of material fact for trial either by submitting affirmative evidence negating an essential element of the non-moving party's case, or by showing that the non-moving party has no reasonable expectation of proving an essential element [*20] of its case at trial. *Flesner v. Technical Communications Corp.*, 410 Mass. 805, 809, 575 N.E.2d 1107 (1991); *Kourouvacilis v. General Motors Corp.*, 410 Mass. 706, 716, 575 N.E.2d 734 (1991).

Once the moving party establishes the absence of a triable issue by either of these methods, the party opposing the motion must respond with evidence of specific facts establishing the existence of a genuine dispute. *Pederson*, 404 Mass. at 17. The opposing party may not rest on the allegations of the pleadings, nor may he rely on "bare assertions and conclusions regarding [his own] understandings, beliefs, and assumptions." *Key*

Case 3:05-cv-30002-MAP     Document 21-3     Filed 08/18/2006     Page 6 of 9

Page 6

17 Mass. L. Rep. 296; 2004 Mass. Super. LEXIS 26, *

*Capital Corp. v. M&S Liquidating Corp.*, 27 Mass.App.Ct. 721, 728, 542 N.E.2d 603 (1989). Mere contradictions of factual allegations, without evidentiary support, are insufficient to raise questions of material fact sufficient to defeat a summary judgment motion. *Madsen v. Erwin*, 395 Mass. 715, 721, 481 N.E.2d 1160 (1985), quoting *Olympic Junior, Inc. v. David Crystal, Inc.*, 463 F.2d 1141, 1146 (3rd Cir. 1972) (noting that conclusory statements, denials, and allegations are insufficient to raise material issues of fact). The opposing [*21] party's obligation, rather, is to demonstrate the existence of admissible evidence sufficient to meet his burden of proof on the issues raised by the motion.

In deciding motions for summary judgment, the Court may consider pleadings, depositions, answers to interrogatories, admissions on file and affidavits. The Court reviews the evidence in the light most favorable to the nonmoving party, but does not weigh evidence, assess credibility or find facts. See *Dawes*, 369 Mass. at 553; Mass.R.Civ.P. 56(c); *Colley v. Benson, Young & Downs Insurance Agency, Inc.*, 42 Mass.App.Ct. 527, 528, 678 N.E.2d 440 (1997); see also *Kelley v. Rossi*, 395 Mass. 659, 663, 481 N.E.2d 1340 (1985). In cases "where notice, intent, or state of mind questions are at issue" summary judgment is often, but not always, inappropriate. See *Brunner v. Stone & Webster Engineering Corp.*, 413 Mass. 698, 705, 603 N.E.2d 206 (1992) (further citations omitted); compare *Matthews v. Ocean Spray Cranberries, Inc.*, 426 Mass. 122, 129-35, 686 N.E.2d 1303 (1997) (upholding summary judgment for defendant in employment discrimination case, where plaintiff provided no evidence to support a finding of pretext).

1. [*22] Age Discrimination

To meet his burden of proof at trial on his claim of age discrimination, the plaintiff must present evidence from which the jury could find four elements: (1) that he was a member of the protected class, in that he was age forty or over; (2) that he was terminated or otherwise subjected to adverse employment action; (3) that the employer held an age-based discriminatory animus; and (4) that the discriminatory animus caused the adverse employment action. See *Lipchitz v. Raytheon Co.*, 434 Mass. 493, 506-08, 751 N.E.2d 360 (2001); *Abramian v. President & Fellows of Harvard College*, 432 Mass.107, 116-18, 731 N.E.2d 1075 (2002). In the absence of direct evidence as to the latter two elements, a plaintiff may prove those elements by inference, based on the three-stage analysis initiated in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 36 L. Ed. 2d 668, 93 S. Ct. 1817 (1973), and adopted and applied in a series of Massachusetts cases, most recently in *Knight v. Avon Products, Inc.*, 438 Mass. 413, 420-27, 780 N.E.2d 1255

(2003). In the first stage, the plaintiff must establish a *prima facie* case, by presenting evidence that he was forty or over, that he had performed his [*23] job at an acceptable level, that he was terminated, and that he was replaced by a similarly or less qualified person who was at least five years younger. See *id.* at 421, 425.

Here, since the record provides no direct evidence of age discrimination, the plaintiff must proceed by way of the pretext analysis. The evidence clearly meets the first three elements of the *prima facie* case: the plaintiff was forty-two, he was terminated, and he was performing acceptably. The fourth element is more problematic. The plaintiff was not replaced in any direct sense; no one was appointed to fill the position he had held. Instead, that position was abolished, and the duties he had performed were parceled out among three people: Struzziery, James, and Holler. n12 One of the three, Holler, was five and a half years younger, just barely meeting the substantiality requirement as established in *Knight, supra*. As to qualifications, Holler had less seniority than the plaintiff with Legal Seafoods, but more experience in management, having run his own seafood business and managed another. n13 Perhaps more important, Holler had the confidence of his superiors to a degree that [*24] the plaintiff did not; both Kloack and Struzziery were of the view that Holler was better able than the plaintiff to make independent decisions and to exercise leadership. The plaintiff has offered nothing to indicate that any supervisor held a contrary view, nor does it appear that the plaintiff had any superiority in objective credentials so as to outweigh these subjective evaluations. n14 The plaintiff's effort to make a *prima facie* case is thus tenuous at best; if his initial showing supports any inference at all, the inference is weak. See *Knight, supra*, at 423.

n12 Kloack, according to the evidence, had already assumed some of the duties the plaintiff had performed before the reorganization, since Kloack himself took on the administrative aspects of the fish purchasing function.

n13 The plaintiff has not offered evidence that Legal Seafoods made a practice of basing employment decisions on seniority within the company.

n14 The performance review forms do not make any specific inquiry regarding leadership and independent decision-making, although these qualities might be thought relevant to the category of growth potential. The record does not contain Holler's performance reviews, so no comparison with the plaintiff's is available.

Case 3:05-cv-30002-MAP     Document 21-3     Filed 08/18/2006     Page 7 of 9

Page 7

17 Mass. L. Rep. 296; 2004 Mass. Super. LEXIS 26, *

[*25]

If the plaintiff's evidence is viewed as meeting the requirement of a *prima facie* case, the next step is the employer's effort to rebut the inference of discrimination by articulating a legitimate, non-discriminatory reason for the termination. See *Knight, supra*, at 420, n. 4. The defendants here have demonstrated their ability to do that by offering evidence that they terminated the plaintiff to eliminate an unnecessary position, and that they chose the plaintiff for termination, rather than Holler, based on characteristics that, while subjective, are work-related and lawful. To meet this response and preserve the inference of discrimination based on the *prima facie* showing, the plaintiff must present evidence from which a reasonable jury could find that the employer's asserted reason was not the real reason, but a pretext. This the plaintiff cannot do with the evidence offered here. As indicated *supra*, he offers nothing to contest the defendants' evidence that the employer abolished his position, and nothing beyond his own opinion to rebut the defendants' showing of his superiors' judgment of his qualities as compared with those of Holler. n15 The plaintiff [*26] therefore cannot meet his burden of proof of the elements of discriminatory animus and causation based on a pretext theory, and his claim of age discrimination must be dismissed. See generally, *Bruce v. Town of Wellesley*, 47 Mass.App.Ct. 800, 805, 716 N.E.2d 670 (1999); *Wooster v. Abdow Corporation*, 46 Mass.App.Ct. 665, 673, 709 N.E.2d 71 (1999); *Gregory v. Raytheon Service Company*, 27 Mass.App.Ct. 1170, 1171, 540 N.E.2d 694 (1989).

n15 Viewing the organization chart on a somewhat broader time frame, comparing early 2000 with July of that year, one might perceive that the company did not actually reduce the total number of positions performing the fish purchasing and processing functions, but merely substituted Struzziery for the plaintiff. This way of looking at the facts does not assist the plaintiff, because Struzziery is older than the plaintiff.

2. Handicap Discrimination

The elements of a claim of handicap discrimination are similar to those of age discrimination. First among them is that the [*27] plaintiff is a member of the protected class--that is, that he is a qualified handicapped person within the meaning of G.L.c. 151B. Under c. 151B, § 1(17) the term "handicap" means, "(a) a physical or mental impairment which substantially limits one or more major life activities of a person; (b) a record of having such impairment; (c) or being regarded as having such impairment." Major life activity is defined in § 1(20) as "functions, including, but not limited to, caring for one's self, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working." See generally, *City of New Bedford v. Massachusetts Commission Against Discrimination*, 440 Mass. 450, 461-66, 799 N.E.2d 578 (2003); *Labonte v. Hutchins & Wheeler*, 424 Mass. 813, 821, 678 N.E.2d 853 (1997). The impairment must be long-lasting or chronic; a temporary disability of short duration does not qualify. See *Hallgren v. Integrated Financial Corporation*, 42 Mass.App.Ct. 686, 687-89, 679 N.E.2d 259 (1997). Where the claimed impairment is alleged to limit the major life activity of working, the plaintiff must show that his condition significantly restricts him from performing not only a particular [*28] job, but "a class of jobs or a broad range of jobs in various classes." *City of New Bedford, supra*, at 464. These requirements apply not only to the first prong of the definition, but to the "record of" and "regarded as" prongs as well; thus, to establish membership in the protected class based on those prongs, a plaintiff must show that he has a record of having a long-term impairment that substantially limited his participation in a major life activity, or that his employer regarded him as having such a condition. See *City of New Bedford, supra*, at 462.

The evidence offered here indicates that, over the thirteen years of his employment with Legal Seafoods, the plaintiff suffered several injuries and one infection, that some of these conditions kept him out of work for some period of time, the longest such period being four months early in his tenure with the company, and that he returned to work after each such period. Nothing in the record indicates that any of these conditions ever substantially limited the plaintiff's ability to perform any class of jobs, or to engage in any other major life activity. Nor, despite the plaintiff's arguments, does anything [*29] in the record suggest that the defendants ever regarded the plaintiff as having any impairment that substantially limited his performance of any major life activity beyond a short-term period. Compare *Dartt v. Browning-Ferris Industries, Inc.*, 427 Mass. 1, 17, 691 N.E.2d 526 (1998) (evidence was "slight" but sufficient to establish that plaintiff was regarded by his employer as having such impairment, where plaintiff had been unable to work for over two years and required two surgical procedures after work-related injury).

The plaintiff relies on G.L.c. 152, § 75B(1), which provides, in pertinent part:

Any employee who has sustained a work-related injury and is capable of performing the essential functions of a particular job, or who would be capable of

Case 3:05-cv-30002-MAP     Document 21-3     Filed 08/18/2006     Page 8 of 9

Page 8

17 Mass. L. Rep. 296; 2004 Mass. Super. LEXIS 26, *

performing the essential functions of such job with reasonable accommodations, shall be deemed to be a qualified handicapped person under the provisions of chapter one hundred and fifty-one B.

The plaintiff reads this provision as displacing the definition of handicap set forth in G.L.c. 151B, § 1(17). Under that interpretation, anyone who has ever experienced a work-related [*30] injury would be a member of the protected class under c. 151B for all time thereafter, without regard to the requirements set forth in that provision. The plaintiff cites no authority for this interpretation.

The defendants propose a narrower interpretation of c. 152, § 75B(1) that is consistent with the language and purposes of both statutes. Under this interpretation, an employee who sustains a work-related injury is entitled to the protections of c. 151B during the time that he is affected by that injury. Thus, an injured employee is entitled to reasonable accommodation to enable him to return to work, and is protected from discrimination based on the injury during the time he is affected by it. Once the injury has resolved, his status is the same as that of all other employees; to invoke the protections of G.L.c. 151B, he must establish the elements required under that statute.

In the absence of any guiding authority on the point, this Court adopts the narrower interpretation, which harmonizes the two statutes in issue. As so interpreted, c. 152, § 75B(1), does not assist the plaintiff in establishing a *prima facie* case of handicap discrimination. At the time of his termination, [*31] the plaintiff was not suffering from any work-related injury. n16 Moreover, even if the requirements of the *prima facie* case were met, as discussed *supra*, the record reveals the plaintiff's inability to prove pretext. Accordingly, the defendants are entitled to judgment as a matter of law on the claim of handicap discrimination.

n16 Chapter 152, § 1, paragraph 7(A) defines "personal injury" to include "infectious or contagious diseases if the nature of the employment is such that the hazard of contracting such diseases by an employee is inherent in the employment." The plaintiff does not suggest that a risk of campylobacter infection was inherent in his employment with Legal Seafoods. Even if it were, the infection had resolved prior to his return to work on June 28, 2000.

3. Retaliation

The plaintiff's retaliation claim invokes G.L.c. 151B, § 4.4A. That statute provides, in pertinent part, that it is unlawful "for any person to coerce, intimidate or threaten to interfere [*32] with another person in the exercise or enjoyment of any right granted or protected by this chapter." The complaint alleges, without specificity, that the plaintiff "exercised statutory rights permitted and protected under G.L.c. 151B." The record presented on this motion does not identify any conduct of the plaintiff in the exercise of such rights prior to his termination. Indeed, there is nothing whatever in the record to indicate that the plaintiff ever invoked any rights under c. 151B, or engaged in any conduct protected under that statute, prior to his termination.

What the plaintiff did do, apparently, was exercise rights under G.L.c. 152, by seeking workers' compensation benefits in connection with his various work-related injuries, most recently in January of 1999, some seventeen months before his termination. n17 That conduct was protected not by G.L.c. 151B, but by G.L.c. 152, § 75B(2), which makes it unlawful for an employer to "discharge, refuse to hire, or in any other manner discriminate against an employee because the employee has exercised a right afforded by this chapter." Although the plaintiff has not pled a violation of that provision, [*33] the Court assumes, for purposes of this motion, that he would be permitted to amend his complaint to do so.

n17 The record establishes as undisputed that the plaintiff did not make a claim under c. 152 for the campylobacter infection in May of 2000; rather, he received benefits under the employer's short-term disability insurance policy for his time out of work with that illness.

To prove a violation of c. 152, § 75B(2), the plaintiff would have to show a causal connection between his termination and his exercise of rights under c. 152. See *Piderit v. Siegal & Sons Investments, Ltd.*, 55 Mass.App.Ct. 1, 5-6, 768 N.E.2d 1099 (2002); see generally *MacCormack v. Boston Edison Co.*, 423 Mass. 652, 662, 672 N.E.2d 1 (1996) (regarding elements of retaliation claim under G.L.c. 151B). "The mere fact that one event followed another is not sufficient to make out a causal link." *MacCormack*, 423 Mass. at 662, n.11, citing *Prader v. Leading Edge Products, Inc.*, 39 Mass.App.Ct. 616, 617, 659 N.E.2d 756 (1996). [*34] Any inference from sequence alone would be particularly attenuated here, where the most recent protected activity was seventeen months before the termination. Lacking any direct evidence, the plaintiff relies for his retaliation

Case 3:05-cv-30002-MAP    Document 21-3    Filed 08/18/2006    Page 9 of 9

Page 9

17 Mass. L. Rep. 296; 2004 Mass. Super. LEXIS 26, *

claim, as for his discrimination claims, on a theory of pretext. That theory fails for the same reasons discussed *supra*; the plaintiff offers no evidence to support it.

## 4. Malicious Interference

The plaintiff's final claim is that defendant Cartwright maliciously interfered with his employment relationship with Legal Seafoods. To recover on that claim, the plaintiff would have to prove, among other elements, that Cartwright acted for an improper purpose, unrelated to any legitimate interest of the employer. See *Sklar v. Beth Israel Deaconess Medical Center*, 59 Mass.App.Ct. 550, 554-55, 797 N.E.2d 381 (2003); see also *Weber v. Community Teamwork, Inc.* 434 Mass. 761, 781, 752 N.E.2d 700 (2001). The only improper motives the plaintiff identifies are the same ones already discussed: discrimination on the basis of age or handicap, and retaliation for the exercise of statutory rights. For the reasons already discussed, the evidence fails to support [*35] these contentions. Accordingly, defendant Cartwright is entitled to judgment as a matter of law on the claim of malicious interference.

## CONCLUSION AND ORDER

For the reasons stated, the Defendants' Motion for Summary Judgment is *ALLOWED*. The Plaintiff's Motion to Strike is *DENIED*.

Judith Fabricant

Justice of the Superior Court

February, 2004

LEXSEE 2004 U.S DIST. LEXIS 17308

PAULA J. CERQUEIRA, INDIVIDUALLY, AND AS ADMINISTRATRIX OF THE
ESTATE OF JOSEPH H. CERQUEIRA; KRISTINA E. CERQUEIRA, PPA, BY HER
MOTHER AND NEXT FRIEND, PAULA J. CERQUEIRA; and JOSEPH M.
CERQUEIRA, PPA, BY HIS MOTHER AND NEXT FRIEND, PAULA J. CERQUEIRA,
Plaintiffs, v. CORNING NET OPTIX, Defendant.

CIVIL ACTION NO. 03–10306–DPW

UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MASSACHUSETTS

2004 U.S. Dist. LEXIS 17308; 94 Fair Empl. Prac. Cas. (BNA) 730

August 13, 2004, Decided

**DISPOSITION:** [*1] Defendant's motion for summary judgment granted.

**COUNSEL:** For Corning Net Optix, Defendant: David S. Rosenthal, LEAD ATTORNEY, Nixon Peabody LLP (BOS), Boston, MA.

For Joseph M. Cerqueira, Plaintiff: Michael E. Mone, Sr., LEAD ATTORNEY, Esdaile, Barrett & Esdaile, Boston, MA.

**JUDGES:** DOUGLAS P. WOODLOCK, UNITED STATES DISTRICT JUDGE.

**OPINIONBY:** DOUGLAS P. WOODLOCK

**OPINION:**

MEMORANDUM AND ORDER

In this extraordinarily sad case, Paula J. Cerqueira, administratrix of the Estate of Joseph H. Cerqueira, presses an action against her late husband's employer, defendant Corning Net Optix ("Corning"), alleging that Corning violated Mr. Cerqueira's rights under the Massachusetts Anti-Discrimination Statute, Mass. Gen. Laws c. 151B, § 4, by creating a hostile work environment in which he was sexually harassed by a male coworker before he committed suicide. Corning has moved for summary judgment. Because I find as a matter of law that Corning took appropriate action under the circumstances to investigate and remedy the harassment complaint, the motion will be granted.

**I. BACKGROUND**

**A. Facts**

On April 7, 2000, Cerqueira started working at Corning as a fiber optic [*2] technician. For his initial six weeks, Cerqueira worked the first shift, 7:00 a.m. to 3:00 p.m., while he received job training, including instruction on Corning's sexual harassment policies. In late May, Cerqueira was transferred to the second shift, working from 3:00 to 11:00 p.m.

On Friday, July 14, 2000, around 8:30 p.m., Paul Samsen, Cerqueira's immediate supervisor, observed Cerqueira pacing back and forth in the dimly lit parking lot. Concerned, Samsen approached him; he observed that Cerqueira's voice was nervous and shaken, although Cerqueira told Samsen he was all right. That same night, Cerqueira told coworker Sarah Lewis that he was having a hard time at work.

At approximately 9:30 p.m., Cerqueira asked to speak in private with Jonathan Sipin, the shift technician who was responsible for handling employee complaints in Samsen's absence. Off the manufacturing floor in a conference room, Cerqueira reportedly declared "I can't take it anymore" and related that he was being sexually harassed by Eric Gonzalez, a coworker who worked near his station. Specifically, Cerqueira complained that Gonzalez was teasing him and calling him "gay." Sipin tried to get Cerqueira to elaborate, [*3] but, on the verge of tears, Cerqueira appeared too upset to provide further details.

Sipin told Cerqueira that he would inform Samsen, the supervisor responsible, and requested that Cerqueira speak with Samsen the next day, Saturday, July 15, when Cerqueira would be working an overtime shift and Gonzalez would not be working. At 10:16 p.m., Sipin sent Samsen an email, apprising him of Cerqueira's complaint. The subject line read "Important!" and contained the following message:

Joe Cerqueira talked to me last night at

2004 U.S. Dist. LEXIS 17308, *3; 94 Fair Empl. Prac. Cas. (BNA) 730

around 9:30 pm about verbal harassment that he has been getting from Eric Guevarra [sic]. This has been going on for some time now. He will be coming at 12:00 noon tomorrow (Saturday) and I told him to talk to you about it. I think it is very serious.

Sipin affixed a note to Samsen's computer, instructing him to read his email immediately upon his arrival to work.

Later, at some point before the end of the shift, Sipin went onto the manufacturing floor and "just looked" to ensure nothing inappropriate was occurring. He observed no remarkable conduct, but checked back with Cerqueira, who said he was doing fine.

On Saturday, July 15, shortly after arriving [*4] at work and reading Sipin's email, Samsen approached Cerqueira to discuss the complaint. Cerqueira seemed reluctant to provide detailed answers, responding that he didn't want to cause trouble and was worried about losing his job. When asked to describe the harassment, Cerqueira reportedly answered, "I know they are making fun of me. I know they are telling jokes about me." When asked to identify his harassers, Cerqueira replied, "I don't want to get anyone in trouble." He did indicate that the individuals worked near his station. When asked specifically about Eric Gonzalez, Cerqueira again responded, "I'm not mentioning any names. I don't want any trouble."

Seeking a solution, Samsen offered to move Cerqueira to another work station in a different section of the manufacturing floor, change his shift, or transfer him to another building. Cerqueira expressed concern over changing work benches, saying "I would still be in the same building with these people and I don't know if I can do that." Samsen then proposed that they both meet with Forrest Roush, Samsen's supervisor, on Monday, July 17, to further discuss the complaint and to find a location where Cerqueira would be more comfortable [*5] working. Assuring Samsen that he was able to finish the remainder of his shift, Cerqueira returned to work.

On Monday, July 17, Samsen reported to work four hours early to discuss Cerqueira's complaint with Roush. He showed Roush the email he had received from Sipin and relayed his Saturday conversation with Cerqueira. Roush and Samsen met with Sipin that afternoon, eliciting further details about Cerqueira's original conversation with him. Roush and Samsen then sought Cerqueira, hoping to meet with him privately to discuss the allegations. Cerqueira, however, had not reported to work. Consequently, they decided to delay the meeting until the next day.

But this meeting did not occur because Cerqueira was absent from work again on Tuesday. Pursuant to company policy, Roush and Samsen did meet with Frank Pine, Human Resources Manager, to inform him of Cerqueira's allegations.

Cerqueira did not report to work again on Wednesday, July 19; this was unusual for Cerqueira, whose prior attendance record was perfect. Samsen, with the permission of his supervisors, called Cerqueira at home to inquire about his unexcused absences. Cerqueira reported that he was tired, weak, and unable to sleep. [*6] Asked if he planned on returning to work, Cerqueira answered "I don't think I can come back, you know and work with those people."

Pressed to identify "those people," Cerqueira explicitly named Eric Gonzalez as his harasser. Cerqueira described being teased about his sexuality: "Eric thinks I am gay, but I'm not. He is telling the other guys this and I know they are making fun of me." As proof, Cerqueira told Samsen of an email Gonzalez had sent him in early June "wanting me to do gay things to him." Cerqueira indicated that other employees, possibly John Foster and Kingsley Osei, might have been copied on the email.

At the end of their conversation, Samsen asked to speak with Mrs. Cerqueira, who confirmed that Cerqueira hadn't been able to sleep and was too tired to care for their children. She reported that Cerqueira had told her Gonzalez and others were bothering him at work, but didn't want details. Samsen and Mrs. Cerqueira scheduled a conference call between both Cerqueiras and the Corning supervisors for Friday, July 21, between 4:00 and 5:00 p.m., to further discuss the harassment claim.

That afternoon, Samsen relayed to Roush and Pine that Cerqueira had identified Gonzalez [*7] as his harasser and that proof might be found in an inappropriate email Gonzalez had sent in early June. Pine said he would contact Corning's technology department about retrieving all of Gonzalez's emails.

It is unclear from the record when the emails were retrieved and reviewed, although it may have been Wednesday afternoon or Friday after the conference call. Pine scrolled through about two weeks of Gonzalez's email traffic, uncovering the "lewd" message, "JOE GIVES HEAD," followed later by one containing just "HEAD." These emails were sent June 8, 2001. Although approximately five weeks of messages were saved to the technology department's tapes, Pine reviewed only those sent during the first weeks of June, as Cerqueira had identified in his conversation with Samsen.

On Thursday, July 20, Cerqueira, at his wife's encouragement, visited his primary care physician. Dr. Robert A. Wainer examined him and noted he was "depressed and anxious since 2 weeks, workplace issues

with co-workers." Dr. Wainer recommended a "psych referral ASAP." That afternoon, Daniel Kane, LISCSW, of the Southeastern Psychiatric Associates, evaluated Cerqueira, submitting:

> Client reports that at work, [*8] a person started calling him "gay." He claims that this person, as well as others, harass him at work. He states that he receives insulting emails, and show him disrespect at work. He feels very anxious about his difficulties at work, and is finding it difficult to cope [with] it ... The client seems very angry and anxious by his current situation.

Mr. Kane arranged to meet with Cerqueira weekly for psychotherapy, identifying "workplace harassment as a primary theme."

On Friday afternoon, July 21, Pine, Samsen, Roush, and Barbara Serating, Corning's nurse, consulted with Cerqueira and his wife via conference call. During this conversation, Cerqueira detailed many of his complaints, alleging that beginning two weeks after he moved to the second shift, his coworkers made jokes about him being a "homo," made obscene gestures at him, played games, and questioned his sense of humor. Cerqueira did not name any participants in the behavior except for Gonzalez, who he described as the person who "drew the crowd." He reported that Gonzalez had sent him and another employee, John Foster, inappropriate emails containing messages such as "BORING" and "JOE GIVES HEAD." Cerqueira alleged [*9] that at one point, Gonzalez came up behind him and made "humping" motions.

In response, Pine reemphasized that if Cerqueira returned to work, Corning would be flexible in making any accommodations necessary to ensure his comfort, offering to move him to another position, shift, or building. Cerqueira responded that he was on the verge of a nervous breakdown, and stated he could not bring himself to go back to work because the "game had been played too far."

On Monday, July 24, Corning learned of Cerqueira's death. Cerqueira had committed suicide in his home on Saturday afternoon, July 22.

Continuing their investigation, on Tuesday, July 25, Roush and Pine interviewed several technicians who worked near Cerqueira on the second shift: Sarah Lewis, Kingsley Osei, and Eric Gonzalez. Lewis did not recall ever witnessing any inappropriate conduct between Gonzalez and Cerqueira, nor did she remember any instances of teasing. Osei, a friend of Gonzalez, described Cerqueira as becoming more quiet and distant in the re-

cent weeks but didn't identify teasing as a contributing factor.

Gonzalez was "candid" and "forthcoming" during his interview; according to Pine, Gonzalez "readily admitted [*10] to just about everything." Roush agreed, observing Gonzalez "basically admitted everything that Joe had complained about." Gonzalez explained that he and Cerqueira were "friends" for a few weeks after Cerqueira's transfer to the second shift, but that they stopped speaking thereafter because of differences in their senses of humor. Gonzalez conceded that he questioned Cerqueira's sexuality, used sexually explicit language, made obscene gestures, and joked about sex in his presence, and sent him lewd emails, including a film clip showing a woman and a dog engaged in sexual intercourse.

The next day, July 26, Corning disciplined Gonzalez for creating a hostile work environment, thereby violating the company's sexual harassment policy. Corning suspended Gonzalez for two days without pay, issued him a final written warning, and revoked his email privileges for one month.

## B. Procedural History

On December 29, 2000, Mrs Cerqueira filed a complaint against Corning with the Massachusetts Commission Against Discrimination (MCAD) alleging violations of Mass. Gen. Laws c. 151B § 4(16A), sexual harassment, and § 4(d), aiding and abetting. Pursuant to 804 CMR [*11] 1.15(2)(b), on June 6, 2001, the MCAD granted Mrs. Cerqueira leave to file a complaint in state court.

Mrs. Cerqueira instituted this action against Corning, a corporation incorporated under the laws of New York, on January 2, 2003, in the Middlesex Superior Court. She brings this suit individually, as administratrix of the Estate of Joseph H. Cerqueira, and as next friend of her two minor children. On February 18, 2003, Corning removed the action to this court pursuant to the diversity jurisdiction of the federal courts. 28 U.S.C. §§ 1332 & 1441.

Corning moved for summary judgment at the completion of discovery.

## II. DISCUSSION

Corning argues it is entitled to summary judgment on three distinct grounds: first, as a matter of law, it cannot be liable for Gonzalez's conduct because it took immediate and effective action to rectify Cerqueira's complaint; second, even if its response was inadequate, the claim fails because Mrs. Cerqueira cannot prove Gonzalez's behavior rose to the level of severity necessary to establish a hostile work environment claim; and third, because the

Case 3:05-cv-30002-MAP    Document 21-4    Filed 08/18/2006    Page 4 of 6

Page 4

2004 U.S. Dist. LEXIS 17308, *11; 94 Fair Empl. Prac. Cas. (BNA) 730

action was filed with the MCAD more than six months after the last act of harassment, [*12] the claim should be dismissed as untimely. Corning separately moves that Mrs. Cerqueira and her children, individually, should be dismissed as plaintiffs to the complaint because they lack standing to assert a harassment claim under Chapter 151B. Because I grant summary judgment on the first ground, I do not reach the remaining contentions.

**A. Standard of Review**

Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). All facts are to be viewed, and all inferences drawn, in the light most favorable to the nonmoving party. Leahy v. Raytheon Co., 315 F.3d 11, 17 (1st Cir. 2002).

Summary judgment may enter when a plaintiff fails to produce sufficient evidence to establish an essential element of his case on which he bears the burden of proof at trial. See Celotex Crop. v. Catrett, 477 U.S. 317, 322, 91 L. Ed. 2d 265, 106 S. Ct. 2548 (1986). "Once a movant avers an absence [*13] of evidence to support the nonmoving party's case, the latter must adduce specific facts establishing the existence of at least one issue that is both 'genuine' and 'material.'" Sheinkopf v. Stone, 927 F.2d 1259, 1261 (1st Cir. 1991).

A fact is "material" if it has the "potential to affect the outcome of the suit under the applicable law." Santiago-Ramos v. Centennial P.R. Wireless Corp., 217 F.3d 46, 52 (1st Cir. 2000). For an issue to be "genuine," the evidence relevant to the issue must be "sufficiently open-ended to permit a rational factfinder to resolve the issue in favor of either side." Nat'l Amusements, Inc. v. Town of Dedham, 43 F.3d 731, 735 (1st Cir. 1995). To establish a genuine issue of material fact, "the evidence illustrating the factual controversy ... must have substance in the sense that it limns differing versions of the truth which a factfinder must resolve." Mack v. Great Atl. & Pac. Tea Co., 871 F.2d 179, 181 (1st Cir. 1989).

**B. Sexual Harassment Claim for Hostile Work Environment**

Massachusetts General Laws c. 151B, § 4(16) makes it unlawful "for an employer, [*14] personally or through its agents, to sexually harass any employee." Sexual harassment includes workplace misconduct such as "verbal or physical conduct of a sexual nature" having the "purpose or effect of unreasonably interfering with an individual's work performance by creating an intimidating,

hostile, humiliating or sexually offensive work environment." Id. at § 1(18). Massachusetts courts have held that this definition comprehensively includes claims for sexual harassment by an employee of the same gender, even where the harassment is not motivated by sexual desire. See Melnychenko v. 84 Lumber Co., 424 Mass. 285, 290, 676 N.E.2d 45 (1997)(finding liability for crude joking, although conduct was not sexually motivated); Cf. Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75, 81, 140 L. Ed. 2d 201, 118 S. Ct. 998 (1998) ("Harassing conduct need not be motivated by sexual desire to support an inference of discrimination"). n1

> N1 I recognize that in certain respects Massachusetts law under Chapter 151B is more generous to plaintiffs than is federal law under Title VII. See, e.g., Brissette v. Franklin County Sheriff's Office, 235 F. Supp. 2d 63 (D. Mass. 2003); Messina v. Araserve, 906 F. Supp. 34 (D. Mass. 1995). In the circumstances of this case the differences between state and federal law, however, are not material.

[*15]

A hostile work environment claim is a unitary cause of action based on the cumulative effect of harassing acts over time. Cuddyer v. Stop & Shop Supermarket Co., 434 Mass. 521, 533, 750 N.E.2d 928 (2001). n2 To establish a hostile work environment claim, the plaintiff must show that he was subjected to unwelcome sexual conduct objectively and subjectively severe and pervasive enough, considering the totality of the circumstances, "to interfere with a hypothetical reasonable person's work performance." Lewis v. Gillette Co., 1993 U.S. Dist. LEXIS 10239, 1993 WL 291771 at *7 (D. Mass. 1993).

> n2 The Cuddyer court recognized that "it is also possible to have an actionable hostile work environment claim based on a single act of sexual harassment." Cuddyer, 434 Mass. at 538 n. 21.

However, even when such a hostile work environment is shown to exist, an employer is not strictly liable for acts of harassment perpetrated by a coworker. n3 An employer's potential liability is negated if, upon receiving actual or [*16] constructive notice of the harassment, the employer responds with immediate and effective remedial action. See College-Town, Div. of Interco, Inc. v. Massachusetts Com. against Discrimination, 400 Mass. 156, 166-67, 508 N.E.2d 587 (1987); see also White v. New Hampshire Dep't of Corrections, 221 F.3d 254, 261 (1st Cir. 2000).

2004 U.S. Dist. LEXIS 17308, *16; 94 Fair Empl. Prac. Cas. (BNA) 730

n3 Under Chapter 151B, an employer is unconditionally liable for sexual harassment by its supervisors. College–Town, 400 Mass. at 165. It is undisputed that Gonzalez was not Cerqueira's supervisor, nor did he wield any supervisory authority. Hence, Corning cannot be held strictly liable for his alleged conduct.

In the instant case, there is no showing that Corning knew or should have known of Gonzalez's conduct prior to July 14, 2000, when Cerqueira first informed a Corning employee that he was being verbally harassed. Cerqueira's supervisors, who spent nearly 90% of their time on the manufacturing floor, testified to never witnessing any inappropriate conduct; similarly, employees [*17] working near Cerqueira's bench reportedly observed nothing unusual between Cerqueira and Gonzalez. There is no evidence supporting Mrs. Cerqueira's assertion that "Corning's supervisors did not adequately monitor" its workers, failing to discover the harassment occurring "right under their nose;" the fact that such activity may in fact have been taking place is insufficient on its own to impute knowledge or notice to Corning's management. See Medina–Munoz v. R.J. Reynolds Tobacco Co., 896 F.2d 5, 8 (1st Cir. 1990). From the record, the earliest Corning can be said to have knowledge, direct or constructive, was when Cerqueira approached Sipin about being teased on July 14.

After obtaining this information on July 14, Corning "had an affirmative obligation to remedy the situation," College–Town, 400 Mass at 167. Corning contends that it discharged this duty by immediately and effectively responding to Cerqueira's complaint. The evidence of record supports that contention as a matter of law.

Given that an investigation began within one day of being informed of the harassment, Corning's response was, by any measure, prompt. n4 Less than an hour after [*18] his initial discussion with Cerqueira, Sipin contacted his supervisor, Samsen, via email to alert him to the complaint. Within hours of receiving this email the next day, Samsen approached Cerqueira to elicit further details and to offer solutions. The next business day (Monday), following company protocol, Samsen met with his supervisor, Roush, and instituted a formal investigation. Only twelve days passed between Cerqueira's first report of harassment and Corning's reprimand of Gonzalez. Those twelve days were filled with meetings between supervisors, communications with Cerqueira and his wife, interviews of witnesses, and a review of email records, all actions designed to pin down and corroborate a reluctant victim's allegations and to prevent future harassment by offering solutions and punishing the perpetrator.

The fact that Gonzalez was not confronted immediately does not mean the investigation was not prompt. Sound investigative strategy reasons existed for deferring that confrontation. It cannot be said that Corning's response was sluggish or lackadaisical: it appears Corning's desire was to solve the problem quickly, as evidenced by the supervisors' intention to meet with [*19] Cerqueira on Monday, July 17 to explore solutions. Those efforts were complicated by Cerqueira's absence from work and his reluctance to provide substantive details for several days.

n4 See, e.g., Foley v. P&G Distrib. Co., 2003 U.S. Dist. LEXIS 12422, 2003 WL 21696544 at *2 (D. Mass. July 21, 2003) ("Remedial action within one month of plaintiff's complaint is, by all standards, prompt.") (emphasis added); Tutman v. WBBM–TV, Inc./CBS, Inc., 209 F.3d 1044, 1048 (7th Cir. 2000) (defendant's reprimand of harassing coworker within one week of complaint prompt); Saad v. Stanley St. Treatment & Resources, 1994 U.S. Dist. LEXIS 20728, 1994 WL 846911, at *9 (D. Mass. May 20, 1994) (initiation of investigation two days after complaint lodged immediate); Roderick v. New Hampshire Hosp., 2000 U.S. Dist. LEXIS 1143, 2000 DNH 26, 2000 U.S. Dist. LEXIS 1143 at *19 (D. N.H. Jan. 28, 2000) (requiring three months to fully investigate complaint does not preclude finding of immediacy as a matter of law).

I find [*20] on this record that Corning's remedial efforts were immediate. I turn to the question of whether those efforts were effective. "The chief measure of adequacy of an employer's response is not the victim's own personal sense of justice, but rather — particularly where there is no prior history of workplace harassment — whether the behavior that gave rise to the complaint has ceased and does not threaten to reoccur." Saad, 1994 U.S. Dist. LEXIS 20728, 1994 WL 846911 at *10 (citing Ellison v. Brady, 924 F.2d 872, 881 (9th Cir. 1991) (remedy should be reasonably calculated to end the harassment and proportionate to the offense)); Sarin v. Raytheon, 905 F. Supp. 49, 53 (D. Mass. 1995) (prompt responses, warnings, and interviews, sufficient).

Applying that standard to the instant case, I encounter a set of facts which took a tragic turn: there was no possible continuation of the harassment because Cerqueira did not return to work and then took his own life. Corning's remedial action consequently was never fully developed. However, as the First Circuit has observed, "where an employer has in good faith taken those measures which are both feasible and reasonable under [*21] the circumstances to combat the offensive conduct" it cannot be

Case 3:05-cv-30002-MAP    Document 21-4    Filed 08/18/2006    Page 6 of 6

Page 6

2004 U.S. Dist. LEXIS 17308, *21; 94 Fair Empl. Prac. Cas. (BNA) 730

charged with discrimination. See DeGrace v. Rumsfeld, 614 F.2d 796, 805 (1st Cir. 1980).

The record reveals such a good faith effort by Corning to resolve Cerqueira's complaint. As detailed in the chronology above, Corning undertook a prompt investigation, complicated by Cerqueira's initial reluctance to provide details and his absence from work. Corning was quick to volunteer solutions, offering to move Cerqueira's work station, change his shift, or transfer him to another building: all such solutions are "reasonably calculated" to prevent a reoccurrence. Following Mr. Cerqueira's death, Corning continued with the investigation, interviewing witnesses and formally reprimanding Gonzalez. Because Cerqueira was at all times during the investigation missing from work, there was no threat that the harassment could continue; had he returned, Corning's proposed alternative corrective actions were not so inadequate as to threaten recurrence of the harassment.

Corning's response was not ineffective because it did not approach Gonzalez, the alleged harasser, until Tuesday, July 25, eleven days after Cerqueira's [*22] initial complaint. Due in part to Cerqueira's absence from work the week following the complaint, Corning's supervisors did not receive details of the allegations until Wednesday, July 19, when Samsen called Cerqueira at home. Gonzalez was not at work that Thursday or Friday, so was unavailable for interview. The Corning management was justified in choosing to have their formal conference call with Cerqueira on Friday before approaching Gonzalez, so as to clarify the details of the allegations. While certainly Corning could have made arrangements to interview Gonzalez earlier, their decision under the circumstances to proceed in an orderly fashion to investigate the events and develop a remedial plan over a few days when Cerquiera and Gonzalez were not at work together does not render their remedial effort inadequate.

Nor does any delay in Corning's review of Gonzalez's emails or its failure to review the entire email history constitute an inadequate response. It is immaterial whether the emails were reviewed on Wednesday or Friday: given that Corning did not become aware of the offensive emails until Wednesday afternoon, their response was prompt under either scenario. Further, [*23] Corning's search of Gonzalez's email was appropriately narrowed by the information Cerqueira had provided: he indicated that the emails were sent in early June. Retrieving the messages as Cerqueira described them, Corning had no pressing reason to search further.

Corning's legal obligation was to develop, in a timely manner, a remedial program reasonably calculated to end established harassment. Corning met this obligation. Accordingly, it is entitled to summary judgment on Cerqueira's claim of a hostile work environment.

## III. CONCLUSION

For the foregoing reasons, defendant's motion for summary judgment is GRANTED.

/s/

DOUGLAS P. WOODLOCK

UNITED STATES DISTRICT JUDGE

LEXSEE 1994 U.S. DIST LEXIS 20728

**ALLYSON ANDROMALOS SAAD, Plaintiff, v. STANLEY STREET TREATMENT AND RESOURCES, INC., PATRICIA EMSELLEM, and NANCY E. PAULL, Defendants.**

**CIVIL ACTION NO. 92–11434–DPW**

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MASSACHUSETTS**

**1994 U.S. Dist. LEXIS 20728**

**May 20, 1994, Decided**

**DISPOSITION:** [*1] Defendants' motion for summary judgment with respect to the claims of employment discrimination due to hostile environment GRANTED; with respect to the claim of retaliation GRANTED; and the motion to dismiss the claim of employment discrimination under M.G.L. c. 93, § 102 GRANTED.

**COUNSEL:** For ALLYSON ANDROMALOS SAAD, Plaintiff: Harvey A. Schwartz, Schwartz, Shaw & Griffith, Boston, MA.

For NC., PATRICIA EMSELLEM, NANCY E. PAULL, Defendants: James S. Franchek, Kevin Hern, Jr., Riemer & Braunstein, Boston, MA. Keith H. McCown, Morgan, Brown & Joy, Boston, MA.

**JUDGES:** DOUGLAS P. WOODLOCK, UNITED STATES DISTRICT JUDGE

**OPINIONBY:** DOUGLAS P. WOODLOCK

**OPINION:**

MEMORANDUM AND ORDER

May 20, 1994

This is an employment discrimination action, involving claims of an employee's exposure to a hostile work environment arising from sexual harassment and of the employer's retaliatory discharge of her for raising the issue. The plaintiff, Allyson Saad, alleges that the defendants, Stanley Street Treatment and Resources, Inc. ("SSTAR"), Nancy Paull, Executive Director of SSTAR, and Patricia Emsellem, Director of Operations of SSTAR, violated her rights under 42 U.S.C. § 2000e et seq. (Title VII), the Massachusetts [*2] Anti–Discrimination statute, M.G.L. c. 151B, § 4, and the Massachusetts Equal Rights Act, M.G.L. c. 93 § 102, first by creating a hostile work environment in which she was sexually harassed, and then by disciplining and firing her after she complained about

the harassment. The defendants have moved for summary judgment. For the reasons given below, the motion will be granted.

I

BACKGROUND n1

> n1 As is required in the summary judgment context, the following account, drawn either from uncontested facts or alleged facts adequately supported by the record, is rendered in the light most favorable to the non-movant, the plaintiff.

SSTAR, a not–for profit corporation located in Fall River, Massachusetts, is primarily a treatment center offering various forms of assistance to people suffering from substance abuse. SSTAR also runs a Women's Center, which focuses on crisis intervention for women struggling with such issues as domestic violence, sexual abuse, and eating disorders. All of SSTAR's various programs [*3] are run by women; during the Fall and Winter of 1991, the period most relevant to this litigation, SSTAR had an employee staff of twelve, eleven of whom were female.

–A–

Saad began working for SSTAR in September 1988 as an executive secretary. In June of 1989, she was promoted to Electronic Data Processing Coordinator/Personnel Administrator ("EDPC"/"PA"), a position she maintained until her demotion in January 1991. As part of her responsibilities in this position, Saad had charge of the personnel files of SSTAR's employees. She was also the Equal Employment Opportunities ("EEO") officer to whom employees were to bring complaints of, inter alia, sexual harassment. See Saad Dep. (V. 3) at 76–77. Saad's immediate supervisor throughout her employment at SSTAR was defendant Emsellem, Director of Operations since 1987. Emsellem Aff. at 1, P 1. Paull, the second individual defendant, has been the Executive Director of SSTAR since 1985.

In the summer of 1989, SSTAR hired Gilbert Duarte as a billing manager, a position responsible for, inter alia, client and service data entry, supervising data entry staff, and general accounting. See Saad Exh. 1 (billing manager job description). [*4] The defendants state that "Duarte's position was generally considered to be of an equal or lesser status than Saad's job." Defs.' Statement of Undisputed Material Facts, P 3. In her capacity as EDPC, Saad was involved in the training and/or minor supervision of Duarte regarding use of the office computer system. See Saad Aff. at 2, P 8; Emsellem Aff. at 1–2, P 2. She attests that she found training Duarte difficult and frustrating due to "his lack of interest and the slow speed at which he learned." Saad Aff. at 2, P 8.

In August 1990, Saad received an annual review from Emsellem. In fourteen of seventeen work categories Saad was rated average or above average and in one category — as "an effective/productive worker" — was marked outstanding; in two categories, however, 1) being "conscientious in protecting dignity, privacy, confidentiality of employees" and 2) "interrelating harmoniously with peers subordinates, superiors and the public", she was rated below average. Saad Exh. B at 1. In detailing those areas needing improvement, the evaluation states:

> Interpersonal relationships, professional demeanor, judgement around "people" issues. Because of Allyson's role as [*5] both a trainer (of staff in use of computers/software) and the guardian of confidential material in payroll & personnel files, it is imperative that she be perceived as respectful of other's [sic] feelings & rights. Allyson has been observed treating colleagues with considerable disrespect and gossiping about staff; complaining, etc. i.e. billing manager, etc.

Id. at 2. The evaluation further states that "Allyson will work on improving her attitude and behavior towards colleagues and we will meet again in 6 months to discuss observed changes." Id. At the close of these remarks, Saad wrote "I agree to the above evaluation & feel that it is accurate . . ." and signed the review form. Id. In her deposition, Saad states that Emsellem indicated to her that the below average ratings were "all centered around [her treatment] of Gil [Duarte]." Saad Dep. (V.1) at 175.

In or around December of 1990, Saad was named employee of the month for work she had done "keeping the labor records in order." Paull Dep. at 49. n2

n2 Saad asserts that she received this award three months prior to her March 1991 termination. See Saad Mem. in Opp. at 2. Paull states simply that it is possible that Saad was named employee of the month in December 1990. See Paull Dep. at 49. Saad also notes that she received at least two merit-based raises during her tenure at SSTAR. See Saad Aff. at P 2.

[*6]

–B–

During September and October of 1990, Saad and Duarte worked on a "counselor bonus project" together, during which period they would occasionally lunch together. Saad Aff. at P 12. From October 1990 and, with increasing frequency, through December 1990, Duarte began to tell Saad that he wished to have "a romantic relationship" with her, would walk into her office, shut the door, and try to "touch [her] hair", kiss her or hug her. Id. at P 13. Saad would tell him that this behavior made her uncomfortable, that she was happily married, and ask him to stop, whereupon he would say something to the effect of "I'm such a jerk" and "I should just kill myself" and withdraw; the same behavior, however, would soon recommence. Id. at PP 14–19.

In early November 1990, Duarte told Saad that he was planning to join the Peace Corps in January 1991, leading Saad to believe that he would no longer be at SSTAR thereafter. Id. at P 20. Around November 28, 1990, Saad, having agreed to give Duarte a ride to work, rang the bell of his building; Duarte came to the door in his underwear, embarrassing and upsetting Saad, but claiming that his alarm had not gone off. Id. at P 21–22. [*7] Saad said she could see from the hallway that Duarte had hanging on his wall "two large pictures" of Sharon Almeida, a high school student working part time at the SSTAR billing department. Id. at P 23. Asked to give him a ride to work the next day, Saad again came to his building, whereupon the scenario of the day before was repeated; Saad, upset, left without him. Id. at P 24–25. Still distressed upon arriving at work, Saad asked Emsellem for a week off, thinking that by her return it would be near time for Duarte to leave for the Peace Corps; she made no complaint concerning Duarte's behavior therefore, remembering that she had previously been criticized for complaining about Duarte. Id. at P 27.

Around December 11, Duarte told Saad that he and two other women wished to take her to lunch for her birthday. Upon arriving at the restaurant, however, Saad found only Duarte, who had thus deceived her, and who then announced that he had withdrawn his Peace Corps application. Id. at P 29–31. Later that day Duarte came into Saad's office seeking a hug on account of his big Peace Corps decision; Saad threatened to tell Emsellem about his behavior, whereupon he pushed [*8] things off her

desk, raised his voice and swore at her. Saad, frightened, stood up with her hand on the phone and told him to leave. Saad discussed this incident with two co-workers, Lopes and Megna, but not with Emsellem. Id. at P 32-33.

Over the next few weeks, Saad was troubled by Duarte standing outside her office lingering at the soda and candy machines; she found it difficult to concentrate and feared he might renew his advances. Id. at P 34. Also around this time, Saad learned (from Megna) that Duarte was spending a great deal of time with Almeida, and grew concerned that he might be sexually harassing or otherwise acting inappropriately toward the teenager. Id. at P 36-38. On January 11, 1991, Saad told Aura Defresne, a co-worker and Almeida's aunt, of this concern and, further, that she had learned (from the personnel files) that Duarte had recently named Almeida his life insurance beneficiary. Id. at P 39.

–C–

On January 14, Duarte reported to Emsellem that Saad had violated the confidentiality of his personnel files and wished to pursue a complaint. Emsellem Aff. at P 5. That same morning, in the company of Pat Fisher, a co-manager at SSTAR, Emsellem confronted [*9] Saad with this allegation, whereupon Saad, after an initial denial, confessed to the breach, but stated that "she had done this because she was under stress over Gil Duarte always trying to kiss her," Emsellem Aff. at P 6, that he had been harassing her for about two months, and she was trying to warn Defresne about her niece. Saad Aff. at P 42. Saad attests that Emsellem stated she did not want to hear about the harassment, that she considered Saad's own actions a serious breach of confidentiality, and that she was suspending Saad for two days until Paull's return to the office. Id. at P 43; Defs.' Exh. B (Saad Dep. at 3-158, 3-159). Cf. Emsellem Aff. at P 7 (same minus statement that she "did not want to hear" about the incident).

On January 16, in a meeting with Paull and Emsellem, Saad described Duarte's treatment of her, her distress, and her consequent concern for Almeida, which had led to her disclosure of the insurance information. Saad Aff. at P 46. After telling Saad they would look into her allegations, see Defs.' Exh. B (Saad Dep. at 3-170), n3 Paull and Emsellem advised Saad that she would no longer be in charge of personnel/payroll matters, her salary would [*10] be cut back to its prior level, a written warning would be put in her file, her office would be moved, and she had off until Friday to consider whether she would accept the newly-defined terms of her position. Emsellem Aff. at P 10.

n3 The defendants attest that they gave Saad a copy of SSTAR's sexual harassment policy (see Paull Aff., Exh. A), asked her if she wished to file a complaint of sexual harassment, and, when she replied that she did, told her that they would investigate and get back to her. They also told her that, if she wished, she could submit any written information concerning the complaint. Emsellem Aff. at P 9; Paull Aff. at P 7.

Later that day Emsellem and Paull advised Duarte of Saad's complaint, gave him a copy of the sexual harassment policy and asked him questions about the alleged incidents; they say he "denied such behavior, but acknowledged that at one point he had gone into her office and asked for a hug[and] that she had hugged him in response to the request." Id. at P [*11] 11. Also on that day, and on the next, Emsellem and Paull interviewed three women in the billing department who worked for Duarte. Without advising them of any specifics or of any claim, they inquired whether they had witnessed any behavior they considered "sexual harassment"; none had. Id. at P 11; Paull Aff. at P 10.

On January 18, Saad met with the two defendants and told them that, because she was pregnant and needed the insurance coverage, she would accept the new terms of her job, but that she also wanted to pursue the complaint against Duarte. She agreed to meet with Duarte provided she could have an advocate. The meeting, planned originally for January 22, was delayed until February 5 due to a medical leave Saad took on account of early pregnancy complications. Id. at P 13; Saad Aff. at P 48; Defs. Exh. B, Saad Dep. at 3-190 - 3-191. Also on January 18, the defendants told Saad that in order to separate her from the personnel files they were moving her into an office next to Duarte's, then occupied by a Ms. Reed, who would move into an empty office. Disturbed at the prospect of being placed in an office next to Duarte's, Saad objected, but was told by Paull and Emsellem [*12] she had no choice. Saad Aff. at P 52.

At the February 5th meeting, with Saad, Emsellem, Paull, Susan Lee (Saad's advocate) and Duarte attending, the claim of sexual harassment was discussed, with the principals giving their respective versions of the relevant events. Duarte admitted he had hugged Saad. n4 Emsellem asked Saad if sometimes she liked it, which the latter found shockingly accusatory. Paull told Duarte that hugging at the workplace was inappropriate. Asked by Lee where Saad's new office was to be, Emsellem again proposed that it be next to Duarte's, but Paull intervened and offered one further removed. Saad Aff. at PP 57-65.

n4 It is disputed how much more Duarte admitted. See Saad Aff at P 57-60 (stating Duarte

admitted to trying to kiss her, touch her hair, and not stopping when she said stop).

After the meeting and a discussion with counsel, the defendants decided that their investigation had been inconclusive as to whether there had been "unwelcome" contact of a "sexual" nature. However, [*13] they also decided that they did not have to resolve the issue since they had understood from Saad that no sexual harassment had taken place for over a month. Hence, in addition to the "no hugging" warning already given Duarte, they "took corrective action in the form of issuing memos". Emsellem Aff. at P 17. See also Defs.' Exhs. B and C (confidential memos dated February 7 from defendants to Saad and Duarte advising them of the office change, that Duarte was not to go into Saad's office, and that billing matters were to be done with others present in Duarte's office).

On February 11, (not having yet received the February 7 memo), Saad asked Emsellem what more was going to be done; the latter asked her what more she expected and told her to put it in writing to Paull. Saad immediately did so, placing a memo in the defendants' mailboxes. The memo, inter alia, stated that she felt "physically and mentally harassed by an employee of S.S.T.A.R." and that she felt the defendants' response had been "unsupportive and insensitive", even "retaliatory", and that she was filing a claim with the MCAD. Saad Exh. A (memo to defendants dated February 11); Saad Aff. P 67–68.

On February [*14] 17, Saad received the memo dated February 2; again she spoke to Emsellem and again wrote to Paull (see Defs.' Exh. D). On February 28, having learned that Duarte had not been given a written warning, Saad received a memo from Paull stating that the matter was closed (see Defs.' Exh. E). On March 1, 1991, Saad filed a complaint with MCAD. In her reassigned position, Saad says she felt ostracized and was given minimal job duties. On March 25, the defendants informed her that she was terminated, and that they did not want to "get into" the reasons. Saad says Emsellem stated only that "'we feel we cannot trust you anymore. We are aware you filed a charge with the state. That is not why you are being terminated, but we just cannot trust you anymore.'" Saad Aff. at PP 69–76.

The defendants state that during February and March, a new computer network which Saad was to manage was being installed and that Saad had missed a training session regarding that system on March 15th, saying the doors of the building had been locked. The defendants further assert that during this period Saad was found to be "surly and uncivil", that Emsellem learned from another employee that Saad had told [*15] that employee that she risked her job if she said "too much" to Emsellem, and that Saad was suspected of looking for other work. The defendants state that for these several reasons they decided on March 18 to fire Saad and that, prior thereto, they were unaware that Saad had filed a complaint of discrimination against them. n5 See Defs. Statement of Undisputed Material Facts, PP 20–24.

> n5 Saad attests that on March 25th, when she was fired, Emsellem stated, "we are aware that you filed a charge with the state." Saad Aff. at P 76. Compare Emsellem Aff. P 21; Paull Aff. P 20 (denying notification or awareness filing of MCAD complaint at time of termination). In this summary judgment context, I must credit plaintiff's position on this issue.

II

SEXUAL HARASSMENT AND HOSTILE ENVIRONMENT

For the purposes of this motion, a review of the foregoing facts in the light most favorable to the non-movant suggests that Saad was subject to sexual harassment of a type which might support a hostile work environment [*16] claim. Actionable sexual harassment is workplace misconduct such as "'unwelcome sexual advances, requests for sexual favors, and other verbal or physical conduct of a sexual nature[]. . . having the purpose or effect of unreasonably interfering with an individual's work performance or creating an intimidating, hostile, or offensive working environment.'" Meritor Savings Bank, FSB v. Vinson, 477 U.S. 57, 65, 91 L. Ed. 2d 49, 106 S. Ct. 2399 (1986) (quoting portions of 20 C.F.R. § 1604(a)). Of course, a single instance of sexual harassment, unless truly egregious, is not likely to support a hostile environment claim; rather, to be actionable, such harassment must be "sufficiently severe or pervasive 'to alter the conditions of [the victim's] employment and create an abusive working environment.'" Id. at 67 (quoted case omitted); Chamberlin v. 101 Realty, Inc., 915 F.2d 777, 783 (1st Cir. 1990).

An argument no doubt could be made that the harassment Saad experienced was too isolated to constitute a "hostile environment." Cf. Saxton v. American Tel. & Tel. Co., 10 F.3d 526, 534–35 (7th Cir. 1993) (two rebuffed advances insufficient for hostile environment claim); [*17] Chamberlin, 915 F.2d at 783 (employer's advances, somewhat less frequent and less physical than advances made by Duarte in the instant case, found insufficient to support "hostile environment" claim where "quid pro quo" theory was more appropriate). To explore plaintiff's claims fully for purposes of this motion, however, I will assume that

the actions of Duarte were sufficiently pervasive and severe in their impact on Saad as to have created an abusive working environment. Cf. Ellison v. Brady, 924 F.2d 872 (9th Cir. 1991) (finding advances and non-debasing "bizarre" love letters from co-worker sufficient to support a hostile environment claim from a reasonable woman's perspective).

With this assumption, the issues before me are whether the facts, again read to favor the non-movant, support a finding that the named defendants either 1) actually or constructively countenanced such conduct, thus rendering them liable for the hostile environment created thereby, and/or 2) impermissibly "punished" Saad for complaining about that environment. As a preview of the discussion to follow, I note that the first inquiry is somewhat complicated by the observation that Saad was herself [*18] the EEO officer to whom a victim of such circumstances might otherwise report and, while she plainly made no report concerning Duarte's behavior until after her own activities had been questioned, she had earlier been warned by the only other personnel available to receive such a report — i.e., her supervisors — to get along better with Duarte.

The second inquiry meanwhile is complicated by the argument that the permissible (i.e., non-retaliatory) justification for Saad's demotion and termination — that is, her breach of employee confidentiality and soured morale — may itself have been a consequence of the harassment and psychological distress to which she had been subject — including her distress at the perceived inadequacy and inequity of the defendants' response to her complaints — such that action taken against her in this regard could itself be considered a form of impermissible retaliation. This conundrum arises from the fact that a "hostile environment" is often both recognized and defined in part by the psychological distress it engenders. Here that distress was arguably exacerbated by the very actions and responses for which Saad was "punished".

The detailing of these [*19] complications reveals a final quandary: If it can be shown that the defendants' response to Saad's complaint not only caused the "bad attitude" which allegedly led to her discharge, but also was so inadequate as to constitute impermissible toleration of a hostile environment, then there is a potential elision of the retaliation issue and the hostile environment issue, in that the defendants' response could be characterized at once as both retaliation and actionable countenancing of sexual harassment. Notwithstanding this potential merger, I proceed to analyze the two issues separately.

–A–

Employer Liability for Hostile Environment

To prove a case of sexual harassment amounting to a hostile work environment, a plaintiff must show 1) that she belongs to a protected class, 2) was harassed, 3) the harassment was sexual in nature, 4) the harassment was sufficiently pervasive and severe as to "alter the conditions of plaintiff's employment and create an abusive working environment" and 5) "that some basis for employer liability has been established." EEOC v. Horizons Hotel Corp., 831 F. Supp. 10, 14 (D.P.R. 1993) (citing Meritor). Saad has adduced sufficient evidence of the [*20] first four of these requirements for the purposes of opposing this motion; the remaining issue is whether she has made an adequate showing to support a theory of employer liability.

In Meritor, the Supreme Court declined to give a definitive rule regarding employer liability in this context. Instead, noting that under Title VII Congress had defined "'employer' to include any 'agent' of an employer," the Court directed factfinders to "look to agency principles for guidance in this area." 477 U.S. at 72. This is in general accord with the EEOC guidelines regarding sexual harassment noted approvingly by the Court and set forth at 20 C.F.R. § 1604.11(c), which state

> (c) Applying general Title VII principles, an employer . . . is responsible for its acts and those of its agents and supervisory employees with respect to sexual harassment regardless of whether the specific acts complained of were authorized or even forbidden by the employer and regardless of whether the employer knew or should have known of their occurrence. The Commission will examine the circumstances of the particular employment relationship and the job functions performed by the individual in determining [*21] whether an individual acts in either a supervisory or agency capacity.

The Meritor Court stopped short of laying down any per se rule regarding employer liability, however, holding simply that while "absence of notice to an employer does not necessarily insulate that employer from liability", neither are employers "always automatically liable for sexual harassment by their supervisors." Meritor, 477 U.S. at 72.

1. Liability by Virtue of Duarte's Supervisory Position

Saad argues that, while Duarte was not her supervisor, he was a supervisor of other employees (according to her uncontradicted affidavit and Duarte's job description), and that the defendants therefore should be held strictly liable for the hostile environment their supervisor

created. While one might adduce some compelling policy arguments for this position, there are countervailing concerns, and the law appears to support the latter. Thus, in a concurrence to Meritor joined by three other Justices, Justice Marshall observes that

> agency principles and the goals of Title VII law make appropriate some limitation on the liability of employers for the acts of supervisors. Where, for example, [*22] a supervisor has no authority over an employee . . . it may be improper to find strict employer liability. See 29 CFR § 1604.11(c) (1985).

477 U.S. at 77 (Marshall, J., concurring). Cf. Lipsett v. Univ. of Puerto Rico, 864 F.2d 881, 901 (1st Cir. 1988) (in Title IX context, adopting Title VII standards developed in Meritor and other circuits to hold that an educational institution is liable for hostile environment sexual harassment, whether perpetrated by supervisor or co-worker, "if an official representing that institution knew, or in the exercise of reasonable care, should have known of the harassment's occurrence, unless that official can show that he or she took appropriate steps to stop it").

Saad contends that a different reading prevails under M.G.L. c. 151B, § 4 n6 as interpreted by College–Town, Div. of Interco, Inc. v. Massachusetts Comm'n. Against Discrimination, 400 Mass. 156, 508 N.E.2d 587 (Mass. 1987), where the Supreme Judicial Court found an employer vicariously liable for the hostile work environment created by its supervisor. While it is true that College–Town employs some broad language arguably susceptible to the interpretation that [*23] employers are to be held per se liable for the abuse wrought by their supervisors, a complete reading of the case reveals that such language is used a) in the context of the specific facts of that case, which involved a supervisor harassing a subordinate employee, see id. at 593–4, and b) in reaction to Title VII cases that would require notice to employers even where supervisors and their subordinates are involved, see id. at 164 n. 5. Saad cites no other support for her contention, and I find none. I reject the argument that an employer is per se liable for the acts of supervisory employees who are not acting in their supervisory role when dealing with another employee. I conclude that the mere fact that Duarte may have been the supervisor of some employees is insufficient to hold the defendants strictly liable for the hostile environment he allegedly created in harassing a non-subordinate co-worker.

n6 M.G.L. c. 151B, § 4(1) in pertinent part makes it an unlawful practice:

> 1. For an employer, by himself, or his agent, because of the race, color, religious creed, national origin, sex, or ancestry of any individual to refuse to hire, or employ or to bar or to discharge from employment such individual or to discriminate against such individual in compensation or in terms, conditions or privileges of employment, unless based upon a bona fide occupational qualification.

M.G.L. c. 151B, § 4(4), relevant here with regard to the retaliation claim, makes it

> an unlawful practice . . .
>
> 4. For any person, employer, labor organization, or employment agency to discharge, expel or otherwise discriminate against any person because he has opposed any practices forbidden under this chapter or because he has filed a complaint, testified or assisted in any proceeding under section five.

Unless otherwise noted, the standards of liability under Title VII and M.G.L. c. 151B, §§ 1–10 are substantially the same. See Villanueva v. Wellesley College, 930 F.2d 124, 127 n.2 (1st Cir.), cert. denied, 502 U.S. 861, 112 S. Ct. 181, 116 L. Ed. 2d 143 (1991); Banerjee v. Trustees of Smith College, 648 F.2d 61, 62 & n.1 (1st Cir.), cert denied, 454 U.S. 1098, 70 L. Ed. 2d 639, 102 S. Ct. 671 (1981).

[*24]

2. Liability by Virtue of an Employer's Affirmative Duty to Prevent Sexual Harassment

As set forth in 29 CFR § 1604.11(d),

> (d) With respect to conduct between fellow employees, an employer is responsible for acts of sexual harassment in the workplace where the employer (or its agents or supervisory employees) knows or should have known of the conduct, unless it can show that it took immediate and appropriate corrective action.

See also Lipsett, 864 F.2d at 901 (applying same rule in Title IX context). In the instant case, there is no showing that the defendants knew or should have known of Duarte's conduct prior to January 14, 1991. Thereafter, of

course, they were alerted to Saad's troubles with Duarte, which arguably gave rise to a duty to take "immediate and appropriate action."

Defendants maintain that even had they taken no action at that time, no liability would attach, for Saad "had not been subject to any sexual harassment for the over one month since she terminated her friendship with Gil Duarte [citing Saad Dep. Vol III, pp. 125–29]" and that the sexually hostile working environment had "already dissipated." Defs.' Mem. at 7. Given that Saad, [*25] in both her affidavit and deposition, plainly states that she continued to be disturbed by what had transpired through early January, that she feared Duarte might renew his advances at any time, that he would linger outside her office, that she found it difficult to concentrate and didn't know how they were to continue working together, n7 I cannot in the summary judgment context accept the breadth of the defendants' contention. Moreover, its premise runs the risk of fundamentally misconstruing the nature of the abuse suffered by a hostile environment victim and too narrowly circumscribing the duty of an employer to address it. That Saad and Duarte had not had direct physical contact over the preceding month hardly ensures that the problem had "dissipated." Nevertheless, the question remains whether the defendants, upon learning of the situation, failed to take "immediate and appropriate action," and the answer to that inquiry is properly shaped by the specific tenor of the situation they were called upon to address. Cf. Ellison v. Brady, 924 F.2d 872, 883 (9th Cir. 1991) (remedy should be reasonably calculated to end harassment and persuade potential harassers to refrain from [*26] unlawful conduct).

n7 See Defs. Exh. B, Saad Dep. at 3–128 – 3–129; Saad Aff. at P 34.

Saad contends that the defendants had a greater duty than simply to take "immediate and appropriate action" after the lodging of a complaint, i.e., that instead of "sitting back and waiting for complaints", they were obliged to "seek out and eradicate [such an] environment." Hansel v. Public Service Co. of Colorado, 778 F. Supp. 1126, 1133 (D. Colo. 1991). The Hansel court's pronouncement to this effect, however, was in the context of employers having constructive, if not actual, knowledge of egregious, pervasive and long-standing hostile environment abuse prior to any complaint actually being lodged. The instant case, involving no prior record of hostile environment at SSTAR and a single malefactor perpetrating short-term abuse, is thus distinguishable.

For similar reasons, I am disinclined to find SSTAR potentially liable for having "done nothing to educate its employees or otherwise take meaningful action [*27] to implement the [sexual harassment policy outlined in its Personnel Policy Manual, attached as Defs.' Exh. A]." Saad Mem. at 18. I note that 29 CFR § 1604.11(f) provides that

(f) Prevention is the best tool for the elimination of sexual harassment. An employer should take all steps necessary to prevent sexual harassment from occurring, such as affirmatively raising the subject, expressing strong disapproval, developing appropriate sanctions, informing employees of their right to raise and how to raise the issue of harassment under Title VII, and developing methods to sensitize all concerned. n8

n8 Saad also cites EEOC: Guidance on Sexual Harassment No. 645, issued March 19, 1990, FEP (BNA) 405:6681, 405:6699 as providing that an employer's sexual harassment policy should be "'clearly and regularly communicated to employees and effectively implemented and that the employer should affirmatively raise the subject with all supervisory and non-supervisory employees and express strong disapproval, and explain the sanctions for harassment.'" Saad Mem. at 18.

[*28]

Given SSTAR's profile, viz., no prior history of hostile environment n9 and an articulated policy in the Personnel Policy Manual outlining the appropriate recourse in case thereof, n10 the plaintiff has failed to show that the defendants reasonably should have perceived that more affirmative action was "necessary to prevent sexual harassment from occurring." The single case Saad cites in support of her argument that merely having a policy is insufficient, Sanchez v. City of Miami, 720 F. Supp. 974 (S.D. Fla. 1989), is again one in which the hostile environment had been long-standing and pervasive. The Sanchez court thus found that the City "had both actual and constructive knowledge" of abuse and that it had "paid mere lip service" to its harassment policy. Id. at 978, 979. These side arguments dismissed, I return to the question whether the instant defendants, upon learning of the situation, took "immediate and appropriate action" to address it.

n9 I note that, except for Duarte, the SSTAR staff was entirely female. Were the gender proportions reversed, perhaps a stronger case could be made that more affirmative steps to prevent harassment should have been taken. Given this environment — and the absence of any complaint by

Saad until her own actions were questioned — the need for a proactive affirmative program was correspondingly reduced.

[*29]

n10 Given that Saad was the EEO officer at SSTAR, her purported lack of training regarding sexual harassment hardly supports her own case. See Saad Dep. Vol 3 at 3–77 ("the policy . . . was never discussed. I was just the EEO O — I didn't even know really what that meant, just if there were any kind of incident, it would be reported to me"). She states that she was aware of the policy as written in the personnel manual and notes also that "we had never had an incident." Saad Dep. Vol. 2 at 99–100; see also Defs.' Exh. A at 2 (signed certification by Saad that she had read and understood SSTAR's "Personnel Policies"); Defs. Supplemental Aff., Ex. A, Saad Dep at 79 (describing that her name as EEO officer was on the bulletin board at work). Saad herself must under the circumstances bear some responsibility for her own failure to develop a fuller understanding of the EEO policies.

Saad's complaints in this regard are as follows:

First, she asserts that the defendants failed to take immediate action in response to Saad's revelations of sexual harassment on January 14. Given that an investigation [*30] of the complaint — which was first raised as a defense to a serious confidentiality breach — began immediately upon Paull's return two days later, however, I find this charge insubstantial.

Second, plaintiff asserts that the defendants Emsellem and Paull were not qualified to investigate Saad's charges. While admittedly the record shows no prior experience or training in such matters, Saad cites no authority for the proposition that such qualifications are requisite to the taking of "immediate and appropriate action."

Third, she asserts that the defendants' investigation was insufficient or ineffective in that they "failed to elicit essential information and facts." Saad Mem. at 21. Specifically, Saad contends that the defendants failed to inquire of other employees whether they had witnessed improper behavior between Duarte and Saad. Id. There is, however, no record support for this broad contention. n11 To the contrary, the affidavits of the defendants state that they interviewed "the three women who worked for Duarte in the billing department and questioned them about whether they had . . . observed [behavior that they would consider 'sexual harassment'] by Duarte towards [*31] others. . . . Each of the women interviewed stated

that they were unaware of any such conduct." Paull Aff. at P 10. Accordingly, this contention must also fail.

n11 Saad cites to "Emsellem Dep., pp. 41–42" for support, but these pages are not included in the Emsellem deposition excerpts.

Finally, and centrally, Saad contends that the defendants' measure of response in verbally reprimanding Duarte and prohibiting him from visiting Saad's office was inadequate and therefore not appropriate. The facts before me will not support a finding that the defendants' response was inadequate or inappropriate as measured against the profile of the abuse reported by Saad and its apparent stasis following the January meetings.

Although Saad states that she remained disturbed by Duarte's behavior at least through early January, there is no evidence of record that she felt in any way harassed by Duarte thereafter, whether through renewed action on his part or reverberations from past events. Indeed, all of Saad's objections [*32] regarding the defendants' response to her complaint center not on its ineffectiveness in addressing the sexual harassment/hostile environment, but rather on the perceived inequity of either a) the relative harshness of the sanctions imposed upon her, n12 or b) the unduly mild reprimand Duarte received. n13 No doubt an inadequate response to a sexual harassment complaint could itself foster a hostile environment and so give rise to liability therefor. n14 In this regard, Saad's protests that the defendants were sending a "message . . . that [Duarte's] actions were not that serious, that this is detrimental to me as a victim of his sexual harassment[, and] I need you to acknowledge how seriously harmful and inappropriate his actions were", Paull Aff., Ex. D, February 21 Memo from Saad, are not to be ignored. However, even taking pains to view events from the victim's perspective, the chief measure of the adequacy of an employer's response is not the victim's own personal sense of justice, but rather — particularly where there is no prior history of workplace harassment — whether the behavior that gave rise to the complaint has ceased and does not threaten to reoccur. Cf. [*33] Ellison, 924 F.2d at 881 (quoting EEOC Compliance Manual (CCH) § 615.4(a)(9)(iii), P 3103, at 3213 (1988), which provides that "an employer's action is appropriate where it 'fully remedie[s] the conduct without adversely affecting the terms or conditions of the charging party's employment in some manner (for example, by requiring the charging party to work . . . in a less desirable location)'."); id. at 881, 882 (approvingly quoting Fourth Circuit standard that "a remedy should be 'reasonably calculated to end the harassment'" and Fifth Circuit charge that "remedies should be 'assessed proportionately to the seriousness of the offense'"). Compare

id. at 882 (adopting victim's perspective of whether harassment had ceased and finding employer response that simply told co-worker to stop harassing complainant and that did not express strong disapproval, reprimand, or put on probation, or notify that further infraction would result in suspension/termination not necessarily reasonable).

   n12 See Saad Ex. A, February 11 Memo to the defendants ("the disciplinary action against me has been more than just harsh, it has been . . . bullying and exploitative"; "we've had staff betray client confidentiality . . . and the disciplinary action for that was a mere written warning"; "and what response has [SSTAR] made after [] Duarte's . . . admittance [sic] that he touched me . . .? To tell him to stay away from me").

[*34]

   n13 See Paull Aff., Ex. D, February 21 Memo from Saad ("I don't know what should be done [to Duarte]. . . but I do feel that something ought to be done. He sexually harassed me . . . and yet has not faced any disciplinary action").

   n14 Thus, for example, the Ninth Circuit has held that in cases where a harasser's mere presence creates a hostile environment, an employer will not have "fully remedied the harassment" short of removing the harasser from the workplace. Ellison, 924 F.2d at 883 n.19.

Assessed by such a measure, the defendants' response in the instant case, even if not a model in terms of spirit or style, appears de facto adequate: While the defendants' contentions as to when the harassment actually stopped (and, implicitly, what constitutes actionable harassment) overstate their case, nonetheless it appears that the harassment had stopped by the time of the January meetings. But see Saad Aff. at P 50 (stating that at the time of the January meetings she was "afraid of Mr. Duarte, especially in light of his recent violent behavior directed at me"). [*35] Moreover, there are no grounds — such as pervasive abuse or past history of harassment at SSTAR — to infer that the verbal warning given Duarte was insufficient to restrain him from committing further improprieties. Cf. De Grace v. Rumsfeld, 614 F.2d 796, 805 n.5 (1st Cir. 1980) (in racially charged work environment, stronger measures than "mere verbal chastisements" were required to avoid Title VII liability for discrimination). Accordingly, I will grant the defendants' motion for summary judgment as to their hostile environment liability under both federal and state law. n15

   n15 A final argument might be raised that, in order to assess the adequacy of their response properly, the defendants were at least obliged to determine for themselves whether or not sexual harassment had in fact occurred. However, I find their response adequate even assuming the harassment occurred, thus mooting the necessity of a conclusive determination on their part. Cf. Nash v. Electrospace System, Inc., 9 F.3d 401, 404 (5th Cir. 1993) (although unable to corroborate harassment allegations, employer responded adequately by investigating complaint promptly and transferring complainant).

[*36]

III

RETALIATION CLAIM

In addition to the hostile environment claim, Saad also alleges a claim of retaliatory discrimination. To make a prima facie showing of this type of discrimination, a plaintiff must show:

   ([1]) that [she] engaged in protected activity, . . . (2) that [her] employer was aware of the protected activity, (3) that [she subsequently suffered an adverse employment action] and (absent other evidence tending to establish a retaliatory motivation), (4) that [the adverse employment action] followed her protected activities within such a period of time that the court can infer retaliatory motivation.

Lewis v. Gillette Co., 1993 WL 291771 at *3 (D. Mass. 1993) (citing, inter alia, Morgan v. Massachusetts Gen. Hosp., 712 F. Supp. 242, 254 (D. Mass. 1989), aff'd in part, vacated in part, 901 F.2d 186 (1st Cir. 1990)); see also Mesnick v. Gen. Elec. Co., 950 F.2d 816, 827 (1st Cir. 1991), cert. denied, 504 U.S. 985, 112 S. Ct. 2965, 119 L. Ed. 2d 586 (1992).

There is little question that Saad, both formally and informally, engaged in protected activities and that her subsequent demotion and termination followed swift [*37] enough to permit an inference of retaliation. n16 Saad having thus established a prima facie case of retaliatory discrimination, it falls to the defendants to articulate a non-retaliatory rationale for their actions. This I find they have adequately done. n17 See Defs.' Mem. at 17 (citing as reasons for Saad's termination 1) several weeks of a bad attitude, 2) reported hunting for other work, 3) undermining management by telling co-worker not to report to Emsellem, 4) plans to invest in new computer system and

1994 U.S. Dist. LEXIS 20728, *37

need to train and invest in a new manager therefor).

n16 Caselaw draws no bright lines as to what constitutes a time period brief enough to permit an inference of retaliation. See, e.g., Rowlett v. Anheuser-Busch, Inc., 832 F.2d 194, 197, 202 (1st Cir. 1987) (9 months between complaint filing and discharge close enough to establish prima facie case of retaliation); Lewis, 1993 WL 291771 at *8 (29 months between plaintiff's arbitration testimony and discharge too long to infer causal connection). Here, however, the time intervals are so short as to give rise to a de facto inference. Indeed, as defendants note, Saad's change of duties/demotion were imposed on her so immediately that a prima facie case that it was for anything other than the breach of employee confidentiality becomes suspect. However, I proceed here assuming a full prima facie case has been established.

[*38]

n17 Saad has adduced no direct evidence of discriminatory animus; accordingly, the case proceeds under "the familiar burden-shifting framework established in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-805, 36 L. Ed. 2d 668, 93 S. Ct. 1817 (1973)." Goldman v. First Nat'l Bank of Boston, 985 F.2d 1113, 1117 (1st Cir. 1993) (citations omitted). Under this framework, once a plaintiff has made a prima facie showing, the defendant is obliged to "articulate a legitimate, non-discriminatory reason for the adverse employment decision." Mesnick, 950 F.2d at 823. However, as recently reaffirmed by the Supreme Court in St. Mary's Honor Center v. Hicks, 125 L. Ed. 2d 407, 113 S. Ct. 2742 (1993), this obligation is one of production only, not of persuasion: "It is important to note . . . 'the ultimate burden of persuading the trier of fact that the defendant has intentionally discriminated against the plaintiff remains at all times with the plaintiff'". Hicks, 113 S. Ct. at 2747 (quoting Texas Dept. of Community Affairs v. Burdine, 450 U.S. 248, 101 S. Ct. 1089, 1093, 67 L. Ed. 2d 207 (1981).

[*39]

Defendants having thus met their burden of production, the presumption of discrimination "raised by the prima facie case is rebutted" . . . and 'drops from the case'". Hicks, 113 S. Ct. at 2747 (quoting Burdine). It then falls to the plaintiff to show pretext, i.e., to demonstrate "'that the proffered reason was not the true reason for the em-

ployment decision'" Id. (quoting Burdine). At this final stage of the McDonnell Douglas framework, however, it will not suffice for the plaintiff simply to show (or the factfinder to find) that the defendant's proffered explanation is unworthy of credence: the plaintiff, as the party bearing the ultimate burden of persuasion, must also show that the true motivation was discriminatory animus. "[A] reason cannot be proved to be 'a pretext for discrimination' unless it is shown both that the reason was false, and that discrimination was the real reason." Id. at 2752. Still, if "rejection of the defendant's proffered reasons will permit the trier of fact to infer the ultimate fact of intentional discrimination," the plaintiff need not put forward new evidence:

> The factfinder's disbelief of the reasons put forward [*40] by the defendant (particularly if disbelief is accompanied by a suspicion of mendacity) may, together with the elements of the prima facie case, suffice to show intentional discrimination.

Id. at 2749. In sum, the court's inquiry at this stage is "whether, on all the evidence of record, a rational factfinder could conclude that [discrimination] was a determining factor in the employer's decision." Mesnick, 950 F.2d at 825.

Applying this standard to the instant case, I find the inference of impermissible retaliation inadequately supported, even under evaluation in the summary judgment context where the facts must be read in the light most favorable to the plaintiff. Even arguendo rejecting out-of-hand the defendants' proffered explanations, the sole direct evidence of a retaliatory motive is Saad's claim that Emsellem stated that "'we just don't trust you anymore. We are aware you filed charges with the state. That isn't what you're being fired for, but we just don't feel like we can trust you anymore." Defs. Exh. B, Saad. Dep. at 3-277. n18 And even this is plainly related to Saad's past breach of employee confidentiality, rather than to her filing a claim of [*41] discrimination. Cf. Mesnick, 950 F.2d at 824, 825 (court must look at the evidence of discrimination [retaliation] not "in splendid isolation, but as part of an aggregate package of proof offered by the plaintiff" to determine "whether, on all the evidence of record, a rational factfinder could conclude that [retaliation] was a determining factor in the employer's decision[s]").

n18 While Emsellem does not deny saying that she could no longer trust Saad, she does attest that "at the time that we terminated Allyson Saad from her employment at SSTAR, I was not aware that

Allyson Saad had filed or intended to file a claim of discrimination against SSTAR." Emsellem Aff. at P 21. I have considered whether Emsellem's asserted lack of knowledge of the filing, contradicted as it is by other evidence which must be credited in this context, should be treated as showing of "consciousness of guilt" sufficient to give material added force to the plaintiff's retaliation claim; however, I find it far too strained to do so.

[*42]

The picture is somewhat complicated by the plausible notion that what led to Saad's "soured mood" was her discontent with the resolution of the hostile environment matter. Nevertheless, as unfortunate as this may be, it does not support an inference of improper retaliation. The undisputed record indicates that Saad was suspended and then demoted immediately upon revelation of her breach of employee confidentiality, a matter she had previously been warned about. Action was initially and briefly deferred regarding the sexual harassment complaint she made in defense of that breach. These circumstances in turn set into motion the problems that led to (and were cited in) her termination, i.e., that she was no longer being given work, had no computer in her office, felt ostracized, and, no doubt predictably, was developing a "bad attitude." That these events may have amounted to a constructive discharge, however, is not enough to get over the bar. Cf. Hicks, 113 S. Ct. at 2748 (quoting District Court finding in same case at 756 F. Supp. 1244, 1252 (E.D. Mo. 1991) ("although [petitioner may have] proven the existence of a crusade to terminate him, he has not proven that the crusade [*43] was racially rather than personally motivated"). Saad here has simply not demonstrated a sufficient issue of fact that her discharge was retaliatory rather than the consequence of a non-retaliatory personnel decision with which the plaintiff disagrees.

As defendants note, "'even in cases where elusive concepts such as motive or intent are at issue, summary judgment may be appropriate if the nonmoving party rests merely upon conclusory allegations, improbable inferences, and unsupported speculation." Goldman, 985 F.2d at 1116 (quoting Medina-Munoz v. R.J. Reynolds Tobacco Co., 896 F.2d 5, 8 (1st Cir. 1990)). Saad's claim of unfair treatment may rest on somewhat more than this; but it fails to support a claim of impermissible retaliation. Accordingly, I will grant the defendants motion for

summary judgment regarding the claim of retaliation.

IV

CLAIM BROUGHT UNDER M.G.L. c. 93, § 102

Defendants assert that M.G.L. c. 151B "provides the exclusive remedy for claims of employment discrimination under Massachusetts law," and, consequently, that the claim under c. 93 § 102 must be dismissed. This proposition was recently settled by the Supreme Judicial Court in Charland [*44] v. Muzi Motors, Inc., 417 Mass. 580, 631 N.E.2d 555 (1994). In that case, the SJC was called upon "to interpret the relationship between G.L. c. 151B (1992 ed.) [footnote omitted] and G.L. c. 93, § 102 and § 103 (1992 ed.)". Id. at 581. After analyzing the provisions and purpose of c. 151B, and precedent in which the remedies under that statute were "consistently" viewed as exclusive, the SJC concluded "that, where applicable, G.L. c. 151B provides the exclusive remedy for employment discrimination not based on preexisting tort law or constitutional protections". Id. at 586. See also, Agin v. Federal White Cement, Inc., 417 Mass. 669 at 670, 672, 632 N.E.2d 1197 (1994) (citing "teaching of Charland" for proposition that "Should a judge decide that G.L. c. 151B is or was available to the plaintiff, the plaintiff would have no viable c. 93 § 103, claim").

Chapter 151B provided a potential remedy for the claim plaintiff also pursues here under M.G.L. c. 93, § 102. To be sure, as I have explained in Section II supra, my intention is to grant summary judgment on the merits of the G.L. c. 151B claim, but its availability as a cause of action—and not its lack [*45] of success in this context—forecloses the G.L. c. 93 claim. Accordingly, I will grant the defendants' motion and dismiss Saad's claim under M.G.L. c. 93, § 102.

CONCLUSION

For the reasons given above, the defendants' motion for summary judgment with respect to the claims of employment discrimination due to hostile environment is hereby GRANTED; with respect to the claim of retaliation is hereby GRANTED; and the motion to dismiss the claim of employment discrimination under M.G.L. c. 93, § 102 is hereby GRANTED.

The clerk will enter judgment for the defendants.

DOUGLAS P. WOODLOCK

UNITED STATES DISTRICT JUDGE

LEXSEE 2000 U.S. APP. LEXIS 33681

**RONDA SANDVIK, Plaintiff‑Appellant, v. SECRETARY OF HEALTH AND HUMAN SERVICES, Defendant‑Appellee.**

No. 99‑35824

**UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT**

2000 U.S. App. LEXIS 33681

**November 14, 2000, Argued and Submitted, Portland, Oregon**
**December 15, 2000, Filed**

**NOTICE:** [*1] RULES OF THE NINTH CIRCUIT COURT OF APPEALS MAY LIMIT CITATION TO UNPUBLISHED OPINIONS. PLEASE REFER TO THE RULES OF THE UNITED STATES COURT OF APPEALS FOR THIS CIRCUIT.

**SUBSEQUENT HISTORY:** Reported in Table Case Format at: 2000 U.S. App. LEXIS 38173.

**PRIOR HISTORY:** Appeal from the United States District Court for the District of Oregon. D.C. No. CV‑98‑00701‑GMK. Garr M. King, District Judge, Presiding.

**DISPOSITION:** AFFIRMED.

**COUNSEL:** For RONDA SANDVIK, Plaintiff‑Appellant: William R. Goode, Esq., Portland, OR.

For SECRETARY OF HEALTH & HUMAN SERVICES, Defendant‑Appellee: Ronald K. Silver, AUSA, USPO‑OFFICE OF THE U.S. ATTORNEY, Portland, OR.

**JUDGES:** Before: BEEZER, RYMER, and GRABER, Circuit Judges. GRABER, Circuit Judge, concurring in part and dissenting in part.

**OPINION:**

MEMORANDUM *

    \* This disposition is not appropriate for publication and may not be cited to or by the courts of this circuit except as provided by 9th Cir. R. 36‑3.

Ronda Sandvik, formerly a Budget Officer with the Portland Area Office (PAO) of the Indian Health Service (IHS), appeals the district court's summary judgment in favor of the Secretary [*2] of Health and Human Services in an action Sandvik brought pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq. We affirm.

I

Sandvik argues that the district court improperly applied the "reasonable woman" standard. As we recently summarized the law in Kortan v. California Youth Authority, 217 F.3d 1104, 1109–10 (9th Cir. 2000):

> Title VII is violated if sexual harassment is so severe or pervasive as to create a hostile work environment. See Montero v. AGCO Corp., 192 F.3d 856, 860 (9th Cir. 1999); Oncale v. Sundowner Offshore Services, Inc., 523 U.S. 75, 118 S. Ct. 998, 1001, 140 L. Ed. 2d 201 (1998). "An employer is liable under Title VII for conduct giving rise to a hostile environment where the employee proves (1) that he was subjected to verbal or physical conduct of a harassing nature, (2) that this conduct was unwelcome, and (3) that the conduct was sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." Pavon v. Swift Trans. Co., Inc., 192 F.3d 902, 908 (9th Cir. 1999). "'Conduct [*3] must be extreme to amount to a change in the terms and conditions of employment.' To be actionable under Title VII, 'a sexually objectionable environment must be both objectively and subjectively offensive, one that a reasonable person would find hostile or abusive, and one that the victim in fact did perceive to be so.'" Montero, 192 F.3d at 860 (quoting Faragher v. City of Boca Raton, 524 U.S. 775, 118 S. Ct. 2275, 2284, 2283, 141 L. Ed. 2d 662 (1998)). "Harassing con‑

duct need not be motivated by sexual desire to support an inference of discrimination on the basis of sex." Oncale, 118 S. Ct. at 1002. The motivation can be a "general hostility to the presence of women in the workplace." Id.

Courts are to determine whether an environment is sufficiently hostile or abusive by "'looking at all the circumstances,' including the 'frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'" Faragher, 118 S. Ct. at 2283 (quoting Harris v. Forklift Systems, Inc., 510 U.S. 17, 23, 114 S. Ct. 367, 126 L. Ed. 2d 295 (1993)). [*4]

Here, there is no question that the work environment created by Madrano was—and was perceived to be—hostile and intimidating by virtue of how loud, "temperamental," and threatening he was. However, as the district court ruled, all but a few of the incidents recorded in Sandvik's log were tantrums that had nothing to do with gender. Madrano yelled, threw things, slammed doors, kicked furniture, and swore indiscriminately. "Title VII does not prohibit all verbal or physical harassment in the workplace; it is directed only at 'discrimination ... because of . . . sex.'" Oncale, 523 U.S. at 80 (alterations in original). While Sandvik correctly contends that "harassing conduct need not be motivated by sexual desire to support an inference of discrimination on the basis of sex," there must nevertheless be evidence to raise a triable issue as to whether the conduct is "so objectively offensive as to alter the 'conditions' of the victim's employment." Id. at 80–81.

We agree with the district court that the handful of incidents which were verbally offensive and of a sexual nature occurring over the three-year period during which Madrano was Sandvik's [*5] supervisor were not sufficiently severe or pervasive to alter her conditions of employment. Madrano occasionally used the word "bitch" to describe female employees, but not Sandvik. (He also called male employees "SOB" on occasion.) Some time in 1985, when Sandvik remarked that she was having trouble finding a Washington, D.C. hotel within her per diem, Madrano said "well, that's easy, just do a couple tricks, you will be fine." Madrano told Sandvik that his wife wore the pants in the family and once surprised him by wanting oral sex in the middle of the day. During a telephone conversation from out of town, Madrano told Sandvik that he had watched a television program about penile enlargement. Finally, during a meeting in his office on February

1, 1996, Madrano said he wanted to show Sandvik the real reason he looked at National Geographic — "It's the nudity. This is great stuff." James Thomas, also present at the meeting, expressed his disgust, precipitating an argument with Madrano. When Thomas left, and Sandvik started to follow, Madrano slammed his office door shut. Sandvik (and Thomas) complained to the Area Director. IHS responded promptly by putting Madrano on administrative [*6] leave, investigating his behavior, demoting him, and ultimately removing him from the PAO.

These statements are not of the same order of magnitude as those in cases upon which Sandvik relies. Cf. Harris v. Forklift Systems Inc., 510 U.S. 17, 19, 126 L. Ed. 2d 295, 114 S. Ct. 367 (1993) (supervisor told Harris to go to the Holiday Inn to negotiate her raise; president told her "you're a woman, what do you know," and called her a "dumb ass woman"; asked Harris and other female employees to get coins from his front pants pocket and threw objects on the ground in front of them and asked them to pick them up; and made sexual innuendos about Harris's and other female employees' clothing); Ellison v. Brady, 924 F.2d 872 (9th Cir. 1991) (co-worker continuously pestered Ellison for dates, wrote letters with sexual innuendo, followed her around and demanded that she talk to him); Steiner v. Showboat Operating Co., 25 F.3d 1459, 1461 (9th Cir. 1994) (vice-president called Steiner a "dumb fucking broad," "cunt" and "fucking cunt"; yelled during confrontation over comping customers, "Why don't you go in the restaurant and suck their dicks while [*7] you are at it . . . ."; told another employee he would hate to fire someone with big boobs; and continued to harass Steiner after a reprimand). See Kortan, 217 F.3d at 1110–11 (discussing cases). By comparison, Madrano's occasional use of the word "bitch" to refer to other women engendered offensive feelings but is the kind of epithet utterance that will seldom affect conditions of employment. See Meritor Savings Bank v. Vinson, 477 U.S. 57, 67, 91 L. Ed. 2d 49, 106 S. Ct. 2399 (1986). His comment about doing tricks, telling Sandvik he had watched a TV program on penile enlargements, and pointing out nude pictures in National Geographic are a good deal more tasteless and insensitive, but over a three-year period appear isolated and incidental. While they are, and are reasonably viewed as, extremely offensive, we cannot say they were "extremely serious." See Faragher v. City of Boca Raton, 524 U.S. 775, 788, 141 L. Ed. 2d 662, 118 S. Ct. 2275 (1998) (noting recurring theme in recent opinions that "offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the 'terms and conditions [*8] of' employment.'"). Accordingly, looking at all of the circumstances, including the fact that there were only a few instances of verbal abuse which were sexual

in nature and that Sandvik did not complain about them, we conclude with the district court that her conditions of employment were not affected to a sufficiently significant degree to violate Title VII.

## II

Sandvik contends that the court incorrectly concluded that her retaliation claim fails because she requested a transfer. We disagree. Sandvik asked to be moved out of Finance, reaffirmed that she wished to stay in her new position after Madrano had been put on leave and was removed from the premises, and never asked to be reinstated. Although she would have preferred to retain her Budget Officer classification, she knew that there was no such position outside Finance. Her new position involved no loss of pay or benefits. Sandvik submits that IHS should have told her more about its proceedings against Madrano so that she would know she was safe, yet nothing suggests that the agency had any duty to keep her informed which it disregarded out of retaliatory animus. She also points to the elimination of her former position after [*9] she had asked to be transferred, but this is immaterial given the transfer that she requested. None of the other evidence upon which Sandvik relies shows an adverse employment action.

AFFIRMED.

**CONCURBY:** GRABER (In Part)

**DISSENTBY:** GRABER (In Part)

**DISSENT:** GRABER, Circuit Judge, concurring in part and dissenting in part:

I concur in Part II of the majority's disposition but respectfully dissent from Part I. In my view, the evidence in the record at the time the district court entered summary judgment against Sandvik was sufficient to permit a reasonable jury to find in her favor on her "hostile work environment" claim. Accordingly, summary judgment was inappropriate as to that claim.

The evidence before the district court, viewed in the light most favorable to Sandvik, was that:

. Madrano used the word "bitch" to describe women at work, and he did so less than once a month. On one occasion, Madrano referred to a female employee who had filed an unrelated EEO complaint as a "bitch" and said

that she deserved every minute of harassment that she had received. Additionally, Madrano spoke "degradingly" of another female employee.

. Madrano recounted sexual jokes about once every six weeks. [*10]

. Madrano suggested that Sandvik could turn a few "tricks" to help cover the cost of her hotel bill for a trip to Washington, D.C.

. Madrano told Sandvik that his wife had surprised him one day by wanting oral sex in the middle of the day. He also told Sandvik that his wife wore the pants in the family.

. Madrano called Sandvik while on a business trip and reported to her that he had been watching a program about penile enlargements.

. Madrano exhibited photographs of nude people in a National Geographic magazine and told her that he read the magazine because of "the nudity. This is great stuff."

It is true (as the majority emphasizes) that the foregoing incidents do not match exactly the facts in any of our earlier cases. But fact-matching is not our task. Our task is only to determine what inferences a jury properly could draw from the particulars of the present case.

Here, a reasonable jury could find that the offending incidents, taken together, were so severe and pervasive as to have created a hostile work environment on account of sex. See Kortan v. California Youth Auth., 217 F.3d 1104, 1109-10 (9th Cir. 2000) (stating elements of a [*11] prima facie case). The question on summary judgment is not whether Sandvik ultimately would win her case, but only whether a genuine issue of fact exists. I believe that it does. Viewing the evidence in Sandvik's favor, and leaving aside evidence of Madrano's general ill temper: In a three-year period, Madrano called women "bitches" about 30 times; told sexual jokes about 26 times; compared Sandvik to a whore; discussed with Sandvik his sex life at home; told Sandvik that he was watching a program about penile enlargement; showed Sandvik a nude photograph; and spoke derogatorily of other female employees, singling out one who had filed an EEO complaint.

For the foregoing reasons, I dissent from Part I.

LEXSEE 2006 US APP LEXIS 8620

**WHITNEY FINNERTY, Plaintiff–Appellant, v. WILLIAM H. SADLIER, INC. and ROBERT RICHARDS, Individually, Defendants–Appellees.**

**No. 05–4494–cv**

**UNITED STATES COURT OF APPEALS FOR THE SECOND CIRCUIT**

**2006 U.S. App. LEXIS 8620**

**April 7, 2006, Decided**

**NOTICE:** [*1] RULES OF THE SECOND CIRCUIT COURT OF APPEALS MAY LIMIT CITATION TO UNPUBLISHED OPINIONS. PLEASE REFER TO THE RULES OF THE UNITED STATES COURT OF APPEALS FOR THIS CIRCUIT.

**SUBSEQUENT HISTORY:** As Amended, April 10, 2006.

**PRIOR HISTORY:** Appeal from the United States District Court for the Southern District of New York (Charles L. Brieant, Judge). Finnerty v. William H. Sadlier, Inc., 2005 U.S. Dist. LEXIS 42143 (S.D.N.Y., July 25, 2005)

**COUNSEL:** STEVEN H. GAINES, Gaines, Gruner, Ponzini & Novick, LLP (Phillip A. Grimaldi, Jr., Joseph M. Buderwitz, of counsel) White Plains, NY, for Plaintiff–Appellant.

BENJAMIN MEANS, Satterlee Stephens Burke & Burke LLP (Robert M. Callagy, Kristina M. Zarlengo, of counsel) New York, NY, for Defendant–Appellee William H. Sadlier, Inc.

WILLIAM H. MULLIGAN, JR., Bleakely Platt & Schmidt LLP, White Plains, NY, for Defendant–Appellee Robert Richards.

**JUDGES:** PRESENT: HON. CHESTER J. STRAUB, HON. ROBERT D. SACK, Circuit Judges, HON. DAVID G. TRAGER, ** District Judge.

   ** The Honorable David G. Trager, United States District Judge, Eastern District of New York, sitting by designation.

**OPINION:**

**AMENDED * SUMMARY ORDER**

* Amended to correct typographical error.

AFTER ARGUMENT AND UPON DUE CONSIDERATION, it is hereby ORDERED, ADJUDGED and DECREED that the judgment of the district court is AFFIRMED.

We assume the familiarity of the parties and counsel [*2] with the facts and procedural history of this appeal, which we recite only as we think necessary to explain our conclusions.

In August 2004, plaintiff Whitney Finnerty filed a complaint in the United States District Court for the Southern District of New York against her employer, William H. Sadlier, Inc. ("Sadlier") alleging, *inter alia*, hostile work environment sex discrimination and retaliation, both in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* n1 At the close of discovery, Sadlier moved for summary judgment, asserting the affirmative defense enunciated in the simultaneously decided cases of *Faragher v. City of Boca Raton*, 524 U.S. 775, 118 S. Ct. 2275, 141 L. Ed. 2d 662 (1998) and *Burlington Industries, Inc. v. Ellerth*, 524 U.S. 742, 118 S. Ct. 2257, 141 L. Ed. 2d 633 (1998) ("*Faragher/Ellerth* affirmative defense"). The district court (Charles L. Brieant, *Judge*) granted Sadlier's motion. *See Finnerty v. William H. Sadlier, Inc.*, No. 04 Civ. 7007 (S.D.N.Y. July 25, 2005). Finnerty now appeals from the ensuing judgment dismissing her Title VII claims. On appeal, the sole issue that Finnerty [*3] raises is whether the district court correctly concluded that Sadlier was entitled to the *Faragher/Ellerth* affirmative defense. We agree that it is and therefore affirm.

   n1 In addition to alleging violations of Title VII, Finnerty also brought claims against Sadlier pursuant to the Family and Medical Leave Act of 1993, 29 U.S.C. § 2601 *et seq.*, New York State Human Rights Law, and for intentional infliction of emotional distress and negligent infliction of emotional

distress. Finnerty also asserted claims against her supervisor, Robert Richards, pursuant to New York State Human Rights Law and for intentional infliction of emotional distress, negligent infliction of emotional distress, assault and battery. For various reasons set forth in its Memorandum Opinion, the district court granted summary judgment to the defendants on all claims except for Finnerty's claims of assault and battery against Richards, over which the court declined to exercise supplemental jurisdiction. *See Finnerty v. William H. Sadlier, Inc.*, No. 04 Civ. 7007 (S.D.N.Y. July 25, 2005). Finnerty does not appeal the district court's judgment with respect to any of these claims.

[*4]  We review de novo a district court's grant of summary judgment and construe the evidence in the light most favorable to the non-moving party. *Mack v. Otis Elevator Co.*, 326 F.3d 116, 119 (2d Cir. 2003). We may affirm the district court's grant of summary judgment for Sadlier only if, in light of the record as a whole, no rational juror could find for Finnerty. *Id.* at 120 (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986)); *see also* Fed. R. Civ. P. 56(c) (summary judgment is proper when "there is no genuine issue of material fact and . . . the moving party is entitled to judgment as a matter of law").

"To survive a motion for summary judgment, a plaintiff claiming he or she was the victim of an unlawful hostile work environment must elicit evidence from which a reasonable trier of fact could conclude . . . 'that the workplace was permeated with discriminatory intimidation that was sufficiently severe or pervasive to alter the conditions of his or her work environment . . . .'" *Mack*, 326 F.3d at 122 (quoting *Richardson v. N.Y. State Dep't of Corr. Serv.*, 180 F.3d 426, 436 (2d Cir. 1999)) [*5] (alterations incorporated). "In addition, the plaintiff must show that a specific basis exists for imputing the objectionable conduct to the employer." *Fairbrother v. Morrison*, 412 F.3d 39, 48–49 (2d Cir. 2005). "Where an employee is the victim of sexual harassment, including harassment in the form of a hostile work environment, by non-supervisory co-workers, an employer's vicarious liability depends on the plaintiff showing that the employer knew (or reasonably should have known) about the harassment but failed to take appropriate remedial action." *Petrosino v. Bell Atl.*, 385 F.3d 210, 225 (2d Cir. 2004). The analysis "differs where the harassment is attributed not to non-supervisory co-workers but to a supervisor with immediate or successively higher authority over the employee," *Fairbrother*, 412 F.3d at 49, such as the defendant Richards. "In that circumstance, a court looks first to whether the supervisor's behavior culminated in a tangible employment action

against the employee." *Id.* (internal quotation marks and citations omitted; alteration incorporated). "If it did, 'the employer will, *ipso facto*, be vicariously liable. [*6] '" *Id.* (quoting *Mack*, 326 F.3d at 124).

> If no such tangible employment action is present, an employer will still be liable for a hostile work environment created by a supervisor unless the employer successfully establishes an affirmative defense. *Petrosino*, 385 F.3d at 225. That defense requires the employer to show that (a) it "exercised reasonable care to prevent and correct promptly any sexually harassing behavior," and (b) "the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise."

*Id.* (quoting *Ellerth*, 524 U.S. at 765).

Finnerty first asserts that Sadlier is not entitled to the *Faragher/Ellerth* affirmative defense because she suffered a tangible employment action when she was reassigned to a new position in its general counsel's office after complaining of sexual harassment by her supervisor, Richards. Finnerty also argues that the alleged termination of her employment constituted a tangible employment action. Both of these contentions are without merit.

As the Supreme Court has explained, because [*7] "when a supervisor makes a tangible employment decision, there is assurance the injury could not have been inflicted absent the agency relation," between the supervisor and the employer, *Ellerth*, 524 U.S. at 761–62, "a tangible employment action taken by the supervisor becomes for Title VII purposes the act of the employer," *id.* at 762; *see also Pa. State Police v. Suders*, 542 U.S. 129, 144–45, 124 S. Ct. 2342, 159 L. Ed. 2d 204 (2004)("When a supervisor takes a tangible employment action against a subordinate, it would be implausible to interpret agency principles to allow an employer to escape liability." (internal quotation marks omitted; alterations incorporated)). Here, however, there is no evidence in the record suggesting that Richards had a hand in Finnerty's reassignment or purported termination, and Finnerty does not allege otherwise. In any event, the record establishes that "any tangible employment action taken against [Finnerty] was not part of [Richards'] discriminatory harassment." *Ferraro v. Kellwood Co.*, 440 F.3d 96, 101 (2d Cir. 2006). Finnerty was reassigned to remove her from Richards' supervision. Her [*8] employment with Sadlier ceased only after she subsequently refused to return to work. *Cf. id.* at 102 (noting that any tangible employment actions taken against

the plaintiff "were independent of [the] discriminatory harassment").

In her reply brief, for the first time, Finnerty argues that the hostile work environment created by Richards itself constituted a tangible employment action. Ordinarily, "we will not consider an argument raised for the first time in a reply brief." *United States v. Yousef*, 327 F.3d 56, 115 (2d Cir.),*cert. denied*, 540 U.S. 933, 124 S. Ct. 353, 157 L. Ed. 2d 241 (2003). In any event, Finnerty's argument is without merit. If a hostile work environment alone could constitute a "tangible employment action," no employer would be able to invoke the *Faragher/Ellerth* affirmative defense in a situation where a hostile work environment existed. But the affirmative defense is designed for precisely such a situation. Indeed, we have decided that even a constructive discharge resulting from a hostile work environment does not constitute a tangible employment action because generally [*9] a constructive discharge, like harassment itself, is not "ratified or approved by the employer." *Caridad v. Metro-North Commuter R.R.*, 191 F.3d 283, 294 (2d Cir. 1999), *cert. denied*, 529 U.S. 1107, 120 S. Ct. 1959, 146 L. Ed. 2d 791 (2000); *accord Suders*, 542 U.S. at 148–49.

*Jin v. Metropolitan Life Ins. Co.*, 310 F.3d 84 (2d Cir. 2002), cited by Finnerty, is consistent with that decision. There, we concluded that the district court erred by giving the jury a definition of tangible employment action that excluded from consideration the fact that in order to retain her job Jin was required to submit, and in fact did submit, to weekly sexual assaults by her superior. *Id.* at 97–99. A rational juror could conclude, we reasoned, that Jin received an official employment benefit – the retention of her job – in return for submitting to her supervisor's physical abuse, a scenario we characterized as "a classic quid pro quo." *Id.* at 94.

Here, by comparison, Finnerty does not contend that Richards explicitly threatened her with termination or otherwise formally altered or threatened to alter her job responsibilities [*10] if she did not submit to his advances. There is no evidence from which a rational juror could conclude that Finnerty suffered a tangible employment action as a result of Richards' alleged harassment.

As noted above, to establish its affirmative defense, Sadlier must show "'(a) that [it] exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and (b) that [Finnerty] unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise.'" *Fairbrother*, 412 F.3d at 53 (quoting *Faragher*, 524 U.S. at 807). Finnerty argues that Sadlier failed to make a sufficient showing that it exercised reasonable care. Although "[a] party faces a significantly heightened standard to ob-

tain judgment as a matter of law on an issue as to which that party bears the burden of proof," *id.*, we conclude that Sadlier has met its burden.

We have said that, although it is not dispositive, "one way for employers to demonstrate that they exercised reasonable care is to show that they had an anti-harassment policy in place." *Mack*, 326 F.3d at 128. It [*11] is undisputed that Sadlier maintained such a policy and that Richards was aware of it. Although Finnerty contends that she is unsure whether she received the employee manual containing the policy, it appears clear that she too was aware of it. As Finnerty set forth in her complaint to the EEOC, she spoke with Fran Marsh, the head of Sadlier's Human Resources Department, because Marsh "was one of the people designated in the Company's Employee Manual to whom such conduct was to be reported." In addition, the record demonstrates that within one week after Marsh received Finnerty's complaint, Sadlier initiated an investigation, determined that Richards' conduct violated company policy, formally reprimanded him and warned him that another incident could lead to his dismissal, and arranged for Finnerty to be transferred to a new department with the same compensation and benefit package. We conclude that no rational juror could find that Sadlier failed to exercise reasonable care in preventing and correcting promptly harassing behavior.

Finnerty also urges that there exist genuine issues of material fact with regard to whether she unreasonably failed to take advantage of any preventative [*12] or corrective opportunities provided by Sadlier or to avoid harm otherwise. However, it is undisputed that although the acts alleged to constitute harassment begin in 2000, Finnerty did not inform Sadlier of what had been occurring until more than three years later, in January 2004, and only then because a co-worker first informed Marsh of Finnerty's allegations.

Finnerty contends that she declined to report Richards' conduct for as long as she did because Marsh told her that a complaint could not be kept confidential, she feared reprisal from Richards, and she held Richards in high esteem. None of those explanations renders her three-year delay reasonable. We have never required a company to maintain a policy that guarantees confidentiality in order to invoke the affirmative defense. *See Leopold v. Baccarat, Inc.*, 239 F.3d 243, 245 (2d Cir. 2001). Indeed, it is hard to imagine how a company could keep a complaint confidential and also conduct a fair and thorough investigation. Nor does Finnerty's alleged fear of reprisals from Richards justify her refusal to report his behavior. For such reluctance to preclude the employer's affirmative defense, "it must be based [*13] on apprehension of what the *employer* [i.e., Sadlier] might do." *Caridad*, 191 F.3d

at 295 (emphasis added).

Moreover, a plaintiff must produce evidence showing that his or her fear is "credible," such as proof "that the employer has ignored or resisted similar complaints or has taken adverse actions against employees in response to such complaints." *Leopold*, 239 F.3d at 246. Finnerty has produced no such evidence. Nor does Finnerty's respect for Richards justify her three-year delay in reporting his conduct. We conclude that no rational juror could find that Finnerty acted reasonably, in the context of Sadlier's assertion of the *Faragher/Ellerth* affirmative defense, in declining to report Richards' behavior for over three years. She may have had reasons that were, for her personally, sufficient to support a decision not to report Richards' behavior earlier, but that cannot be part of our analysis.

Finally, to be sure, Sadlier's alleged tangible employment decisions — the reassignment and ultimate termination of Finnerty — would be relevant to Finnerty's retaliation claims brought directly against Sadlier. It would appear, though, that [*14] despite counsel's assertion to the contrary at oral argument, Finnerty has abandoned her retaliation claims on appeal by not raising any argument before us that is explicitly directed to these claims in her briefs on appeal. *See Omnipoint Commc'ns, Inc. v. City of White Plains*, 430 F.3d 529, 532 n.1 (2d Cir. 2005). We note, nonetheless, that in granting summary judgment to the defendants, the district court engaged in no separate analysis of Finnerty's retaliation claims, stating only that "because *Faragher – Ellerth* is a complete defense, Sadlier's motion to dismiss the sexual harassment claims is granted." *Finnerty*, slip op. at 9. We think that the court was mistaken. The *Faragher/Ellerth* affirmative defense is about the extent to which an employee's misbehavior may be attributed to his or her employer under principles of vicarious liability. It has no role in analyzing Sadlier's direct liability to Finnerty for its own actions with respect to the change of her employment position subsequent to her complaints of harassment, and her alleged subsequent termination. In analyzing the retaliation claims, the court should have employed the burden-shifting [*15] framework described in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973). *See, e.g., Gordon v. N.Y. City Bd. of Educ.*, 232 F.3d 111, 116 (2d Cir. 2000). After engaging in the *McDonnell Douglas Corp.* burden-shifting exercise, the district court might well have been compelled to grant summary judgment to Sadlier on the ground that Finnerty elicited no evidence that Sadlier "was motivated by prohibited retaliation," *Gordon*, 232 F.3d at 116 (internal quotation marks omitted; alteration incorporated), in reassigning and then allegedly dismissing her. But Finnerty has not placed that issue before us.

For the reasons set forth above, the judgment of the district court is therefore hereby AFFIRMED.

LEXSEE 1999 U.S. DIST. LEXIS 12938

**JEFFREY BALEK, Plaintiff, v. HOBART CORPORATION, Defendant.**

**No. 97 C 8130**

**UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION**

*1999 U.S. Dist. LEXIS 12938*

**August 16, 1999, Decided**
**August 17, 1999, Docketed**

**DISPOSITION:** [*1] Mr. Balek's motion for partial summary judgment denied. Hobart's summary judgment motion granted as to Count I and denied as to Count II. Hobart's motion for summary judgment granted as to counts III and IV.

**COUNSEL:** For JEFFREY BALEK, plaintiff: Gregory X. Gorman, Gorman & Gorman, Chicago, IL.

For HOBART CORPORATION, defendant: Philip Andrew Miscimarra, Patricia Louise Hubbard, Seyfarth, Shaw, Fairweather & Geraldson, Chicago, IL.

For GREGORY X GORMAN, respondent: Timothy A. Bridge, Attorney, Wheaton, IL.

**JUDGES:** Elaine E. Bucklo, United States District Judge.

**OPINIONBY:** Elaine E. Bucklo

**OPINION:**

### MEMORANDUM OPINION AND ORDER

Plaintiff Jeffrey Balek sued defendant Hobart Corporation ("Hobart") under the Americans with Disabilities Act ("ADA"), *42 U.S.C. § 12101 et seq.*, alleging unlawful termination and failure to reasonably accommodate. He also claims intentional infliction of emotional distress and retaliatory discharge. Mr. Balek moves for summary judgment on counts I and II (the ADA claims) of his first amended complaint. Hobart moves for summary judgment on all counts. n1 For the reasons set forth below, the motions are granted in part and denied [*2] in part.

n1 Count V of the first amended complaint, which alleged breach of contract, was voluntarily dismissed by Mr. Balek on September 22, 1998.

Background

Mr. Balek worked for Hobart from April 4, 1988, to January 20, 1997, and was terminated on July 10, 1997. For most of his tenure at Hobart, Mr. Balek worked as a service technician in the company's Chicago branch office. His duties included installing, servicing and repairing commercial food equipment at customer locations and at Hobart's in-house shop. It is undisputed that Mr. Balek's work as a service technician involved significant heavy lifting and physical labor, including lifting as much as 200 pounds and manipulating equipment weighing as much as 1,400 pounds.

Mr. Balek's history of back problems began prior to his employment with Hobart, which knew of those problems when it hired him. He has had four major back surgeries, one in 1986 and the other three during his tenure at Hobart.

The situation that led to Mr. Balek's dismissal began on [*3] December 26, 1996, when he experienced severe back pain. He missed work from then until January 6, 1997. One week later, according to Mr. Balek, he reinjured his back while attempting to maneuver a 300-pound motor into a mixing machine. He worked the remainder of that week and on Saturday, January 18, met with Dr. E. Quinn Regan (his back physician), who gave him the results of an MRI performed earlier in the week. According to Mr. Balek, Dr. Regan told him he had two herniated disks and probably would need surgery. Mr. Balek also testified Dr. Regan told him he might have to find a new career and that if he did not, there was a good chance he would be crippled by the time he was 50.

The following Monday, Mr. Balek went to work but before starting work met with his supervisor, Del Lawson, and told him what Dr. Regan had said. Mr. Lawson discussed the situation by telephone with Hobart's human resources department. He then told Mr. Balek to get his

personal belongings from his work vehicle, and said he would drive Mr. Balek home. Mr. Lawson also gave Mr. Balek a Functional Capacities Evaluation ("FCE") form for Dr. Regan to complete indicating Mr. Balek's work restrictions.

Mr. Balek [*4] did not return to work at Hobart after January 20, 1997. He was placed on short-term disability ("STD") leave (retroactive to December 27, 1996) under which he received full pay for 26 weeks. n2 On February 6, 1997, Dr. Regan completed the FCE form listing Mr. Balek's work restrictions. According to that form, Mr. Balek could lift no more than 25 pounds, and only occasionally during the workday. Less than two weeks later (February 18, 1997), Mr. Balek had disk-fusion surgery, and on March 7, Dr. Regan completed a second FCE form indicating Mr. Balek could not work at all and that it was unknown when he could return. A third FCE form completed by Dr. Regan on April 30 indicated Mr. Balek could work with restrictions: he could lift no more than 10 pounds and could not do any pushing, pulling, bending, squatting, climbing or carrying.

> n2 Mr. Balek then received two-thirds of his pay until December 1997. (Balek Dep. at 86.)

At the end of his 26-week STD leave, Mr. Balek was informed (by letter dated July 11, 1997) [*5] that he was being discharged because of a company policy that "at the end of a six (6) month medical leave . . . we must separate you from our employment." (Pl.'s First App. Ex. 12.) In late August 1997, Mr. Balek applied for a position with Hobart within his medical restrictions. Mr. Lawson requested an updated evaluation of those restrictions, but Mr. Balek never provided one. In January 1998, Mr. Balek applied for a service manager position with Hobart, which would have represented a promotion. That position apparently was never filled.

Discriminatory discharge

Mr. Balek claims Hobart's policy of discharging employees who were on disability leave for six months constitutes termination because of a disability in violation of the ADA. *See 42 U.S.C. § 12112(3)(A).* Such a disparate treatment claim may be analyzed under the *McDonnell Douglas* approach, which requires Mr. Balek to show (1) he is disabled within the meaning of the ADA, (2) his work performance met Hobart's legitimate expectations, (3) he was discharged, and (4) it is more likely than not his disability was the reason for his discharge. *Weigel v. Target Stores, 122 F.3d 461, 464-65 (7th Cir. 1997).* [*6] Hobart questions whether Mr. Balek can meet the first requirement. (Def.'s Resp. to Pl.'s Mot. at 5 n.2; Def.'s Mem. in Supp. of Mot. at 6 n.4.) An individual is dis-

abled under the ADA if he has "a physical or mental impairment that substantially limits one or more of [his] major life activities." *42 U.S.C. § 12102(2)(a).* Major life activities include "caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working," *29 C.F.R. § 1630.2(i),* as well as sitting, standing, lifting and reaching, 29 C.F.R. pt. 1630.2(i) app. A person is substantially limited in one or more of those activities if he is unable to perform it or is significantly restricted in his performance of it. *Sutton v. United Air Lines, Inc., 527 U.S. 471, 144 L. Ed. 2d 450, 119 S. Ct. 2139, 2145 (1999)* (citing *29 C.F.R. § 1630.2(j)*). According to the April 30 FCE, at the time Mr. Balek was discharged he was restricted to lifting no more than 10 pounds. (Pl.'s App. in Supp. of Mot. Ex. 9.) In addition, he could stand and walk for no more than two to three hours in a workday, and could sit for no more than four to five hours. *Id.* He also [*7] was prohibited from doing any pushing and pulling, bending, squatting, climbing or carrying. *Id.* Hobart has failed to raise a triable issue as to whether Mr. Balek was disabled under the ADA.

However, Mr. Balek cannot meet the fourth *McDonnell Douglas* requirement. He asserts the letter notifying him of his discharge shows termination was mandatory under Hobart's policy. (Pl.'s App. in Supp. of Mot. Ex. 12.) He also asserts it was his absence from work during his STD leave that was the sole reason for his termination. However, Mr. Balek's submissions fall far short of showing his disability was more likely than not the reason for his firing. There is nothing in the record to indicate Hobart's policy distinguished between disabled and non-disabled employees. *See Gantt v. Wilson Sporting Goods Co., 143 F.3d 1042, 1046 (6th Cir. 1998).* The policy simply states that "employment may be terminated" for "illness or injury beyond 26 weeks of absences." (Pl.'s App. in Supp. of Mot. Ex. 10.) Leave policies such as Hobart's that are uniformly applied do not violate the ADA. 29 C.F.R. pt. 1630.5 app. Accordingly, Mr. Hobart's motion for summary judgment as to Count I is [*8] denied, and Hobart's motion is granted as to Count I.

Reasonable accommodation

Mr. Balek also claims Hobart failed to reasonably accommodate his disability. He contends Hobart's STD policy makes no allowance for an interactive process with the employee to determine appropriate accommodations. He also asserts the policy makes no provision for identifying alternate positions (reassignment) for a disabled employee. Under the ADA, an employer is required to make "reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an . . . employee, unless [the employer] can demonstrate that the accommodation

would impose an undue hardship on the operation of [its] business." *42 U.S.C. § 12112*(b)(5)(A). The employer's obligation to provide such accommodations is triggered once the employee informs the employer of his disability. *Hendricks-Robinson v. Excel Corp., 154 F.3d 685, 693 (7th Cir. 1998)*. At that point, the employer must engage in a "flexible, interactive process" with the employee to determine what his limitations are and what possible accommodations might be appropriate. **[*9]** *Id.* If the employee is unable to perform his job with or without reasonable accommodation, reassignment to a different position must be considered. *Id.*

Hobart was aware of Mr. Balek's disability in general when it hired him. Further, Mr. Balek informed Hobart of the specific disability at issue in this case on January 20, 1997, when he told Mr. Lawson what Dr. Regan had told him about the MRI results. Mr. Balek also gave Mr. Lawson FCE forms on three occasions between January 20 and his termination date. Only the second one, dated March 7, 1997, prohibited Mr. Balek from working. The other two, dated February 6 and April 30, released Mr. Balek to work and stated his medical restrictions. At minimum, Hobart's obligation to engage in an interactive process with Mr. Balek to identify reasonable accommodations began no later than the date it received the February 6, 1997, FCE. However, there is little evidence of such an interactive process here.

Hobart asserts it did take part in an interactive process with Mr. Balek. It notes Mr. Lawson conducted an "ongoing evaluation of whether or when [Mr. Balek] could return to work," and that "he had recurring discussions with [Mr. **[*10]** Balek], during which [Mr. Balek] requested no accommodation." (Def.'s Resp. to Pl.'s Mot. at 14.) Hobart also cites the "26 weeks of job-protected leave" it provided Mr. Balek, as well as its efforts to consider him for possible reemployment after he was terminated. *Id.* None of those rises to the level of a "flexible, interactive process" in which Hobart and Mr. Balek "together . . . might identify [his] precise limitations and discuss accommodations which might enable [him] to continue working." *Hendricks-Robinson, 154 F.3d at 693*. Based on the record evidence, Mr. Lawson's "ongoing evaluation" consisted essentially of reviewing the FCE forms Mr. Balek submitted to him. Further, it appears accommodations were not broached during Mr. Lawson's "recurring discussions" with Mr. Balek. Hobart says Mr. Balek never requested any accommodation. Mr. Balek says he repeatedly reported for work, however, and under prevailing case law, if he in any way indicated he wanted to continue working, this may be enough to trigger an employer's obligations to engage in a process of determining whether there is an acceptable job that the employee can do. *Hendricks-Robinson, 154 F.3d at 694*.

**[*11]** Moreover, there is nothing interactive about a 26-week leave, much of which, according to Mr. Balek, was imposed on him by Hobart. In addition, there is little evidence of an interactive process in Hobart's alleged efforts on Mr. Balek's behalf after he was discharged.

As to reassignment, where an employee is unable to perform the essential functions of his job with or without accommodation and notifies his employer that he wants to continue working, "the employer must consider reassignment as one form of accommodation." *Id.* It is undisputed that Mr. Balek could not perform the duties of his service technician job without accommodation, and Hobart implies there were no accommodations that would have enabled him to return to work, (Def.'s Reply in Supp. of its Mot. at 7.) Nevertheless, Hobart asserts it had no duty to reassign Mr. Balek because he did not identify a vacant position for which he was qualified at the time he was discharged. (Def.'s Resp. to Pl.'s Mot. at 13); *see McCreary v. Libbey-Owens-Ford Co., 132 F.3d 1159, 1165 (7th Cir. 1997)*. However, the Seventh Circuit has held that an employer's duty to accommodate by reassignment requires it to "'identify **[*12]** the full range of alternative positions for which the individual satisfies the employer's legitimate, nondiscriminatory prerequisites.'" *Hendricks-Robinson, 154 F.3d at 694* (quoting *Dalton v. Subaru-Isuzu Automotive, Inc., 141 F.3d 667, 678 (7th Cir. 1998))*. The employer then must determine if the disabled employee could perform the essential functions of any of those positions with or without reasonable accommodation. *Id.* Hobart human resources representative Vicki Phillippi testified it is not Hobart's practice to search for jobs for which employees do not apply. (Phillippi Dep. at 108–09.)

There is no triable issue here as to whether Hobart engaged in the requisite interactive process with Mr. Balek, nor whether it properly considered reassignment as a possible accommodation. However, there is a dispute that cannot be resolved on these motions as to whether Mr. Balek sought accommodation, a prerequisite to the employer's duty to engage in the interactive process or to offer an accommodation. Mr. Balek's summary judgment motion is denied as to Count II. Hobart's motion is also denied as to Count II.

Qualified individual with a disability **[*13]**

Hobart claims Mr. Balek does not meet the requirements of a "qualified individual with a disability" because he could not perform the essential functions of his job, with or without accommodation, and therefore is not protected by the ADA. *42 U.S.C. § 12112*(a). Hobart presents a wealth of evidence that Mr. Balek could not perform the essential functions of his job. However, that is not the issue. The proper question under the ADA is whether

Mr. Balek could perform the essential functions of his job "with or without reasonable accommodation." *42 U.S.C. § 12111*(8). The fact that he might not be able to perform the tasks of his specific position do not decide this issue. *E.g., Hendricks-Robinson, 154 F.3d at 694–95.* Mr. Balek asserts Hobart could have accommodated him with a "light duty" assignment. Hobart claims the service technician position could not be modified in any way that would accommodate Mr. Balek's disability. However, that does not address whether there might have been other positions for which Mr. Balek was qualified. Further, Mr. Lawson testified Mr. Balek had been given "lighter–duty jobs" in the past [*14] to accommodate his back problems.

Hobart also claims Mr. Balek's 26–week absence from work during his STD leave means he was unable to perform the essential functions of his job and so is not a qualified individual with a disability. *See Nowak v. St. Rita High Sch., 142 F.3d 999, 1003 (7th Cir. 1998).* However, Mr. Balek notes correctly that, based on the FCEs he submitted to Hobart, he was unable to work for only a portion of that six–month period. It is undisputed that on January 20, 1997, the day Mr. Lawson drove him home, Mr. Balek had no medical documentation indicating he could not work. Further, both the February 6 and April 30 FCEs indicated Mr. Balek could work with restrictions. Only the March 7 FCE, the first following his February 18 surgery, prohibited him from working. Moreover, Mr. Balek testified that when he gave Mr. Lawson the February 6 FCE, he expressly asked to return to work but was told his work restrictions were "too limited." (Balek Dep. at 131.)

### EEOC charge

Hobart also asserts any claim Mr. Balek makes as to Hobart's handling of his post-termination employment applications is jurisdictionally barred because those applications were not [*15] mentioned in his EEOC charge. One of the allegations in Mr. Balek's EEOC charge is that he was "not given a light duty position or otherwise reasonably accommodated." (Pl.'s App. in Supp. of Mot. Ex. 2.) A discrimination claim is cognizable if it is "'like or reasonably related to the allegations of the [EEOC] charge and growing out of such allegations.'" *Babrocky v. Jewel Food Co., 773 F.2d 857, 864 (7th Cir. 1985).* Mr. Balek's post-termination application claims are sufficiently related to his EEOC charge.

### Intentional infliction of emotional distress

Hobart moves for summary judgment on count III of the first amended complaint, which alleges intentional infliction of emotional distress ("IIED"). In order to prevail on an IIED claim, Mr. Balek must show that (1) Hobart's conduct was extreme and outrageous, (2) his emotional distress was severe, and (3) Hobart knew or was substan-

tially certain its conduct would cause him such distress. *Bast v. Ford Motor Credit Corp., 631 F.2d 508, 509–10 (7th Cir. 1980).* Mr. Balek testified it was his discharge by Hobart that caused his emotional distress. (Balek Dep. at 704–06.) In order to support IIED liability, [*16] the conduct at issue must be so outrageous and extreme "'as to go beyond all possible bounds of decency.'" *Bast, 631 F.2d at 509* (quoting *Public Fin. Corp. v. Davis, 66 Ill. 2d 85, 90, 360 N.E.2d 765, 767, 4 Ill. Dec. 652, 654 (1976)).* Mr. Balek presents nothing to show Hobart's firing of him meets that requirement. Further, emotional distress sufficient to support liability must be "'so severe that no reasonable man could be expected to endure it.'" *631 F.2d at 510.* With the exception of an alleged sexual dysfunction that Mr. Balek said he discussed with Dr. Regan, Mr. Balek testified he never sought treatment for any of the emotional distress symptoms alleged in his complaint. (Pl.'s Rule 12(N) Resp. P 31; Balek Dep. at 725–27.) There is no evidence indicating Mr. Balek's distress was severe enough to support an IIED claim.

### Retaliatory discharge

Hobart also moves for summary judgment on Count IV, which alleges Mr. Balek's discharge was in retaliation for his filing of a workers' compensation claim. To succeed on a retaliatory discharge claim, Mr. Balek must show (1) he was Hobart's employee prior to his injury, (2) he exercised a right guaranteed [*17] by the Illinois Workers' Compensation Act, and (3) his discharge was causally related to his workers' compensation claim. *Sweat v. Peabody Coal Co., 94 F.3d 301, 304 (7th Cir. 1996).* "The causality requirement calls for more than a sequential connection—the filing of a workers' compensation claim followed by a termination. The plaintiff must affirmatively show that the discharge was primarily in retaliation for his exercise of a protected right. The critical issue is the employer's motive or intent." *Roger v. Yellow Freight Sys., Inc., 21 F.3d 146, 149 (7th Cir. 1994)* (citations omitted). Mr. Balek testified that on January 20, 1997, while Mr. Lawson was taking Mr. Balek home, Mr. Lawson told him he was a liability, a comment Mr. Lawson denies. Mr. Balek offers no other evidence that would show discriminatory intent. Inappropriate remarks, standing alone, do not necessarily support an inference of discriminatory intent. *Huff v. Uarco, Inc., 122 F.3d 374, 385 (7th Cir. 1997).* Mr. Balek's termination came three months after the denial of his workers' compensation claim for an injury alleged to have occurred on January 13, 1997. Hence, [*18] Hobart knew it had no liability for the workers' compensation claim before it discharged Mr. Balek. I conclude that the evidence is insufficient to support Mr. Balek's retaliatory discharge claim.

### Conclusion

1999 U.S. Dist. LEXIS 12938, *18

For the foregoing reasons, Mr. Balek's motion for partial summary judgment is denied. Hobart's summary judgment motion is granted as to Count I and denied as to Count II. Hobart's motion for summary judgment is granted as to counts III and IV.

**ENTER ORDER:**

**Elaine E. Bucklo**

United States District Judge

**Dated:** August 16, 1999

LEXSEE 2006 U.S. DIST. LEXIS 47270

**NANCY M. BILLINGS, Plaintiff, v. TOWN OF GRAFTON, RUSSELL J. CONNOR, JR., ROGER HAMMOND, SUSAN M. MILLS, CHRISTOPHER R. LEMAY, BROOK PADGETT, and PETER ADAMS, Defendants.**

**Civil Action No. 02–40248–FDS**

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MASSACHUSETTS**

*2006 U.S. Dist. LEXIS 47270*

**July 5, 2006, Decided**

**COUNSEL:** [*1] For Grafton, Town of, Defendant: David K. McCay, Mirick, O'Connell, DeMallie & Louggee, LLP, Worcester, MA; Richard C. Van, Nostrand Mirick, O'Connell, DeMallie & Lougee, LLP, Worcester, MA.

For Nancy M. Billings, Plaintiff: Richard A. Mulhearn, Law Offices of Richard A. Mulhearn, Worcester, MA.

**JUDGES:** F. Dennis Saylor, IV, United States District Judge.

**OPINIONBY:** F. Dennis Saylor, IV

**OPINION:**

**MEMORANDUM & ORDER ON DEFENDANTS' RENEWED MOTION FOR SUMMARY JUDGMENT**

**SAYLOR, J.**

This is a civil action arising out of the alleged sexual harassment of an employee of the Town of Grafton. Nancy Billings filed suit against the Town and her former supervisor, Russell J. Connor, Jr., for injuries arising out of Connor's alleged sexual harassment over a period of approximately three years. The original complaint asserted claims for sexual harassment and discrimination in violation of Title VII of the Civil Rights Act of 1964, *42 U.S.C. § 2000e et seq.*, against the Town (Count I); for retaliation in violation of Title VII against the Town (Count II); for sexual harassment and discrimination in violation of Mass. Gen. Laws ch. 151B against both the Town and [*2] Connor (Count III); for retaliation in violation of ch. 151B against both the Town and Connor (Count IV); and for intentional infliction of emotional distress against Connor (Count V).

Defendants filed a motion for summary judgment as to all counts on March 24, 2004. On May 3, 2004, Billings moved to amend her complaint to add five additional parties as defendants–the acting Town Administrator, Roger Hammond, and four members of the Town's Board of Selectmen, Susan M. Mills, Christopher R. LeMay, Brook Padgett, and Peter Adams–and to make additional allegations of retaliation based on events occurring after the lawsuit was filed. At the same time, she moved for an extension of time to complete discovery.

On March 14, 2005, the Court issued its memorandum and order granting summary judgment for defendants as to the claims for sexual harassment, discrimination, and intentional infliction of emotional distress (Counts I, III, and V). As to the retaliation claims (Counts II and IV), the Court deferred its ruling on the grounds that Billings did not yet have an opportunity to conduct full discovery. The Court granted Billings's motion to amend, which it treated as a motion to supplement. [*3] The Court also permitted the parties to conduct additional limited discovery.

On July 20, 2005, all defendants renewed the motion for summary judgment on Billings's remaining retaliation claims. For the reasons stated below, the renewed motion will be granted. n1

> n1 The newly named defendants did not move for summary judgment as to Count III (alleging sexual harassment) insofar as it was amended to include them. However, the count as amended is factually and legally indistinguishable from the count as brought against Connor and the Town, in whose favor the Court already granted summary judgment. Accordingly, for the reasons detailed in the Court's March 2005 memorandum and order, summary judgment will be granted in favor of the newly named defendants as to Count III. *See Young v. City of Providence ex rel. Napolitano, 404 F.3d 4, 12 (1st Cir. 2005).*

## I. Factual Background

The facts are described in the light most favorable to the plaintiff. n2

> n2 In April 2006, Billings filed a motion to supplement the summary judgment record to include evidence regarding an event that allegedly occurred the preceding February. Defendants do not oppose the motion and seek to introduce additional evidence in response. The Court will grant her motion to supplement and will consider the supplemental evidence offered by both sides.

[*4]

### A. Position as Secretary to the Town Administrator

Russell J. Connor, Jr., was appointed Town Administrator by the Grafton Board of Selectmen on August 23, 1999. As Town Administrator, Connor was the town's top executive employee. He reported directly to the Selectmen.

In September 1999, Connor hired Nancy Billings as his part-time secretary. In May 2001, her position was classified as an exempt, full-time position, and she received a salary increase. It was, and apparently continues to be, a non-union position.

Billings testified that her duties included answering the telephone, filing, typing letters, opening the mail, and helping citizens who came into the office. She also testified that she helped town boards and commissions, and that, on occasion, she attended and took the minutes of the meetings of the Board of Selectmen to fill in for the secretary who usually did so. She had limited access to confidential information: it was her responsibility to open, stamp, and sort mail containing confidential information about legal issues and lawsuits involving the town, but she had no responsibility to review the correspondence or any substantive input into these issues. [*5]

Billings's work station was located in the Grafton Municipal Center. She shared an office with, and sat in a desk adjacent to, Nancy Hazen, the administrative assistant to the Selectmen.

### B. Billings's Complaints of Sexual Harassment

A few months after she was hired, Billings noticed that Connor began staring at her breasts with some regularity. She spoke with other employees about Connor's behavior, some of whom indicated that they had experienced the same thing and that it made them feel uncomfortable. However, in the early part of her employment, Billings did not discuss her discomfort with Connor or make a for-

mal complaint. A full recitation of the facts relevant to her harassment claims can be found in the Court's March 15, 2005 memorandum and order, and will not be repeated here.

The Town's sexual harassment policy designated Hazen as the employee to whom complaints of sexual harassment should be made. In March 2001, Billings filed a formal complaint of sexual harassment with Hazen, who reported the complaint to one of the Selectmen. In response, the Selectmen asked town counsel Theresa Dowdy to investigate.

Dowdy interviewed Connor, Billings, and other women who [*6] had complained about Connor's behavior. In a letter to the Selectmen in April 2001, Dowdy reported that she had conducted her interviews and that Connor told her that he was unaware that he was staring at female employees' breasts, and that he would make a conscious effort to be aware of his eye contact. Connor knew by at least July 2001 that it was Billings whose complaint prompted the investigation.

According to Billings, this did not end Connor's inappropriate behavior. By letter dated November 16, 2001, to the then-Chairman of the Board of Selectmen, Billings again complained about Connor's conduct, and asked for another formal investigation. This time, the Selectmen asked town counsel Sharon P. Siegel to investigate the allegations. Siegel interviewed Connor and two Selectmen; she spoke to Billings twice, but Billings ultimately refused to participate in the investigation on the grounds that Siegel could not fairly investigate her complaint. n3 Siegel reported to the Selectmen on December 18, 2001, that her investigation did not substantiate Billings's claim of sexual harassment as that term is defined by law, and recommended that the matter be closed. n4

> n3 Siegel's report indicated that Billings told her that she refused to participate because Billings had filed a complaint with the Massachusetts Commission Against Discrimination ("MCAD") and preferred to pursue her complaint in that forum. Billings eventually withdrew her case from the MCAD and filed a complaint with this Court.

[*7]

> n4 According to Billings, Siegel's investigation was flawed because Connor was the only person she interviewed who had first-hand knowledge, and she simply adopted his version of events. Billings concedes that Siegel's investigation was hampered by the absence of complaining witnesses, but suggests Siegel could have conducted an independent survey

of female town employees.

Around this time, on December 13, 2001, Billings filed a complaint of discrimination with the Massachusetts Commission Against Discrimination ("MCAD"). It is not clear when the fact of her MCAD complaint first became known to Connor or the other defendants; it may have been served on the Town in approximately March or April 2002.

Several months later, Billings again complained to the Selectmen about Connor. On March 20, 2003, she wrote a letter to Roger Demers, Chairman of the Board of Selectmen, which stated that Connor's "leering at [her] chest has not ceased." The letter listed eleven separate dates, beginning in January 2003, on which the staring occurred, and requested that action be taken to stop the behavior. n5 This [*8] allegation prompted the town to hire attorney Judy Loitherstein to look into the allegations. She was not retained as an attorney for the Town, but as an independent investigator. Loitherstein investigated and concluded that, in her opinion, Connor did not "leer" or "stare" at Billings's breasts on the eleven occasions set forth in the letter. n6 In the meantime, Billings and Connor continued to work together. The working environment between the two became, understandably, strained.

> n5 In addition to the eleven incidents identified, Hazen's logbook contains references to other complaints made by Billings from March 23, 2001, to August 13, 2003.

> n6 Loitherstein based this conclusion in part on Connor's behavior during her interview with him. She stated that Connor's eyes frequently "darted down and then back up again" and that he "frequently looked down toward [her] chest, but just as frequently looked down and to [her] right, or down and to [her] left," and occasionally looked up or up and away. Loitherstein did not get the impression that Connor was staring at her chest. She thus concluded that Connor may have been looking at Billings's chest involuntarily, perhaps as a result of a physical condition. She did not find "any sexual intent or undertone" to this conduct.

[*9]

### C. The Alleged Retaliatory Acts

Billings contends that Connor, Hammond, and the individually named Selectmen retaliated against her for complaining about Connor's actions. Specifically, Billings points to (1) Connor's increased scrutiny of her

conduct and performance; (2) a reprimand by Hammond for opening confidential mail; (3) her involuntary transfer to another secretarial position; (4) the Town's refusal to reinstate her to her former position after Connors left the Town's employment; (5) Hammond's instruction that she avoid the Selectmen's office; and (6) Hammond's refusal to accommodate her absences in connection with this litigation. The alleged retaliatory acts occurred between November 2001 and February 2006.

### 1. Connor's Increased Scrutiny of Her Performance

Billings first complains, based on three separate incidents, that she has been unfairly subjected to increased scrutiny by Connor of her conduct and work performance. The first occurred on August 8, 2001. The day before, Billings had attended a Selectmen's meeting and asked a question about the appointment of Hammond to be the Director of Public Works. The next day, Connor called Billings into his [*10] office, shut the door, and accused her of attending the meeting and asking that question to embarrass and humiliate him. n7

> n7 Connor apparently invited Billings to ask the Selectmen whether they would agree with him that the question was intentionally embarrassing and humiliating. According to Billings, she did so, and none of the Selectmen agreed with Connor's assessment; each, however, asked Billings why she had not asked Connor the question privately before the meeting. Billings responded that she did not put herself in the position of being alone with Connor because of his improper behavior. According to Connor, Billings was motivated by political issues, including her disagreement with his August 2001 appointment of Hammond as the Director of Public Works.

The other two occasions occurred on April 1, 2003. On that day, Connor issued two typed memoranda to Billings concerning performance issues. The first indicated that Billings had improperly placed mail in the Selectmen's correspondence file without Connor's [*11] first having reviewed it. The second concerned the apparent loss of computer files by Billings and indicated that she had made insufficient efforts to recover the files. Billings contends that these memoranda were issued without any basis and demonstrate an increased and unfair scrutiny of her work performance.

According to Connors, because Billings "ratcheted up the litigation" and was documenting everything that could be construed to help her cause, he felt he should also document incidents of problematic work performance. He

concedes that in the absence of the litigation he would have handled the issues less formally-for example, by merely talking to her about the problems or detailing them in a handwritten note. n8

> n8 Billings replied in writing to the two memoranda.

### 2. Hammond's Reprimand

In February or March 2002, Billings opened confidential correspondence to the Town and placed it on a desk in full view. Although the content of the letter is disputed, it may have been from the Town's law firm, [*12] and may have concerned the litigation that Billings had brought against the Town and Connor. Another incident occurred on March 18, 2002, while Connor was on vacation, when Billings opened a letter that was marked "personal and confidential" from Connor's personal attorney concerning the MCAD complaint brought by Billings. According to Billings, she did not know that the letter was from Connor's personal attorney because she had never heard of him. When Billings realized who sent the letter, she and Hazen taped the envelope closed and placed it in Connor's inbox.

Billings testified that it was her job to open all of the mail that came to the Selectmen's office, whether it was marked "personal and confidential" or not. According to Billings, neither Connor nor the Selectmen had previously informed her of the attorney's existence, nor had they previously instructed her to stop opening mail marked "personal and confidential." Both Billings and Hazen testified that the office protocol was for Billings to open the mail, date stamp it, and put it on the corner of Hazen's desk. Hazen would then read the mail and place relevant items in Connor's inbox. Hazen also testified that there was [*13] "quite a bit" of mail marked "confidential." Connor confirmed that Billings opened many letters from attorneys marked "personal and confidential" because most attorneys marked their bills that way.

Connor notified the Selectmen and the Town's counsel about the March letter-opening incident. Connor contends that, on Town counsel's advice, he initiated a formal disciplinary investigation of Billings and appointed Hammond to conduct it. n9 On August 20, 2002, Hammond submitted a report to the Selectmen detailing his investigation of the incident. Hammond's report stated that in late February or early March 2002, Selectman LeMay issued a verbal directive to Billings through Hazen that confidential mail coming into the office was to be opened only by the addressee. Hazen's testimony, however, is inconsistent with that statement. She testified that LeMay had come into the office on April 3, 2002, and,

for the first time, instructed her not to open any mail that was marked "personal and confidential." Hazen relayed LeMay's instruction to Billings, as directed. According to Hazen, this represented a change in procedure for her and Billings with regard to personal and confidential mail. Subsequently, [*14] on April 23, 2002, LeMay issued a memorandum to Hazen and Billings to the same effect. Hazen thus testified that both the verbal and written instructions were given *after* the letter-opening incident of March 18, 2002.

> n9 According to Connor, because the incident involved his personal mail, he recused himself and appointed Hammond to conduct the investigation as the acting Town Administrator. Connor admitted that he would have handled the matter differently if Billings not filed "false allegations of sexual harassment" against him: he would have confronted her directly. The Board of Selectmen voted on June 4, 2002, to have Hammond conduct a formal investigation and report his findings to them.

In any event, Hammond concluded that Billings opened the letter from Connor's attorney in violation of a prior directive she had received from LeMay that confidential mail coming into the office was to be opened only be the addressee. Hammond concluded that Billings should be disciplined; as a result he gave her a written [*15] reprimand on September 12, 2002, that was placed in her personnel file. There is no evidence concerning what effect, if any, the reprimand has had or might have on her employment.

### 3. Involuntary Transfer

In May 2003, the Town offered Billings a position as a clerk in the Assessor's Office, and then in approximately November 2003, she was offered the Recreation Department secretary position. She turned down both, as she considered them demotions.

Approximately one year after Billings filed her original complaint, on December 22, 2003, the Town transferred her against her wishes to her current position as a secretary in the Recreation Department. Her basic compensation and benefits remain the same. n10 However, she now receives overtime pay when she works extra hours. Her basic duties as a secretary remain the same: typing, copying, answering phones, and assisting the public either in person or by phone. In addition, she maintains the Recreation Department webpage.

> n10 The job grade for Billings's current position is S-1. The "S" in the job grade means staff. The job grade for her former position was M-1. "M" means

management. The pay scale for a Grade S–1 position is from $19,657.86 to $23,207.50, but the pay scale for a Grade M–1 position is from $28,472.54 to $33,614.09. Billings is currently paid above the salary range of her current position. She argues that her opportunity for future salary increases has been hindered by the transfer. However, the Town has submitted evidence–which Billings does not controvert–that in her new position she has enjoyed, and will continue to enjoy, the same salary increases that she would have received in her old position, irrespective of the change in her formal job classification. Although Billings points out that this arrangement is subject to collective bargaining, as it is a unionized position, there is no reason from the record to believe that the arrangement will not continue.

[*16]

Billings states that the position was in fact a demotion for several reasons. First, the status and prestige of the position is lower because she now reports to the Recreation Department Coordinator (who reports to the Town Administrator), instead of directly to the Town Administrator, and because she no longer opens and sorts confidential mail dealing with matters of significance to the Town. The only confidential information that she handles now is medical and financial information of recreation program participants. n11 Second, the majority of her time in her current position is spent doing routine tasks, such as typing and copying. Third, in her new position she is required to be a member of the union; as a result, union dues of $8.10 per week are deducted from her paycheck and she has to punch a time card instead of simply keeping track of her hours in writing.

n11 As further evidence of a drop in status, Billings points to (1) the fact that the minimum qualifications for the position as secretary to the Town Administrator are higher than those for her current position and (2) differences in the responsibilities of the positions as stated in their respective job descriptions. The job description for her previous position includes, among other things, responsibilities to act as the liaison between the Town Administrator and the public or other town departments; to assume administrative authority in the absence of the Town Administrator; to research records and files; to compile data; to monitor budgetary performance; to assign certain work to clerical workers and monitor their progress; and to respond to and resolve problems or difficulties. Billings did not testify one way or the other as

to whether she actually performed the duties listed in the job description. Her current job description does not reflect these duties.

[*17]

The Town contends that her involuntary transfer came as the result of a medical accommodation that it decided to provide to Connor. In the fall of 2003, Connor began to experience health problems. First, he suffered a severe heart attack, was hospitalized, and was placed on medical leave. He then attempted to return to work, but suffered an atrial fibrillation, resulting in his further hospitalization. He requested accommodations for his medical condition, including a request that the Town reduce the stress to which he would be subjected upon his return. In support of the request, Connor's psychologist opined in a letter to the Selectmen dated December 2, 2003, that "were Mr. Connor to return to his position as Town Administrator while Mrs. Billings is still employed by the Town as Secretary of the Town Administrator, it would likely result in significant jeopardy to his health and his need to cease his employment status." Connor's physician added in a letter to the Selectmen dated December 5, 2003, that Connor "should [work] in a less stressed environment," noting that "[h]e states that there have been some stressful situations at work and I think in anyway [*sic*] that they [*18] could be avoided that would certainly be best for Mr. Connor's health." n12

n12 Billings complains (1) that the Town did not conduct any independent medical evaluation of Connor; (2) that the letter from the psychologist had an advocative tone (*e.g.*, he recited Connor's view that the case against him was meritless and brought for improper purposes) rather than a clinical, or dispassionate, tone; and (3) that the letters did not spell out other work restrictions or indicate how long the accommodation should be in place. She also argues that Connor wrongly refused to provide certain information to her in discovery regarding the nature and treatment of his medical condition. Whatever the merits of her position as to the latter issue, her assertion of it is clearly untimely.

The Selectmen considered the accommodation request during at least two meetings at which Hammond was present. Selectman Padgett testified that the Board considered possible alternative responses to the request. Hammond's testimony is contradictory:    [*19]  he answered "no" to the question of whether there were "any alternatives discussed, other than to remove her from the secretary's position and put her someplace else." n13 Hammond and the Selectmen were aware of Billings's

lawsuit against the Town and Connor at this time; one Selectman testified that he was concerned about transferring Billings because he feared that it would be perceived to be retaliatory (even though he did not believe that the transfer was in fact retaliatory).

> n13 In addition, Hammond testified that they also discussed "whether it would be possible to transfer Mr. Connor to some other position" and that doing so wasn't "feasible" because there were no equivalent positions.

According to the Town, it needed to transfer either Billings or Connor. Billings could be transferred to an equivalent position where the same status, pay, hours, and benefits could be maintained, but there was no position equivalent to that of Town Administrator to which Connor could be transferred. Accordingly, in December [*20] 2003, Hammond, the acting Town Administrator–at the direction of Selectmen Mills, LeMay, Padgett, and Adams–transferred Billings to a secretarial position in the Recreation Department. She was told that she was being transferred so that the Town could accommodate Connor's medical condition. With the permission of his physician, Connor returned to work part-time on December 22, 2003.

### 4. The Town's Refusal to Re–Transfer Billings after Connor's Departure

After Billings was transferred, the Town advertised her former position and interviewed candidates. It hired Cindy Ide effective March 1, 2004. Since that time, she has performed well in that position.

Connor is no longer Town Administrator; his last day was February 24, 2006. The new Town Administrator started in April 2006.

Billings requested reinstatement to her former position effective the day after Connor's departure. The Town responded that her former position was filled by a permanent employee and denied her request. Hammond–who made the decision after discussing the request with the Board of Selectmen and town counsel–testified that it was not in the best interests of the Town. Granting her request would have meant [*21] transferring two employees (Billings and Ide) who were both performing well in their current positions. Billings considers this refusal a further act of retaliation. Hammond contends that it was a decision made solely to facilitate the efficacy and continuity of Town operations.

### 5. The Instruction to Avoid the Selectmen's Office

According to Billings, as of January 2004, Hammond

barred her from being in the Selectmen's office for any reason whatsoever, even though she had legitimate work reasons to be there, in order to prevent interaction between her and Connor. Hammond testified that he believed this was necessary to accommodate Connor upon his return from medical leave. This directive caused Billings to miss a training session regarding maintenance of the Town webpages. Hammond also instructed Hazen not to socialize with Billings on work time. Whenever she needs to speak to Hazen, she has to knock on the door and wait for her to come outside.

### 6. The Refusal to Accommodate the Litigation

Billings contends that the Town required her to use personal time to attend her deposition and the mediation of this case, but did not require other employees who were deposed [*22] to do so. She also complains that Hammond criticized her for failing to provide no more than a day's notice that she would be attending the mediation, despite the fact that he knew that she was required to attend.

### D. Investigation of Claims of Retaliation

Billings reported some of the alleged retaliatory acts to Loitherstein during the course of the spring 2003 investigation. In August 2003, Loitherstein obtained permission from the Town to investigate those allegations. In her report dated October 15, 2003, Loitherstein cited three occasions where Connor learned of a complaint by Billings and subsequently addressed performance issues with her that otherwise might have been left unaddressed or addressed in a less formal way. n14 Loitherstein found that Connor did not intend to treat Billings differently out of any animus or sense of revenge but felt constrained in addressing performance issues with her in light of her complaint against him. Loitherstein did not believe, however, that there was any tangible effect on Billings's job.

> n14 The first occasion was Connor's discussion with Billings about her question at the August 2001 Selectmen's meeting, which occurred shortly after he learned that Billings accused him of sexual harassment. The second was Connor's report to the Selectmen regarding the letter-opening incident, which occurred within a few weeks of the service of Billings's MCAD complaint. The third was the issuance of the two memoranda to Billings on April 1, 2003, which occurred shortly after Connor learned that Billings had sent a letter to the Selectmen accusing him of continued harassment.

[*23]

### E. Complaint of Retaliation with the MCAD

On March 5, 2004, Billings filed a retaliation charge with the Equal Employment Opportunity Commission ("EEOC") and the MCAD based on the alleged adverse action taken against her after she filed her first MCAD complaint, including, primarily, the involuntary job transfer. Billings asked both the MCAD and the EEOC to dismiss the new retaliation charge upon filing to allow her to move to add the claim to this case. On April 8, 2004, the EEOC issued a notice of right to sue. As noted above, the Court granted leave to supplement her complaint to add further allegations of retaliation.

## II. Legal Analysis

### A. Standard of Review

The role of summary judgment is "to pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." *Mesnick v. General Elec. Co., 950 F.2d 816, 822 (1st Cir. 1991)* (quoting *Garside v. Osco Drug, Inc., 895 F.2d 46, 50 (1st Cir. 1990)*). The burden is upon the moving party to show, based upon the pleadings, discovery, and affidavits, "that there is no genuine issue as to any material fact and that the moving party [*24] is entitled to a judgment as a matter of law." *Fed. R. Civ. P. 56(c)*. Once the moving party has satisfied its burden, the burden shifts to the nonmoving party to set forth specific facts showing that there is a genuine, triable issue. *Celotex Corp. v. Catrett, 477 U.S. 317, 324, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986)*. The court must view the entire record in the light most hospitable to the nonmoving party and indulge all reasonable inferences in that party's favor. *O'Connor v. Steeves, 994 F.2d 905, 907 (1st Cir. 1993)*.

### B. Retaliation

Counts II and IV of the complaint assert claims of retaliation under Title VII and Mass. Gen. Laws Chapter 151B, respectively.

The anti-retaliation provisions of Title VII state as follows:

> [i]t shall be an unlawful employment practice for an employer to discriminate against any of his employees . . . because he has opposed any practice made an unlawful employment practice by [Title VII], or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under [Title VII].

*42 U.S.C. § 2000e-3(a)* [*25] . Similarly, Chapter 151B provides that it is an unlawful practice "[f]or any person [or] employer . . . to discharge, expel or otherwise discriminate against any person because he has opposed any practices forbidden under [Chapter 151B]," *§ 4(4)*, or "[f]or any person to coerce, intimidate, threaten, or interfere with another person in the exercise or enjoyment of any right granted or protected by [Chapter 151B]," *§ 4(4A)*.

A plaintiff must establish three elements to prove a *prima facie* case of retaliation under either statute. Under Title VII, the plaintiff must establish that (1) she engaged in protected conduct, (2) she suffered a materially adverse action in that it "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination," and (3) there is a causal connection between the protected activity and the adverse action. *Burlington Northern & Santa Fe Ry. v. White, 548 U.S. , 2006 U.S. LEXIS 4895, 2006 WL 1698953, at *10 (June 22, 2006)*; *Noviello v. City of Boston, 398 F.3d 76, 88 (1st Cir. 2005)*. n15 Under Chapter 151B, the first and third elements *of the prima facie* case are the same; the second [*26] element apparently requires that there be a materially adverse employment action. *See MacCormack v. Boston Edison Co., 423 Mass. 652, 662, 672 N.E.2d 1 (1996)* (plaintiff must establish adverse employment action "substantial enough to count as the kind of material disadvantage that is a predicate for a finding of unlawful retaliation"); *Ritchie v. Dep't of State Police, 60 Mass. App. Ct. 655, 664, 805 N.E.2d 54 & n. 16 (2004)* (plaintiff must show that she suffered an "adverse employment action"; in the case of claim for coercion, intimidation, or threats under § 4(4A), the threat itself suffices to meet this prong). n16

n15 In *Burlington Northern*, the Supreme Court resolved a disagreement among the circuits as to whether the alleged retaliatory action must be related to the plaintiff's employment and the "level of seriousness to which [the harm from the action] must rise before it becomes actionable retaliation." *548 U.S. , 2006 U.S. LEXIS 4895, 2006 WL 1698953, at *3, *10.* The Court held that Congress intended that the alleged retaliatory action "produce[] an injury or harm;" that harm must transcend the "trivial" and rise to the level of harm that is "materially adverse." *2006 U.S. LEXIS 4895, [WL] at *10.*

[*27]

n16 But see *Mole v. Univ. of Massachusetts, 442 Mass. 582, 591, 814 N.E.2d 329 & n. 14 (Mass. 2004)* (stating that plaintiff must show "some adverse action"; issue in case did not concern this element, however, but causation).

The claimed retaliatory actions in this case are clearly connected to Billings's employment, so the distinction between the statutes is not significant here. The primary issue, as fully explained below, is whether a jury could find that they are *materially* adverse.

Under both statutes, once the plaintiff has established this *prima facie* showing, defendant must articulate a legitimate, nonretaliatory reason for its action in order to avoid summary judgment. *Valentin-Almeyda v. Municipality of Aguadilla, 447 F.3d 85, 95 (1st Cir. 2006); Mole, 442 Mass. at 591.* If the defendant meets this burden, plaintiff must show that the decision was a pretext for the defendant's retaliatory animus. *Valentin-Almeyda, 447 F.3d at 95; Mole, 442 Mass. at 591; see also Abramian v. President & Fellows of Harvard Coll., 432 Mass. 107, 121, 731 N.E.2d 1075 (2000)* [*28] (plaintiff must show that the employer's "desire to retaliate against [him] was a determinative factor in its decision."). The fact that a plaintiff is unable to establish an underlying discrimination claim–which the Court previously concluded with respect to Billings's sexual harassment claim–does not mean that she cannot establish a claim for retaliation. *Mesnick, 950 F.2d at 827; Abramian, 432 Mass. at 121-22.*

Here, there is no dispute that Billings engaged in protected activity. The parties disagree, however, as to whether Billings has satisfied the second and third elements of a retaliation claim. Specifically, defendants contend that Billings did not suffer a materially adverse action because her transfer to her current position was a lateral move with no loss of compensation, benefits, or other material accouterments of employment. Defendants also argue that the other retaliatory acts of which she complains do not rise to a materially adverse action. Finally, defendants argue that her transfer, the Town's recent refusal to reinstate her, and the other acts of which she complains were not causally connected to her sexual-harassment complaints. [*29]

**1. Materially Adverse Action**

The first issue is whether the acts alleged to have been taken against Billings rise to the level of a "materially adverse" action such that it "well might have dissuaded a reasonable [person] from making or supporting a charge of discrimination." n17 *Burlington Northern, 548 U.S. , 2006 U.S. LEXIS 4895, 2006 WL 1698953, at *10; see also MacCormack, 423 Mass. at 662* (action must be to plaintiff's material disadvantage).

n17 Billings also argues that, under *M.G.L. c. 151B, § 4(4A)*, retaliation claims can be based on allegations of coercion, threats, intimidation, and interference, which do not require proof of an ad-

verse employment action. *See Mole, 442 Mass. at 592 n. 14* ("Under *§ 4(4A)*, adverse action is any action 'to coerce, intimidate, threaten, or interfere with' the plaintiff."); *Ritchie, 60 Mass. App. Ct. at 664-65 & n.16* (same). Billings has not argued that any of the acts of which she complains coerced, intimidated, threatened, or interfered with her in the exercise or enjoyment of her rights under 151B. In any event, the requirement of materiality also applies to *§ 4(4A)* actions. *See Bain v. City of Springfield, 424 Mass. 758, 760, 765-66, 678 N.E.2d 155* (supervisor's communication to plaintiff that mayor told supervisor to "get rid of" her, in context of supervisor's reprimand that she not go over his head to criticize mayor, constituted actionable threat or intimidation; mayor's actions that suggested that he was avoiding plaintiff, and was acting cold or hostile towards her, did not).

**[*30]**

Adverse employment actions include "demotions, disadvantageous transfers or assignments, refusals to promote, unwarranted negative job evaluations, and toleration of harassment by other employees." *Hernandez-Torres v. Intercontinental Trading, Inc., 158 F.3d 43, 47 (1st Cir. 1998); see MacCormack, 423 Mass. at 662* (requiring a materially disadvantageous change in working conditions). Whether an action is adverse is measured by an objective standard. *Burlington Northern, 548 U.S. at , 2006 U.S. LEXIS 4895, 2006 WL 1698953, at *10; Marrero v. Goya of Puerto Rico, Inc., 304 F.3d 7, 23 (1st Cir. 2002); MacCormack, 423 Mass. at 663.* Where an adverse action is alleged to have occurred in the workplace, it is materially adverse if the employer "(1) take[s] something of consequence from the employee, say, by discharging or demoting her, reducing her salary, or divesting her of significant responsibilities or (2) withhold[s] from the employee an accouterment of the employment relationship, say, by failing to follow a customary practice of considering her for a promotion after a particular period of service." *Blackie v. Maine, 75 F.3d 716, 725-26 (1st Cir. 1996)* [*31] (citations omitted). The "creation and perpetuation of a hostile work environment" can also constitute a materially adverse action under Title VII and Chapter 151B. *Noviello, 398 F.3d at 88.*

An ostensibly lateral job transfer can be a materially adverse action if it is in substance a demotion. *Marrero, 304 F.3d at 23.* In *Marrero*, the First Circuit explained that "a transfer or reassignment that involves only minor changes in working conditions" normally is not actionable, even if it causes the plaintiff to feel "stigmatized and punished." *Id. at 23-25.* But a transfer that results in an objectively "more tangible change in duties or work-

ing conditions" can be a materially adverse action. *Id. at 25* (internal quotation omitted). Similarly, a change in the type of work that an employee performs does not always equal a demotion–particularly when the perceived adverse change is based on the employee's subjective preferences as opposed to a change in responsibilities so significant as to constitute a setback to the employee's career. *See Rodriguez v. Bd. of Educ., 620 F.2d 362, 366 (2d Cir. 1980)* (finding [*32] an adverse employment action where the transfer would have radically changed the nature of plaintiff's work and rendered useless her 20 years of experience and specialized study), *cited with approval in Marrero, 304 F.3d at 24.*

In most respects, Billings's current position is equivalent to her prior position. She enjoys the identical salary and benefits; even her opportunity for future salary increases remains substantially the same. n18 Her duties are, for the most part, the same in both positions: typing, copying, answering the telephone, and assisting the public. It is true that her new position is slightly less prestigious than working for the Town's highest executive employee, and that her current job (on paper) requires lesser qualifications. An objectively reasonable loss of prestige is one factor suggesting that a change of duties may constitute a materially adverse action. *Burlington Northern, 548 U.S.    , 2006 U.S. LEXIS 4895, 2006 WL 1698953, at *12* (plaintiff's former job duties required more qualifications, which was an indication of more prestige, and were objectively considered better than her new duties; this, in addition to the fact that her [*33] new duties were "by all accounts more arduous and dirtier," supported jury verdict in her favor). Here, however, the difference in prestige is objectively slight, and Billings's complaints arise largely out of her own subjective feelings of disappointment. *See MacCormack, 423 Mass. at 663.* n19 Furthermore, she did not have more onerous duties in the new position, or indeed very different duties at all. It is true that she was no longer able to handle mail that included highly confidential information concerning legal matters and lawsuits. But she admitted that in her former position she had no substantive input into these matters, and indeed that she was not even required to review the correspondence. Nor is there any evidence that this occupied any substantial amount of her time.

n18 The only apparent financial difference is the fact that in her new position she is required to pay union dues.

n19 Similarly, in *Serna v. City of San Antonio*, the plaintiff police officer contended that his transfer from a foot and bike patrol unit to a patrol unit in another part of the city was an adverse employment action for purposes of his *First Amendment* retal-

iation claim' because the former assignment was considered to be prestigious and the plaintiff personally preferred it. *244 F.3d 479, 483–84 (5th Cir. 2001), cited with approval in Marrero, 304 F.3d at 25.* The court held that these subjective criteria were insufficient to establish that plaintiff suffered an adverse employment action. *Serna, 244 F.3d at 485.*

[*34]

On the whole, her loss of job responsibilities, and the episodic and more formalized criticism that she encountered from Connor, are similar to the facts detailed by the First Circuit in *Marrero*. In that case, plaintiff's transfer to another secretarial position came with more work for her (that appeared to be temporary), an increased scrutiny of her performance, a probationary period to ensure that she could handle the new duties, and an instruction not to handle certain confidential mail and phone calls. The First Circuit concluded that the transfer was not a materially adverse employment action, judged by an objective standard, because the changes did not amount in substance to a demotion. *304 F.3d at 25.* It was not enough that the plaintiff felt "stigmatized and punished by the transfer." *Id.* By the same token, the facts of Billings's transfer are far removed from those cases where courts have found that the plaintiffs did suffer materially adverse actions as a result of a job transfer or the removal of significant responsibilities. *See, e.g., Melendez–Arroyo v. Cutler–Hammer de P.R. Co., 273 F.3d 30 (1st Cir. 2001); cf. Simas v. First Citizens' Federal Credit Union, 170 F.3d 37 (1st Cir. 1999).* [*35]

The fact that Billings's reporting structure also changed does not require a different conclusion. For example, in *Flaherty v. Gas Research Institute*, the plaintiff argued that the fact that in his new position he report to a former subordinate, whereas he previously reported to a senior vice president, demonstrated that a facially lateral transfer was in substance a demotion. *31 F.3d 451, 457 (7th Cir. 1994).* The Seventh Circuit disagreed, reasoning that the change was "largely semantic where the employee's salary, benefits, and level of responsibility would remain unchanged." *Id.* Being placed lower on the organizational totem pole may have bruised plaintiff's ego, but it was not enough to establish a materially adverse employment action. *Id.* Likewise, in *MacCormack*, the plaintiff claimed that a department reorganization that resulted in a different reporting structure for him was a retaliatory adverse employment action. *423 Mass. at 661.* The Supreme Judicial Court ruled that plaintiff's complaints "amoun[ted] to no more than subjective feelings of disappointment and disillusionment" because he did not establish that "he had been disadvantaged [*36] in

respect to salary, grade, or other objective terms and conditions of employment." *Id.* at 663.

The other evidence, whether considered individually or as a whole, does not amount to a materially adverse action. In the context of this case, "[t]o be adverse, an action must materially change the conditions of plaintiff['s] employ." *Gu v. Boston Police Dep't, 312 F.3d 6, 14 (1st Cir. 2002).* There is no evidence that her prohibition from the Selectmen's office or the ban on social contact with Hazen during office hours have materially affected her. In any event, they are not materially adverse actions under the circumstances. Likewise, the criticism about her job performance and the reprimand, while certainly unpleasant, were not shown to have had any tangible impact on her employment or future employment relationship. *See Hernandez-Torres, 158 F.3d at 47* (supervisor's admonition to complete work within a specified time period "or else" not an adverse employment action); *Rodriguez v. Potter, 419 F. Supp. 2d 58, 66 (D.P.R. 2006)* (formal warning letter, not accompanied by any loss of pay or benefits, and not used as [*37] a precedent to any other action, not an adverse employment action); *Bain, 424 Mass. at 765–66* (that mayor acted "coldly" or had hostile body language toward city employee, and that her supervisor "second-guessed her" were "subjective and intangible impressions" that could not be considered retaliatory actions); *cf. Noviello, 398 F.3d at 89* (for retaliatory harassment to be actionable, it must be so severe or pervasive to materially alter the conditions of plaintiff's employment); *Thomas v. Eastman Kodak Co., 183 F.3d 38, 54–55 (1st Cir. 1999)* (for statute of limitations purposes, a negative performance evaluation will not trigger the running of the statute unless the plaintiff is on notice of its "tangible consequences"). n20 None of the acts are likely to dissuade an objectively reasonable person in plaintiff's position from complaining about unlawful acts of discrimination. *See Burlington Northern, 548 U.S. at , 2006 U.S. LEXIS 4895, 2006 WL 1698953, at *5.*

n20 Connor's more formal treatment of Billings after the filing of the lawsuit appears to be a normal response to a naturally awkward situation, not a materially adverse action. It is unrealistic to think, even under the best of circumstances, that parties on the opposite sides of litigation would not interact with each other somewhat more formally or stiffly. *See, e.g., Bain, 424 Mass. at 759–61, 765–66* (after plaintiff charged mayor with bypassing her for a position because of "blatant discrimination," he acted coldly toward her, avoided making eye contact and talking directly to her, and discounted the things she said in a meeting with others; this was not actionable retaliatory conduct).

[*38]

Finally, because her transfer did not rise to the level of a materially adverse action, the Town's refusal to reinstate her to her prior position cannot be one either. *See LePique v. Hove, 217 F.3d 1012, 1013–14 (8th Cir. 2000); Craven v. Texas Dep't of Criminal Justice, 151 F. Supp. 2d 757, 766 (N.D. Tex. 2001).*

Plaintiff has thus failed to establish facts sufficient to support the second element of her retaliation claim.

## 2. Causation

The final element of plaintiff's retaliation claim is causation. Billings must establish facts sufficient to show that a causal connection existed between her protected conduct and the allegedly adverse actions. *Mesnick, 950 F.2d at 828; see Abramian, 432 Mass. at 121.*

Billings's principal causation argument is straightforward: she argues that her complaints against Connor were the *only* reason that she was transferred to the Recreation Department. In the "but–for causation" sense, that is literally true. If not for her complaints, Connor would not have obtained a medical opinion that a separation from Billings was necessary for his health, and the Selectmen would not [*39] have made the decision to transfer her. However, while that is sufficient to establish the element of causation for purposes of a *prima facie* case, it is not enough to survive summary judgment.

Defendants have articulated a non-retaliatory reason for the decision to transfer Billings: the transfer was an accommodation to the health-related concern raised by Connor's physicians. They have also articulated a non-retaliatory reason for the decision not to reinstate her to her prior position: the fact that a new employee had been hired for that position and therefore substantial disruption would ensue from a reinstatement. Accordingly, Billings must proffer sufficient evidence that "the legitimate reasons offered by the defendant[s] were not [their] true reasons, but were a pretext" for a desire to retaliate. *Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 143, 120 S. Ct. 2097, 147 L. Ed. 2d 105 (2000)* (internal quotation omitted); *accord Mole, 442 Mass. at 591.* At that point, whether judgment is appropriate will depend on a number of factors, including "the strength of the plaintiff's prima facie case, the probative value of the proof that the employer's explanation is [*40] false, and any other evidence that supports the employer's case and that properly may be considered on a motion for judgment as a matter of law." *Reeves, 530 U.S. at 148–49.*

In short, to survive summary judgment, Billings must put forth evidence that the stated reasons for the transfer

were pretextual. It is not enough that her allegations of sexual harassment set in motion a chain of events that led to her transfer.

Billings does not dispute that it was the Selectmen, not Connor, who made the decision to transfer her. She does not offer any evidence to suggest that their decision was somehow not independent. Furthermore, she has offered no evidence that any of the Selectmen acted out of a retaliatory animus. n21 Indeed, Billings has not controverted the only evidence in the record as to the stated reason for the transfer: two medical professionals expressed the opinion that Connor's stress level needed to be reduced, and one specifically stated that Connor needed to be separated from Billings in the work environment. n22

> n21 The fact that one Selectman (who is not a defendant) dissented on the grounds that the transfer might be perceived to be retaliatory is not evidence of retaliation; in fact, he testified that he did not believe that it was retaliatory.

[*41]

> n22 The fact that the Selectmen twice offered her voluntary transfers to other secretarial positions–which she refused–does not change the analysis. Ordinarily, an offer of a lateral transfer by an employer to an employee who had sued her direct supervisor for sexual harassment would reflect appropriate concern for the well-being of the employee. The fact that she was not involuntarily transferred at the time she refused the offers, but continued to work in her position for many more months (and that she was not involuntarily transferred until after Connor's heart attack and medical request), does not suggest in any way retaliatory animus by the Selectmen.

The Selectmen's decision was also objectively reasonable under the circumstances. Clearly something had to be done; it was unrealistic to expect that Connor and Billings, under the circumstances, would work together amicably and indefinitely. The Selectmen could not transfer Connor, as there was no comparable position anywhere in the Town. They could have credited Billings's accusations, and discharged Connor for cause; but at the time the [*42] decision was made, three successive internal investigations had failed to substantiate her claims. n23 Instead, the Selectmen chose to transfer Billings to a reasonably comparable position without any loss of pay or benefits. n24 While it was not a perfect solution, it was objectively reasonable, and Billings has put forth no evidence that it was pretextual or otherwise based on retaliatory animus.

> n23 Her allegations of retaliation by Connor had also been discredited by an independent investigator.

> n24 Billings complains that the transfer decision was made without seeking an independent medical evaluation, and without much, if any, discussion as to possible alternatives. However, she has not put forth any evidence to controvert those medical opinions or to identify any alternative, such as a position to which Connor could reasonably have been transferred.

Her other causation arguments may be disposed of summarily. She essentially alleges that, in addition to the transfer, other adverse actions (e.g., her [*43] reprimand for opening mail, the bar from the Selectmen's office, the charging of personal time in connection with the lawsuit, and the more formal treatment by Connor) were taken in retaliation for her complaints of sexual harassment. Her causation argument is largely based on the temporal relationship of various events: she contends that each of her complaints of harassment was followed by an action taken against her. n25

> n25 "The mere fact that one event followed another is not sufficient to make out a causal link" of retaliation. *Mole, 442 Mass. at 592* (quoting *MacCormack, 423 Mass. at 662 n. 11*). This is true even as to events that follow closely in time. "Were the rule otherwise, then a disgruntled employee, no matter how poor his performance or how contemptuous his attitude toward his supervisors, could effectively inhibit a well-deserved discharge by merely filing, or threatening to file, a discrimination complaint." *Mesnick, 950 F.2d at 828; accord Mole, 442 Mass. at 592.*

[*44]

As set forth above, those events do not amount to materially adverse actions under the circumstances of this case. Moreover, even assuming that Billings can establish *prima facie* causation, in each instance there is uncontroverted evidence of a non-retaliatory reason and an absence of evidence as to pretext. The bar from the Selectmen's office was ordered by Hammond in order to effectuate a complete separation of Connor from Billings. The charging of personal time was also ordered by Hammond, on the basis that Billings (who was the plaintiff) was not on Town business during her deposition and mediation, but that other employees (who were mere fact witnesses) were. The reprimand was issued by LeMay after Billings admittedly opened mail marked "personal

2006 U.S. Dist. LEXIS 47270, *44

and confidential." Finally, while Connor admitted that he treated her more formally because of the lawsuit, as noted above, that was a normal reaction to the tensions inherent in the circumstances, and cannot form the basis of a claim of retaliation.

To summarize, there is no question that the transfer of Billings from the Town Administrator's office to the Recreation Department was directly related to her complaints of sexual harassment. [*45] Nonetheless, it is not actionable retaliation. The transfer was not a materially adverse action because it was not in substance a demotion and did not otherwise involve material changes in her work environment. Furthermore, according to the uncontroverted evidence, the transfer decision was made by the Board of Selectmen in response to independent medical recommendations that were not motivated by a retaliatory animus. Defendants' motion for summary judgment will therefore be granted.

## III. Conclusion

For the reasons set forth above, Plaintiff's Motion to Supplement Summary Judgment Record to Include Additional Allegations of Material Fact Concerning Post-Motion Events is GRANTED and Defendants' Renewed Motion for Summary Judgment on Plaintiff's Retaliation Claims is GRANTED.

**So Ordered.**

/s/ F. Dennis Saylor

United States District Judge

Dated: July 5, 2006