UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

_____

)
RHONDA HALL,                                    )
                                                )     CIVIL ACTION NO. 05-30002-MAP
                            Plaintiff,          )
        v.                                      )
                                                )
VERIZON COMMUNICATIONS, INC.,  and )
VERIZON NEW ENGLAND, INC.                )
                                                )
                            Defendants.          )     AUGUST 18, 2006
                                                )
_____

## DEFENDANTS' LOCAL RULE 56.1 STATEMENT OF UNDISPUTED MATERIAL FACTS AS TO WHICH THERE ARE NO GENUINE ISSUES TO BE TRIED

Defendants Verizon Communications, Inc. and Verizon New England, Inc. (collectively referred to herein as "Defendants" or "Verizon") hereby submit, pursuant to L. Civ. R. 56.1 their Statement of Undisputed Material Facts as to which there are no genuine issues to be tried. This statement is submitted in support of Defendants' Motion for Summary Judgment, and Memorandum of Law in Support thereof, both of which are filed herewith.

1.      Verizon had an anti-harassment policy in place at the time of all of Plaintiff's various allegations against her coworkers and others. (McGovern Dep. Exh. 1.)[1]

2.      Plaintiff began her employment at Verizon in March, 1989, and held various positions until, in January 2000, she was assigned as a Central Office Technician ("CO Tech") to Verizon's Holyoke Central Office ("CO").  (Hall Dep. 15-16.)[2]

_____

[1] Exhibits from the deposition of Paul McGovern are attached at Exhibit A.

[2] Pages from the deposition of Rhonda Hall are attached at Exhibit B.

3.      Also assigned to the Holyoke CO were two other CO Techs, Eugene "Skip" Pula and Michael Stawacz.  (Hall Dep. 6.)

4.      As a CO Tech, Plaintiff was a member of the IBEW.  (Hall Dep. 21.)

5.      Plaintiff's responsibilities included responding to calls and questions from outside technicians, who would seek assistance from the CO Techs on the phone or in person regarding customers' service in the field.  (Hall Dep. 6-7.)

6.      As a CO Tech, Plaintiff reported to Jack Lynch, the first level supervisor or "turf team leader," who in turn reported to George Savaria, the second level manager.  (Hall Dep. 13-14, 223.)

7.      Lynch's office was at Verizon's Central Office on Worthington Street in Springfield, and he visited the Holyoke CO a few times each month.  (Hall Dep. 54-55.)

8.      In August 2002, a steward of Plaintiff's union, Julie Kilbride, advised Plaintiff that the outside technicians had complained about her failure to answer the phone at the Holyoke CO when they called for assistance.  (Hall Dep. 183-85.)

9.      As a result of this conversation with Kilbride, Plaintiff complained to Lynch that outside technicians visiting the Holyoke CO had used race-related and other inappropriate language and had left her workspace in disarray.  (Hall Dep. 139, 196, 183-85.)

10.     Verizon immediately convened a meeting to discuss Plaintiff's concerns, which Plaintiff, her union president, Lynch, and Savaria attended.  (Hall Dep. 185; Lynch Dep. 45-46; Lynch Dep. Exhs. 1 & 2.)[3]

11.     Plaintiff reported in this meeting that other fellow union employees had told jokes and made comments regarding various racial or ethnic groups and had made statements such as "your job is to serve us [outside technicians]."  (Hall Dep. 137, 143, 196.)

12.     At that meeting, Plaintiff also reported that an outside technician had asked her, "Why do you guys get mad when we say "nigger" when you say it all the time?"  (Hall Dep. 139; Lynch Dep. Exhs. 1 & 2.)

13.     Because Plaintiff's report was that only outside technicians had engaged in inappropriate language and conduct, Lynch and Savaria limited outside technicians' visits to the Holyoke CO.  (Lynch Dep. 51-52; Lynch Dep. Exh. 2.)

14.     During the August 2002 meeting, Plaintiff never complained about Pula or Stawacz, her co-workers in the Holyoke CO.  (Lynch Dep. Exhs. 1 & 2.)

15.     As a result of Plaintiff's complaints about their inappropriate conduct, Verizon issued verbal reprimands to outside technicians.  (Lynch Dep. Exh. 2.)

16.     After the August 2002 meeting, Plaintiff confirmed for Lynch that she no longer had any problems at the Holyoke CO and told him that the outside technicians no longer spent time there. (Hall Dep. 182; Lynch Dep. 51-52.)

_____

[3] Pages from the deposition of Jack Lynch are attached at Exhibit C.  Exhibits from the deposition of Jack Lynch are attached at Exhibit D.

17.     On September 5, 2002, while Pula and Plaintiff were in the Holyoke CO, Pula cut a lock of Plaintiff's hair with pliers, just as Plaintiff was saying she could not find her pliers. (Hall Dep. 46-47; Hall Dep. Exh. 1 at 000099.)[4]

18.     Plaintiff did not report this conduct to Lynch or any other manager immediately; rather, she mentioned the event to a fellow CO Tech and the union steward, Kathy Collins, when Collins called Plaintiff for an unrelated reason that day.  (Hall Dep. 49.)

19.     Collins told Lynch that Plaintiff had reported to her that Skip Pula had cut Plaintiff's hair.  (Hall Dep. 49.)

20.     Lynch immediately went to the Holyoke CO and spoke to Plaintiff and to Pula about what had happened.  (Hall Dep. 54-57.)

21.     After Lynch left the Holyoke CO that day, Plaintiff called him, stated that she was not happy with her treatment at the Holyoke CO.  (Hall Dep. 66-67.)

22.     As a result of this call with Plaintiff and his understanding of the situation, Lynch planned to meet the next day with the three CO Techs assigned to the Holyoke CO: Plaintiff, Pula, and Stawacz. (Lynch Dep. 103; Hall Dep. 82.)

23.     Plaintiff never reported to work at Verizon again after September 5, 2002.  (Hall Dep. Exh. 9 at 000310.)

24.     On Friday, September 6, 2002, she called Lynch and informed him that she was taking a sick day.  (Hall Dep. 83-84.)

---

[4] Exhibits from the deposition of Rhonda Hall are attached at Exhibit E.

25.    Lynch advised Plaintiff that he had planned a meeting of the Holyoke CO Techs that very morning, and told her that they could do it on Monday, September 9, 2002, at which point Plaintiff said she would not be at work on Monday, either.  (Hall Dep. 82.)

26.    Plaintiff also requested to meet with Savaria.  (Hall Dep. 82.)

27.    At Plaintiff's request, Lynch arranged for a meeting to take place on Tuesday, September 10, 2002, with Plaintiff, Lynch, Savaria, Collins, and the union president.  (Hall Dep. 82.)

28.    This meeting took place at Verizon's Worthington Street facility.  (Hall Dep. Exh. 1 at 000104.)

29.    At this meeting, Plaintiff expressed concerns about Pula's treatment of her, including but not limited to the pliers incident, and she also complained for the first time about conduct by Lynch.  (Hall Dep. 153.)

30.    Plaintiff complained for the first time in this September 2002 meeting that Lunch told her, in the presence of her co-workers, that she was acting like a "bitch" (Hall Dep. 153) and that after she started in the Holyoke CO in January 2000, Lynch asked her if she would be able to do her job with long fingernails.  (Hall Dep. 45, 200-01.)

31.    The only occasion in which Plaintiff observed Lynch engaging in any inappropriate conversations about women was the one occasion where he allegedly referred to her as a bitch.  (Hall Dep. 213.)

32.     As a result of this meeting, Plaintiff was referred to Verizon's EEO department, and Paul McGovern of that department investigated her concerns.  (Hall Dep. 88, 95, 111-12.)

33.     After his investigation, which included interviews of Plaintiff, Pula, and Lynch, among others, McGovern concluded that no unlawful conduct had occurred.  (Lynch Dep. Exh. 7.)

34.     McGovern nonetheless recommended that Pula receive a written warning, because his act of cutting Plaintiff's hair violated Verizon policy; Pula was so disciplined. (Lynch Dep. Exhs. 5 & 7.)

35.     Beginning in September 2002, Plaintiff sought treatment from a mental health care provider, and she was approved for short term disability benefits.  (Savaria Dep. Exhs. 12 & 13; Plaintiff's Prod. 000354-55.)[5]

36.     Plaintiff's treatment providers and the short term disability carrier cleared her to return to work on January 13, 2003, at which point her disability benefits ceased.  (Hall Dep. 226.)

37.     Because Plaintiff's mental health care providers requested that Plaintiff be given a different working environment (Hall Dep. Exh. 9), Verizon offered Plaintiff a CO Tech position in the Worthington Street facility (Hall Dep. 222, 225.).

38.     At the Worthington Street facility in Springfield, Plaintiff would not have regular contact with those employees whom she had accused of harassment. (Hall Dep. 219.)

---

[5] Exhibits from the deposition of George Savaria are attached at Exhibit F.  Pages from Plaintiff's production of documents are attached at Exhibit G.

39.     Plaintiff refused this transfer (Hall Dep. 222, 225), and failed to suggest an alternative location for her return to work (Hall Dep. 228, 238).

40.     Verizon advised Plaintiff to return to work by May 27, 2003, and, when she did not do so, Savaria and Paul LaBonte, Savaria's supervisor, terminated her employment.  (Hall Dep. Exh. 7; Savaria Dep. 101.)[6]

41.     Verizon sent a written notice of termination, citing Plaintiff's failure to return to work as the reason for termination.  (Hall Dep. Exh. 7.)

42.     In August 2003, Plaintiff began work at a child care center.  (Hall Dep. 231.)

43.     From September 2002 through August 2003, Plaintiff took care of her young son (Hall Dep. 40), participated in PTA meetings at her son's school (Hall Dep. 36), served on the advisory board of a nonprofit organization (Hall Dep. 37-38), attended church twice a week (Hall Dep. 40), taught children's church school (Hall Dep. 40), and cared for her grandmother who lives in her home (Hall Dep. 41).

44.     Plaintiff filed a charge with MCAD on October 7, 2002 (Hall Dep. Exh. 8), and she commenced this lawsuit on or about January 10, 2005. (Complaint.)

---

[6] Pages from the deposition of George Savaria are attached at Exhibit H.

Respectfully submitted,

DEFENDANTS, VERIZON
COMMUNICATIONS, INC. AND
VERIZON NEW ENGLAND, INC.


/s/ Stacy Smith Walsh
  Victoria Woodin Chavey (*pro hac vice*)
  Stacy Smith Walsh (BBO No. 647420)
  Day, Berry & Howard LLP
  CityPlace I
  Hartford, Connecticut 06103-3499
  (860) 275-0100
  (860) 275-0343 (fax)
  vwchavey@dbh.com
  sswalsh@dbh.com
  Their Attorneys


## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on August 18, 2006, a copy of foregoing **Defendants' Motion for Summary Judgment** was filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the Court's CM/ECF System.


      /s/ Stacy Smith Walsh
      Stacy Smith Walsh

# EXHIBIT

# A



# *Connecting with Each Other*

## Non-Discrimination, Equal Opportunity and Diversity

Verizon is committed to establishing and maintaining a workplace that promotes diversity and is free from discrimination. Various laws also prohibit certain forms of discrimination. The company benefits by encouraging all employees to value and respect each other and maintain an environment supportive of individual differences, where each of us can participate and contribute free from discrimination. This consideration should also be extended to our business partners.

### Non-Discrimination

We will make all employment and other business decisions without discriminating on the basis of age, color, citizenship, disability, disabled veteran status, gender, race, religion, national origin, marital status, sexual orientation, military service or status or Vietnam-era veteran status.

Discrimination should not occur regarding terms and conditions of employment, including, but not limited to: recruitment, hiring, job benefits, compensation, training, performance appraisals, upgrading and promotional opportunities, assignment transfers, leaves of absence, lay-offs, returns from layoffs, providing work-related assistance or information, access to or participation in social and recreational programs, use of company equipment or facilities, disciplinary action and termination of employment.

> **See Also:** *Supplier Selection, p. 42*
> *Customer, Supplier or Competitor Discrimination, p. 51*

### Equal Opportunity and Diversity Efforts

We will fully support programs that encourage qualified women, minorities, disabled individuals, and Vietnam-era veterans or others to seek equal employment opportunities or business relationships with Verizon. We will also fully support other Verizon efforts to achieve a culture where diversity is valued.

### Reasonable Accommodations

We will make reasonable accommodations for employees and applicants as provided by law. We should contact the Human Resources Department for more information.

### Exclusionary Practices

For company business, we will only use facilities, sponsor events or maintain memberships at businesses or organizations that do not have exclusionary membership practices.

### Reporting Discrimination

We will immediately report any instances of discrimination that we know about or witness.

> **See Also:** *Reporting Channels, p. 5*

## Harassment

Verizon is committed to providing a harassment-free work environment. Harassing behavior demeans others, threatens productivity, can adversely affect the company's reputation and may violate the law.

> **See Also:** *Employee Assistance Program, p. 15*
> *Use of E-Mail and the Internet, p. 38*

### Harassment

We must not engage in any behavior that ridicules, belittles, intimidates, threatens or otherwise demeans co-workers or others associated with the company, including contractors, customers, suppliers, employment applicants or other business partners and competitors. Verizon also will not tolerate harassment by any of the parties mentioned above against a Verizon employee. Harassment can include making racist, sexist, or ethnic comments, jokes or gestures or hazing. Verizon prohibits harassment based on a person's race, color, gender, religion, national origin, age, disability, sexual orientation, or any other reason.

### Sexual Harassment

We must not engage in unwelcome sexual conduct or make unwelcome sexual overtures to co-workers, business partners or any others identified under **Harassment** previously.

This includes but is not limited to any behavior that:

- Requires or implies that another person's submission to or rejection of sexual advances will affect that person's employment. This can include hiring, job assignment or duties, shifts, compensation, appraisals, promotion or advancement, transfers, training opportunities, disciplinary action, termination, or any other conditions of employment or career development.

- Creates a hostile work environment for another that is sexually abusive, demeaning, intimidating, threatening or offensive. We will not request sexual favors, engage in visual, verbal or physical conduct of a sexual nature, display sexually suggestive objects or pictures, tell offensive jokes, use sexually suggestive language, or send sexually suggestive e-mail.

### Reporting and Addressing Harassment

We will immediately report any instances of harassment that we know about or witness. This may include sexual harassment or harassment based on a person's race, color, gender, religion, national origin, age, disability, sexual orientation, or any other reason. We will not retaliate against employees for filing a complaint of alleged harassment or for participating in an investigation of alleged harassment.

In some situations, such as when others tell offensive jokes, we can resolve this matter by speaking with the person and expressing our concerns. If we cannot resolve the matter in this way, or are uncomfortable doing so, we should consult with our manager, another manager, VZ EEO, and/or other relevant departments.

> **See Also:** *Reporting Channels, p. 5*

## Employee Privacy

As employees, we respect each other's privacy and should maintain this trust. At the same time, we recognize that this privacy is limited and subject to business needs.

### Handling Employee Information

We will:

- Only gather employee information that is required for effective business operation.

- Only access or use employee information for authorized business purposes.

- Safeguard this information when entrusted to us.

- Disclose employee information only:
  – To authorized personnel.
  – For legitimate reasons.
  – According to Verizon policies or applicable laws.

- Handle external requests for employee information according to company policies regarding employment verification and references.

*(continued)*

# EXHIBIT
# B

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

- - - - - - - - - - - - - x

RHONDA HALL,                    :

               Plaintiff, :  Civil Action No.

        vs.             :     05-30002

VERIZON COMMUNICATIONS, :     (MAP)

INC. and VERIZON NEW     :

ENGLAND, INC.,           :

            Defendants.:

- - - - - - - - - - - - - x

        Deposition of RHONDA HALL, taken

pursuant to the Federal Rules of Civil

Procedure at the law offices of Day, Berry &

Howard, CityPlace I., Hartford, Connecticut,

before Elizabeth A. Zawacki, LSR #00087, a

Registered Merit Reporter and Notary Public in

and for the State of Connecticut, on Friday,

December 2, 2005, at 10:26 a.m.

HALL v. VERIZON COMMUNICATIONS                    December 2, 2005

Page 6

1    transcript whether that would be a yes or a no.  So

2    I'll ask you to answer yes or no verbally to

3    questions.

4              Do you understand that?

5        A.    Yes.

6        Q.    Can you tell me what your title was at

7    Verizon at the time, on your last day of work?

8        A.    I was a central office technician.

9        Q.    Was that in the Holyoke office?

10       A.    Yes.

11       Q.    How many other central office technicians

12   were in the Holyoke office when you were there?

13       A.    Two.

14       Q.    Who were they?

15       A.    Mike Stawascz and Skip Pula.

16       Q.    Is there something at Verizon called

17   external technicians?

18       A.    Yes.

19       Q.    Did I use the right word for it?

20       A.    Outside technicians.

21       Q.    Did you have outside technicians that

22   worked in and around the office?

23       A.    Yes.

24       Q.    Now, did those outside technicians report

25   to the office?

1      A.    No.

2      Q.    What would be the reason that an outside

3   technician would have to come into the Holyoke

4   office?

5      A.    There are several different reasons.  It

6   could be to actually provide the customer service.

7   We are like the last point of contact that the

8   technician has before they give a customer service.

9   Or it could be a repair issue, it could be that

10  power, that lines went down and they had to come

11  into the office to check for dial tone from our

12  office.

13     Q.    Just so I understand, the central office

14  in Holyoke, are there switching facilities there,

15  like technical things that control phone service?

16     A.    Yes.

17     Q.    Another rule that I forgot to mention,

18  that it's really important that you let me finish my

19  question before you answer.  Lots of times deponents

20  like you know exactly where I'm going with the

21  question, so your tendency is to answer it before I

22  finish it, but the record will be clearer if you try

23  and let me finish first.  Okay?

24     A.    Yes.

25     Q.    So the outside technicians would come into

HALL v. VERIZON COMMUNICATIONS

December 2, 2005

Page 13

1    the phone when the phone rings.

2        Q.    Then it would get shipped to whichever one

3    of you was in the best position to fix the problem

4    or to help the technician out?

5        A.    Exactly.

6        Q.    So if it was a switching problem, perhaps

7    it would go to Mr. Stawascz or Mr. Pula because they

8    were on that side of the building?

9        A.    And because they were --

10        Q.    They had those skills?

11        A.    They had those skills.

12        Q.    You said you sat next to the frame?

13        A.    Yes.

14        Q.    So if it had to do with the frame, you

15    were more likely to keep the call or to get a call

16    transferred from one of the other two; is that

17    right?

18        A.    No.  If they answered the telephone, if

19    it's a frame question, then they come over and they

20    handle the situation.  They didn't necessarily if

21    they were in the middle of something, and I could

22    help out and I wasn't doing, busy doing my work,

23    then I would answer the phone call if they needed

24    it.

25        Q.    The person that you and Mr. Stawascz and

HALL v. VERIZON COMMUNICATIONS

```
1    Mr. Pula reported to was Jack Lynch; is that

2    correct?

3         A.    Yes.

4         Q.    Was that the same for the entire time you

5    worked in Holyoke?  Was he your supervisor for the

6    entire time?

7         A.    He was my primary supervisor.  There is

8    several in the office.

9         Q.    Who are the other supervisors in the

10   office?

11        A.    Jack -- Bob Cote.  Actually, I don't even

12   know if I can remember all their names.  George

13   Savaria was our second level supervisor.  It's been

14   a while.  I don't even remember all of their names,

15   but there was at least five of them I would say.

16        Q.    Those five, did they have offices or desks

17   in Holyoke, or did they have offices or desks

18   somewhere else?

19        A.    No, no supervisor, including Jack, had a

20   desk in Holyoke.

21        Q.    So the three of you were, just to confirm,

22   you were the only three employees physically located

23   on site in Holyoke?

24        A.    Yes.

25        Q.    Now, you worked for Verizon for 14 years,
```

December 2, 2005

Page 15

1    correct?

2        A.    Yes.

3        Q.    Where in Verizon were you working prior to

4    your getting the position as the central office tech

5    in Holyoke?

6        A.    I was a central office technician in

7    Springfield.

8        Q.    When did you move from being a CO tech in

9    Springfield to being a CO tech in Holyoke?

10       A.    January of 2000.

11       Q.    When did you start as a CO tech in

12   Springfield?

13       A.    I had only been doing that job

14   approximately a year, somewhere in there.

15       Q.    What did you do before you were a CO tech?

16       A.    I was an administrative assistant.

17       Q.    Where were you?  Were did you work as an

18   administrative assistant?

19       A.    In the Springfield office as well.

20       Q.    How long were you an administrative

21   assistant?

22       A.    Probably, again, about a year.

23       Q.    What about before that?

24       A.    I was an operator.

25       Q.    How long were you an operator?

HALL v. VERIZON COMMUNICATIONS

Page 16

1        A.      For -- I started my career as an operator,

2   so from '89.  I started in '89.

3        Q.      Almost ten years, nine to ten years.  Were

4   you always in Springfield?

5        A.      Yes.

6        Q.      Earlier we were talking about your job

7   duties as a central office technician.  You said as

8   a percentage of your time 25 percent of it was spent

9   helping the outside techs; is that right?

10       A.      Approximately I would say.

11       Q.      I understand that's an estimate.

12               What was the other 75 percent of your job

13  responsibilities?

14       A.      To wire lines, new service.

15       Q.      Anything else?

16       A.      To assist other company employee who might

17  call up with an issue or a problem, to clear

18  tickets.

19       Q.      What does that mean, to clear tickets?

20       A.      If there's a machine that comes across and

21  if there's a problem, if a customer may report or

22  someone, a customer might report or a technician

23  might report that there's a problem with the line,

24  then they would send over what they would call a

25  ticket, which is a report for us to check the line,

HALL v. VERIZON COMMUNICATIONS

Page 21

1  but it's a computer that works, that's specific to

2  the phone company.  It's not like, it wasn't like a

3  personal computer that I would work on and it was

4  just specific to me.  As a matter of fact, any

5  technician that was a central office technician

6  could utilize it to pull off their work.

7      Q.    Was that true of all the computers in the

8  area?  In other words, could you have gone to the

9  computer on Mr. Stawascz' desk and done the same

10  thing?

11      A.    Yes.

12      Q.    Were all of the computers that you have

13  described as being in that work area, both in

14  Mr. Stawascz' and Mr. Pula's area and your area,

15  would you describe all of them as the phone

16  company-type computers that were not like personal

17  computers?

18      A.    Right.

19      Q.    You were a member of the union when you

20  were employed at Verizon; is that right?

21      A.    It's a closed shop.

22      Q.    So that's yes, then?

23      A.    Yes.

24      Q.    Do you remember who your union steward was

25  at the time you worked there?

1  say, sponsored by a church or a local community

2  group?

3      A.     I belong to Saint John's Congregational

4  Church.

5      Q.     How long have you belonged there?

6      A.     About, it's been about five years.

7      Q.     You have a son, right?

8      A.     Yes, I do.

9      Q.     He's how old?

10     A.     He's 11.

11     Q.     Does he go to public school in

12  Springfield?

13     A.     Yes, he does.

14     Q.     Are you involved in the PTA at all?

15     A.     I was the, I was formerly involved with

16  the PTA.  I was president of the PTA.

17     Q.     When were you president?

18     A.     2000, around 2000, 2001.

19     Q.     So your son would have been in elementary

20  school then?

21     A.     Yes.  He's still in elementary.

22     Q.     So did you maintain any involvement in the

23  PTA after your year as president?

24     A.     I maintained -- I still attend meetings

25  and things like that.

HALL v. VERIZON COMMUNICATIONS                December 2, 2005

Page 37

```
 1        Q.      You're a single parent, correct?

 2        A.      Yes, I am.

 3        Q.      Do you attend any support groups or

 4   anything like that for single parents?

 5        A.      There was a single parents ministry that I

 6   was a part of.

 7        Q.      At Saint John's Church?

 8        A.      Yes.

 9        Q.      Any other group or ministry like that,

10   other than the one at the church, that you have

11   attended?

12        A.      Like for single parents, you mean?

13        Q.      Yes.

14        A.      No.

15        Q.      For any other reason, not single parents,

16   but young women in the community, just as an

17   example?

18        A.      I'm involved with a group called

19   Sisterhood and Brotherhood on the Move.

20        Q.      Is that based in Springfield?

21        A.      No, that's based out of Boston.

22        Q.      What does that organization do?

23        A.      It's a nonprofit organization that

24   empowers the youth to take responsibility for their

25   actions and so forth and so on.
```

HALL v. VERIZON COMMUNICATIONS

December 2, 2005

Page 38

| | | |
|---|---|---|
| 1 | Q. | How are you involved with them? |
| 2 | A. | I am on the advisory board. |
| 3 | Q. | How long have you been doing that? |
| 4 | A. | For about, I would say about five years. |
| 5 | Q. | Do you attend meetings in Boston? |
| 6 | A. | At times, yes. |
| 7 | Q. | Is there a local chapter or a local group |

8  in Springfield that you work with?

9      A.    The Brotherhood on the Move is actually

10 located in Springfield.

11     Q.    So is it two different organizations, one

12 Sisterhood on the Move and one Brotherhood on the

13 Move?

14     A.    It's all under the umbrella of Sisterhood

15 on the Move, and recently the Brotherhood on the

16 Move was just developed.

17     Q.    In Springfield?

18     A.    In Springfield.

19     Q.    Recently?  How recently?

20     A.    When that was developed?  Probably about a

21 year.  About a year in the making.

22     Q.    Did you have any responsibility in helping

23 to get that started in Springfield?

24     A.    I was just support.

25     Q.    Who is the person that runs that in

HALL v. VERIZON COMMUNICATIONS

December 2, 2005

Page 39

1    Springfield or is the head of it?

2         A.    Andrew Keaton, K-E-A-T-O-N.

3         Q.    Any other community or civic organizations

4    that you are involved with currently besides the

5    ones you've told me about?

6         A.    No.

7         Q.    So we have Sisterhood and Brotherhood on

8    the Move, the PTA, at one point, or perhaps

9    currently, and I'll clarify that in a moment, the

10   single parent ministry at Saint John's Church, and

11   nothing else you can think of?

12        A.    No, basically just a lot of church

13   activities.

14        Q.    The single parent ministry, are you

15   currently involved with that?

16        A.    No.

17        Q.    When were you involved with that?

18        A.    I have not been involved with them

19   actively since 2000.  No, I'm sorry, 2002.

20        Q.    Now, when you say a lot of church

21   activities, how frequently would you say, how many

22   times a week would you say you're involved in a

23   church activity besides going to services, let's

24   say?

25        A.    In the past?

HALL v. VERIZON COMMUNICATIONS

1        Q.      Currently.

2        A.      Currently I have not been.

3        Q.      You haven't been since when?

4        A.      August.

5        Q.      Is there a reason for that?

6        A.      School, and just taking care of my son,

7   and different things like that.

8        Q.      So you just became too busy; is that fair

9   to say?

10        A.      Yes.

11        Q.      In the past, let's say prior to August of

12   2005, how many times a week would you say you were

13   involved in a church activity?

14        A.      Probably two times a week, I would say,

15   besides services, and I was a teacher at children's

16   church.

17        Q.      Your current address is Waldorf Street; is

18   that right?

19        A.      Yes.

20        Q.      That's in Springfield?

21        A.      Yes.

22        Q.      Do you own or rent that?

23        A.      I own.

24        Q.      How long have you owned it?

25        A.      About ten years.

HALL v. VERIZON COMMUNICATIONS
December 2, 2005

Page 41

1      Q.    Does anyone live there with you besides

2  your son?

3      A.    I have a tenant on the other side, my

4  grandmother.

5      Q.    Did you say a tenant?

6      A.    Yes.

7      Q.    I just did not hear you.

8      A.    A tenant on the other side who is my

9  grandmother.

10     Q.    It's a duplex, then?

11     A.    It has an in-law apartment.

12     Q.    How old is your grandmother?

13     A.    83.

14     Q.    Are you responsible for caring for her if

15  she needs caring for?

16     A.    I take care of her, yes.

17     Q.    I want to turn your attention to

18  specifically the allegations that have been made in

19  both your MCAD complaint and the federal complaint

20  you've brought in court.

21           Is it fair to say that your claim,

22  summarized generally, is that Verizon discriminated

23  against you for a variety of reasons in the course

24  of your employment?

25     A.    Yes.

HALL v. VERIZON COMMUNICATIONS

1    A.    I had technicians walk in the building

2    screaming and hollering at me, and I was told to

3    take the high road, and again nothing significant

4    happened to these employees.  I was told that it is

5    my job and duty to serve them, and once I told my

6    supervisor about that incident, again nothing was

7    done.  I was told just to disregard them.  I advised

8    my supervisor that my co-workers referred to me as

9    colored.  He told me that was nothing.  My

10   supervisor called me a bitch; again nothing came out

11   of that.

12            Are you done?

13   Q.    She's getting it all.

14   A.    My male co-workers constantly used the

15   ladies' bathroom, and I was the only woman there,

16   and I advised them that I felt very uncomfortable

17   with them using the bathroom.  They acted like they

18   were -- took what I said into consideration and

19   changed the locks; however, they turned around and

20   changed it to a lock that all of them had the key to

21   anyways, so their efforts were in vein, and they

22   were well aware that the technicians had the key, so

23   basically they did nothing about that.

24            The technicians keyed my car.  They did

25   nothing about that.  They spit on my clothing.  They

HALL v. VERIZON COMMUNICATIONS

Page 45

1   ladies' room caught on fire, basically at the time

2   they made me go upstairs to use the men's room that

3   was upstairs because the bathroom had caught on

4   fire, but basically the way they handled the

5   situation kind of, in my opinion, they weren't

6   really concerned about my concerns and my safety.

7           There were times when the technicians will

8   call up and harass me about the fact that we had to

9   do hot cuts and that came before them.  I advised

10  the supervisor about it.  His response was to ignore

11  them instead of basically addressing the issue.

12          They constantly told me that they would

13  address the issues, and nothing really happened.

14  When I asked what happened in certain situations,

15  "It's been taken care of," and basically it was all

16  put back on me, and the reason that I believe it all

17  happened is because they didn't treat the other two

18  males in the office the way they treated me.  From

19  the first day I got there my supervisor wanted to

20  know if I had long fingernails and if I could

21  perform the job.  If you're a woman, then basically

22  we had to prove ourselves above and beyond what the

23  males had to do.

24      Q.    Is that all you can think of at this

25  minute?  We can come back if you think of anything

December 2, 2005

HALL v. VERIZON COMMUNICATIONS

Page 46

1    later.

2        A.    Thank you.

3        Q.    The last major incident, which was the

4    first one you described, is when Skip Pula cut off

5    your hair, correct?

6        A.    Yes.

7        Q.    Did you save the piece of hair that he cut

8    off?

9        A.    He took the piece of hair that he cut off.

10    He took one part, and then he came back and took the

11    other part.

12        Q.    Did you give it to him?  Where did he take

13    it from when he came back to get it?

14        A.    Well, he snipped one part from my head,

15    and then he took the other part from my hand as I

16    was saying, "Why did you do it?"

17        Q.    It was in your hand as you were saying,

18    "Why did you do it," and he literally reached into

19    your hand and took it from you?

20        A.    Yes.

21        Q.    Was it a pair of needle-nosed pliars that

22    he used to cut your hair with?

23        A.    Yes.

24        Q.    The type of needle-nosed pliars I'm

25    thinking of are the ones that have a sharp cutting

HALL v. VERIZON COMMUNICATIONS

Page 47

1   edge sort of down low, for like stripping a wire or

2   cutting a wire.  Is that the part that cut your

3   hair?

4       A.    Right, the part at the very bottom.

5       Q.    Sort of close to the joint?

6       A.    Right.

7       Q.    Do you believe that Mr. Pula intentionally

8   cut your hair?

9       A.    Yes.

10      Q.    You know that he has said that it was an

11  accident?

12              MR. HEISLER:  I object to the form of

13  the question; but you can answer.

14      A.    I've heard that.

15      Q.    Where did you hear that?

16      A.    In his -- they sent my lawyer, I don't

17  know what they call it, a statement.

18      Q.    That's where you read or that's where you

19  heard -- you read that statement --

20      A.    And Mr. McGovern also said that he said it

21  was an accident.

22      Q.    Did Mr. Pula ever tell you it was an

23  accident, like that day, at the time?

24      A.    No.

25      Q.    Who else was present when that happened?

HALL v. VERIZON COMMUNICATIONS

1    can't believe he cut my hair"?

2        A.    No.  It was, "I can't believe he cut my

3    hair, I can't believe that he just cut my hair."

4        Q.    Like that tone of voice you just shared

5    with me then?

6        A.    Yes.

7        Q.    So it would be fair to describe that as

8    angry, your tone of voice just now?

9        A.    No, shocked.

10       Q.    Were you angry?

11       A.    Yes.

12       Q.    After he cut your hair off, you told your

13   supervisor about it, correct?

14       A.    No.

15       Q.    Did your supervisor learn about it at some

16   point?

17       A.    Yes.

18       Q.    How did he learn about it?

19       A.    From Kathy Collins.

20       Q.    Your supervisor is Jack Lynch, right?

21       A.    Yes.

22       Q.    How did Kathy Collins learn about it?

23       A.    She learned about it from me.

24       Q.    When did she learn about it from you?

25       A.    When she called into the office.

HALL v. VERIZON COMMUNICATIONS

December 2, 2005

Page 54

```
 1      A.    No.

 2      Q.    Did he speak to you at all?

 3      A.    No.

 4      Q.    Would you normally have spoken to Skip

 5  just in order to do your job over the course of a

 6  regular business day?

 7      A.    Yes, you would normally speak to him if he

 8  had to come over for something.

 9      Q.    Did he come over?

10      A.    No.

11      Q.    So he never came over and he never spoke

12  to you for the rest of that day?

13      A.    Yes, he spoke to me towards the end; but

14  basically he stayed on his side of the building.

15      Q.    When he spoke to you at the end of the day

16  what did he say?

17      A.    He came over.  Well, actually, Jack came

18  through the building and came down.  He came through

19  Skip's side of the building, talked to Skip, and

20  then came over and sat down to talk to me.

21      Q.    This was near the end of the day?

22      A.    No, it was around 2:00 o'clock.

23      Q.    Was it normal for Jack to pop into the

24  Holyoke office?

25      A.    No.
```

December 2, 2005

Page 55

1      Q.      How many times a week would you say he

2  came by?

3      A.      There were times when we wouldn't see him.

4      Q.      For weeks?

5      A.      For weeks; but we talked to him.

6      Q.      So he came in around 2:00 p.m. and talked

7  to Skip.  Did you see him talking to Skip?

8      A.      No.

9      Q.      You couldn't see him through the cage?

10     A.      No.

11     Q.      Why not?

12     A.      Because there's equipment in the cage.

13     Q.      So you can't see that work area over there

14  where Mike and Skip are from where you sit in your

15  work area because of the equipment?

16     A.      Right.

17     Q.      You know it's there?

18     A.      It's an open area.  You know it's there.

19     Q.      You could sort of yell at them?

20     A.      Yes.

21     Q.      And they would know you were there, but

22  you can't physically see?

23     A.      No, because there's equipment, unless you

24  position yourself to see between the equipment or at

25  a point in the cage where you can open the door.

HALL v. VERIZON COMMUNICATIONS                                    December 2, 2005

Page 56

1      Q.      Did you know Jack was talking to Skip?

2      A.      I'm assuming that he was talking to Skip,

3  yes.

4      Q.      Why are you assuming that?

5      A.      Because he went through that side of the

6  building, and he would have gone by his desk, and he

7  came out on the side towards his desk.

8      Q.      Just so I'm clear, could you see him when

9  he came into the building, like when he first got

10  there?

11     A.      No.

12     Q.      You couldn't see him when he was talking

13  to Skip, if he talked to Skip?

14     A.      Right, but I know that he came through

15  that side.  There are several doors, and he didn't

16  come through the door where I can see him directly.

17     Q.      So you're assuming that Jack talked to

18  him, and you don't know how long Jack talked to

19  Skip?

20     A.      Right; and I'm assuming that he talked to

21  him because later on in the statement he said, "Oh,

22  yeah, he told me."

23     Q.      So when Jack comes over to talk to you,

24  based on what Jack tells you during that

25  conversation, you figure that he must have talked to

HALL v. VERIZON COMMUNICATIONS                          December 2, 2005

Page 57

1    Skip?

2        A.      Right; but his initial response to me is,

3    "No, no, no, I didn't talk to him.  No, he didn't

4    tell me," but then later on he says, "Oh, yeah, oh,

5    yeah, he said that."

6        Q.      Let's start from the beginning of the

7    conversation you had with Jack.  When Jack came over

8    to talk to you, what was the subject of the

9    conversation at first?  Did you start it or did he

10   start it?

11       A.      He started it.

12       Q.      What did he say?

13       A.      I'm assuming.  He basically said, "I hear

14   there's a problem at Holyoke."

15       Q.      What did you say?

16       A.      I said, "Yeah.  Did you talk to him?"  He

17   told me Kathy told him there was a problem in

18   Holyoke.

19       Q.      So the next thing out of your mouth is,

20   "Did you talk to Skip about it?"

21       A.      I was like, "Yeah.  Did he tell you what

22   he did?"

23       Q.      What did he say?

24       A.      "No, no, no."

25       Q.      He said no three times?

HALL v. VERIZON COMMUNICATIONS                    December 2, 2005

Page 66

1      Q.      What was your reaction to that?  What did

2  you say to him, other than what you've already told

3  me?

4      A.      After what?  Which part?

5      Q.      After he says to you, "I'm not going to

6  suspend the guy, what would that prove?"

7      A.      I told him that I was sick of Holyoke, I

8  was tired of it, that they don't have respect for

9  me, and I said a few other things.  I went on and on

10  about all of the things that they had been doing and

11  how basically nothing has been done.

12      Q.      So how long were you on the phone with

13  Jack?

14      A.      Not long.  I was crying, so I had to hang

15  up.  I told him how unhappy I was, and I told him --

16  and he told me that a lot of people aren't happy,

17  there's a lot of changes that are going on.

18      Q.      So you said you went on and on about all

19  the things that had been happening in Holyoke.  Did

20  you give him some subset of the list that you gave

21  me earlier in the deposition about all the things

22  that had been going on?

23      A.      No.  He had already known about it.

24      Q.      What did you go on and on about then?

25      A.      How I was upset that it happened, and how

HALL v. VERIZON COMMUNICATIONS                    December 2, 2005

Page 67

1  could he then turn around and tell him that I would

2  get over something like that.

3       Q.    So when you say you went on and on about

4  all the things that were going on in Holyoke, what

5  you were going on and on about is how it was

6  affecting you; is that fair to say?

7       A.    Yes.

8       Q.    So rather than describing it to him, you

9  were describing the events to him, you were

10 describing your reaction to the events?

11      A.    Yes.

12      Q.    You don't think the conversation lasted

13 very long because you got off the phone --

14      A.    Yes.

15      Q.    -- quickly because you were upset?

16      A.    Yes.

17      Q.    What did you do after you hung up the

18 phone?

19      A.    I went upstairs to the bathroom.

20      Q.    Were you still crying?

21      A.    Yes.

22      Q.    Were you crying before you talked to Jack?

23      A.    Before I talked to him when?

24      Q.    That conversation that you just described.

25 Had you cried earlier in the day about the incident

December 2, 2005

Page 82

1      Q.    Let me go back to my original question

2  because I may not have been clear about it.  When is

3  the next time after September 5, 2002, when is the

4  next time you talked to Jack Lynch about Skip

5  cutting your hair?

6      A.    I told him I wanted to have a meeting with

7  the second level, as well as him.  He told me he was

8  coming out, I think that Monday, to discuss what was

9  happening in Holyoke, and I told him I wouldn't be

10  there because my doctor's note covered me for that

11  Monday.

12         So basically that was it until we had that

13  meeting with George and Jack, and I think Louie

14  Brunetti and Kathy Collins.  That's when we had

15  another discussion about Skip.

16      Q.    So before that meeting happened you didn't

17  have any other specific conversation with Jack about

18  what had happened, what had happened with Skip?

19      A.    No.

20      Q.    George Savaria is the second level

21  supervisor?

22      A.    Yes.

23      Q.    Kathy Collins was at that meeting as the

24  union steward?

25      A.    She was there.  Well, both of them were

Page 83

1    there as union representatives.

2         Q.    Both of them being Louie Brunetti --

3         A.    Yes, and Kathy Collins.

4         Q.    What was Louie's relationship?

5         A.    He was the president of the union, and he

6    also works in our work group.

7         Q.    He's president of the local?

8         A.    Yes.

9         Q.    Do you remember what day the meeting with

10   George and Jack and Kathy and Louie and you

11   happened?

12        A.    No.

13        Q.    September 10 sound right?

14        A.    Don't know.

15        Q.    When you left the message for Jack Lynch

16   to say that you weren't going to be coming in on

17   September 6, you were taking a sick day -- did you

18   tell him you were taking a sick day?

19        A.    I said I wouldn't be in.

20        Q.    Did you tell him why you wouldn't be in?

21        A.    No, I don't think that came up.

22        Q.    At some point --

23        A.    He called me back.

24        Q.    At some point he called you back and asked

25   you what kind of day you were taking?

HALL v. VERIZON COMMUNICATIONS                           December 2, 2005

Page 84

1      A.    Yes, and I told him a sick day.

2      Q.    Did you tell him what you were sick about,

3  or did he not ask?

4      A.    He didn't ask.

5      Q.    Were you sick?

6      A.    Yes.

7      Q.    How were you sick?

8      A.    I had a headache over my eye, I was

9  nauseated, and I didn't feel good.

10     Q.    You said you had a doctor's note that kept

11 you out of work for a couple of days; is that right?

12     A.    Yes.

13     Q.    Did you provide that doctor's note to

14 Verizon?

15     A.    Yes.

16     Q.    Did you tell anyone at Verizon anything

17 about your sickness other than the date that you

18 would return?  In other words, did you describe for

19 them the symptoms or how you were feeling?

20     A.    I told Jack that day that I had a headache

21 over my eye the day it happened, the day he cut my

22 hair.

23     Q.    Did you tell him that in the phone

24 conversation, or in the face-to-face meeting that

25 you had?

HALL v. VERIZON COMMUNICATIONS

Page 88

1   things further, and that the third level,

2   Mr. Labonte, was well aware of the situation, and

3   that they were going to further investigate it, and

4   because I had called ethics and the EEO, the equal

5   opportunity people, EAP, and so many other people,

6   he was saying that basically it was out of his

7   hands, and that Paul McGovern was going to handle

8   it, and security was involved as well.

9       Q.    Wasn't involved or was involved?

10      A.    Was, would be involved.

11      Q.    So between September 5, 2002 and the

12  meeting that you had, you made calls to Verizon's

13  EEO line?

14      A.    Yes.

15      Q.    And the security line?

16      A.    Yes.

17      Q.    And the ethics line?

18      A.    Yes.

19      Q.    And the EAP?

20      A.    Yes.

21      Q.    Did you call anyone else, sort of an

22  official Verizon entity, in the days between

23  September 5 and that meeting?

24      A.    No.

25      Q.    Did you have more than one conversation

HALL v. VERIZON COMMUNICATIONS

1  undertaken by some of those people?

2  　　　　　MR. HEISLER:  Objection to the form

3  of the question; but you can answer.

4  　　Q.　　No.  No, the ball was not rolling.

5  　　Q.　　When George Savaria told you that because

6  you had made the calls to all these other places it

7  was out of their hands, what did you take that to

8  mean?

9  　　A.　　When I said I had contacted the police

10 department, and when I called MCAD, that's when he

11 was like, "Oh," that I had gone further with it.  He

12 wasn't talking about the ethics, because they didn't

13 do anything.  I didn't assume he was talking about

14 the ethics line.

15 　　Q.　　But what about EEO?  I thought you said

16 earlier it was in Paul McGovern's hands?

17 　　A.　　No.  I said Paul McGovern, that I was

18 contacting Paul McGovern.  They had given me the

19 number.  Joe Osediac, he's the security person who

20 said it was going to be in Paul McGovern's hands.

21 What he said was that Paul Labonte, who was the

22 third liner, knew all about it.

23 　　Q.　　He didn't mention Paul McGovern's name?

24 　　A.　　No.

25 　　Q.　　George Savaria didn't?

1      Q.    You see on the last paragraph on page 9,

2   that's your page 9, it looks like it relates to a

3   conversation that you had with George after the

4   meeting.  Does that --

5      A.    Which one?

6      Q.    Sorry, the two-line sentence there at the

7   end.

8      A.    Okay.

9      Q.    This says that, "He advised me that he had

10  spoken to Paul McGovern of EEO and the investigation

11  was in their hands."

12             Is that accurate?  Is that what George

13  told you?

14     A.    Yup.

15     Q.    So did you understand that Paul McGovern

16  was undertaking an investigation of your claims at

17  that point?

18     A.    I understood that they had referred it to

19  the EEO, and that they had also spoken to them.

20     Q.    That "they," "they" being who?

21     A.    That George had.

22     Q.    Also spoken to Paul McGovern?

23     A.    Right.

24     Q.    Had you spoken to Paul McGovern yourself

25  at this point, by September 10, 2002?

1       A.      I would have to look back, but if I'm not

2   mistaken, no.

3       Q.      Do you remember the first time you had a

4   conversation with Paul McGovern?

5       A.      It would be in my notes, but I spoke to

6   Mr. Osediac first, and then he referred the case to

7   Mr. McGovern.

8       Q.      Mr. Osediac is the gentleman who is with

9   Verizon security?

10      A.      Yes.

11      Q.      Did he give you Mr. McGovern's phone

12  number?

13      A.      I don't remember if he gave me his phone

14  number, but Mr. -- the gentleman from the EAP, he

15  also was referring it to Paul McGovern.  So there

16  were two people who said -- so I had already heard

17  their names.

18      Q.      When you talked to George on the 10th?

19      A.      Yes.

20      Q.      So that wasn't a strange name to you that

21  afternoon when you were talking to George?

22      A.      No.

23      Q.      When is the last time you read this

24  document before today?

25      A.      Probably a couple -- a year or so ago.

HALL v. VERIZON COMMUNICATIONS

Page 136

1    of one of the things that happened to you was that

2    technicians walked into the building screaming and

3    hollering, and that you were told to take the high

4    road.  Do you remember telling me about that?

5         A.    Yes.

6         Q.    When you say technicians walked in, do you

7    mean the outside technicians?

8         A.    Yes.

9         Q.    Do you mean any technicians in particular

10   whose names you can tell me?

11        A.    His name is Brian King in the incident

12   that you are talking about.

13        Q.    This is one particular incident you're

14   talking about here?

15        A.    When you are talking about the person that

16   came in and yelled at me, yes.

17        Q.    Who did you tell about this?

18        A.    Kathy and Jack was notified about it as

19   well.

20        Q.    Did you notify Jack, or did someone else

21   notify Jack?

22        A.    If I'm not mistaken, someone else notified

23   him.

24        Q.    Did he talk to you about it?

25        A.    Yes.

HALL v. VERIZON COMMUNICATIONS                                    December 2, 2005

Page 137

1      Q.      He told you to take the high road is what
2  you recall?

3      A.      Yes, him and Louie Brunetti both together.

4      Q.      Louie Brunetti again is the union
5  president?

6      A.      Yes.

7      Q.      He was the union president at the time?

8      A.      Yes.

9      Q.      You said nothing happened to the
10  employees, and do you mean nothing happened to Brian
11  King as a result of that?

12     A.      Yes.

13     Q.      You also said that someone told you that
14  your job was to serve the outside technicians.  Do
15  you remember that?  Who told you that?

16     A.      Ray Cichy.

17     Q.      When did he tell you that?

18     A.      That was after he said why do we get mad
19  when people call us "niggers," when we say the word
20  all the time.

21     Q.      When he made that statement to you where
22  were you?

23     A.      I was at the frame.

24     Q.      You were sitting at your work station?

25     A.      No, I was at the frame.

December 2, 2005

Page 139

1      A.    Yes.

2      Q.    You were paying attention to both things?

3      A.    Yes.

4      Q.    Mr. Cichy at some point came over to you

5    and posed this question to you?

6      A.    No, he didn't come over to me.  He just

7    posed the question.

8      Q.    From where he physically was near your

9    work station?

10     A.    Yes.

11     Q.    So did he say it loudly?

12     A.    He was talking out loud, yes.

13     Q.    You've testified that his statement is,

14   "Why is it not okay for us to call you niggers when

15   you say the word 'nigger' all the time?"  Is that

16   what he said?

17     A.    He said, "Why do you guys get mad when we

18   say 'nigger' when you say it all the time?"

19     Q.    Had he ever heard you say the word

20   "nigger"?

21     A.    No.

22     Q.    Have you ever said the word "nigger"

23   outside of this legal proceeding?

24     A.    I don't use that word.

25     Q.    Can you say that you have never used that

Page 143

1    occasion.

2        Q.    But it was after in time this

3    conversation?

4        A.    Right.

5        Q.    After Mr. Cichy posed this question to

6    you, you told Mr. Lynch about it?

7        A.    Yes.

8        Q.    Did you tell anyone else about it to

9    complain?

10       A.    Yes.  I told my co-workers about it.

11       Q.    So Skip Pula and Mike Stawascz?

12       A.    Yes.

13       Q.    Anyone else?

14       A.    I mean, who do you want to --

15       Q.    I mean like literally to complain about

16   what happened, to tell somebody who could do

17   something about it.  You may have told people about

18   how terrible it was, but who at work did you say,

19   You have to do something about this?

20       A.    Well, at one point in time George Savaria

21   knew, Jack Lynch knew, Lou Brunetti knew.

22       Q.    Who did you tell that day?

23       A.    That day Skip and I talked about it, a few

24   other people, we talked about it.

25       Q.    When did you tell Jack Lynch about it?

HALL v. VERIZON COMMUNICATIONS

Page 153

1      Q.    In August of 2002?

2      A.    In September.

3      Q.    So the first time George Savaria heard

4  about it was September 2002?

5      A.    Yup.

6      Q.    After Skip Pula cut your hair?

7      A.    Yes.

8      Q.    You said that your male co-workers used

9  the ladies bathroom earlier.

10     A.    Yes.

11     Q.    You told them that you felt uncomfortable

12  with them doing that?

13     A.    Yes.

14     Q.    You said that they acted like they took

15  your feelings into consideration when you told them

16  that; is that right?  Does that sound familiar?  Do

17  you remember telling me that earlier?  When you say

18  they acted like they took your feelings into

19  consideration, who is the "they"?

20     A.    Jack Lynch.

21     Q.    When you say you told them you felt

22  uncomfortable, who is the "them"?

23     A.    The technicians that were in there.

24     Q.    Did you also tell Jack Lynch you felt

25  uncomfortable?

HALL v. VERIZON COMMUNICATIONS

Page 157

1    Q.    So who did you tell about your car being

2    keyed?

3    A.    Jack.

4    Q.    What did Jack say when you told him?

5    A.    He didn't have any specific comment.

6    Again it was at one of our meetings when Brian King

7    had come in and he was meeting with me.  So he

8    didn't give any other response besides, "Take the

9    high road," in response to all of the issues that I

10   brought up.

11   Q.    So that was literally what he said every

12   time you brought something up, "Take the high road"?

13                MR. HEISLER:  Object to the form of

14   the question; but you can answer.

15   A.    At the end of our meeting he left it at,

16   "Take the high road."

17   Q.    At the end of which meeting?

18   A.    The meeting after Brian King came in and

19   was yelling at me.

20   Q.    After Brian King came in and yelled at you

21   you had a meeting with Louie Brunetti and Jack

22   Lynch?

23   A.    Yes.

24   Q.    It was you, Jack, and Louie?

25   A.    Yes.

Page 182

1   outside technicians that you have complained about

2   and described both in your testimony today and in

3   the various documents that have been produced, did

4   that behavior ever improve?

5       A.      They visited the office less frequently.

6       Q.      That was an improvement in your mind?

7       A.      That was a blessing, yes.

8       Q.      Now, did they do that because Jack Lynch

9   or George Savaria told them to, or of their own free

10  will?  Do you know?

11      A.      I don't know.

12      Q.      How many other female CO techs did you

13  know of in Western Mass working for Verizon?

14      A.      That I know?

15      Q.      Yes, or that you knew of.

16      A.      (No response.)

17      Q.      A handful?

18      A.      Yes, it was only a handful.

19      Q.      Kathy Collins is one?

20      A.      Yes.

21      Q.      Anyone else's name you can think of?

22      A.      Don Baretta is the person I used to work

23  with.

24      Q.      Anyone else you can think of?

25      A.      Joyce Eldbridge.  There's a few other

HALL v. VERIZON COMMUNICATIONS

December 2, 2005

Page 183

1    girls, but I only know them by like nicknames.

2        Q.    Can you tell me their nicknames?

3        A.    Chickie is one of them, and I don't know

4    -- Julie Kilbride.  There could be more.

5        Q.    Did you ever talk to any of those other

6    females CO techs about behaviors you thought the

7    outside techs or anyone -- strike that.

8              Did you ever talk to any of the other

9    female outside techs about perceived discrimination

10   against women at Verizon?

11       A.    Julie Kilbride came in to see me, to

12   advise me about the technicians issues.

13       Q.    She's another CO tech?

14       A.    Yes.

15       Q.    In what office?

16       A.    I don't know which office she was out of.

17   If I'm not mistaken, maybe Northampton, somewhere up

18   that way, but she used to be in Springfield, I

19   think.

20       Q.    Julie came into Holyoke to talk to you

21   about issues with the outside techs?

22       A.    Yes.

23       Q.    Did she talk to you about the complaints

24   the outside techs had about you?

25       A.    Yes.

HALL v. VERIZON COMMUNICATIONS

December 2, 2005

Page 184

```
 1         Q.      Was she a union steward?

 2         A.      Yes.

 3         Q.      Was she the steward before Kathy or at the

 4    same time as Kathy?

 5         A.      I'm assuming at the same time.

 6         Q.      So she came to you and said the outside

 7    techs have complaints about you?

 8         A.      Yes.

 9         Q.      How did you react?

10         A.      I told her that they were wrong.

11         Q.      And their complaints were that you weren't

12    answering the phone?

13         A.      Right.

14         Q.      Was this the meeting where the phone

15    started ringing while you were meeting with her and

16    Mr. Stawascz didn't pick it up?

17         A.      Yes.

18         Q.      So what happened after that meeting?  Did

19    Julie agree that their complaints were bogus?

20         A.      She didn't have a remark about it one way

21    or the other, but I requested the meeting with Jack

22    and George.

23         Q.      After the meeting with Julie?

24         A.      Yes.

25         Q.      Shortly after the meeting with Julie?
```

Page 185

1      A.    Yes.

2      Q.    So if I understand your testimony

3  correctly, a couple of things happened that led up

4  to your requesting a meeting with George and Jack

5  and Louie in August 2002, right?

6      A.    Yes.

7      Q.    Those things were Ray Cichy's comment to

8  you about you should serve the outside techs?

9      A.    Yes.

10     Q.    And although you had another meeting about

11  it, Brian King's yelling at you fed into it as well?

12     A.    I don't think we discussed him at that

13  time.

14     Q.    But your meeting with Julie Kilbride was

15  part of what prompted you to want that meeting?

16     A.    Yes.

17     Q.    Their harassing you about hot cuts, was

18  that dealt with in the prior meeting, or did you

19  talk about it in the August 2002 meeting?

20     A.    We discussed it in the August 2002 meeting

21  as well.

22     Q.    You discussed it with them both times?

23     A.    Yes.

24     Q.    Now, did you tell Julie in this meeting

25  that you thought that the outside techs were

HALL v. VERIZON COMMUNICATIONS                    December 2, 2005

Page 196

1      A.      I'm sure that I told them about several of

2  the comments that were made, racist comments that

3  were made continually.

4      Q.      In the September 2002 meeting with Jack

5  and George?

6      A.      No, it would have been before then, in the

7  August meeting.

8      Q.      I thought the August meeting was mostly

9  about the outside techs having a -- wait.

10     A.      Go ahead.  Sorry.

11     Q.      It was mostly about the outside techs

12 saying that you needed to serve them?

13     A.      We talked about a lot of different things

14 in that meeting, so we did talk about me needing to

15 serve them.

16     Q.      But there were other things?

17     A.      Right.

18             (In the presence of Ms. Chavey:)

19             (Recess:  3:45 go 3:59 p.m.)

20 BY MS. WALSH:

21     Q.      Ms. Hall, you testified earlier that there

22 were some things that you put into your

23 interrogatory responses that you had not included in

24 what's been marked as Exhibit 1, right?

25     A.      Yes.

1                    MS. WALSH:  Can you read it back.

2                    (Question read.)

3        A.     I can't say exactly once a month he made a

4   comment, but his comments were frequent.  You asked

5   the question how frequent.  I'm saying maybe once a

6   month.

7        Q.     But that happened from January 2000 until

8   September '02?  Whatever the frequency was, it was

9   constant?

10       A.     It was constant, and I didn't get there

11  until the end of January.

12       Q.     Did anyone else besides you hear Skip

13  making these comments?

14       A.     About women?

15       Q.     Yes.

16       A.     Yes.

17       Q.     Who?

18       A.     Mike, some outside technicians, Jack.

19       Q.     Did Jack ever make these comments, other

20  than the bitch conversation that you mentioned

21  earlier, about women in the same way that Skip did?

22       A.     Well, he asked me, like I said, in regards

23  to my hair, my fingernails, and questions like that

24  that has nothing to do with my job performance.

25       Q.     You told me earlier that Jack asked you

HALL v. VERIZON COMMUNICATIONS                                    December 2, 2005

Page 201

1    whether you had long fingernails when you started

2    work because he wanted to know if you could work on

3    the wires with long fingernails, right?

4              MR. HEISLER:  I object to the form of

5    the question again.

6        A.    Right.

7        Q.    What did Jack ask you about your hair?

8        A.    Well, they made comments about that I go

9    to get my hair done all the time.

10       Q.    Who is "they"?

11       A.    Well, Skip.  Not necessarily Jack, but

12   Skip.  They made comments, and some of the outside

13   technicians, that I go get my hair done all the

14   time.

15       Q.    A few moments ago you said that Jack made

16   comments about your fingernails and your hair.  So

17   what comments did Jack make about your hair?

18       A.    I'm not sure about the hair, but he

19   definitely made comments about my fingernails.

20       Q.    He did that when you started?

21       A.    When I started.

22       Q.    Did he ever talk about your fingernails

23   again to you?

24       A.    No.

25       Q.    Did you ever tell Skip that you thought

HALL v. VERIZON COMMUNICATIONS                    December 2, 2005

Page 213

1    bathroom, my co-workers are putting their feet up on

2    my desk.  It could have been a number of things.

3         Q.    Did you ever say, My co-workers are saying

4    inappropriate things about women?

5         A.    He knew that they were saying

6    inappropriate things about women.  He also said

7    inappropriate things about women.

8         Q.    Other than that conversation about bitches

9    which you've told me about, was there any other

10   conversation that you observed Jack Lynch

11   participating in where he said inappropriate things

12   about women?

13        A.    No.

14        Q.    Did you ever hear him in a conversation

15   where other people said inappropriate things about

16   women and you saw him having a conversation where

17   other people were saying those things, the

18   inappropriate things?

19        A.    No.

20        Q.    You've told me that Skip talked about

21   people being a pretty face, a good looker, about the

22   Adidas comment, about his password was, that someone

23   was smart for a woman.  Can you think of anything

24   else, any other examples about Skip Pula, language

25   or words that he used?

HALL v. VERIZON COMMUNICATIONS                    December 2, 2005

Page 219

1  eliminated the central office technicians in that

2  office.

3      Q.    Are you aware of any conversations that --

4  strike that.

5           Are you aware that Verizon continued to

6  make an offer for you to return to work in

7  Springfield for some time after the date of this

8  April 10 letter?

9      A.    Am I aware of it?

10     Q.    Yes, that they wanted you to come back for

11  a while after that April 10 letter.

12     A.    I was aware that the stipulation was

13  always for me to return to Worthington Street.  I

14  don't know of another.  I don't know of any other

15  offer that was given.

16     Q.    Just so I understand, your basis for

17  rejecting that offer is because you thought, you

18  believed that you would still have to interact with

19  the same people that were the source of the problem?

20     A.    Yes.

21     Q.    Do you know any central office techs who

22  work in Springfield?

23     A.    Yes.

24     Q.    How many central office techs work in

25  Springfield at the Worthington Street address?

Page 222

1    bottom as Jack Lynch's signature?

2         A.     Yes.

3         Q.     Did you understand that the company was

4    taking the position that by not returning to work

5    you were abandoning your job?

6         A.     I understood that that's what they were

7    trying to tell me, yes.

8         Q.     You disagreed with that, right?

9         A.     Right.

10        Q.     I'm showing you what's been marked as

11   Exhibit 5.  I just want to give you a minute to look

12   at it, and tell me if you've seen it before.

13        A.     Yes.

14        Q.     Do you agree that you would have had a new

15   direct supervisor if you had gone to work at

16   Worthington Street?

17        A.     That's what it says here, yes.

18        Q.     Do you have any reason to believe that

19   that's not true?

20        A.     That I wouldn't have a new direct

21   supervisor?

22        Q.     Right.

23        A.     No, I don't have one.

24        Q.     Do you know who the new direct supervisor

25   would have been?

Page 223

1      A.      It said it would have been Mr. Pendergast.

2      Q.      Where does it say Mr. Pendergast?

3      A.      I'm sorry, on Exhibit 4 it says

4  Mr. Pendergast.

5      Q.      Did you know Mr. Pendergast?

6      A.      Yes.

7      Q.      What was his job title?  Do you know?

8      A.      He had the same job title as Jack Lynch,

9  as turf team leader.

10     Q.      Turn your attention back to Exhibit 5.

11 Did you agree that you would have little or no

12 interaction with Mr. Lynch if you went back to work

13 at Worthington Street?

14     A.      No, I did not agree that I would have

15 little or no interaction with him.

16     Q.      Why did you disagree with that?

17     A.      Because he sent me a letter telling me to

18 return to work.  If he's sending me letters, then

19 that means I'm still going to have contact with him.

20     Q.      That's the only reason you thought that?

21     A.      No, because during the days when we rotate

22 and things like that, then he would still be my

23 supervisor and I still would have interaction with

24 him.

25     Q.      So would that be true for anyplace you

1   Exhibit 6.  I'll ask you to take a look at that and

2   tell me if you recognize it.

3       A.      Yes.

4       Q.      Is that your signature on the letter?

5       A.      Yes.

6       Q.      That's a letter you wrote to Jack Lynch?

7       A.      Yes.

8       Q.      Did you hand-deliver it to him at

9   Worthington Street?

10      A.      No.

11      Q.      Who hand-delivered it?

12      A.      My attorney.

13      Q.      You told Mr. Lynch that you were medically

14  unable to return to work "as you have ordered,"

15  right?

16      A.      Yes.

17      Q.      Had you discussed with your doctors the

18  suggested transfer that Verizon was proposing?

19      A.      Yes.

20      Q.      Had you explained to your doctors that you

21  believed Mr. Lynch would still -- you would still

22  have contact with him?

23      A.      Yes.

24      Q.      I'm showing you what's been marked as

25  Exhibit 7.  I'll give you a moment to take a look at

HALL v. VERIZON COMMUNICATIONS                                December 2, 2005

Page 226

1    it.

2         A.    Yes.

3         Q.    Do you remember receiving this letter?

4         A.    Yes.

5         Q.    Do you know or recognize that that's Paul

6    Labonte's signature at the bottom of it?

7         A.    I can only assume that it is.

8         Q.    Do you agree that you were instructed to

9    return to work on January 13, 2003 by a Verizon

10   corporate health services consultant?

11        A.    No.

12        Q.    You do agree that your short-term

13   disability benefits were not approved past January

14   13, 2003, correct?

15        A.    Yes.

16        Q.    Did you understand that your time out of

17   work starting on September 2, 2002 was approved

18   family medical leave?

19        A.    Starting when?

20        Q.    Starting on September 6.  I probably said

21   the wrong date.  September 6, 2002.

22        A.    That it was --

23        Q.    You had family medical leave starting on

24   that day?

25        A.    I was under the impression that it was

HALL v. VERIZON COMMUNICATIONS                     December 2, 2005

Page 228

1    I'm not sure.

2        Q.    If you had been able to work at the State

3    Street office, would you have been comfortable that

4    you wouldn't have had interaction with Mr. Lynch?

5        A.    Yes.

6        Q.    What about Mr. Pula?

7        A.    Yes, I would have been comfortable that I

8    would have had no interaction with him.

9        Q.    What about the outside techs that were

10   giving you so much trouble in Holyoke?

11       A.    They don't frequent the State Street

12   office.

13       Q.    Did you tell anyone that you thought the

14   State Street office might be a place that you could

15   return to work at Verizon?

16       A.    No.

17       Q.    Part of your claims are that Verizon

18   discriminated against you on the basis of a

19   disability, correct?

20       A.    That they discriminated on me on the basis

21   of my disability?

22       Q.    Yes.

23       A.    I know it's on the basis of my race and my

24   gender.

25       Q.    Do you believe that Verizon failed to

HALL v. VERIZON COMMUNICATIONS                                  December 2, 2005

Page 231

1      Q.     But you understood them to be treating you

2   for depression certainly?

3      A.     Yes, and anxiety.

4      Q.     Now, how would you say that that

5   depression and anxiety affected you in your ability

6   to function in your life?

7      A.     I wasn't able to function.  I had been a

8   14-year employee of the company, since basically out

9   of high school.  My mother worked there, my sister

10  used to work there, and that's where I was

11  comfortable, and in a matter of a few days it was

12  taken from me.

13     Q.     Just specifically I'm talking about as a

14  result of that, you had all these symptoms,

15  headaches, nightmares, nausea, depression.

16     A.     Yes.

17     Q.     Were you able to care for yourself, take

18  showers, cook dinner for yourself and your son

19  during that time?

20     A.     We did a lot of take-out.  My mother

21  helped out a lot, and I did limited activities.  I

22  basically stayed in the house.

23     Q.     Could you drive?

24     A.     If I had to.

25     Q.     Could you walk?

HALL v. VERIZON COMMUNICATIONS                    December 2, 2005

Page 238

1    other offices besides the central offices, and they

2    have offices in the surrounding areas.

3        Q.    Would you have been willing to move to

4    Boston, for example, if a position had opened there?

5    Would you have considered that a good accommodation

6    to get you away from those people?

7        A.    No.

8        Q.    You wanted to stay in Western Mass?

9        A.    Or even Central Mass.

10       Q.    Near Worchester?

11       A.    Yes.

12       Q.    Did you ever suggest to anyone at Verizon

13   that you thought -- where you thought that you might

14   go that would be a good place, where you wouldn't

15   have to deal with Mr. Lynch or Mr. Pula or anyone

16   else?

17       A.    No.

18       Q.    When was it that you realized that you

19   could not or would not be able to return to work at

20   Verizon, like you finally in your own mind said,

21   That will never happen?

22       A.    When they fired me.

23       Q.    Have you stayed in touch with Darnell

24   Williams about your case against Verizon?

25       A.    No.

HALL v. VERIZON COMMUNICATIONS                    December 2, 2005

Page 255

1        Q.      Do you agree that his conclusion, like

2    your own doctors', was you could return to work if

3    you were working in a different situation?  I'm

4    paraphrasing.  Is that fair to say?

5        A.      He says in a different capacity, albeit a

6    different job.  They did not offer me a different

7    job.  They offered me the same job at a different

8    location.

9        Q.      I want to make sure we come to an

10   agreement about what the doctors were saying.  This

11   doctor and your own doctors, would you agree, all

12   said you could return to work as long as you weren't

13   in the same situation?

14       A.      Yes.

15       Q.      So with that caveat or with that

16   understanding, you receive Jack Lynch's May 20

17   letter.

18            Let's start with the April 10 letter from

19   Paul McGovern which says you've exhausted your

20   leave, Please come back to work at 295 Worthington

21   Street, right?  I'm paraphrasing again.

22       A.      It says that they were willing to transfer

23   me to 295 Worthington Street as a central office

24   technician.

25       Q.      Your response to that was, That's not good

# EXHIBIT
# C

1

Volume 1, Pages 1-158

Exhibits: 1-9

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

---------------------------

RHONDA HALL,

              Plaintiff

v.                 Docket No. 3:05-cv-30002-MAP

VERIZON COMMUNICATIONS, INC., and

VERIZON NEW ENGLAND, INC.,

              Defendants

----------------------------

DEPOSITION OF JOHN J. LYNCH

Wednesday, January 25, 2006, 10:12 a.m.

Rath, Young & Pignatelli, P.A.

Capital Plaza

Concord, New Hampshire


----Reporter:  Kathleen Mullen Silva, RPR, CRR----

Real-Time Court Reporting

1331 Main Street

Springfield, Massachusetts  01103


413.732.1157   Fax: 413.781.4101

45

1    office maintenance machine that was on duty to take

2    care of those issues.  So you couldn't cage

3    everything in.  I mean, it wouldn't make sense,

4    really.

5        Q.  Would they be entitled to prove a trouble

6    when there was a central office technician on the

7    job and working?

8        A.  Like I said before, they could come in,

9    because a lot of them had a -- they sent tone on

10   multiple pairs, and they'd have a technician outside

11   hunting for a tone.  There were certain things they

12   would come in for legitimately, but in my

13   estimation, and I'm sure everyone that worked in

14   Holyoke's estimation, most of the time they didn't

15   need to be in there.

16       Q.  Okay.  After Rhonda came in and talked to

17   you about the issues that had been raised by

18   Ms. Kilbride, do you recall what your response was?

19       A.  Yes, because it was more than just what

20   Ms. Kilbride said.

21            THE WITNESS:  I did say Kilbride?

22            MS. WALSH:  Yes.

23       A.  That's when she told me about -- again, I

24   don't remember their names -- the outside

1    technicians coming in and asking her, "Why is it" --

2    and I think they said, "you people get upset with

3    us," meaning they're white, "when we use the N-word

4    and you don't get upset when you use it amongst your

5    own?"

6              And then she mentioned remarks they made

7    about Bunty.  He was a manager that worked up on

8    State Street.  He's a good guy, and he was of Indian

9    descent.  I think literally his family came from

10   India.  I'm not sure on that, but he moved into

11   Wilbraham, and I guess one of them made a remark,

12   "How does a person like that move into Wilbraham?"

13   Something to that effect.  And as soon as she said

14   that, my response to Rhonda was, "This is bigger

15   than me.  We're going to set up a meeting with my

16   boss, George," which subsequently we did.  I don't

17   remember -- it wasn't that day, but it was the next

18   day or the day after that.

19       Q.  Okay.  Do you recall whether that meeting

20   that you had with Rhonda, before the meeting with

21   Mr. Savaria was set up, did she mention anything

22   else?

23       A.  I can't remember.  I mean, if my memory

24   gets jogged, but I can't remember.

1    that same meeting.  I remember her using the term --

2    not her using the term, but referring to somebody

3    using the term Jew baggers.  I believe that was it.

4    I can't think of anything else.

5        Q.  Now, you mentioned that after she came to

6    you with these complaints, you arranged a meeting?

7        A.  With my boss.

8        Q.  Do you recall who was present for that

9    meeting?

10       A.  George Savaria, myself, Rhonda and Louie

11   Brunetti.  He was the steward, but I think he was

12   also the president of the union.

13       Q.  And do you recall what was discussed at

14   that meeting?

15       A.  Rhonda, you know, told all of us about the

16   issues I just talked about, and she said that all

17   she wants to do is her job.  She doesn't want all

18   this other stuff, which we all agreed, she shouldn't

19   have to put up with that, and George was going to

20   set up a meeting with Tom Hurley, the second-level

21   manager outside, Paul Gazda, who was at the time

22   the -- he was the first-level supervisor for the

23   outside area, like I was the first-level for the

24   central office technicians, George and myself.  So

51

```
 1    the four of us were going to have a meeting, either
 2    conference call or whatever, and talk about this,
 3    and come up with a plan to stop it.
 4         Q.  Do you recall whether that meeting with
 5    Mr. Hurley and Mr. Gazda ever took place?
 6         A.  Yes, it did.
 7         Q.  And when did that take place, if you
 8    recall?
 9         A.  It was the beginning of August.  I don't
10    remember the date.  It was like -- it might have
11    been the day after we had our meeting with Rhonda,
12    or a couple days after, and it was a conference
13    call, and George brought up all the issues that
14    Rhonda was having, and it was agreed that the
15    outside techs were going to be told by Mr. Hurley or
16    Paul Gazda, "Stay out of Holyoke.  You're not
17    supposed to be there anyways.  Stay out of Holyoke.
18    Clean up your act."  I don't remember the exact
19    words, but as far as "the way you talk to people,"
20    et cetera.  There's something in the notes, but I
21    can't remember everything, but basically it was,
22    "Hey, talk to your outside guys.  We're not going to
23    tolerate this in the central office.  We don't want
24    them in the central office.  Keep them out of the
```

52

1    central office," and basically that's what the

2    meeting was about.

3        Q.  Okay.  Do you know whether either

4    Mr. Hurley on Mr. Gazda followed up on that

5    conference call in any way?

6        A.  My feeling is they did, because after that,

7    things were a lot different in Holyoke, because when

8    I went into the central office, I'd ask

9    specifically, "How are things going?  Are they

10   better than they were?"  And they were.  So they got

11   the word.  You know, that was something that no one

12   should have to put up with.  It could have been

13   Rhonda.  It could have been anybody.  But these

14   outside people, they get overbearing sometimes.  I

15   mean, at times in Holyoke, I felt like a

16   kindergarten cop, not with my guys and gals, but

17   trying to just keep everyone else out of there so

18   they could do their work, because all three of them

19   did their work very well.  I didn't have any

20   problems with any of them, Rhonda, Skip or Mike.

21   Any problems I perceived were coming from that

22   outside group.

23       Q.  That had been an ongoing problem?

24       A.  Ongoing, as long as I can remember.

1    A.  I told her that I was in Holyoke that

2  morning, because I wanted to talk with her and Skip

3  and Mike and sit down and talk about Holyoke.  And

4  she said to me -- she was in Springfield when I was

5  in -- it made it sound like when I was in Holyoke

6  at -- before 8:00.  I was there before 8:00, she was

7  in Springfield.  That's what it sounded like to me,

8  so...

9    Q.  Did you discuss anything else at that time?

10    A.  Not that I recall.

11    Q.  Did you discuss at all whether she would be

12  returning to work on Monday?

13    A.  I don't remember.  I don't remember asking

14  that question.

15    Q.  Do you recall if during that conversation

16  she requested -- that she said she would like to

17  have a meeting with Mr. Savaria?

18    A.  I don't think it was that call.  I think we

19  talked again because the employees call in every day

20  they're out up until the sixth day or something.

21  And I believe she requested that the following week,

22  probably Monday or Tuesday.  I'm not sure what day.

23    Q.  Okay.  Do you recall how that phone

24  conversation was initiated?

# EXHIBIT D

<u>**Meeting with**</u>

<u>**Rhonda Hall**</u> .

<u>**8-6-2002**</u>

**Attendees:** Rhonda Hall, Louis Brunetti, John Lynch, George Savaria

A meeting was held at 295 Worthington St. Springfield Ma. to discuss the concerns from Rhonda Hall by the treatment she is experiencing from the National Operations Technicians. Ms. Hall stated that some technicians from the Hatfield garage are treating her disrespectfully. She stated that about 9 months ago Mr. Raymond Cichy asked her " How come you people get mad if we call you a nigger, but you call each other a nigger". She also stated that Mr. Matthew Provencal and Mr. Benjamin Table was also treating her badly.

She stated that there appears to be no problem with people from the Westfield and Springfield garages. She complained that these techs would occupy her work area (terminal, printer, and desk area). They would impede her access to this area and sometimes her screen would be erased.

She also over heard comments from them about " how does a person like Bunty live in Wilbraham". Bunty is a National Operations Turf Team Leader, Bhupinder Bahal, who is of Indian descent.

At times they would complain that the telephone wouldn't get answered or it was busy. Ms. Hall explained that her manager, Jack Lynch, gave her priorities. Those being, troubles, provisioning, Hot Cuts, ADSL. The outside techs felt that she should take care of their needs first. Ms. Hall also stated that her personal car had been keyed.

On Aug. 2, 2002 Ms. Julie Kilbride, Union Steward, had approached Ms. Hall and tried to address complaints about her from the outside techs. Julie asked Rhonda to explain to the techs as to why she can't get to their work immediately. One person stated that he waited 5 hours to do an LST. On another occasion Ms. Hall told a tech to send her a trouble that was in the Central Office. This was between 1 and 2 PM. The trouble was actually sent in after 5PM. She also stated that many test tags had been broken by outside techs during the course of time.

Ms. Hall is requesting respect from her peer group. She stated that she is doing her job and that when she is in the process of working something like a Hot Cut that she has to stay on that because of the short time frame and the criticality of completing it on time. She told us that she treats everyone in a professional manner. She doesn't appreciate the racial overtones of some of the conversations that she has heard.

I told Rhonda that I would arrange to meet with Mr. Thomas Hurley – Manager National Operations and his two Turf Team Leaders, Ms. Laura Letender and Paul Gazda as well as my Turf Team Leader Jack Lynch. I asked her to continue to act professionally and that I would get back to her with our plan of action.



EXHIBIT

Lynch

1

1|25|06   KmS

VZ0209

August 6, 2002
09:07 AM

Meeting with Rhonda Hall
RE: Problems at the Holyoke CO with SST's

Attendee's: George Savaria, Jack Lynch, Louie Brunetti, Rhonda Hall

Discussion Included:
     SST's complaint of Rhonda not answering phones or putting them on hold for long periods of time.  Union Rep, Julie Kilbride, visited Rhonda at the Holyoke CO representing Bill Gorman (Union Business Manager) to talk about issues SST''s had with Rhonda.  I was not aware that the Union had talked to Rhonda until Rhonda brought it to my attention. The discussion Julie had with Rhonda upset Rhonda and that's why Rhonda came to me about it. SST's say Rhonda is the only COT they are having a problem with in Holyoke.
Rhonda said she always answers the phone and only puts people on hold if she is tied up on something else ( Hotcuts, Trouble Tickets, Working with another SST, etc.)  These were the priorities I gave Rhonda for working with the SST''s.

Other issues discussed were:
     SST's Ray Cichy, Matt Provencal and Ben Table asked Rhonda why you get upset if we call you nigger but you don't get upset when you call each other nigger.  This same group of SST's also asked how someone like Bhuphinder Bahal (Indian Descent) was living in a community like Wilbraham. Rhonda stated that these techs offended all races using terms like Jewbagger and when a Hispanic was shot and killed made the statement one less of them.

     George Savaria told Rhonda that we would contact the SST's managers and discuss her issues with them.  Rhonda stated she just wanted to do her job and not have to put up with these individuals remarks.

August 8, 2002
George Savaria, Jack Lynch, Tom Hurley (AOM SST's), and Paul Gazda (Supervisor SST''s) discussed the problem in Holyoke.  It was agreed that the all SST's that report to the Hatfield garage would be talked to about the Code of Business Conduct. The SST's would be told to stay out of the Holyoke CO unless absolutely necessary.  The union was told of the problems Rhonda was having and they also agreed to talk to the SST's out of the Hatfield garage.



EXHIBIT
Lynch
2
1/25/06 KmS

VZ0585



Paul McGovern
10/15/2002 03:29 PM

To:      George Savaria@VZNotes, Paul Labonte/EMPL/MA/Bell-Atl@VZNotes, Carolyn Ciraco@VZNotes
cc:
Subject:   Rhonda Hall / Eugene Pula – EEO Investigation – Summary

Attached please find a summary of EEO investigation findings and recommendations.



hall.rhonda.exec.summary.doc

Paul McGovern
EEO Management Consultant
617 743 4996
fax 617 743 1369



EXHIBIT
Lynch
5
1/25/06 bns

VZ0181

## EXECUTIVE SUMMARY

October 10, 2002

<div align="right">NOT FOR DISTRIBUTION</div>

TO    Lisa Birkdale, Legal Department

FROM  Paul McGovern, EEO Management Consultant

RE    Rhonda Hall

### Allegation

Rhonda Hall is an African American CO Tech (Holyoke, MA) who maintains that peer CO Tech Eugene "Skip" Pula cut her hair and, on two occasions, stepped on her shoes. She maintains that SSTs working or otherwise present in the Holyoke Central Office have made racist comments. She maintains that SSTs have treated her with a lack of respect, conduct which she attributes to her being African American and a female.

### NO EEO Violations Substantiated

Investigation does not substantiate that the actions of Pula or of SSTs constitute discrimination or create a hostile sexual or racial environment.

### Comments

Pula states that he inadvertently clipped Hall's hair and, in "kidding around," stepped on her shoes or sneakers. Peers state that Pula is "playful." Hall alleges no overtly racist or sexist conduct on Pula's part.

Hall stated that in the approximately two years that she has been at the Holyoke CO, she overheard SSTs make one allegedly racist comment concerning African Americans, one comment concerning Jews, and one concerning an Indian manager. She maintains that comments concerning Hispanics have occurred more frequently. None of the four witnesses she identified have corroborated her allegations concerning race-related comments. Managers took appropriate action after Hall met with them in August, 2002 – speaking to SSTs she identified (who denied the comments), warning them to avoid any such comments, and restricting SSTs' access to the CO.

Hall's gender complaints involve etiquette – use of lady's room, use of equipment – and have been addressed by managers as they arose.

### Recommendations

Recommend that Pula receive written warning that future touching of employees could result in further discipline. Although investigation did not substantiate EEO violations, it may be useful to provide diversity/sensitivity training in the Holyoke CO and the Hatfield garage, as this may serve to address issues that are perceived by Hall as prejudicial.

VZ0182



**CONFIDENTIAL**

DATE:      October 22, 2002
TO:        Eugene Pula
SUBJECT:   Complaint Investigation – Warning Letter

This memo is to confirm the meeting and discussion we had on October 22, 2002 regarding your personal behavior. Attending the meeting at 324 Maple St, Holyoke, Ma were John Lynch representing Verizon, Kathy Collins representing IBEW Local 2324 and Eugene Pula. Although investigation concluded that your behavior did not constitute race or gender related harassment, it is important that you remember that the Company's Equal Employment Opportunity & Zero Tolerance Policy states that Verizon does not tolerate activities that <u>might</u> constitute employee harassment of any kind. This commitment extends beyond that which may be required by law and strives to maintain a work environment totally free from activity that is demeaning, intimidating, threatening, or offensive.

This letter is to remind you that you have a responsibility as a Verizon employee to refrain from any conduct which might create a hostile environment or that belittles, intimidates, or otherwise demeans or offends co-workers or others associated with the Company.

As discussed, you are to refrain from activities corroborated during the EEO investigation of your actions, specifically, from unwanted touchings of your peers. You are to act in accordance with your responsibility for providing a positive, productive and non-offensive work environment for all Verizon employees.

Failure to adhere to Company policy or failure to comply with the above expectations may lead to further corrective action, up to and including termination.

Do you understand the contents of this letter? (yes/no)
If you have any questions, or would like to have further clarification, please let me know.

John J Lynch                 REFUSED TO SIGN         REFUSED TO SIGN
Manager                      Katherine Collins  10·22·02    Eugene Pula  10·22·02
                             Union Local 2324

cc:
    Employee Personnel File
    Employee Relations Representative

EXHIBIT
Lynch
7
1/25/06 KmS

VZ0208

# EXHIBIT E

Rhonda Hall

The morning of Thursday, September 5, I was on the frame side of the building. Between approximately 9:30 – 10:00 a.m., my coworker, Eugene "Skip" Pula, approached me while I was speaking to a CXM technician from the Westfield area named Beth. Beth was in the Holyoke area that day doing work. Skip approached me in order to advise me that he was leaving for a funeral. He was debating on whether or not he should go because we were short staffed. As he approached me, I asked him if he had seen my needle nose pliers. He said something to the effect of "If it was a snake, it would have bitten you." At that point, I took the pliers off my desk and walked toward Beth and Skip; they were standing side by side. When I was walking toward him, I was making a statement about the fatigue I was experiencing. I was shaking my head and saying, "The way I am feeling today....." when Skip reached out and took hold of a piece of my hair that was hanging past my chin and severed it from my body. He snatched a portion of the hair that was chopped, jumped away from me and then scurried away with it. It looked like he was skipping around the office. I looked in disbelief and I kept on repeating, "You cut my hair? I can't believe you really cut my hair?" Then, Beth said to me, "You have something hanging." I combed through my hair with my fingers and recovered the remaining locks from the portion of my hair that had been maimed. As I was shaking my head in disbelief and repeating, "You cut my hair! You really cut my hair!", Beth, a former professional hair designer, said with shock and disbelief, "Why would you cut off her hair? You just chopped three inches off of her head!" Skip nonchalantly replied by saying, "She goes to the hairdresser every week." He said this as he shrugged one shoulder while leaning against a piece of equipment. Beth then rebutted with, "But the hairdresser can't grow her hair for her." I then approached Skip personally with the lock of hair and begged for an explanation to the following question: "Why would you cut off my hair?" I walked toward him with my arms extended and my hands opened. He removed the hair from my hand and said, "Oh, I am going to put it in my book." I said, "A book?" He said, "Yeah, I got a book. I am going to put it in my book." I shook my head in disbelief, walked passed him and said, "Skip, move. Just get away from me. Go to the other side."

I proceeded to continue wiring an order from a ticket that I had just started. Less than 20 minutes later, he walked over to me as I was sitting at a computer. He said to me, "I am sorry if I hurt your feelings." Then I told him, "You didn't just hurt my feelings. You have just pissed me off!" He replied with," Well, I'm sorry if I pissed you off." He left my area and went to change clothes for the funeral. Upon his return, he made idle chit chat with me (ex. "Is my tie straight?"), and then left for the funeral. At approximately 12:15 p.m., the union rep named Cathy Collins called the office. I advised her at that time that Skip cut off my hair. She then questioned what I had just said as if she didn't hear me. I repeated, "Skip cut off my hair with his needle nose." Her response was, "I would have killed him! He's on my shit list anyways!" She said this with obvious disgust. Then she told me, "I am going to talk with him." I then advised Cathy that I was

Rhonda Hall
Page 2

fed up with Holyoke as a whole and I couldn't take it anymore. As we were talking, Skip walked through the door. He came over toward my desk. I advised him that Cathy wanted to talk to him. I left the area and shortly after left for my hour lunch break.

At approximately 2:00 p.m., my manager, Jack Lynch, came in the building, walked through the toll side in Skip's work area, stopped for a few minutes and then came through the cage and took a seat in order to have a conversation with me. He said, "What's going on? I hear there's a problem." I asked him if he spoke with Skip. "Did he tell you what he did?" I questioned. He said, "No, no, no, nothing like that. Cathy just called me and told me there is a problem in Holyoke and I should get out there. So, what's going on?" Then I said to him, "Well, he cut off my hair. He cut off my hair with his needle nose pliers." He looked up, then reached up and then wiped his face with anguish. Then, I said, "Yeah, I feel the same way. I have a splitting headache, right over my eye." Then he said to me, "Well, yeah, he did admit he did that. He said it wasn't malicious. He said it was a stupid thing to do. He said he is very sorry for it. You don't think it was malicious, do you?" I said, "Well, I guess not like that."

Then, Jack began to tell me a story. "One day there was this woman who used to work in the office. She kept herself in excellent shape. She had to be over 50, but she had the longest legs, she had beautiful legs. She would wear shorter skirts sometimes. (He motioned how short the skirts were.) He then said how one day he walked up to her, playing a joke, and opened an umbrella in her face. As the umbrella opened, the edge of it sliced open her thigh. 'And imagine me, as a manager, having to tell my supervisor that I did that and she is bleeding. So, I know all about doing something stupid at times.'"

So, then he goes on a totally different subject. He begins to discuss our rearrangements of surplus, our possible layoffs and other work related issues that did not pertain to my situation at hand. He then said, "I am going to go over to the other side and speak with Skip." He leaves to go to the toll side of the building, speaks to Skip for a short time and then he leaves. I then called Jack's office and left a message on the voice mail and questioned what was the outcome of our meeting. Jack called back and said, "You called me? You left me a message?" He sounded bewildered, as if he didn't know why I would be leaving a message. He then made a joke about Skip chopping off my hair. I said, "Huh, what did you say?" Then he said, "Nothing, nothing." I told him, "Yes, I wanted to know what happened. You just left. What did you say to him?" Jack nonchalantly said to me," I told him you're just mad right now. You'll get over it in a couple of days." I said, "You said that to him?" He said, "Yeah." I said, "You really said that to him?" He said, "Yeah, I don't know what you want me to do. He said he's sorry. He admits he was wrong. I mean, it's not like I am going to suspend the guy. What would that prove?" Then I told him, "My level of aggravation is at its highest. I just cannot take this anymore. I cannot take it anymore. I have had it with Holyoke as a whole. There's a level of respect that obviously no one has for me. They can just do what they want to me

Rhonda Hall
Page 3

and it's no big deal. I am not happy. Jack replied, "Well, a lot of people are not happy.
There are a lot of things going on in this company." I began to cry and told him,"I gotta
go upstairs. I gotta call you back." He said, "Are you alright?" I replied, "Well, no I am
not alright. I'll talk to you later." Then, we hung up. He called me back about 30 minutes
later. He said he had called and asked if I forgot to call him back; he was worried about
me. I told him that I didn't forget to call him back and I had gotten busy. Then, he hung
up.

At the end of the day, I heard the gate close.
The incident between Skip and I was left unresolved on my end, and over and done with
on Verizon's end.

Friday, September 6, 2002

I called in to work at 7:30 a.m. to advise Jack that I would not be in today and if he had
any questions, he could call me. I then left my telephone number. I drove down to the
Worthington Street Verizon building, where my manager's office is. I met another
manager, Bob Cote, going up the elevator. He commented on how tired I looked. I went
up into the office to see Jack and to get my paycheck, but no one was available. I left the
office, and shortly thereafter, went to The Commonwealth of Massachusetts Commission
Against Discrimination office. I put my name on the waiting list, sat down on the bench
and waited my turn to speak with Melvin Arocho, Intake/Investigator. Mr. Arocho and I
began our meeting at 11:30 a.m. At the conclusion of our meeting, he wrote down that I
could possibly have basis for a general, gender or racial harassment claim. He also
provided me with the phone numbers to The Hampden County Bar Association and the
Employment Rights. He advised me that I would have to sit down and put everything in
writing for their review.

Shortly thereafter, I left and walked in to see my HMO at the Riverbend Medical Center
in Chicopee. I waited in Urgent Care and was eventually seen by Dr. David Ott. After
my consultation with him, he prescribed Butalbital for my pain.

I went home and listened to my messages. There was a message from Jack Lynch
requesting me to page him. I paged Jack and he called back at 4:26 p.m. I questioned why
he wanted me to page him. He said, "You didn't say what kind of day you were taking."

Rhonda Hall
Page 4

I advised him that it was a sick day and that I had a headache. He said, "Okay. I was going to have a meeting with everyone in Holyoke on Monday." I told him," I would not be in on Monday." He questioned, "You won't?" I said, "No, my doctor's note does not have me coming back until Tuesday." I then advised him that I wanted a meeting with George Savaria, the Western Massachusetts Area Second Level Central Office Manager. He said that he would try to set something up, but George has not been in the office because of the force rearrangement. He said, "I guess you don't care what day it is just as long as it is next week." He said he would check George's schedule. I said, "Okay." Then, we hung up.

I drove to Holyoke and went to the Holyoke Police Department. I arrived at the police department around 9:00 p.m. I spoke with an Officer C. Porter at the desk. I explained my situation to her. Because of the nature of the crime and the fact that she felt this was an unusual incident, she wasn't sure of how she should take the report. She asked which company was in question and I told her Verizon. She then told me to hold on and she went to speak to her lieutenant. When she came back, she told me that she spoke to her Lieutenant Cassidy. He told her to tell me that,"…because the party is known to her, she needs to file a complaint with Holyoke District Court."

I questioned, "You won't take the report?" She said, "No, because you are going to have to do it again down there anyways. So, you'll have to go there on Monday." I then advised her that I was not from the area and I didn't even know where Holyoke District Court was. She then wrote down the name, address and phone number for me.

Saturday, September 7, 2002

I spoke with Michelle of Verizon Ethics Line (1-800-473-8255) at 8:20 a.m. I explained my situation from Thursday to her, the response that my manager gave me, and backround information and examples from the past two and a half years of harassment that I have been experiencing. Michelle questioned if I had been to any other outside agencies; basically she wanted to know what steps had I taken already. I explained one of the many steps that had been recommended to me by Melvin Arocho of MCAD. He suggested that I seek advice from legal counsel. When I shared this with Michelle, she quickly blurted out, "Oh, I wouldn't suggest that." She then advised me that this was not a matter for the Ethics Line. She suggested that I call Security and she gave me the number. She also gave me the number for the EEO. I questioned why I even contacted the Ethics Line if they couldn't help me. She said that even though they couldn't help me here, they were able to point me in the right direction by giving me the correct phone numbers that I needed to call.

Rhonda Hall
Page 5

At 8:35 a.m., I called the Verizon Security Line (1-800-997-3287) and spoke to Maggie. She took the report and said that she would have the agent give me a call because he was on call and they would not consider this a life-threatening situation. She would Lotus note him the information and he would get back to me as soon as possible.

Monday, September 9, 2002

At 8:13 a.m., Jack called and left a message on my voice mail. He told me to call the Absence Reporting Line and he provided me with the number.

At 9:16 a.m., Jack called again. He told me that he had set up the meeting that I requested with George. He explained to George what was going on and George agreed to meet with me at 1:00 p.m. on Tuesday, September 10, 2002.

At 8:45 a.m., I called the MCAD. I spoke to Magdalia Riveria additional information. I told her about my meeting with Melvin Arocho. She said Melvin had spoken to her about the situation. She asked me if I had documented accounts of my incidents. I told her that I didn't have anything at the time. She confirmed Mr. Arocho's suggestions for documentation.

My next stop was back to Holyoke District Court. I filed an application for complaint and requested a restraining order (but was refused one because I did not have an intimate or blood relationship with Skip, per the Office of Victims Assistance).

At 12:33 p.m., I called the Verizon EAP (1-800-327-2037). I made a telephone appointment to converse with Peter Magmer. I made an appointment with Mr. Magmer for a 2:15 p.m. call back session. At 1:36 p.m., I called the Hampden County Bar Association and left a message on the voice mail regarding legal assistance. At 1:41 p.m., Joe Osediacc of Verizon Security spoke to me. I explained to him portions of my present situation. He advised me that he was going to look into it and give me a call back. At 2:13 p.m., Peter Magmer called me back. I explained my situation to him. He was absolutely appalled. He told me that the EAP only does assessments and referrals now. He suggested that I seek therapy and call the 800 number on the back of my medical card for mental health services. He also told me that he was going to personally contact Paul McGovern of Verizon's EEO Department (617-743-4996) and have him give me a call. He strongly urged me to seek therapy. At 2:38 p.m., Joe Osediacc from Verizon Security called me back. He told me that my situation was not a security issue; however, he had been in contact with the EEO Department himself. I said, "Paul McGovern." He said, "Yes." He said, "Paul McGovern would be taking over this situation and that he would

Rhonda Hall
Page 6

be in touch with you." I told him that I had just gotten off the phone with Peter Magmer and that's how I new Mr. McGovern's name. At that point, he questioned if I had phone numbers for Mr. Magmer readily available. I politely said, "Yes." Then, I gave him the numbers.

I hung up and then called the 800 number on the back of my medical card. I spoke with Ericka from Migellen. She advised me that my HMO had its own behavioral health services and I would have to contact them directly. At 2:47 p.m., I called Riverbend Medical Group. I spoke to Gail in Behavioral Services. I was advised that Dr. Brian Pickell would have to give me a call back. At 3:19 p.m., I received a phone call from Paul McGovern of EEO. I explained the situation, yet again. He advised me that his office would be taking over the investigation. He also told me that I should not discuss their involvement in this situation. He then said he would be in touch. At 4:20 p.m., Dr. Pickell from Riverbend Medical Group called back. I told him that I needed an appointment as soon as possible. He said there was nothing available until Friday, September 13, 2002, at 10:15 a.m. I had no other choice but to settle for that appointment.

Tuesday, September 10, 2002

The morning of September 10, 2002, I called the IBEW Local Office on Cottage St. to get the telephone numbers of Cathy Collins and Louie Bernetti, my two union reps. I paged Cathy and Louie at the same time. Cathy called me back. I told her that I was still waiting to hear from Louie. I told Cathy that I had a meeting with George and I needed someone to come in with me. Cathy suggested that we meet one hour before the meeting in the conference room on Worthington St. so we would all be on the same page. She said that she would contact Louie herself to make sure that he was there. At 12 p.m., Louie, Cathy and I met in the conference room at Verizon. I advised Louie of what had taken place since our last meeting on August 6, 2002. I gave them an update of what has been going on between my coworkers and I, along with the lack of response from my superiors. I reminded Cathy of several incidents regarding Skip. I then told her that he has gone from smaller infractions to much larger infractions. I told Cathy and Louie about the steps outside of the union that I had taken (outside agencies and internal Verizon agencies). When Cathy heard that I went to the district court in order to file charges, she questioned whether or not going after Skip in that fashion was the right thing to do. We concluded our meeting and then began a new meeting at 1:00 p.m. The second meeting included Jack, George, Cathy, Louie and I. At the second meeting, George questioned why I didn't call the Absence Reporting Line on my first day of absence. I told him that I called Jack's direct line/voice mail and left him a message there. I also told him that Jack didn't give me that number until Monday, and I called it on Monday to report my absence. From there, I repeated my entire story from Thursday and advised George of what happened and what my supervisor's response to it was.

000104

Rhonda Hall
Page 7

I also advised him of Cathy Collins' response of "I would have killed him." I reminded them of other incidents when Skip had stepped on me on purpose on two different occasions around the month of May 2002.  I had to resort to speaking with Cathy, the union steward, in order to make him stop.

CCO105

Rhonda Hall
Page 8

After concluding my story, Jack indirectly admitted at the meeting that there was a three way pow-wow between Cathy, Skip and himself. He said, "I never said,' you'd get over it.'" I told him, "You most certainly did." He said, "Well, I don't remember saying that." Then I said, "Well, you did." I said, "Do you remember saying,'Well, I am not going to suspend the guy. What would that prove?' Do you remember saying that?" He said, "Yeah, I said that while we were sitting down talking." I told him, "No, you did not. You made that statement on the telephone when I called you back. You gave me no conclusion whatsoever when you left. That's why I called you back." He said, " I wish you had shown this much passion that day. I responded with, "Why? Everybody doesn't always respond the way that you think they should." Then he said, "I thought everything was okay. I didn't know all this other stuff happened. Then I said, " I'll give you that. You didn't know about what he said to Beth because you left. You said you were going to talk to Skip and then you left the building. Then he said, "I asked you was it on purpose and you said no." Then I said, "You didn't ask me that. You asked me if it was malicious. I said no I don't think like that. But I was meaning to kill me right then, no." Then he said, "I went over to talk to Skip. I asked him where the hair was and he showed it to me in the trashcan. And I told him that was a stupid thing to do and I don't know where this is going to go." Jack's supervisor, George Savaria, asked him why did he leave the building. Jack said, "I don't know why" as he wiped his face. Then George questioned how my relationship with Mike Stawacz is. I told him, "It's alright. He never put his hands on me." Jack asked, "What else has happened where Skip has put his hands on you?" George cut him off quickly and said, " I count three right here; how many more do you need?"

I told them that I had a doctor's note up until Tuesday, September 10, 2002, and I had an appointment with behavioral services on Friday, September 13, 2002. Jack asked me if I wanted to get my belongings from Holyoke. I told him that I didn't want anything from Holyoke. George advised me that if I returned to work, Skip and I would not be working together. He also advised me that his manager, Mr. LaPonte, was on a plane to New York, but he would give him an update of this meeting. As I looked at him, George looked at me and questioned if I believed him. I hunched my shoulders and said, " Alright." At the conclusion of the meeting, George said that he had received two voicemails from EEO and he had to give them a call back. Both Louie and Cathy advised me that they would stay in touch.

After the meeting, Cathy and I walked out together. Before we parted ways, she said to me, " I need to say that you never contacted me as a steward in any of those cases." I quickly looked around and said, "What?! You're the only union steward we have, so if I didn't contact you, who did I contact?" She said,

Rhonda Hall
Page 9

" Well, I'm only saying this because if they call me, I could get in trouble for not doing anything." Then I said, "Well, you can tell them what you want to, but when they call me, I am going to tell them you're the person I was in contact with. Why'd you say that you didn't do anything? Well, didn't you do something? Didn't you call Jack? Didn't you make Skip apologize for the last incident?" Then she kept saying that she didn't know the whole. I told her they sent Julie to see me, and they were wrong. She said Julie wasn't aware of what was going on, either. I then began to explain how women have been treated in the past, specifically women from the Holocaust and slavery. Men would cut women's hair in order to belittle them. It was a form and sign of control. They were ridiculed and ostracized by society. We concluded our conversation and parted ways.

At 4:33 p.m., George paged me. I called him back and he advised me that he had spoken to Paul McGovern of EEO and the investigation was in their hands.

Rhonda Hall
Page 10

Backround Information

Since coming to Holyoke Central Office, I have had several negative encounters with
several technicians from the Hatfield garage and from my own coworkers. They are as
follows:

- I had to request that they put a lock on the ladies' bathroom in the building
  because I constantly was made aware that males who had access to the building
  were using it. The result was they changed the bathroom lock that most outside
  technicians didn't have a key to and they put a sign on the door.
- Because most of the outside technicians are in grimy environments, I kept a bottle
  of disposable disinfectant wipes in my desk. I would periodically wipe down the
  phones after their use. Some employees of Verizon thought it would be funny to
  change the handsets on the phones around and leave them noticeably filthy and
  dirty. My manager was eventually notified of the situation. No action was taken.
- I constantly had a problem with technicians invading my work area. They would
  sign me off of the computer constantly and they would constantly cat out from the
  frame. I had to threaten to tell my male coworker in order to make them stop. My
  manager was eventually advised of this. The solution was to remove the desk and
  the phone that they had wired without authorization. He then spoke to their
  Second Level Manager, Tom Hurley, and they agreed to reopen a basement room
  that had been previously closed and locked due to their ill behavior. The hope
  was that the outside technicians would go there instead of my workspace.
- I would constantly find outside technicians disrespecting my workspace. For
  instance, they would put their feet up on by desk and leave a trail of mud, dirt and
  boot prints on it. My supervisors were eventually advised of this.
- Three technicians, Ray Seeky, Matt Provential and Ben Table, were having a
  conversation in regards to a manager of Indian decent. They questioned why he
  was allowed to live in a well-to-do neighborhood in Wilbraham. (Something to
  the effect of "Who let him in there? How did he get to live out there?") Following
  that statement, I questioned why wouldn't he be able to live out there. Ray Seeky
  then directed his racist statements toward me and indirectly called me a nigger by
  asking,"How come you people get mad when we call you nigger and you say
  nigger all the time?" John Reilly, a union steward at the time, was aware of the
  incident and contacted me directly. He advised me that Ray had been spoken to
  and if anything else ever happened, he was my union steward and I could contact
  him. My supervisors were eventually made aware of the situation. There was
  mention of a suspension. I advised them that I would leave the situation in their
  hands. I was advised that there would be a conference call with Tom Hurley,

C00103

Rhonda Hall
Page 11

    Second Level Manager from the outside; Paul Gazda, Outside First Level
Manager; Jack Lynch and George Savaria. Outcome unknown.

- My vehicle was keyed out in the parking lot after some outside technicians told
  me that I wasn't doing my job fast enough. My supervisor was eventually was
  made aware of this situation, but no action was taken.

- The jacket that I kept in the office because of the air conditioning had mucous on
  it. My supervisor was made aware of that situation, but no action was taken.

- Outside technician, Brian King, walked in the central office screaming and yelling
  at me in a threatening and hostile manner. He was told to get out of the building
  by Mike Stawacz, my coworker. My supervisor was immediately made aware of
  this situation. The outcome was a meeting with a union representative and Jack
  Lynch. The technician had to apologize.

- Outside technician, Ray Seeky, called me in a harassing and argumentative
  manner on the phone advising me that my first job and responsibility was to cater
  to the outside technicians. I advised him that that was not my first responsibility.
  My supervisor was made aware of this incident. I told to ignore him because I
  was doing a great job. He had no complaints and I was advised to continue to do
  things the way that I had been.

- There were several occasions were children in Holyoke were either killed or
  seriously injured. Several technicians made comments with glee about their
  demise stating, "That's one less that we'll have to worry about later."

- Outside technicians made comments about their coworkers being "Jew bags".
  When I asked, "What does that mean?", the response was, "That's a Jewish
  person who hoards all of their money." I advised them that my son was partly of
  Jewish decent and that they should be careful with their comments because
  someone is bound to be offended, and it is bound to be me.

- The technicians had to constantly be reminded not to curse in front of me. They
  would frequently get mad, yell, scream and on one occasion throw a vital piece of
  equipment against the wall and shatter it.

- My coworker, Skip, stepped on my brand new light brown work boots. He was
  asked to stop, but didn't. On another occasion, he stepped on my brand new light
  colored sneakers and continued to do so. I spoke to union representative, Cathy
  Collins. She said, "I can't believe him. I am going to call him up and speak to
  him." He eventually came over and apologized.

- One day, without management approval, union representative, Julie Kilbride,
  came to my office to reprimand me in regards to a technician's complaint that
  they had received. She advised me that the Business Manager of IBEW Local
  2324, Billy Gorman, had sent her there to speak to me personally. I asked her why
  was she only speaking to me about the problem. She advised me that the
  complaint was only in regards to me. The complaint against me was that I did not
  answer the phones. However, while Ms. Kilbride was there meeting with me, the

Rhonda Hall
Page 12

- phone rang. My coworker, Mike Stawacz, did not answer the phone even though he was told by Ms. Kilbride to answer the phone if it rang because of our meeting. At that point, I questioned her about me being the only one who doesn't answer the phone. Since she observed Mike Stawacz not answering a ringing phone, her response to me was, "Point taken." The other complaint was I would put the outside technicians on hold for too long. I explained my responsibilities, per my manager, to Julie. She advised me that I should just really try to get along and we all have to work together. I explained to her that I am always professional while dealing with them. Several other things were mentioned, but in conclusion, I notified my manager immediately. We then agreed to involve his manager, George Savaria, and Louie Bernetti, the Union President. After our meeting, the outcome was there would be a meeting between the second level managers from both outside technicians and Central Office managers. A face-to-face meeting never happened. I was told a conference call did take place. The outcome was that they didn't want to get the outside technicians in an uproar because some of the issues were too outdated to take disciplinary actions on. They felt that maybe I was subconsciously slighting them; therefore, they would attempt to get me trained on toll equipment so that I could be included in the rotation within the office. My training dates were as follows: September 23, 2002 and October 7, 2002. In addition, my manager would make his presence more visible around the office. Both of my coworkers were extremely upset and bothered by this and verbally expressed their dismay.
- Shortly after this meeting, postage stamps were stolen out of my desk drawer. My supervisor was made aware of it. His response was something to the effect of, "You shouldn't have left them in the desk drawer."

During the meeting listed above, Jack Lynch said something to the effect of " If anything happens, anything at all, don't wait. Tell me about it and I'll take care of it." George Savaria also made mention of technicians having issues with my gender, as well as race. He also told me that I was not the only female central office technician who has had difficulty on the job because of outside technicians. He reminded Louie that this was not the first incident of its kind, they have prior problems that are similar and he there better not be any physical retaliation by the outside technicians.

CCC110



Paul R. Labonte
Director
Network Operations
New England

900 Chelmsford St., Twr 2, Floor 3
Lowell, MA 01851

Phone 978 446-5050
Fax 978 446-8074
paul.r.labonte@verizon.com

May 27, 2003



Rhonda Hall
74 Waldorf St.
Springfield, MA 01109

Ms. Hall:

On 1/10/2003 you were notified by telephone that Verizon's Corporate Health Services Consultant found you able to work. You were instructed to return to work on 1/13/2003, and subsequently you failed to return to work and perform the essential functions of your job assignment as directed.

Upon your failure to report, you were again instructed to return to work and perform the essential functions of your job assignment at 295 Worthington St., Springfield, MA on 5/26/2003 at 8:00am, in a letter dated 5/20/2003. This letter advised you that your failure to return to work as directed on this occasion would be cause for terminating your employment.

You have failed to return to work on 5/26/2003 as directed, and as a result, you have been discharged from employment with Verizon, effective 5/26/2003.

Enclosed is a Massachusetts Workers How to File for Unemployment Insurance Benefits Package (Form 5090) for presentation to the Division of Employment Security if application for unemployment compensation is made.

Paul R. Labonte
Director
Network Operations
New England

000000

DISCRIMINATION COMPLAINT
MASSACHUSETTS COMMISSION AGAINST DISRIMINATION AND EEOC

FEPA NO.:                          FILING DATE:
EEOC:                              VIOLATION DATE: 9.05.02        

NAME OF AGGRIEVED PERSON OR ORGANIZATION:            OCT 0 7 2002

Rhonda Hall                        TELEPHONE NUMBERS:        
74 Waldorf Street                  Home:  (413) 783-7007     Commission Against
Springfield, MA 01109                                        Discrimination
                                                             Springfield Office

NAMED IS THE EMPLOYER, LABOR ORGANIZATION, EMPLOYMENT AGENCY OR
STATE/LOCAL GOVERNMENT AGENCY WHO DISCRIMINATED AGAINST ME:

Verizon                          TELEPONE NO: (413) 788-1625
322 Maple Street
Holyoke, MA 01040

CAUSE OF DISCRIMINATION BASED ON:   Race, Color, and Sex
On September 5, 2002, Verizon discriminated against me by subjecting me to unequal terms and
conditions of employment by failing to provide a harassment free environment and failed to take
immediate corrective action, thereby creating a hostile work environment based on my race and
color (Black) and gender (Female). Verizon's actions are in violation of M.G.L. Chapter 151B,
S4 (1) and Title VII of the 1964 Civil Rights Act.

THE PARTICULARS ARE:

1) Verizon hired me on March 13, 1989, as an Operator, and my work performance has always
   been satisfactory. I began to work in the Holyoke branch as a CO Technician on or about
   January 31, 2000.
2) During my first few months in Holyoke, approximately January through March 2000, male
   co-workers were using the female restroom. When I complained they changed the lock to one
   which few of the technicians had keys to, and a sign was put on the door. As the only female
   worker in the area, I was still uncomfortable with the fact that male co-workers still had
   access to the female restroom.
3) I have been exposed to an overtly racist work environment for the duration of my
   employment in the Holyoke branch. The outside technicians, including Ray Seeky, Matt
   Provential, and Ben Table, have made these comments, and many similar, continuously from
   January 2000 to the present:
   a) There were several occasions when children in Holyoke were either killed or seriously
      injured. Several technicians made comments with glee about their demise, stating "That's
      one less that we'll have to worry about later."
   b) Outside technicians made comments about their co-workers being "Jew bags." When I
      asked what that meant, their response was, "That's a Jewish person who hoards all their
      money."
   c) Certain technicians asked why a manager of Indian descent was allowed to live in a
      certain well-to-do neighborhood: "Why let him in there? How did he get to live out
      there?"

d) When I asked one of the technicians, Ray Seeky, why the manager shouldn't be allowed to live there, he responded by asking, "How come you people get mad when we call you nigger and you say nigger all the time?"

4) For the duration of my employment at the Holyoke branch, I have felt harassed from my fellow employees:

a) Consistently for the past two and a half years my personal work areas and telephone handles have been consciously dirtied when I was absent.

b) During the spring of 2001, my vehicle was keyed in the parking lot. My supervisor, Jack Lynch, was made aware of the situation, and no action was taken.

c) During the spring of 2001, someone put mucous on my jacket. My supervisor was made aware of this and no action was taken.

d) Sometime during the summer of 2001, outside technician Brian King walked into the central office screaming and yelling at me in a threatening and hostile manner. He was told to get out of the building by my male co-worker, Mike Stawacz. My supervisor was immediately made aware of the situation, and the outcome was a meeting with a union representative and my supervisor, Jack Lynch. The meeting resulted in a mandatory apology from Mr. King.

e) Sometime between February and April of 2002, an outside technician, Ray Seeky, called me in a harassing and argumentative manner, and advised me that my first job and responsibility was to cater to the outside technicians. My supervisor was made aware of the incident, and I was told to ignore it because I was doing a great job.

f) The technicians had to be constantly reminded not to curse in front of me. They would frequently get mad, yell, scream, and on one occasion, threw a vital piece of equipment against a wall.    *2002*

g) On or about the month of May, my co-worker, Skip Pula, stepped on my feet on at least two separate occasions, and refused to stop when I asked him to. I had to ask my union representative, Cathy Collins, to speak to him. Mr. Pula eventually apologized for his actions.

h) After a meeting on or about the winter of 2001 and 2002, Mr. Lynch, Mr. Pula, Mr. Stawacz, and myself, the gentleman somehow began a conversation about a woman Mr. Pula referred to as a "bitch." I told him that he shouldn't speak about her in that manner. Mr. Lynch said to me, "Why, because you are acting like a bitch?" I asked him to clarify what he had said in case I misheard, and Mr. Pula, jokingly, mentioned that I should call 1-800-Ethics. Mr. Lynch said, "No sir, no sir. Please don't do that. I'm only kidding."

i) On or about August 2, 2002, union representative Julie Kilbride approached me about a technician's complaint they had received concerning me. We discussed the complaint, and I explained the priorities of my job. The complaint, which stated that I did not answer the phone and that I kept technicians on hold for too long, was not valid when the responsibilities of my job were clarified. This encounter led to a decision to have a meeting with myself; George Savaria, the Western Massachusetts Area Second Level Central Office Manager; and Louis Bernetti, the union president.

5) This meeting led to the decision to have a face-to-face meeting with both the outside managers and co-managers. This face-to-face meeting with the outside managers and co-managers never occurred, but I was informed that a conference call did take place. When Mr. Lynch described this call to me, he said the following:

a) They were concerned I was subconsciously slighting the outside technicians, and therefore were going to attempt to train me on toll equipment so I could be included in the office rotation. The training dates were as follows: September 23 and October 7, 2002.

b) My manager would make his presence more visible around the office. Both of my co-workers were extremely upset about this, and verbally expressed their dismay.

c) Mr. Lynch said something to this affect, "If anything happens, anything at all, don't wait. Tell me about it and I'll take care of it."

d) Mr. Savaria also made mention of technicians having issues with my gender, as well as race. He stated that I was not the only female central office technician who has had difficulty on the job because of outside technicians. He reminded Mr. Bernetti that this was not the first incident of its kind, that they have had prior problems that are similar, and that there had better not be any physical retaliation by the outside technicians.

6) On September 5, 2002, Mr. Pula cut a portion of my hair off with a pair of pliers. He did this in front of another co-worker.

7) When I showed disbelief and anger, Mr. Pula stated, "She goes to the hairdresser every week."

8) Approximately twenty minutes later, Mr. Pula apologized for making me angry. He did not seem to understand that I felt physically violated.

9) At or about 12:15 pm, Ms. Collins called the office. I advised her of the situation with Mr. Pula. She stated she would speak to him, and when Mr. Pula entered the room, I gave him the phone indicating the union representative had something to say to him.

10) At or about 2:00 pm, Mr. Lynch came in and spoke to me. He said Ms. Collins had encouraged him to come see what happened. After I described the event, he stated that Mr. Pula had apologized, and believed he had made a stupid mistake. He asked me if I thought Mr. Pula's action had been meant maliciously. I responded, "Well, I guess not like that."

11) Mr. Lynch then told me a story: "One day there was this woman who used to work in the office. She kept herself in beautiful shape. She had to be over fifty, but she had the longest legs, she had beautiful legs. She would wear shorter skirts sometimes." He motioned to show how short her skirts were. He continued on to tell how, playing a joke, he had accidentally injured her.

12) During a phone call we had later that day, Mr. Lynch made a joke about Mr. Pula cutting my hair. When I asked him about the conversation he had with Mr. Pula, he replied, "I told him you're just mad right now. You'll get over it in a couple of days."

13) I attempted to go through Verizon to have my situation dealt with:

a) On September 7, 2002, I sought therapy at the suggestion of Peter Magmer of Verizon Employee Assistance Program (EAP).

b) On September 10, 2002, I met with my union representatives, Ms. Collins and Mr. Bernetti, and we discussed the situation and the steps I had taken. These steps included calling the Verizon Ethics Line, the Verizon Security Line, the EEO, and the EAP.

c) After this meeting, I attended the meeting scheduled with Mr. Savaria, Ms. Collins, Mr. Bernetti, and Mr. Lynch. I informed Mr. Savaria of everything that had happened, and the steps I had taken. Mr. Savaria told me that if I returned to work, Mr. Pula and I would not be working together.

14) I am currently a full-time employee of Verizon, and have been on sick leave since the day after the incident. The sole reason for this leave of absence has been emotional distress, and is related only to my work environment.

15) In the year 2001, Verizon employed a woman named Tanya (White) as a technician in the Southampton area. Although she, too, faced sex discrimination, the harm and harassment done this woman was responsibly and promptly investigated.

a) Allegedly, this woman faced similar situations concerning the female restroom. However, this woman was promptly accommodated. The lock, whose keys were then available to male co-workers, was immediately changed and the only key was given to her.

16) In another instance, graffiti was written about an unnamed woman inside a restroom. Again, this was immediately investigated. The tile holding the graffiti was removed from the wall, and was taken to a handwriting specialist as an attempt to find the author.

I believe that I have been unlawfully discriminated against as an African-American woman. The consistently hostile work environment led naturally to Mr. Pula's physical violation of my body. The established pattern of discrimination in my workplace was perpetuated by the reaction of my supervisors. Verizon subjected me to unequal terms and conditions of my employment based solely on my identity as an African-American and as a woman.

I also want this charge filed with the EEOC:          XX

I WILL ADVISE THE AGENCIES IF I CHANGE MY ADDRESS OR TELEPHONE NUMBER AND I WILL COOPERATE FULLY WITH THEM IN THE PROCESSING OF MY CHARGE IN ACCORDANCE WITH THEIR PROCEDURES.

I SWEAR AND AFFIRM THAT I HAVE READ THIS COMPLAINT AND THAT IT IS TRUE TO THE BEST OF MY KNOWLEDGE, INFORMATION, AND BELIEF.

Rhonda Hall

SWORN TO AND SUBSCRIBED BEFORE ME THIS _7TH_ DAY OF _OCT._, 2002.

Notary Public

MELVIN AROCHO
Notary Public
Commonwealth of Massachusetts
My Commission Expires
January 13, 2007

RECEIVED

OCT 07 2002

CCCC98

Neuropsychology Service
Department of Psychiatry
University of Connecticut Health Center
263 Farmington Avenue
Farmington, CT 06030-2103
(860) 679-3497
FAX: (860) 679-4077



**Name:** Rhonda HALL
**MRN:** T01069684
**DOB:** 08/25/70
**DOS:** 11/06/2002

**Reason for Referral:** Ms. Rhonda Hall is a 32 year-old right handed woman referred for a neuropsychological evaluation by UNIVAL to document her current level of cognitive functioning and psychological functioning and aid in differential diagnosis.

Ms. Hall understood the purpose of the evaluation. She was informed that we were not establishing a doctor-patient relationship and that the limits of confidentiality differed from that of typical doctor-patient relationship.

The following history was obtained from the patient and medical records.

**Educational/Employment History:** Ms. Hall is a high school graduate who went on to earn associate degrees, in marketing and management, at Springfield Technical Community College. She denied any history of learning problems. She has worked for Verizon for 13 years, the last two and a half as a technician in their central office. She has been on medical leave since September 6, 2002.

**Psychosocial History:** Ms. Hall is single and lives with her eight year old son. She denied any past psychiatric history. She does not smoke and only rarely drinks alcohol.

**Past Medical/Family History:** Ms. Hall's previous medical history is non contributory. She is in good physical health.

Her parents are alive and well. Her son is in good health.

**History of the Present Illness:** Ms. Hall stated that her primary problems were poor concentration and trouble falling and staying asleep. She also reported feeling depressed, anxious and fatigue. She has been more forgetful. Ms. Hall stated that these problems stemmed from an incident at work, on September 5, 2002, when she was "assaulted" by a co-worker. According to her, a coworker clipped a piece of her hair for no apparent reason. Afterwards, he stated he wanted to put it in a book. She was humiliated by this, but not physically hurt. This had been part of a pattern of harassment and disrespect dating back to when she became a technician, and was the only African American woman in a office with all white males. She reported this incident to her supervisor who indicated

Rhonda HALL, T01069684                                                           2

that the co-worker apologized and that she not make a big deal over it. She has since pursued this with the Massachusetts Committee for discrimination and is taking legal action. She has not returned to work since the hair-cutting incident, and continues to suffer from anxiety, headaches, depression, problems with concentration, poor sleep and weight gain.

Ms. Hall receives psychotherapy once a month. She was initially treated with Lorazepam for anxiety and insomnia, and Zoloft for depression. However, these were discontinued and her only current medication is Butalbital for headaches.

Ms. Hall maintains that she cannot to return to her job at Verizon because of the above-mentioned symptoms. There is also increased anxiety associated with that work environment because she would be working for the same supervisor.

**Behavioral Observations:** Ms. Hall arrived on time and appropriately dressed. She was friendly and cooperative. She initiated and would engage in normal conversation, and asked for clarifications when she was unsure about a procedure. However, she became tearful when talking about her problems at work. She had a headache throughout the testing which she rated as a 6.5 on a 1-10 scale. Although the headache was likely a distraction, she appeared to put forth an adequate effort. Testing was completed over a period of 8 hours with a break for lunch.

**Tests Given:** Wechsler Abbreviated Scale of Intelligence Test (WASI), Trail Making Test, Wisconsin Card Sorting Test, Stroop Test, Complex Figure Test, Controlled Oral Word Association, California Computerized Assessment Package (CalCAP), California Verbal Learning Test-II, Wechsler Memory Test-Revised, Grooved Pegboard, Aphasia Screening, Test of Memory Malingering, Beck Depression Inventory and MMPI-2.

**General Cognitive Abilities:** Intelligence testing was done using the WASI. Her estimated IQ is in the average range (37th percentile). Age-corrected Scaled-scores are as follows:

| Vocabulary | 8 | Block Design | 9 |
| Similarities | 7 | Matrix Reasoning | 12 |

All subtest scores were solidly in the average range ($\geq 16$th percentile).

**Copying:** Her copy of the Complex Figure was complete earning all 36 possible points (> 16th percentile). She used a normal strategy and organized the drawing around a central figure.

**Attention, Conceptualization and Executive Functions:** Ms. Hall's performance on written and oral administrations of the Symbol Digit Modalities Test was below average (< 10th percentile). On the Stroop test, he performed below average on word naming (5th percentile), color naming (<1st percentile) and the interference trial (<1st percentile),

FROM : PAMELA ROY    TO : RN Pamela Roy    Page 4/6    Date: 12/26/02 3 30 18 PM

Rhonda HALL, T01069684                                                    3

suggesting slowed processing rather that distractibility.  On the California Computerized
Assessment Package, a series of continuous performance reaction time (RT) tests
requiring focused, sustained, and divided attention, her RT performances varied but were
all in the average range.  She performed normally on a simple RT test (42nd percentile).
On a choice RT test, in which the stimuli are degraded, her RT and accuracy were in the
average range ($\geq 50^{th}$ percentile).  She performed slightly worse on the two divided
attention tasks, but her performances (RT and accuracy) were still both in the average
range ($\geq 16^{th}$ percentile).

On the Trailmaking test, a test of visual conceptualization, planning and sequencing, she
performed in the average range (46th percentile) on Part A, which requires scanning and
connecting consecutive numbers.  She performed similarly on the more difficult part B,
which requires connecting alternating numbers and letters (31st percentile).

Performance on the Wisconsin Card Sorting Test, a test of abstract reasoning and the
ability to shift responses to changing task demand, Ms. Hall's scores were normal (6
categories) with an average number of perseverative errors (79th percentile).

**Memory:** Her answers to the questions from the Information and Orientation section of
the Wechsler Memory Test-Revised (WMS-R) were all correct (14/14), indicating that
she was oriented to time and place. On the California Verbal Learning Test, a word list
learning and memory test, she recalled 12 of 16 words (50th percentile) after a short
delay and 12 after a 20 minute delay (31st percentile).  Delayed recognition memory was
similar (31st percentile).

Immediate and delayed memory for the Complex Figure were average and at the 66th and
31st percentile ranks respectively.  Delayed recognition memory for the elements in the
Complex Figure was similar (21st percentile).

**Language:** Ms. Hall's language abilities were normal.  Performances on tests of naming,
following sequential commands, repetition, reading and writing were all normal.

Her ability to generate words from letters was average (31st percentile), as was word
generation from a category (31st percentile).

**Psychological Status:** Ms. Hall was administered the Beck Depression Inventory II,
Beck Anxiety Inventory and the MMPI-2 to screen for symptoms of psychopathology.
Ms. Hall reported symptoms on the Beck Depression Inventory and Beck Anxiety
Inventory indicative of mild depression and anxiety. Ms. Hall's produced a valid MMPI-
2 profile.   She appears depressed, resentful and angry.  Individuals with this profile are
typically aggressive and oversensitive.  Emotional conflict is frequently expressed by
physical complaints, and she is likely to overreact to minor health issues.

**Test Validity:** Ms. Hall's motivation to do well and level of effort were assessed by the
Test of Memory Malingering (TOMM). The results indicate that she made an adequate

Rhonda HALL, T01069684

4

effort to perform well on this test, and we should consider her performances on other similar memory tests is an accurate reflection of her ability.

**Summary and Impression:** Ms. Hall earned IQ scores indicate that she is a woman of average intelligence. Her performances on tests of word knowledge, verbal reasoning, abstract reasoning, visual spatial organization, verbal memory, and language were all within the normal range and consistent with her IQ estimate. However, performances on some tests requiring complex attention and speed of information processing (e.g., Symbol Digit and Stroop tests) were lower than expected. Based on these data, I strongly suspect her reported memory problems are related to problems with sustained attention rather than actual memory problems per se.

Ms. Hall's behavior during the evaluation indicated that she made a reasonable attempt to do well.

Taken together, I believe that problems with Ms. Hall's cognitive functioning are secondary to her emotional state rather than a neurological disorder. It also appears Ms. Hall has tendency to convert emotional discomfort into physical symptoms. Moreover this is consistent with the history of her current physical complaints. She described the timeline of her headaches as occurring with the anxiety and depression, and being precipitated by her work situation. In fact, she denied problems prior to that incident.

In my opinion, an adjustment disorder with anxiety and depression is the correct diagnosis. I also believe that Ms. Hall's mental state and physical problems are highly interrelated. As is typical in anxiety and depression, her motivation fluctuates and she may sometimes processes information more slowly, impacting both concentration and memory. Despite this, Ms. Hall was able to complete today's lengthy test battery and perform reasonably well on most of the tests, including measures requiring concentration, problem solving and memory.

Axis I:  Adjustment Disorder with mixed anxiety and depressed mood (309.28)

Axis II:  None

Axis III:  Headaches

Axis IV:  inadequate finances

Axis V:  GAF = 65  (current)

It is my opinion that Ms. Hall's symptoms stem from chronicity of problems specific to the above described work situation, including the incident which triggered her current symptoms. The ongoing process of her attempt to remedy that situation continues to fuel her anxiety and depression. I strongly suspect that Ms. Hall's emotional state will improve if she would be willing to consider another job, and she would be able to work in albeit same capacity, albeit in a different job.

Rhonda HALL, T01069684                                                    5

Thank you for referring this patient. If you have any questions, please don't hesitate in contacting me.

Richard F. Kaplan, Ph.D., ABPP/CN
Director of Clinical Neuropsychology and Associate
Professor of Neurology and Psychiatry

000314

# EXHIBIT
# F



# RiverBend
## MEDICAL GROUP

**Administrative Office**
232 Main Street
Agawam, MA 01001-1838
413-789-8000  Fax 413-789-8047

February 11, 2003                                              0422

Weiner & Peskin, PC
Attorney's at Law
95 State Street, Suite 918
Springfield, MA 01103

RE:  Rhonda Hall

Dear Attorney Peskin:

This letter is in regards to Rhonda Hall, a 32 year-old woman
followed at the RiverBend Behavioral Health Services since 9/13/02.

At that time she noted considerable stress in her work situation.
There had been a number of incidents over the previous 2 1/2 years,
such as racial comments, her shoes being stepped on, and an
incident in which a worker cut her hair with a pair of pliers.  She
noted considerable anxiety about this situation and made it
difficult for her to focus on her work activities.  It lead to
sleep loss, interrupted trains of thought, and eventually
diminished interest in activities with her child, restrictions in
her mood and irritability.  Elements of an adjustment disorder with
anxious mood and possible stress disorder were of concern.  She had
preferred not to pursue the antianxiety or SSRI anti-depressant
interventions at that time.  The symptoms did seem to come from her
employment experience and she was not able to return to work there,
given the likelihood of recurrence or exacerbation of these
symptoms in her previous work setting.

She was last seen by the psychiatrist in November.  We discussed in
the past consideration of an alternative work setting at Verizon.
It is unclear as to whether that would even be available.  I do not
see her totally disabled from working from this experience,
however, I did recommend that she did not return to the work
setting she was in previously.

Cordially,

David L. Honeyman, M.D., Psy
RiverBend Medical Group

DLH/bss20

**Agawam Office**
230 Main Street
Agawam, MA 01001-1830
413-789-6800  Fax 413-789-5171

**Chicopee Office**
444 Montgomery Street
Chicopee, MA 01020-1997
413-594-3111  Fax 413-598-7115

**Springfield Office**
305 Bicentennial Highway
Springfield, MA 01118-1967
413-733-4101  Fax 413-796-6821

**Westfield Office**
Hampton Ponds Plaza
1029 North Road (Rte 202)
Westfield, MA 01085-9711
413-533-2900  Fax 413-536-4519

TOTAL  P.01



**RiverBend**
MEDICAL GROUP

Administrative Office
232 Main Street
Agawam, MA 01001-1838
413-789-8000   Fax 413-789-8047

HALL, RHONDA                                                                 0422

May 13, 2003

Gary Weiner, PC and Judd Peskin, PC
Attorneys at Law
95 State Street
Suite 918
Springfield, MA 01103

RE:   Rhonda Hall
MR#: 34334283

Dear Attorney Peskin:

This is a letter in regard to Rhonda Hall, a 32-year-old woman
followed at RiverBend Behavioral Health Services since 09/13/02.

My most recent contact with her was 05/13/03. We reviewed the
current work situation and considerations therein. She knows that
should she move from the Holyoke to the Springfield office, she
would be dealing with the same managers and supervisors and also
see at times the individuals involved with her stress at the
previous work site. She would not see this as a change in her work
setting and I doubt from a psychiatric perspective, she would be
able to manage the level of distress she would likely feel in a
tentative work site as mentioned above.

She is now utilizing the antidepressant Paxil and was recently
started on that at a 20 mg per day dose with hopeful beneficial
effects for her. Even should she respond to the medication, the
above concerns regarding the Greenfield office work site remain
unchanged.

Cordially,

David Honeyman, M.D.
Psychiatrist, RiverBend Medical Group

**Agawam Office**
230 Main Street
Agawam, MA 01001-1830
413-789-6800   Fax 413-789-5171

**Chicopee Office**
444 Montgomery Street
Chicopee, MA 01020-1997
413-594-3111   Fax 413-598-7115

**Springfield Office**
305 Bicentennial Highway
Springfield, MA 01118-1967
413-733-4101   Fax 413-796-6821

**Westfield Office**
Hampton Ponds Plaza
1029 North Road (Rte 202)
Westfield, MA 01085-9711
413-533-2900   Fax 413-536-4519

.

# EXHIBIT G

Attn: Rhonda Jackson + Chris

Aetna™ Verizon Managed Disability Center 1-800-459-3329

NOTICE OF DISABILITY
Date Prepared: 01/13/03
PAMELA ROY - REG
M719988

This is in connection with your current disability absence.

Employee
RHONDA HALL
74 WALDORF ST.
SPRINGFIELD, MA 01109

First Date of Absence: 09/06/02
Beginning Disability Date: 09/13/02

Certified Through Date: 01/12/03

**Disability Benefit Denial**

Our Medical Staff has reviewed your request for time away from work. Based on the information provided, we are unable to certify sickness disability benefits because your certified period of disability under the plan ends on the date you are no longer disabled from working. Your disability certification has not been extended because we have not been provided with sufficient clinical information to indicate you are, or continue to be, disabled from working. Section 4(1); Section 6(10). Please note that if you or your Health Care Provider can provide new or additional information, you or your Health Care Provider should contact me immediately upon receipt of this letter.

Your Supervisor is being sent a Notice setting forth your period of disability certification and current expected return to work date.

Any certified period of disability will run concurrently with any leave approved under the FMLA. Also, when your certified period of disability ends, if you are not certified for disability benefits, you could be eligible for unpaid leave under the FMLA. If you are not eligible for FMLA at such time, you will be expected to return to work. Please direct questions regarding FMLA to Verizon at 1-800-377-7333.

| Certification is based upon the medical information provided. This notice is not a guarantee of benefits. Payment of benefits is subject to any subsequent review (s) of medical information or records, the member's eligibility on the date the disability begins, and any other provisions of the plan. |
|---|

You are entitled to a review of this decision if you do not agree.

Verizon

To obtain a review, you or your authorized representative should submit a written request. Your request should include your group's name, your name, social security number, other pertinent identifying information, comments, documents, records and other information you would like to have considered. You may also ask for copies of documents relevant to your request.

If your claim was initiated prior to January 1, 2002, your written request must be mailed or delivered to the address below within 60 days following receipt of this notice. Ordinarily, you will receive notification of the appeal determination within 60 days following receipt of your request. If special circumstances require an extension of time for the decision, you will be notified during these 60 days.

If your claim was initiated on or after January 1, 2002, your written request for review must be mailed or delivered to the address below within 180 days following receipt of this notice, or a longer period if specified in your plan brochure or Summary Plan description. You will receive notification of the final determination within 45 days following receipt of your request. This period may be extended up to an additional 45 days if special circumstances require such an extension, in which case you will be notified prior to the end of the first 45 day period.

If you do not agree with the final determination on review by Verizon, you have the right to bring a civil action under section 502(a) of ERISA.

If the determination was made based on the definition of disability, or similar limitation or exclusion, an explanation of the scientific or clinical judgement for the determination, applying terms of the plan to your medical condition, will be provided free of charge upon request by you or your authorized representative.

In any event, a copy of the specific rule, guideline or protocol relied upon in the adverse determination will be provided free of charge upon your or your authorized representative's request.

Please direct your appeal to the following address:

Aetna, Inc.
Group Disability Appeals Unit
151 Farmington Avenue
Hartford, CT 06156-2970
Attn: Rhonda Jackson RT 32

Metlife
P.O. Box 14590
Lexington, KY
40511-4590
Fax (860-690-1264

**If you have any questions concerning this notice please direct inquires to:**

1 (800) 638-4228

Verizon Managed Disability Unit
1-800-459-3329

000055

# EXHIBIT H

1

COMMONWEALTH OF MASSACHUSETTS

United States District Court

Civil Action No. 3:05-cv-30002-MAP

* * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

RHONDA HALL,                          *

        Plaintiff                     *

vs.                                   *

VERIZON COMMUNICATIONS, INC.,   *

and VERIZON NEW ENGLAND, INC., *

        Defendants                    *

* * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

DEPOSITION OF:  GEORGE R. SAVARIA

HEISLER, FELDMAN & McCORMICK, P.C.

1145 Main Street

Springfield, Massachusetts

January 23, 2006                2:15 p.m.

Sharon Waskiewicz

Court Reporter

**98**

1   the past?
2       A.   Yes.
3       Q.   What do you recall about those occasions
4   where it has been done in the past?
5       A.   A person physically wasn't able to do
6   their job anymore, to the point it would jeopardize
7   their life and death, and accommodations would be
8   made to transfer to another department.
9       Q.   And were you ever involved in that type
10  of transfer?
11      A.   Yes.
12      Q.   Can you just describe to me what you did
13  in order to accomplish that transfer.
14          MS. CHAVEY:   Objection.
15      A.   I accepted the employee.  I didn't have a
16  choice.  Our department accepted the employee.
17      Q.   And you were approached by another
18  department, or how did it come to your attention?
19      A.   I got a phone call by my boss that this
20  person would come to our department.
21      Q.   Are you aware of what union involvement
22  there was in that process?
23      A.   I was not specifically aware of it, but
24  they had to agree to that.

**99**

1       Q.   I see.  Has that happened more than once;
2   have you been involved more than once in that type
3   of transfer?
4       A.   That was the only time, that one time.
5       Q.   Are you aware of any other occasions
6   where that has occurred?
7       A.   No, not personally.
8       Q.   Do you have any knowledge that it has
9   occurred in other departments?
10      A.   Not personal knowledge, no.
11      Q.   Are there any other ways, other than the
12  bidding process and the process that you just
13  described, where someone would move to another
14  department?
15      A.   No.
16      Q.   You made a reference to a forced
17  rearrangement.  What were you referring to?
18      A.   When you have vacancies that you have to
19  fill, usually because of a layoff, you have to
20  balance your work force and you have a force
21  rearrangement.
22      Q.   Did you say a force rearrangement or a
23  forced rearrangement?
24      A.   It was a force rearrangement, but it can

**100**

1   be a forced rearrangement.  If I lost two people
2   out of Westfield and there is three people there,
3   because of a layoff, and I need more than one
4   person out there, you look at your existing force
5   and find out where you have to move people.  So
6   some people go willingly, and some people against
7   their will.
8       Q.   Is that only done within a department or
9   between departments?
10      A.   That is only done within a department.
11      Q.   Can it be done in different departments?
12      A.   It would be spelled out in a labor
13  agreement.  That is something that is not used
14  there very often.  I don't remember the exact
15  mechanisms that they use.
16      Q.   Do you recall having any discussions with
17  anyone about a deadline in which Ms. Hall would
18  need to accept the transfer?
19      A.   I believe it was five business days.  It
20  was usually five business days after the notice to
21  return, from the date she should return.
22      Q.   When you say "usually," why is that?
23      A.   If you are asked to come back on Monday,
24  if you were not back by Friday, the termination

**101**

1   letter will be going out the following Monday.
2       Q.   I see.  I will just ask again:  Were you
3   involved in any discussions about setting a
4   deadline for Ms. Hall's accepting the transfer or
5   not?
6       A.   Yes.
7       Q.   Who was involved in that decision?
8       A.   Myself, Paul Labonte, and labor
9   relations.
10      Q.   How did you decide what the deadline
11  should be?
12      A.   It is common practice.  It is used in
13  every case.  It is usually one week.
14      Q.   I'm a little bit confused about what you
15  mean by one week.  Is it one week from the date you
16  direct someone to return?
17      A.   If you are asked to return on a Monday,
18  if you are not back by the following Monday, a
19  letter will go out.  So it gives a person a week to
20  think about what they are doing.  In other words,
21  you are not terminated the day after you are asked
22  to return to work.  There is a grace period in
23  there.
24      Q.   What goes into making the decision about