UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

_____

RHONDA HALL,                              :
                                          :
               Plaintiff,                 :
                                          :
V.                                        :        Civil Action No. 3:05-cv-30002-MAP
                                          :
VERIZON COMMUNICATIONS, INC.,             :
and VERIZON NEW ENGLAND, INC.             :
                                          :
               Defendants.                :
_____:

**PLAINTIFF'S STATEMENT OF MATERIAL FACTS
AS TO WHICH THERE EXISTS A GENUINE ISSUE TO BE TRIED**

There exists genuine issues of material facts in the above-entitled matter, and,

for purposes of the Defendant's pending Motion for Summary Judgment, the following

facts must be construed in a light most favorable to Plaintiff Rhonda Hall (hereafter

referred to as "Ms. Hall").

**I.    Employment Background**

1.    Ms. Hall is an African American woman. <u>See</u>, Affidavit of Hugh Heisler

submitted in support of the Plaintiff's Opposition to Defendants' Motion for Summary

Judgment (hereafter referred to as "Heisler Affi."), Exhibit 1, p. 1.

2.    She began working for the Defendants (hereafter collectively referred to

as "Verizon") in or around March 1989. In or around January 2000, Ms. Hall began

working in Verizon's central office facility in Holyoke, Massachusetts (hereafter referred

to as the "Holyoke CO") as a Central Office Technician (hereafter referred to as "CO

Techs"). <u>See</u>, Heisler Affi., Exhibit 1, p. 1, ¶ 1, and Exhibit 2, pp. 15-16.

3.    Ms. Hall's first level supervisor, or "Turf Team Leader," was Jack Lynch.

The second level manager responsible for supervising central office technicians and

operations in Western Massachusetts was George Savaria. Both Mr. Lynch and Mr. Savaria are white males. <u>See</u>, Heisler Affi., Exhibit 2, pp. 13-14.

    4.     Throughout the time that Ms. Hall worked in the Holyoke CO, there were only three Verizon employees assigned to work in the building; Ms. Hall and two other CO Techs, Eugene "Skip" Pula and Mike Stawasz, both of whom are white males. <u>See</u>, Heisler Affi., Exhibit 2, pp. 6 & 9.

    5.     In 1999, there were approximately seventy (70) CO Techs working for Verizon in Western Massachusetts. Only one to ten of these seventy CO Techs were women, and probably none of them were African American. <u>See</u>, Heisler Affi., Exhibit 3, p. 17.

    6.     Outside technicians (hereafter referred to as "OTs") regularly came into and out of the Holyoke facility. <u>See</u>, Heisler Affi., Exhibit 3, pp. 29-30; Heisler Affi., Exhibit 4, pp. 30.

    7.     In 2003, there were approximately two hundred (200) OTs working in Western Massachusetts. <u>See</u>, Heisler Affi., Exhibit 4, p. 17. The vast majority of OTs were white and male. In 1994, only about fifteen (15) percent of OTs were women. Only several of the OTs were African American. The percentage of OTs who were women might have gotten larger between 1994 and 2002. <u>See</u>, Heisler Affi., Exhibit 5, pp. 30-32.

    8.     During the time that Ms. Hall worked in the Holyoke CO, there were more than fifty white male outside technicians who would come into and out of the Holyoke CO. <u>See</u>, Heisler Affi., Exhibit 2, pp. 149-150.

9.      According to both Mr. Lynch and Mr. Savaria, the OTs had **no** legitimate business reasons for being in the Holyoke facility. <u>See</u>, Heisler Affi., Exhibit 3, pp. 29-30.  Mr. Lynch testified as follows:

> Q:      Would outside technicians have had any business purpose for being at the Holyoke facility?
>
> A:      In my opinion, no, but they were there all the time.

<u>See</u>, Heisler Affi., Exhibit 4, p. 30.

10.      Prior to August 2002, there had been constant complaints about OTs hanging out in the Holyoke CO. These complaints came from both people in the neighborhood surrounding the Holyoke CO and from CO Techs working in the facility. <u>See</u>, Heisler Affi., Exhibit 3, p. 35. Problems with the OTs in the Holyoke CO had been ongoing for as long as Mr. Lynch could remember. These problems had existed even prior to February 1989 when Mr. Lynch became the Turf Team Leader for the area encompassing the Holyoke facility. <u>See</u>, Heisler Affi., Exhibit 4, pp. 52-53.

11.      Verizon managers responded to these earlier complaints about the OTs hanging out in the Holyoke CO by calling their second level managers who were expected to "control their own people." Turf Team leaders for the OTs would also be sent to move the OTs out of the Holyoke CO, and calls would be made to "maintenance central" to see if there was work for the OTs to do. <u>See</u>, Heisler Affi., Exhibit 3, p. 36.

12.      Prior to Ms. Hall's transfer to the Holyoke CO, a woman by the name of Ellie Tobiasz had worked as a CO Tech in the facility. Ms. Tobiasz had registered complaints to Verizon managers about the OTs conduct in the building. In particular, Ms. Tobiasz had complained about male OTs using the women's restroom. On one occasion, Ms. Tobiasz complained that a male CO walked into the women's restroom while she was in there using the facilities. Mr. Lynch responded to Ms. Tobiasz'

3

complaints by talking to the manager of the OTs and having the lock changed on the bathroom door. However, this response did not resolve the problem. The male OTs got copies of the key and also broke the door a few times, and the problem persisted. As Mr. Lynch testified in his oral deposition, "[i]t was always an ongoing issue … It was always a hassle." See, Heisler Affi., Exhibit 3, pp. 31-32; and Exhibit 4, pp. 33-34.

13.    The Holyoke CO is a large structure with four floors, including a basement. There is a room set aside for the OTs in the basement. The CO Techs work on the first and third floors. There are two men's restrooms in the building; one in the basement and one on the third floor. There is only one women's restroom which is located on the second floor. There is a fenced in parking lot in the rear of the building. See, Heisler Affi., Exhibit 4, pp. 28-30 & 37.

**II.    Throughout the course of her employment in Verizon's Holyoke facility, Ms. Hall was subjected to a hostile work environment based upon her gender and her race.**

14.    A white male OT by the name of Ray Cichy directly inquired of Ms. Hall, "Why do you people get upset when we call you 'niggers' when you say 'nigger' to each other all the time?" See, Heisler Affi., Exhibit 2, p. 139; Exhibit 1, ¶ 3.d.; Exhibit 6, p. VZ0123; and Exhibit 7, p. 1.

15.    When there were news reports of Hispanic or African American children having been killed in Holyoke, white male OTs would make jokes about there being one less that we'll have to worry about later. See, Heisler Affi., Exhibit 2, p. 174-175 ; Exhibit 1, ¶ 3.a.; Exhibit 6, p. VZ0124; and Exhibit 7, p. 1.

16.    When a Verizon supervisor of Indian descent purchased a home in the well-to-do predominately white town of Wilbraham, white male OTs made comments,

including "Who let him in there?" and "How did he get to live out there?"  See, Heisler Affi., Exhibit 2, p. 141; Exhibit 1, ¶ 3.c.; Exhibit 6, p. VZ0123; and Exhibit 7, p. 1.

17.     White male OTs would make comments about Latino and Black families in Holyoke "living like pigs" and how they hated working in the homes of Latino and Black families in Holyoke and other minority communities. They would also make references to Puerto Rican families as being "nasty," and that all they do is burn things down, and they don't clean up their houses. See, Heisler Affi., Exhibit 1, ¶. 3.d.; Exhibit 6, p. VZ0123; Exhibit 7, p. 2.

18.     White male OTs would complain about the music played by Ms. Hall and other African American co-workers, and refer to it as "noise." See, Heisler Affi., Exhibit 7, p. 2.

19.     A White male OT referred to an African American co-worker as someone who was "just hired to fill a quota." See, Heisler Affi., Exhibit 7, p. 2.

20.     An OT referred to a co-worker as "Jew bags" and explained that the term refers to "a Jewish person who hoards all their money." Ms. Hall informed the OT that her son is partly of Jewish descent, and he should be careful with his comments because she found them offensive. See, Heisler Affi., Exhibit 2, p. 191-194; Exhibit 1, ¶ 3.b.; and Exhibit 6, p. VZ0124.

21.     Despite her repeated complaints, OTs were constantly disrupting Ms. Hall's workspace by leaving dirt, mud and debris on her desk, phone and computer, and using her computer and logging her off of her computer. See, Heisler Affi., Exhibit 2, p. 159; Exhibit 1, ¶ 4.a.; Exhibit 6, p. VZ0123. The OTs **never** used the computers of Ms. Hall's white male CO Tech co-workers without first asking their permission. See, Heisler Affi., Exhibit 13, pp. 175-176.

22.    As when Ms. Tobiasz was a CO Tech in the Holyoke CO, White male co-workers continued to repeatedly use the woman's rest room despite Ms. Hall's repeated complaints and the availability of two separate men's rest rooms. See, Heisler Affi., Exhibit 2, p. 153; Exhibit 4, pp. 34-35; Exhibit 6, p. VZ0123; Exhibit 7, p. 3.

23.    After repeated complaints by Ms. Hall, Verizon managers changed the lock on the women's rest room, as they did after Ms. Tobiasz complained.  As before, many of the male OTs had the key to the new lock, and continued to use the women's rest room. Mr. Lynch himself acknowledged that problems with men using the rest room could have continued after the lock was changed. See, Heisler Affi., Exhibit 2, p. 154; Exhibit 4, p. 35.

24.    As with Ms. Tobiasz, there were occasions when men would walk into the women's rest room when Ms. Hall was in there using the facilities. See, Heisler Affi., Exhibit 4, p. 35.

25.    A white male OT by the name of Brian King came into the Holyoke CO and started yelling at Ms. Hall and berating her for not answering the phone quickly enough when OTs phoned into the CO. Mr. King was being so abusive that another co-worker of Ms. Hall had to intervene and persuade Mr. King to leave the building. See, Heisler Affi., Exhibit 2, p. 135-137; Exhibit 1, ¶ 4.d.; Exhibit 6, p. VZ0124; and Exhibit 7, p. 2.

26.    Answering phone calls from OTs was a shared responsibility between Ms. Hall and her two white male CO Tech co-workers. There was no phone answering pecking order in the office. See, Heisler Affi., Exhibit 2, p. 165-166.

27.    Another OT  by the name of Ray Cichy called Ms. Hall and insisted that she give priority to the work he wanted her to do for him over her own work. When Ms.

Hall declined to do so, Mr. Cichy stated to Ms. Hall that her job was to serve him and the other OTs. See, Heisler Affi., Exhibit 2, p. 144 &179-180; Exhibit 1, ¶ 4.e.; and Exhibit 6, p. VZ0124.

28. Ms. Hall's first level and second level supervisors both confirmed that Ms. Hall was 100% correct that her own work had a higher priority than the work requested by the OTs. Mr. Lynch further confirmed that Ms. Hall was entirely justified in refusing to prioritize Mr. Cichy's request and in complaining about his comments to her. See, Heisler Affi., Exhibit 3, pp. 39-40; and Exhibit 4, pp. 41-42.

29. The OTs next complained directly to union officials about Ms. Hall not answering the phones quickly enough. Ms. Hall was approached by a union steward by the name of Julie Kilbride who told Ms. Hall that the union business manager had asked her to speak to Ms. Hall about the OTs complaints. Ms. Hall explained to Ms. Kilbride that answering the phones was the responsibility of all the CO Techs, not just hers. She also explained the work priorities established by her supervisors and that responding to calls from the OTs was a lower priority. As she was speaking to Ms. Kilbride, the phones in the central office began ringing, and Mike Stawasz ignored the call because he was busy with his own work. See, Heisler Affi., Exhibit 2, pp. 183-184; Exhibit 1, ¶ 4.i.; and Exhibit 6, p. VZ0124-VZ0125.

30. Brian King **never** entered the Holyoke CO and yelled or screamed at the two white male CO Techs, and he **never** complained to the two white male CO Techs in the office that they were not answering the phones fast enough, even though they also would not answer the phones if they were busy with their own work. See, Heisler Affi., Exhibit 2, p. 165-166 & 184; Exhibit 4, pp. 42-44; Exhibit 6, p. VZ0124-VZ0125. Ray

Cichy **never** stated to Mike Stawasz or Skip Pula that it was **their** job to serve the OTs. See, Heisler Affi., Exhibit 2, p. 147.

31.     Around the time that Ms. Hall was complaining to her supervisors about the conduct and comments of white male OTs in the Holyoke CO, Ms. Hall's car was "keyed" in the fenced in parking lot used by the OTs, and someone with access to the central office spit on her coat where it was always hung up. Personal possessions belonging to Ms. Hall were also taken from her desk. See, Heisler Affi., Exhibit 2, p. 156-157, 159 & 189; Exhibit 4, pp. 35-36; Exhibit 1, ¶ 4.a., b. & c.; Exhibit 6, p. VZ0123-VZ0124; and Exhibit 7, p. 3.

32.     White male co-workers constantly referred to women as "bitches" and frequently used other obscenities in Ms. Hall's presence despite her repeated objections. See, Heisler Affi., Exhibit 1, ¶ 4.f.; Exhibit 6, p. VZ0124; Exhibit 7, p. 2.

33.     During a meeting with Skip Pula and Jack Lynch, Mr. Pula referred to another woman co-worker as a "bitch."  When Ms. Hall complained about his use of that term in reference to another woman, Mr. Lynch interjected, "Why, because you're acting like a bitch?"  See, Heisler Affi., Exhibit 2, p. 151-152; Exhibit 1, ¶ 4.h.; and Exhibit 7, p. 2.

34.     Skip Pula made repeated offensive and demeaning comments about women co-workers. On one occasion he stated that a woman co-worker was incompetent and should "stick to being a pretty face."  He stated on another occasion that a particular woman co-worker "knows her stuff, for a woman." Mr. Pula would also comment on the physical appearance and outward behavior of other female co-workers, referring to one as a "good-looker" and another as a "tease." See, Heisler Affi., Exhibit 2, pp. 197-198; and Exhibit 7, p. 2.

35.    Ms. Hall often wore Adidas clothing with the Adidas symbol, and on each occasion, Skip Pula would comment, "Do you know what ADIDAS stands for? All Day I Dream About Sex," despite Ms. Hall's repeated objections. See, Heisler Affi., Exhibit 2, pp. 198 & 202-203; and Exhibit 7, p. 2.

36.    When she first started working in Holyoke, she was required for months to log onto her computer using Skip Pula's password "hooters" to access the computer, despite her objections and repeated requests to be assigned her own password. See, Heisler Affi., Exhibit 2, p. 198; and Exhibit 7, p. 2.

37.    Skip Pula repeatedly referred to Ms. Hall and other African Americans as "colored," despite Ms. Hall's objections that she considered it to be an offensive term. See, Heisler Affi., Exhibit 2, p. 148; and Exhibit 7, p. 2.

38.    On multiple occasions when Ms. Hall was working on a latter, Skip Pula would shake the latter despite Ms. Hall's objections and despite his knowledge that she was afraid of heights. See, Heisler Affi., Exhibit 2, pp. 43-45; and Exhibit 7, p. 3.

39.    During the time that she worked in Verizon's Holyoke CO, Ms. Hall was also subjected to repeated instances of unwanted physical touching by Mr. Pula. See, Affidavit of Rhonda Hall submitted in support of the Plaintiff's Opposition to Defendants' Motion for Summary Judgment (hereafter referred to as "Hall Affi."), ¶¶ 2 – 7.

40.    On multiple occasions, Mr. Pula would come up from behind Ms. Hall when she was working and start massaging her neck and shoulders. On each of these occasions, Ms. Hall was startled by his touching her and she was extremely uncomfortable with that sort of physical contact with a male co-worker in her place of work. Ms. Hall would deliberately move away from Mr. Pula when he would attempt to massage her. However, Ms. Hall's obvious discomfort with his physical attention did not

9

deter Mr. Pula from continuing this conduct. <u>See</u>, Hall Affi., ¶ 3; <u>see also</u>, Heisler Affi., Exhibit 2, pp. 214-215.

41.    On two separate occasions, Mr. Pula stepped on Ms. Hall's shoes with his shoes. On the first occasion, Ms. Hall and Mr. Pula were on opposite sides of a desk. Ms. Hall had worn a new pair of sneakers to work that day, and Mr. Pula reached across the surface of the desk and grabbed both of her arms so that she could not move away from him. He started stepping on each of Ms. Hall's feet and scuffing her sneakers with his shoes. When Ms. Hall strenuously objected to what he was doing, Mr. Pula stated that he wanted her shoes to be as dirty as his. Ms. Hall related to him how upset I was with what he had done, and I insisted that he never do that again. <u>See</u>, Hall Affi., ¶ 4; <u>see also</u>, Heisler Affi., Exhibit 2, pp. 170-172; Exhibit 1, ¶ 4.g.; Exhibit 6, p. VZ0124; and Exhibit 7, p. 2.

42.    Prior to the second incident, Verizon management had begun requiring that CO Techs wear steel-tipped work boots in the workplace. On the first day that Ms. Hall came into work wearing the new boots, Mr. Pula approached her from the front, grabbed both of her shoulders, stomped on the toes of one of her feet, and then stood up with both of his feet on the steel-tipped toes of Ms. Hall's boots in a manner which caused the length of their bodies to come into contact. <u>See</u>, Hall Affi., ¶ 5; <u>see also</u>, Heisler Affi., Exhibit 2, pp. 170-172; Exhibit 1, ¶ 4.g.; Exhibit 6, p. VZ0124; and Exhibit 7, p. 2.

43.    On or about September 5, 2002, Skip Pula approached Ms. Hall with a pair of needle-nosed pliers in his hand and used the needle-nosed pliers to chop off a section of her hair. Ms. Hall had misplaced her own pliers, and Mr. Pula walked up to her and stated that if the pliers were a snake, they would bite her. Ms. Hall retrieved her

pliers, and Mr. Pula walked up to her, grabbed a section of her hair which was hanging loose with one hand, and with the pliers in his other hand deliberately cut off the section of hair. See, Heisler Affi., Exhibit 2, pp. 46-47 & 129; Exhibit 1, ¶¶ 6 & 7; and Exhibit 6, p. VZ0114.

**III.    Verizon Supervisors and managers were aware that Ms. Hall was being subjected to a hostile work environment and failed to take immediate and effective remedial action which was reasonably calculated to either put an end the hostile work environment or prevent further harassment.**

44.    Ms. Hall complained repeatedly to Mr. Lynch about male OTs using the women's restroom. Mr. Lynch was aware that male OTs were walking in on her when she was using the rest room. See, Heisler Affi., Exhibit 2, p. 153; and Exhibit 4, pp. 34-35.

45.    Mr. Lynch's response to her complaints was to change the lock on the door. This was the same response which proved to be so ineffectual after earlier complaints from Ellie Tobiasz. See, Heisler Affi., Exhibit 2, p. 154; and Exhibit 4, pp. 33-34.

46.    Changing the locks after receiving Ms. Hall's complaints proved to be equally as ineffectual. Male OTs continued to use the women's rest room, and Ms. Hall renewed her complaints to her supervisors. However, no further action was taken by Verizon management. See, Heisler Affi., Exhibit 2, pp. 154-156; and Exhibit 4, pp. 33-34.

47.    Ms. Hall separately complained to Mr. Lynch about her car being keyed in the fenced in parking lot used by the OTs. He did not attempt any manner of investigation. His only response was to advise Ms. Hall to report the incident to the police. See, Heisler Affi., Exhibit 4, pp. 35-37.

48.     Ms Hall requested a meeting with Mr. Lynch and a union representative after she was publicly berated by Brian King because he felt she was not being sufficiently responsive to calls from the OTs. During this meeting, Ms. Hall complained about Mr. King's abusive treatment of her; she complained about her car being keyed in the fenced in parking lot used by the OTs; she complained about someone spitting on her coat; she complained about the OTs continuously fouling her workspace; and she complained about the OTs continued use of the women's rest room. Mr. Lynch's response to Ms. Hall's complaints was to encourage her to "take the high road." See, Heisler Affi., Exhibit 2, pp. 158-160.

49.     The only action taken by Mr. Lynch after hearing the broad range of complaints raised by Ms. Hall was to call the supervisor of the OTs and insist that Mr. King apologize to Ms. Hall. This action by Mr. Lynch was similar to the response of Verizon managers, including Mr. Lynch, to prior complaints about the conduct of OTs in the Holyoke facility. See, Heisler Affi., Exhibit 3, pp. 35-36; and Exhibit 4, pp. 38-39.

50.     As reflected in paragraphs 8 through 11 above, there was a long history of problems with the behavior of OTs in the Holyoke CO, and the standard response of Verizon managers was to call the OTs supervisors and request that they "control their people." As fully acknowledged by Mr. Lynch, the earlier efforts to control the conduct of the OTs had not resulted in any long-term changes in their behavior, and his response to Ms. Hall's renewed complaints about the OTs treatment of her proved to be equally as ineffectual. See, Heisler Affi., Exhibit 3, pp. 35-36; and Exhibit 4, pp. 52-53.

51.     Following the incident with Brian King, Ms. Hall received the call from Ray Cichy during which he instructed her that her job was to serve the OTs, as recounted in paragraph 26 and 27 above. Ms. Hall complained to Mr. Lynch about this continued

harassment from the OTs.  Mr. Lynch told her not to worry about it, and no further action was taken. See, Heisler Affi., Exhibit 2, pp. 145-146.

52.    In the absence of any further managerial action in response to Ms. Hall's ongoing complaints, the harassment from the OTs persisted. As reflected in paragraph 28 above, the OTs next complained to union officials that Ms. Hall was not responding to their needs quickly enough. After being approached by a union representative about the complaints of the OTs, Ms. Hall requested a meeting with Mr. Lynch and Mr. Savaria together with representatives of the union, and this meeting was conducted on August 6, 2002. During the course of this meeting, Ms. Hall complained about the OTs treating her disrespectfully; she complained about racist and anti-Semitic comments and statements made by the OTs; she complained about the OTs occupying and dirtying her workspace and logging her off of her computer; and she complained about ongoing harassment from the OTs in the form of baseless complaints about Ms. Hall not meeting their needs. See, Heisler Affi., Exhibit 8; and Exhibit 9.

53.    During the August 6th meeting, Ms. Hall discussed problems with the overall work environment in the Holyoke CO, and raised certain issues she was having with Skip Pula, including the two incidents when Skip Pula stepped on her shoes which had occurred prior to August, and his repeated references to sex when she wore Adidas brand clothing. See, Heisler Affi., Exhibit 2, pp. 170-171 & 206.

54.    Ms. Hall's supervisors confirmed that the complaints of the OTs were entirely without merit. However, their response to the battery of issues raised by Ms. Hall during the August 6th meeting was to arrange a conference call with Paul Gazda and Tom Hurley, the first level and second level supervisors of the OTs, respectively,

and, in effect, request once again that they "control their people." See, Heisler Affi.,

Exhibit 3, pp. 38-41; and Exhibit 4, pp. 40-42 & 50-52.

55.    During the course of the conference call, Mr. Savaria explained all the

issues that Ms. Hall was having with the OTs in the Holyoke CO. He described the

comments which had been made to her, and provided Mr. Hurley with the names of the

OTs mentioned by Ms. Hall. Mr. Hurley simply responded that he would discuss these

issues with his technicians. There was also an agreement that the OTs would be told to

stay out of the Holyoke CO unless absolutely necessary. See, Heisler Affi., Exhibit 3,

pp. 38-41; Exhibit 4, pp. 50-52; and Exhibit 9.

56.    Following this conference call, Mr. Hurley only discussed one racial

comment made to Ms. Hall with one of his technicians. He did not discuss the issue of

racial speech in the Holyoke CO with any other OTs. He did not discuss any gender

issues with any of the OTs. Nor did he discuss any issues related to being disrespectful

to Ms. Hall, dirtying her work area, or using her equipment with any of the OTs. See,

Heisler Affi., Exhibit 10; and Exhibit 11.

57.    Ms. Hall reported that the OTs came into the Holyoke CO less frequently

during the remainder of the month of August 2002. However, there is no way of

determining whether the perfunctory steps taken by Verizon managers would have

resulted in any long-term improvements in Ms. Hall's work environment because she

worked her last day for Verizon on September 5, 2002. See, Heisler Affi., Exhibit 2, p.

182.

58.    On September 5, 2002, the date that Skip Pula deliberately grabbed a

section of Ms. Hall's hair and cut it off with a pair of needle nose pliers, Jack Lynch

came out to the Holyoke facility to speak with Ms. Hall about what had happened.

14

However, he left Ms. Hall alone with Mr. Pula in the Holyoke CO and returned to Springfield without informing Ms. Hall what action, if any, he was intending to take. See, Hall Affi., ¶ 7.

59.    After Ms. Hall received no further communication from Mr. Lynch, she called him later in the afternoon and asked him why he had left the Holyoke CO and what he was planning to do about what happened. Mr. Lynch stated that he had reassured Mr. Pula that Ms. Hall was upset, but that she would get over it. When Ms. Hall expressed surprise that he would say such a thing, Mr. Lynch responded, "I don't know what you want me to do. He said he's sorry. He admits he was wrong. It's not like I'm going to suspend the guy. What would that prove." Ms. Hall told Mr. Lynch that she couldn't take working in Holyoke anymore. She stated her belief that her co-workers could do anything they wanted to her, and it was no big deal. She started to cry and told Mr. Lynch that I had to get off the phone. See, Hall Affi., ¶ 8;  see also, Heisler Affi., Exhibit 2, pp. 65-66.

60.    When she left work that evening, it was clear to Ms. Hall that Mr. Lynch had no intention of doing anything about what had happened to her. See, Hall Affi., ¶ 10.

61.    Ms. Hall spent the next three days calling one Verizon office after another trying to find somebody who would take her concerns seriously. Each office passed her on to a different office and nobody seemed to have the interest, the inclination or the authority to respond to the issues of physical aggression and harassment in Ms. Hall's workplace. The day after Mr. Pula cut her hair, Ms. Hall went to the Verizon administrative office in Springfield and obtained the phone number for the Verizon Ethics Line. She called the Ethics Line and was advised that her problem was not a

matter for the Ethics Line. They referred her to the numbers for Verizon Security and the Employee Assistance Program (EAP). Ms. Hall was advised by Verizon security that the incidents she was complaining about were not security issues and they referred me to the Verizon EEO office. When she called the EAP, Ms. Hall was similarly referred to the Verizon EEO office and also advised to seek professional mental health counseling. See, Hall Affi., ¶ 11.

62.    Feeling that she had exhausted her options, Ms. Hall called Mr. Lynch and requested another meeting with her second level supervisor, George Savaria. See, Hall Affi., ¶ 12.

63.    At the meeting, Ms. Hall recounted the events that had occurred with Mr. Pula, and I reminded Mr. Lynch and Mr. Savaria about the other incidents involving Mr. Pula and the OTs that had occurred in Holyoke. When she mentioned that she had gone to the office of the Massachusetts Commission Against Discrimination looking for help and recounted the other steps she had taken to get assistance, her supervisors effectively washed their hands of the situation, and told her that they would leave it up to the Verizon EEO office to investigate. In the meantime, Ms. Hall's work situation was left entirely unresolved. No reference was made to whether she would be expected to return to work with Mr. Pula in the Holyoke CO or whether any other options were available to her. See, Hall Affi., ¶ 13; see also, Heisler Affi., Exhibit 12.

64.    For her part, Ms. Hall knew for certain that she could not return to work with Mr. Pula in the Holyoke CO at that time. Based upon the lack of responsiveness to her numerous prior complaints, she was convinced that nothing would be done to stop any continued harassment and physical aggression toward her if she returned to Holyoke. See, Hall Affi., ¶ 14.

65.    Paul McGovern, an EEO officer for Verizon, was responsible for investigating the complaints raised by Ms. Hall about the treatment she had received in the Holyoke CO. Mr. McGovern had been an employee of Verizon since 1995. See, Heisler Affi., Exhibit 13, pp. 10 & 102.

66.    Mr. McGovern was aware at the outset of his investigation that Ms. Hall had already contacted the Massachusetts Commission Against Discrimination about her complaints. He also became aware that she had filed a formal discrimination complaint with the MCAD while his investigation was still ongoing. See, Heisler Affi., Exhibit 13, p. 64; and Exhibit 14.

67.    Despite the fact that he was already conducting an internal investigation into the treatment of Ms. Hall by her co-workers and supervisors, Mr. McGovern assumed responsibility for simultaneously responding to her formal complaint to the MCAD.  See, Heisler Affi., Exhibit 13, p. 64.

68.    Throughout the course of his investigation, Mr. McGovern failed to make any inquiries regarding a number of complaints raised by Ms. Hall which he was aware of at the inception of the investigation or became aware of during the course of the investigation. Mr. McGovern's interview notes do not reflect any inquiries regarding issues raised by Ms. Hall relating to baseless complaints by the OTs about Ms. Hall not being responsive to their needs; unwanted massages by Mr. Pula; her car being "keyed" in the fenced in parking lot; her coat being spat on; her personal possessions being taken from her desk; Mr. Pula referring to her as "colored"; the misuse of her computer by the OTs; or the OTs use of obscenities in the workplace. See, Heisler Affi., Exhibit 15; and Exhibit 13, pp. 175-176.

17

69.    After experiencing some frustration communicating with Paul McGovern, Ms. Hall contacted Karen James-Sykes, a Verizon Vice-President of Public Relations, and sent her a summary Ms. Hall had prepared recounting a number of the troubling things that had happened to her while working in the Holyoke CO. See, Hall Affi., ¶ 21.

70.    Ms. James-Sykes forwarded a copy of the summary prepared by Ms. Hall to Mr. McGovern by facsimile dated October 2, 2002. See, Heisler Affi., Exhibit 6, p. VZ0112. When he received this summary from Ms. James-Sykes, the investigation was still ongoing and Mr. McGovern conceded that the contents of the summary were relevant to his investigation. See, Heisler Affi., Exhibit 13, p. 179.

71.    Nevertheless, with the exception of a single e-mail to Thomas Hurley dated October 10, 2002, Mr. McGovern did not conduct any further investigation into those complaints of Ms. Hall's which were brought to his attention for the first time in the summary he received from Ms. James-Sykes. See, Heisler Affi., Exhibit 13, pp. 180-181 & 185-186; and Exhibit 10.

72.    In his e-mail to Mr. Hurley, Mr. McGovern made the following inquiry: "Which techs did you speak to concerning Rhonda Hall's allegations concerning racial speech? Did you address gender issues with them, for example, respect, dirtying of Hall's work area, and use of her equipment without permission?" See, Heisler Affi., Exhibit 10.

73.    Mr. Hurley responded that he had only discussed one racial comment made to Ms. Hall with one of his technicians. See, Heisler Affi., Exhibit 11.

74.    Mr. McGovern was fully aware that a substantial number of Ms. Hall's complaints involved allegations of mistreatment of her by multiple OTs. He was also aware of a decision by Verizon managers that Mr. Hurley would speak to the OTs

18

working under him about the issues raised by Ms. Hall. In his October 3, 2002 interview with Jack Lynch, Mr. Lynch reported that "Hurley made [a] commitment to keep his people out of Holyoke and discuss remarks that Hall reported." In fact, a major assumption guiding the course of Mr. McGovern's investigation was that the multiple issues involving the conduct of the OTs had been effectively addressed by Verizon managers through the implementation of these prior decisions. See, Heisler Affi., Exhibit 115, p. VZ0204; and Exhibit 13, pp. 176-177 & 184.

75.     Having learned from Mr. Hurley that prior decisions to remedy the misconduct of the OTs were never implemented, Mr. McGovern did not engage in any further inquiry about the reason for this lapse. See, Heisler Affi., Exhibit 113, pp. 190-192.

76.     During his deposition, Mr. McGovern acknowledged that in an investigation into whether Ms. Hall was being mistreated in ways which were related to her gender and race, it would have been appropriate to inquire as to whether white male co-workers were being mistreated in the same way. See, Heisler Affi., Exhibit 113, pp. 165-166. However, Mr. McGovern consistently made no inquiries throughout the course of his investigation into whether the white male OTs and Skip Pula were behaving toward other white male co-workers in the same ways that they were behaving toward Ms. Hall. See, Heisler Affi., Exhibit 113, pp. 146, 155, 168-169, 171, 174 & 183.

77.     To the extent that Mr. McGovern did inquire into particular incidents which Ms. Hall found to be offensive and objectionable, and significant number of her complaints were corroborated by co-workers who were interviewed during the course of his investigation. Mr. Lynch confirmed the long history of bad behavior by OTs in the Holyoke CO. See, Heisler Affi., Exhibit 113, p. 172; and Exhibit 15, p. VZ0204. Mr.

19

Stawasz confirmed that he had heard question posed to Ms. Hall about why "you people get upset when we call you niggers." See, Heisler Affi., Exhibit 113, p. 172; and Exhibit 15, pp. VZ0204. The investigation confirmed that the incident when an OT entered the Holyoke CO and was loudly berating Ms. Hall had been addressed. See, Heisler Affi., Exhibit 113, p. 174. Mr. Stawasz confirmed that OTs had made comments about the death of Hispanics in Holyoke which were "not complimentary." See, Heisler Affi., Exhibit 15, p. VZ0205. Mr. Lynch, Mr. Stawasz and Mr. Pula confirmed that Mr. Pula had stepped on Ms. Hall's shoes. See, Heisler Affi., Exhibit 15, pp. VZ0204 & VZ0205. Mr. Pula and Elizabeth Corse confirmed that Mr. Pula cut her hair with his needle nose pliers. See, Heisler Affi., Exhibit 15, p. VZ0205.

78.    On October 10, 2002, Mr. McGovern issued the findings of his investigation in the form of an Executive Summary constituting a single page. See, Heisler Affi., Exhibit 16.

79.    Despite the fact that he did not inquire about many of the complaints raised by Ms. Hall during his investigation and undeterred by the number of Ms. Hall's complaints which were corroborated by witnesses, Mr. McGovern concluded that his investigation did not substantiate that the actions of Skip Pula and the OTs constituted EEO violations. See, Heisler Affi., Exhibit 16.

80.    In his Executive Summary, Mr. McGovern highlights Mr. Pula's self-servicing claim that he inadvertently cut Ms. Hall's hair with his pliers (while pointedly ignoring Ms. Hall's insistence that his actions were deliberate), even though nobody else familiar with the incident was willing to support this characterization of what happened. Elizabeth Corse, the only other witness to the incident, stated to Mr. McGovern that Pula "cut [a] lock of her hair." While she didn't think his actions were "malicious", she

didn't know what his intentions were. See, Heisler Affi., Exhibit 15, pp. VZ0205. George

Savaria, the second level manager who was ultimately responsible for implementing Mr.

McGovern's recommendation, was far more explicit about what he believed occurred:

> Q:    What was your understanding of what Mr. Pula had done on September 5, 2002?
>
> A:    That he was horsing around and grabbed a hold of her with a short-nose pliers, and grabbed a lock of her hair and cut it.

See, Heisler Affi., Exhibit 3, p. 56.

81.    Even Mr. Pula's factual rendition to Mr. McGovern of what happened on

September 5th is at odds with his claim of inadvertence. Mr. McGovern's notes reflect

that Mr. Pula stated to Ms. Hall that if her pliers were any closer to her they would bite

her. Then "for 'some reason' he went towards her with his own pliers." After purportedly

cutting off multiple strands of her hair by accident, he said nothing to her until he

realized she was upset. See, Heisler Affi., Exhibit 15, pp. VZ0205.

82.    In his Executive Summary, Mr. McGovern attributes the multiple instances

of physical contact with Ms. Hall initiated by Mr. Pula to "kidding around" and being

"playful."  Included among this playful conduct are unwanted massages which Mr.

McGovern failed to investigate, two separate confirmed instances of stepping on Ms.

Hall's feet while grabbing her and holding her in place, and a final confirmed incident of

cutting off a lock of Ms. Hall's hair with a pair of needle-nose pliers. See, Heisler Affi.,

Exhibit 16; see also, Hall Affi., ¶¶ 3-5.

83.    In his Executive Summary, Mr. McGovern inaccurately states that none of

the four witnesses identified by Ms. Hall corroborated her allegations concerning race-

related comments. As reflected in his own interview notes, Mr. Stawasz confirmed that

he had heard the question posed to Ms. Hall about why "you people get mad when we

call you niggers" and that OTs had made comments about the death of Hispanics in

Holyoke which were "not complimentary." <u>See</u>, Heisler Affi., Exhibit 16; and Heisler Affi.,

Exhibit 15, p. VZ0205.

84. Mr. McGovern next asserts in his Executive Summary that managers took

appropriate action in response to Ms. Hall's complaints about the conduct of OTs and

addressed issues as they arose. Each of these assertions is flatly contradicted by

Thomas Hurley who provided information to Mr. McGovern indicating that prior

management decisions intended to remedy the harassing behavior of the OTs had not

been implemented. <u>See</u>, Heisler Affi., Exhibit 16; and Heisler Affi., Exhibit 11.

85 The only formal recommendation contained in Mr. McGovern's Executive

Summary is that Mr. Pula receive a written warning. <u>See</u>, Heisler Affi., Exhibit 16.

86. Despite his understanding that Mr. Pula grabbed ahold of a lock of Ms.

Hall's hair and cut it off with his pliers, Mr. Savaria adopted the recommendation of a

written warning. <u>See</u>, Heisler Affi., Exhibit 3, pp. 53-54 & 56. A memorandum dated

October 22, 2002 was issued to Mr. Pula in which he was simply reminded of Verizon's

EEO policies and expectations, and further advised to refrain from unwanted touchings

of his peers. <u>See</u>, Heisler Affi., Exhibit 17.

87. Mr. McGovern closes his Executive Summary with a suggestion that "it

may be useful to provide diversity/sensitivity training in the Holyoke CO and the Hatfield

garage …" <u>See</u>, Heisler Affi., Exhibit 16.

88. As of November 2003, over a year after Mr. McGovern issued his findings,

no diversity or sensitivity training had taken place in the Holyoke CO. As of the dates of

their retirement in November 2003, neither Mr. Savaria nor Mr. Lynch were aware of

any plans to conduct any form of sensitivity or diversity training in the Holyoke CO. See, Heisler Affi., Exhibit 3, p. 63; and Exhibit 4, pp. 8 & 121-122.

89.    Conspicuously absent from Mr. McGovern's findings is any recommendation regarding Ms. Hall's work situation or any reference to her future work assignment. The clear inference to be drawn from Mr. McGovern's silence on this issue is that Ms. Hall was expected to return to her position in the Holyoke CO working side-by-side with Skip Pula. This inference appears to be borne out by Mr. McGovern's subsequent conversation with Ms. Hall. See, Heisler Affi., Exhibit 16.

90.    Ms. Hall called Mr. McGovern in mid to late October 2003 to inquire about the status of his investigation, and he advised her that he did not think that the things that had happened to her constituted an EEO violation. He said he was recommending that there be some sort of training for Verizon employees, but that he could not tell Ms. Hall what if any action was being taken with respect to Skip Pula. Ms. Hall does not recall Mr. McGovern making any reference to her work situation, and as far as she knew, if she were to return to work she would have to resume her CO Tech position in the Holyoke facility working directly with Mr. Pula. No alternatives were suggested or offered to Ms. Hall by Mr. McGovern or anyone else at Verizon. See, Hall Affi., ¶ 22. Mr. McGovern's notes of this conversation reflect that he simply asked Ms. Hall straight away whether she had returned to work yet. See, Heisler Affi., Exhibit 18.

91.    In November 2002, Verizon Health Services Consultant required that Ms. Hall be examined by a consulting physician selected by Verizon. She was examined by Dr. Richard F. Kaplan on December 6, 2002. In a report issued to Verizon's Health Services Consultant, Dr. Kaplan confirmed that Ms. Hall was disabled from returning to her job at Verizon's Holyoke facility. In the Summary and Impression section of his

report, Dr. Kaplan confirmed that Ms. Hall was suffering from "an adjustment disorder with anxiety and depression." He went on to conclude that her psychological difficulties and interrelated physical problems stemmed from the "chronicity of problems" specific to her work situation at Verizon, including the assault upon Ms. Hall by the white male co-worker which triggered her existing symptoms. See, Heisler Affi., Exhibit 19.

92.    In late December 2002, Verizon's Health Services Consultant asked Dr. Kaplan when I would be able to perform my occupational requirements. Dr. Kaplan responded, "Immediately, in a new work situation." Asked whether I was currently able to perform my occupational requirements on a full or part time basis, Dr. Kaplan responded, "Yes. Again, in a new work situation." See, Heisler Affi., Exhibit 20.

93.    Dr. Kaplan's conclusions were entirely consistent with what Ms. Hall's own psychiatrist had stated repeatedly in periodic reports he submitted to recertify her continued eligibility for short term disability benefits.  As early as his first report dated September 27, 2002, Dr. Honeyman stated that the estimated length of Ms. Hall's disability was "unknown at this time – depends on availability of alternative work setting." In referring to any restrictions which might apply to a return to work, Dr. Honeyman consistently requested "consideration of alternative work setting out of current department. He repeated the same prognosis and return to work restrictions in each of two successive reports submitted to Verizon prior to the termination of my short term disability benefits, and in a subsequent letter dated February 11, 2003. See, Heisler Affi., Exhibit 21; Exhibit 22; Exhibit 23; and Exhibit 24.

94.    Despite the consensus among every medical professional who examined or treated Ms. Hall since September 5, 2002 that she was unable to return to work in the Holyoke CO, Ms. Hall received a call on January 9, 2003 from Verizon's Health

Services Consultant advising her that she was not being certified for continued short term disability benefits beyond January 12, 2003, and that she would have to return to her position in Holyoke as of January 13, 2003. Ms. Hall filed a timely appeal of this determination, which was not finally decided until September 2003. <u>See</u>, Hall Affi., ¶ 26; <u>see also</u>, Heisler Affi., Exhibit 25

95.    Soon after Ms. Hall received the January 9th phone call expressing Verizon's expectation that she return to work in Holyoke,  Ms. Hall was served with Verizon's Position Statement prepared and filed by Paul McGovern in response to her complaint to the MCAD. Upon her review of the attachments to Mr. McGovern's Position Statement, Ms. Hall learned for the first time that the only action taken by Verizon as a result of the EEO investigationhad been to give Mr. Pula a mild warning letter in which he was simply reminded of Verizon's EEO policies and expectations, and further advised to refrain from unwanted touchings of his peers. <u>See</u>, Hall Affi., ¶ 23.

96.    Ms. Hall's attorney received a letter from Paul McGovern dated April 10, 2003 in which he offered Ms. Hall a transfer to Verizon's Springfield CO in full settlement of her discrimination claims pending before the MCAD. This correspondence represented the first time since Ms. Hall had left work in early September that Verizon communicated a willingness to have her return to work in a different work setting, as her psychiatrist had been repeatedly urging since transmitting his first Psychiatric Assessment to Verizon in late September. <u>See</u>, Heisler Affi., Exhibit 26.

97.    Ms. Hall was not willing to give up her discrimination claims as a condition to returning to work,  transfer he unconditionally to a CO Tech position in Springfield. In a letter to Mr. McGovern dated April 18, 2003, Ms. Hall's attorney expressed Ms. Hall's gratitude that Verizon was willing to transfer her to a position away from the Holyoke

CO. Ms. Hall's attorney further expressed that she was not prepared to give up her discrimination claims as a condition to retuning to work, but welcomed further dialogue. See, Heisler Affi., Exhibit 27.

98.    On May 1, 2003, Paul McGovern sent to Ms. Hall's attorney in which he offered Ms. Hall a transfer to the Springfield CO without condition. Thus, approximately eight months elapsed before Verizon took a remedial step in the direction urged by every medical professional who had examined and treated Ms. Hall . See, Heisler Affi., Exhibit 28; Exhibit 20; Exhibit 21; Exhibit 22; Exhibit 23; and Exhibit 24.

**IV.    Ms. Hall suffered from substantial work-related impairments which substantially interfered with her major life activities of sleeping, eating, thinking, concentrating, social interaction, and caring for her son, herself and her home.**

99.    After her final phone conversation with Mr. Lynch on September 5, 2002, Ms. Hall felt totally isolated and vulnerable. She had developed a piercing headache behind her eyes and had a difficult time holding back tears. See, Hall Affi., ¶ 9.

100.    In the days following the haircutting incident, Ms. Hall continued to experience excruciating headaches, and began to experience feelings of deep depression and anxiety. Ms. Hall was psychologically unable to return to work at Verizon on September 6, 2003 and she went out on sick leave. She was prescribed pain medication by her doctor, and she began receiving treatment from a psychiatrist and a licensed psychiatric social worker. Ms. Hall applied for short term disability and between September 2002 and January 13, 2003, Ms. Hall was determined by Verizon's short term disability insurer to be disabled from working for purposes of receiving sickness disability benefits. See, Hall Affi., ¶ 15.

101.    For more than a year or so, Ms. Hall continued to suffer from depression and anxiety. As a result of the depression, she experienced feelings of deep sadness

most of the time. She struggled with feelings of worthlessness and the belief that she had lost the power to control her own life. She went through prolonged periods of sleeplessness, and was immobilized by fatigue for long stretches of time. Frequent nightmares and headaches contributed to her sleeping difficulties. Ms. Hall's eating patterns also fluctuated dramatically and she went through periods of diminished appetite and corresponding weight loss, as well as periods of excessive food consumption and weight gain. Ms. Hall lacked the motivation to accomplish even simple goals which she attempted to establish for myself.  During periods when the depression was particularly intense, Ms. Hall couldn't sleep at all, but neither could she summon up the energy to get out of bed. She spent long periods of time in bed unable to face up to performing even the most routine tasks. Ms. Hall was fortunate to have family members who rallied to assist her during this time because she was unable to adequately care for my son, herself or her home. See, Hall Affi., ¶ 16.

102.    The anxiety I was experiencing during this time caused me to have a pervasive sense of dread. I felt nervous much of the time, but I was often entirely unable to identify the source of the nervousness. I was unable to effectively absorb and respond to ordinary stresses of everyday living. I would become uncharacteristically irritable and angry for no good reason, and verbally lash out at the people around me, including my son. I suffered from recurrent severe headaches, as well as abdominal problems and persistent nausea.  The persistence of headaches and feelings of anxiety made it difficult for me to concentrate. I was easily distracted and had a difficult time focusing my attention on particular tasks for more than brief periods of time. I didn't venture out of the house much and I avoided contact with friends and family alike. See, Hall Affi., ¶ 17.

103.    A substantial factor contributing to Ms. Hall's depression and anxiety was the ongoing uncertainty about her job situation. She was fearful that she would be required at some point to return to work with Skip Pula and the outside technicians who had shown such contempt for her. Ms. Hall was also fearful that she would have to return to a position working under supervisors who had demonstrated a total disregard and indifference to her safety and were willing to turn a blind eye to inequitable treatment of her based on her race and gender. See, Hall Affi., ¶ 18.

104.    The medical symptoms of her disabilities were consistently documented by every medical professional who examined or treated her over the course of the next twelve months. In a FMLA Certification Form completed back on September 13, 2002, Ms. Hall's therapist, Linda C. Robinson, LICSW  recorded that she was suffering from a disruption of eating and sleeping, exhaustion, depression and anxiety; headaches, and upset stomach. See, Heisler Affi., Exhibit 29.

105.    Ms. Hall's treating psychiatrist describes similar symptoms in each of the three Psychiatric Assessments he submitted to Verizon's Health Services Consultant. See, Heisler Affi., Exhibit 21; Exhibit 22; and Exhibit 23.

106.    Ms. Hall was treated with Lorazepam for anxiety and insomnia and Zoloft for depression, and she also was prescribed Butalbital for headaches. See, Heisler Affi., Exhibit 19, p. 2. Dr. Kaplan administered a battery of psychological tests, and diagnosed her with and adjustment disorder with mixed anxiety and depressed mood and observed that her illness had negative impacts on her motivation level, ability to concentrate and memory. He went on to conclude that her psychological difficulties and interrelated physical problems stemmed from the "chronicity of problems" specific to her work

situation at Verizon, including the assault upon Ms. Hall by the white male co-worker which triggered her existing symptoms. Id., p. 4.

107.    In a report dated February 11, 2003, Dr. Honeyman, confirmed that Ms. Hall suffered from "[e]lements of an adjustment disorder with anxious mood and possible stress disorder." He further supported Dr. Kaplan's conclusion that her symptoms stemmed from the work environment and treatment Ms. Hall experienced at the Verizon Holyoke CO.  Dr. Honeyman concluded that Ms. Hall was not able to return to work there "given the likelihood of recurrence or exacerbation of these symptoms." See, Heisler Affi., Exhibit 24.

108.    Dr. Kenneth Jaffe, a Board certified psychiatrist, conducted an impartial psychiatric examination of Ms. Hall for the Department of Industrial Accidents on September 30, 2003 and issued a report dated October 2, 2003. Dr. Jaffe also administered multiple psychological tests which registered results consistent with a severe level of depression and anxiety. He chronicled the following symptoms of her disabilities: feeling sad all the time, hard to do anything, poor sleep, fatigue, decreased appetite and weight loss, irritability, loss of interest in other people, difficulty making decisions, having to push herself most of the time, feeling more nervous than usual, feeling afraid for no reason, being easily upset, headaches, feeling weak and getting tired easily, flushing and nightmares. Dr. Jaffe entered a diagnosis of Major Depressive Disorder. He concluded that there is a direct causal connection between Ms. Halls psychiatric condition and multiple incidents of inappropriate behavior which occurred during her employment with Verizon in the Holyoke CO. sHe also concluded that working in any position at Verizon which would involve even infrequent contact with

previous co-workers and supervisors would not be in her medical interest. <u>See</u>, Heisler Affi., Exhibit 30.

**V.    Verizon failed to engage in good faith in an interactive dialogue with Ms. Hall regarding her requests for a reasonable accommodation and failed to provide Ms. Hall with a reasonable accommodation.**

109.    In early May 2003, Ms. Hall's attorney received a letter from Paul McGovern in which he communicated Verizon's willingness to transfer Ms. Hall unconditionally to a CO Tech position in Springfield. <u>See</u>, Hall Affi., ¶ 27; <u>see also</u>, Heisler Affi., Exhibit 28.

110.    Ms Hall was extremely pleased that Verizon was willing to transfer her to a different work location, but she had serious concerns about the particular position being proposed by Verizon. <u>See</u>, Hall Affi., ¶ 28.

111.    If she were to have taken a position in the Worthington Street office of Verizon, she would have had regular contact with Jack Lynch and George Savaria, who both worked at this location. The fact that the directive Ms. Hall received to report to the Springfield office was sent by Jack Lynch seemed to confirm that she would continue to be subject to his supervision and at least partly dependent upon him to oversee this new work environment. At times Mr. Lynch would have been Ms. Hall's direct supervisor as a result of standard supervisor rotations for weekends, vacations and holidays. <u>See</u>, Heisler Affi., Exhibit 3, pp. 11-14; and Exhibit 4, p. 12. Based upon her experience working in Holyoke, Ms. Hall had no confidence that if she continued to receive discriminatory or retaliatory treatment upon returning to work in this new location that Mr. Lynch or Mr. Savaria would effectively intervene on her behalf.  <u>See</u>, Hall Affi., ¶ 29.

112.    There was also a substantial likelihood that Ms. Hall would continue to have contact with Skip Pula if she worked in the Springfield central office. As one of the

more experienced CO Techs, he almost certainly would have been called in on a periodic basis to work in the Worthington Street central office, and would have been in that office on a regular basis to pick up supplies and his paycheck. See, Heisler Affi., Exhibit 3, p. 110; see also, Hall Affi., ¶ 30.

113.    Ms. Hall's extreme uneasiness about the transfer proposed by Verizon was exacerbated by several racial incidents in the Springfield area involving Verizon employees in the Spring of 2003 which were grossly mishandled by first and second level supervisors working in Springfield. One particularly egregious incident involved vile white supremacist graffiti on the inside of a Verizon cross box which could only be accessed by Verizon employees. See, Hall Affi., ¶ 31.

114.    In March 2003, Greg Drew, who is an African American male, was working with another African American technician in Springfield, MA. They opened a locked cross box located at 410 Carew Street, and discovered a swastika painted on the inside of the cross box door along with the statement, "Kill all Jews and Niggers !" There was also the statement, "Stanton haz (sic) a Vagina !"  See, Affidavit of Greg Drew submitted in support of the Plaintiff's Opposition to Defendants' Motion for Summary Judgment (hereafter referred to as "Drew Affi."), ¶ 3.

115.    The cross box was always kept locked and only Verizon employees possessed the tool required to open the box. See, Drew Affi., ¶ 4.

116.    Mr. Drew and his co-worker, Christopher Winslow, immediately complained about this vile and threatening graffiti to our Verizon supervisor. See, Drew Affi., ¶ 5.

117.    Mr. Winslow also took a photograph of the graffiti which was shared with Verizon management. See, Drew Affi., ¶ 6; and Exhibit 1.

118.    Mr. Drew and other African American technicians were exposed to this graffiti every time we opened the cross box. <u>See</u>, Drew Affi., ¶ 7.

119.    On a daily basis, Mr. Drew asked his first level supervisor about plans for the removal of the graffiti. On two or three occasions, Mr. Drew went directly to his second level manager, Sally Lynch, and complained that nothing was being done to paint over or remove the graffiti or replace the lock box door. On one of these occasions, Mr. Drew mentioned to Ms. Lynch that there was an available cross box door in a Verizon equipment yard which could be used to replace the door with the graffiti. Mr. Drew also pointed out on more than one occasion that a temporary measure would be to simply paint over the graffiti so that it was no longer visible. <u>See</u>, Drew Affi., ¶¶ 8 & 9.

120.    After more than a month went by with no action being taken to remove the graffiti, Mr. Drew went to see Thomas Pritchard, a Verizon District Manager in Springfield. He complained to Mr. Pritchard about the apparent unwillingness of Verizon management to respond to our numerous complaints about the graffiti. Mr. Drew offered to replace the cross box door myself, and Mr. Pritchard authorized him to do this. Soon after his meeting with Mr. Pritchard, Mr. Drew replaced the cross box door himself in or around the second week in May 2003. <u>See</u>, Drew Affi., ¶¶ 10 & 11.

121.    Mr. Drew was particularly upset about the unaccountable delay in dealing with the cross box graffiti because there had been multiple prior occasions when he had complained about other racist graffiti in other Verizon equipment boxes and facilities. Some of this other graffiti was directed at Mr. Drew personally, and made references to his race and ancestry in terms which were profoundly offensive and disturbing. On

these prior occasions, Mr. Drew encountered similar resistance and delays in effectively dealing with the graffiti. <u>See</u>, Drew Affi., ¶¶ 12.

122.    The lack of response by Verizon supervisors in Springfield to the complaints about the cross box graffiti further confirmed Ms. Hall's fears about working in the Springfield office. The failure of Springfield supervisors to deal with this particularly egregious example of racist and threatening behavior by Verizon employees reinforced her conviction that she would continue to be vulnerable to unchecked harassment or retaliation if she were to accept a transfer to Springfield. <u>See</u>, Hall Affi., ¶34.

123.    Particularly troubling to Ms. Hall was the fact that the vile graffiti on the cross box could only have been written by outside technicians who would be among the outside technicians she would be interacting with if she became a central office technician in the Springfield office. The prospect of facing more discriminatory and possibly retaliatory treatment at the hands of outside technicians who were capable of producing such graffiti was more than Ms. Hall could bear at that time. <u>See</u>, Hall Affi., ¶35.

124.    After receiving Verizon's offer of a transfer to the Springfield office, Ms. Hall discussed her concerns about the proposed transfer with her psychiatrist and therapist at her next appointments with them. Each of them wrote letters advising against a transfer to the Springfield office. In a letter dated May 13, 2003, Dr. Honeyman expressed his belief that Ms. Hall would not be able to manage the level of distress she would likely feel if she were to be transferred into the position in Verizon's Springfield office. Dr. Honeyman correctly noted that such a transfer would require that Ms. Hall continue interacting and having contact with managers and supervisors whose

actions and inaction contributed to the hostile work environment she experienced in the Holyoke office. Dr. Honeyman further stated his opinion that Ms. Hall would not be able to manage the distress I would likely feel if I were transferred to the Springfield office.See, Hall Affi., ¶36; see also, Heisler Affi., Exhibit 31.

125.    Ms. Hall's attorney sent a letter to Verizon's EEO officer, Paul McGovern, on May 16, 2003 in which he expressed Ms. Hall's serious reservations about the transfer to Springfield and the reasons for her reservations, citing the lack of action by Verizon supervisors to remove the cross box graffiti as one prominent concern. In this letter, Ms. Hall's attorney highlights the fact that he and Ms. Hall were awaiting receipt of more recent medical reports which would address the proposed transfer. Ms. Hall's attorney explicitly states that he would contact Mr. McGovern immediately upon receipt of the additional medical information..See, Heisler Affi., Exhibit 32.

126.    During the course of his representation of Ms. Hall with regard to a worker's compensation claim, Attorney Judd Peskin received a letter dated May 13, 2003 from Ms. Hall's treating psychiatrist, Dr. David Honeyman, in which Dr. Honeyman expressed his professional opinion that a proposed transfer of Ms. Hall to Verizon's Springfield office would likely have an adverse impact upon her mental health. See, Affidavit of Judd Peskin submitted in support of the Plaintiff's Opposition to Defendants' Motion for Summary Judgment (hereafter referred to as "Peskin Affi."), ¶ 3.

127.    Attorney Peskin sent a copy of Dr. Honeyman's letter to Verizon's attorney, Matthew F. King, by facsimile on May 20, 2003. See, Peskin Affi., ¶ 4 and Exhibit 1.

128.    Attorney Peskin followed up on his facsimile to Attorney King with a letter to him dated May 21, 2003 in which Mr. Peskin also referred to the conclusions

expressed by Dr. Honeyman in his May 13th medical report. See, Peskin Affi., ¶ 5 and Exhibit 2.

129.    Despite the above communications, Ms. Hall received a letter from Jack Lynch dated Tuesday, May 20, 2003 instructing her to report for work in the Springfield office on Monday, May 26, 2002. See, Hall Affi., ¶39; and Heisler Affi., Exhibit 33.

130.    Ms. Hall received the letter from Mr. Lynch on Wednesday, May 21, 2003. Ms. Hall took the letter to her attorney's office, but he was away on business until the following week. Another person in his office assisted Ms. Hall in preparing a brief letter in response to Mr. Lynch which Ms. Hall sent to him by overnight and regular mail. In this letter, Ms. Hall confirmed that she had not abandoned her job, and she reminded him that her medical providers had concluded that she could not return to work in the Springfield office and that this conclusion had been communicated to Verizon. See, Hall Affi., ¶40; and Heisler Affi, Exhibit 34.

131.    On Thursday, May 22, 2002, Paul McGovern sent Ms. Hall's attorney a letter flatly rejecting Ms. Hall's reasons for underlying her reservations about the proposed transfer, as expressed inMr. Heisler's May 16th letter, and insisted that Ms. Hall report to work on  the following Monday, May 26, 2003 or face termination for job abandonment. See, Heisler Affi, Exhibit 35.

132.    As promised in his May 16th letter, Ms. Hall's attorney sent a follow-up letter to Mr. McGovern dated May 30, 2003 enclosing a copy of the report of Dr. Honeyman dated May 13, 2002 which had previously been provided to Verizon's attorneys by Attorney Peskin.  See, Heisler Affi, Exhibit 36.

133.    Although the position in the Springfield central office was not a viable option for Ms. Hall, she was encouraged that Verizon appeared willing to transfer her to

a new position. After her attorney had received the offer of the transfer to the Springfield office from Mr. McGovern in early May 2003, Ms. Hall began investigating other transfer options. In particular, she identified a range of positions which had comparable wage rates and which I believed I was qualified for or could perform with a minimum of training. <u>See</u>, Hall Affi., ¶41.

134.    As part of her independent research into transfer possibilities, Ms. Hall spoke with other Verizon employees about possible alternatives, and she went through the Wage Tables in the union contract which was in effect at the time and highlighted positions which she thought might be appropriate. <u>See</u>, Hall Affi., ¶42 and Exhibit 1.

135.    Ms. Hall did not have an opportunity to share the results of her research with Verizon or suggest alternative transfer options because Verizon abruptly terminated her employment effective May 26, 2003. <u>See</u>, Hall Affi., ¶43.

136.    It would not have placed an undue burden on Verizon to have allowed Ms. Hall to remain on unpaid leave of absence until either: 1) Ms. Hall's health improved enough to enable to return to work in her former CO Tech position or the Springfield CO Tech position; or 2) a transfer position could be identified for her which would not have brought her into regular contact with those individuals who contributed to the hostile work environment in Verizon's Holyoke facility and those individuals who failed to take reasonable measures to remedy the hostile work environment.

137.    Verizon has expressly waived any "undue hardship" affirmative defense to Ms. Hall's claim that she was denied a reasonable accommodation under the ADA. <u>See</u>, Heisler Affi., Exhibit 37, Answers to Interrogatories numbered 14 & 15.

138.    When asked at the conclusion of his oral deposition whether there was any reason why it would have been a burden on his department or Verizon to have

allowed Ms. Hall to remain on unpaid leave after May 27th, 2003, George Savaria responded, "No." See, Heisler Affi., Exhibit 3, p. 120.

139.    There was clearly no urgency to fill the Springfield CO Tech position. The Springfield position had been vacant since the Fall of 2002 when the CO Tech in that position was transferred to fill Ms. Hall's position in the Holyoke CO. This transfer was made because the Holyoke CO Tech position was considered to be too vital to be left empty, even on a temporary basis. The Springfield CO Tech position remained vacant for over a year and was still vacant when George Savaria retired from Verizon in November 2003. The position had never been filled during that time, and there were no plans to fill it as of Mr. Savaria's retirement. See, Heisler Affi., Exhibit 3, pp. 70-72.

140.    Management decisions about setting a date of return for employees on leave is based solely upon information Verizon managers receive from the employee's Doctors. In the case of Ms. Hall, the decision to set May 265, 2003 as her date of return was based entirely on information from her doctor. There was no other criteria used in making the decision about the date set for her return. There was no other business related reason for establishing the date of May 26, 2003 for Ms. Hall's return to work.

141.    Mr. Savaria expressly acknowledged that there was **no** urgency whatsoever in having Ms. Hall return to work other than the fact that Ms. Hall's doctors had previously cleared her to return to work in a different work environment or in a different department..

142.    As reflected in paragraphs 125 through 128, paragraph 130 and paragraph 132 above, Verizon was in possession of information from Ms. Hall's treating psychiatrist stating that she would not be able to manage the stress she would experience if transferred to the Springfield CO Tech position, but her employment was

nevertheless terminated due to her failure to report to work in that position on May 26, 2003.

## VI.    Verizon terminated Ms. Hall's employment for an alleged reason which was a mere pretext for retaliation against her for making ongoing requests for a reasonable accommodation.

143.    The facts set forth in paragraphs 109 through 142 above are equally as relevant to Ms. Hall's to the Defendants Motion for Summary Judgment on her retaliation claim under the ADA and Chapter 151 B, and are incorporated herein by reference.

Respectfully submitted,

PLAINTIFF RHONDA HALL
By her Attorney,

Dated:  October 25, 2006

_____/s/ Hugh D. Heisler_____
Hugh D. Heisler
BBO # 563925
Heisler, Feldman, McCormick &
    Garrow, P.C.
1145 Main Street, Suite 508
Springfield, MA 01103
(413) 788-7988

CERTIFICATE OF SERVICE

I, Hugh D. Heisler, hereby certify that a true copy of the foregoing document was served electronically upon the attorney of record for the Defendants on October 25, 2006.

_____/s/ Hugh D. Heisler_____
Hugh D. Heisler