UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

_____

RHONDA HALL,

              Plaintiff,

V.                      Civil Action No. 3:05-cv-30002-MAP

VERIZON COMMUNICATIONS, INC.,
and VERIZON NEW ENGLAND, INC.

              Defendants.

_____

**PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION
TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

**I.  Introduction**

Ms. Hall brings this action for equitable relief and compensatory and punitive damages against defendants Verizon Communications, Inc. and Verizon New England, Inc.  (hereafter collectively referred to as "Verizon") under Title VII of the Civil Rights Act, the Americans with Disabilities Act and the Massachusetts laws against discrimination for persistent and continuous acts of discrimination against her on the basis of her race, color, gender and disability and for policies and practices which had the effect of discriminating against her on the basis of her race.

During the course of her employment for Verizon in its Holyoke, Massachusetts facility, Ms. Hall was subjected to discriminatory actions and omissions by the defendant which included the following:  a) Ms. Hall was subjected to a hostile work environment which included threatening, offensive, demeaning and assaultive treatment and comments directed at her in whole or in part because she is an African American woman;  b) Ms. Hall's efforts to complain to Verizon supervisors and managers about

hostile and harassing treatment and comments were trivialized, dismissed or ignored and these supervisors and managers failed to respond in any meaningful or effective way to racist and sexist actions of Verizon employees; c) Ms. Hall became disabled as a result of the treatment she received as an employee of Verizon and Verizon failed to reasonably accommodate her disability; and d) Ms. Hall's employment was terminated as a direct consequence of the discriminatory and retaliatory treatment to which she was subjected.

Ms. Hall seeks equitable relief designed to assure that the defendants discontinue policies and practices which serve to foster discrimination against African American, female and disabled employees of Verizon.  She also seeks compensation for the grave harm she has suffered and continues to suffer as a result of the discriminatory actions and omissions of the defendants.

The Defendants (hereafter collectively referred to as "Verizon") have moved for summary judgment on the Plaintiff's reasonable accommodation claim. In particular, Sodexho contends that the facts in this case do not support a conclusion that the Plaintiff is disabled within the meaning of the Americans with Disabilities Act ("ADA"). They further argue that the Plaintiff's resignation deprived the Defendants of the opportunity to reasonably accommodate her. For the reasons set forth below, Sodexho is not entitled to an award of summary judgment, and their motion should be denied.

## II.    Factual Background

The Plaintiff has prepared a detailed Statement of Material Facts (hereafter "Plaintiff's SOF") which she has submitted in support of her opposition to the Defendant's Motion for Summary Judgment, and the Plaintiff incorporates those facts into this Memorandum of Law by reference.

### III.    Summary Judgment Standard

Under the Federal Rules of Civil Procedure, summary judgment is appropriate only when all the relevant pleadings and supporting documents, viewed in a light most favorable to the non-moving party, present no genuine issue of material fact, and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c); *Barbour v. Dynamics Research Corp.*, 63 F.3d 32, 36 (1st Cir. 1995). All reasonable inferences which may be drawn from the record before the court are to be indulged in favor of the nonmoving party. *Oliver v. Digital Equipment Corp.,* 846 F.2d 103, 105 (1st Cir. 1988).

The movant bears the initial burden of proving that no genuine issues of material fact exist for trial.  *Sands v. Ridefilm Corp.,* 212 F.3d 657, 661 (1st Cir. 2000).  See, *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 -324 (1986). The First Circuit has defined a "genuine issue of material fact" as that which "might affect the outcome of the suit under the governing law." In deciding a motion for summary judgment, "the court must ask 'whether a fair-minded jury could return a verdict for the plaintiff on the evidence presented." *Lipsett v. University of Puerto Rico*, 864 F.2d 881, 894 (1st Cir. 1988), *quoting, Anderson v. Liberty Lobby, Inc.*, 477 U.S. at 248, 252, 91 L.Ed.2d 202, 106 S.Ct. 2505 (1986)(internal quotations omitted).  In other words, "[a]n issue is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Oliver,* 846 F.2d at 105 (citations omitted).

As set forth below, a reasonable jury could find on the facts presently before the court that Ms. LaBrecque suffers from a disability within the meaning of the ADA, and that she attempted in good faith to engage in an interactive process with Sodexho around her request for a reasonable accommodation, but was met with an outright refusal from Sodexho to make such an accommodation.

In general, summary judgment is an inappropriate tool for resolving claims of employment discrimination. Discrimination cases often involve issues of motivation and intent which can only be proved through reliance on circumstantial evidence. Such determinations regarding motivation and intent depend on complicated inferences from the evidence and are therefore peculiarly within the province of the jury. See eg., LeBlanc v. Great American Ins. Co., 6 F.3d 836, 840 (1st Cir. 1993), *cert. denied*, 128 L. Ed. 2d 72, 114 S. Ct. 1398 (1994); Waltman v. International Paper Co., 875 F.2d 468 (5th Cir. 1989). Thus, courts should exercise particular caution before granting summary judgment for employers on such issues of pretext, motive and intent. Santiago-Ramos v. Centennial P,R, Wireless Corp., 217 F. 3d 46, 54 (1st Cir. 2000). The reason for this caution is "because of the availability of seemingly neutral rationales under which an employer can hide its discriminatory intent." Hodgens v. General Dynamics Corp., 144 F.2d 151, 167 (1st Cir. 1998).

**IV.    Throughout the course of her employment in Verizon's Holyoke facility, Ms. Hall was subjected to a hostile work environment based upon her gender and her race.**

Under Title VII, a hostile work environment is one form of disparate treatment on the basis of "race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). Whereas other disparate treatment claims may scrutinize discrete harms such as hiring or discharge, a hostile work environment claim analyses a workplace environment as a whole to discover whether it is "abusive." Harris v. Forklift Systems, Inc., 510 U.S. 17, 22, 126 L. Ed. 2d 295, 114 S. Ct. 367 (1993); see also, Meritor Savings Bank, FSB v. Vinson, 477 U.S. 57, 64, 91 L. Ed. 2d 49, 106 S. Ct. 2399 (1986). "When the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an

abusive working environment, Title VII is violated." *Oncale v. Sundowner Offshore Servs.,* 523 U.S. 75, 78, 118 S.Ct. 998, 1001, 140 L.Ed.2d 201 (1998) (internal quotation marks omitted) (quoting *Harris,* 510 U.S. at 21, 114 S.Ct. at 370).

The First Circuit has summarized the factors which must be considered in determining whether a plaintiff has a viable hostile work environment claim under applicable Supreme Court standards: (1) whether she (or he) is a member of a protected class; (2) whether she was subjected to unwelcome sexual harassment; (3) whether the harassment was based upon sex; (4) whether the harassment was sufficiently severe or pervasive so as to alter the conditions of plaintiff's employment and create an abusive work environment; (5) whether sexually objectionable conduct was both objectively and subjectively offensive, such that a reasonable person would find it hostile or abusive and the victim in fact did perceive it to be so; and (6) whether some basis for employer liability has been established. O'Rourke v. City of Providence, 235 F.3d 713, 728 (1st Cir. 2001).

The Defendants do not appear to dispute for purposes of their present motion that the first five factors are satisfied in this case. The thrust of their motion is focused on the last of the factors. However, although the Defendants do not challenge the factual basis for the existence of a hostile work environment, they attempt to portray Ms. Hall's workplace as a fairly benign environment, and in order to place the inadequacy of the Defendants' remedial actions in the proper factual context, it is important to illustrate the pervasiveness of the hostile treatment Ms Hall was subjected to.

Ms. Hall began working for the Defendants in or around March 1989. In or around January 2000, Ms. Hall began working in Verizon's central office facility in Holyoke, Massachusetts (hereafter referred to as the "Holyoke CO") as a Central Office

Technician (hereafter referred to as "CO Techs"). The Holyoke CO has four floors, including a basement. There is a room set aside for the OTs in the basement. The CO Techs work on the first and third floors. There are two men's restrooms in the building; one in the basement and one on the third floor. There is only one women's restroom which is located on the second floor. There is a fenced in parking lot in the rear of the building. See, Plaintiff's Plaintiff's SOMF, ¶¶ 2 and 13.

Ms. Hall's first level supervisor, or "Turf Team Leader," was Jack Lynch. The second level manager responsible for supervising central office technicians and operations in Western Massachusetts was George Savaria. Both Mr. Lynch and Mr. Savaria are white males. Throughout the time that Ms. Hall worked in the Holyoke CO, there were only three Verizon employees assigned to work in the building; Ms. Hall and two other CO Techs, Eugene "Skip" Pula and Mike Stawasz, both of whom are white males. In 1999, there were approximately seventy (70) CO Techs working for Verizon in Western Massachusetts. Only one to ten of these seventy CO Techs were women, and probably none of them were African American. See, Plaintiff's Plaintiff's SOMF, ¶¶ 3-5.

Outside technicians (hereafter referred to as "OTs") regularly came into and out of the Holyoke facility. In 2003, there were approximately two hundred (200) OTs working in Western Massachusetts. The vast majority of OTs were white and male. During the time that Ms. Hall worked in the Holyoke CO, there were more than fifty white male outside technicians who would come into and out of the Holyoke CO. According to both Mr. Lynch and Mr. Savaria, the OTs had **no** legitimate business reasons for being in the Holyoke facility, but they were there all the time. See, Plaintiff's Plaintiff's SOMF, ¶¶ 6-9.

Prior to August 2002, there had been constant complaints about OTs hanging out in the Holyoke CO. These complaints came from both people in the neighborhood surrounding the Holyoke CO and from CO Techs working in the facility. Problems with the OTs in the Holyoke CO had been ongoing for as long as Mr. Lynch could remember. These problems had existed even prior to February 1989 when Mr. Lynch became the Turf Team Leader for the area encompassing the Holyoke facility. Verizon managers responded to these earlier complaints about the OTs hanging out in the Holyoke CO by calling their second level managers who were expected to "control their own people." Turf Team leaders for the OTs would also be sent to move the OTs out of the Holyoke CO, and calls would be made to "maintenance central" to see if there was work for the OTs to do. See, Plaintiff's Plaintiff's SOMF, ¶¶ 10-11.

Prior to Ms. Hall's transfer to the Holyoke CO, a woman by the name of Ellie Tobiasz had worked as a CO Tech in the facility. Ms. Tobiasz had registered complaints to Verizon managers about the OTs conduct in the building. In particular, Ms. Tobiasz had complained about male OTs using the women's restroom. On one occasion, Ms. Tobiasz complained that a male CO walked into the women's restroom while she was in there using the facilities. Mr. Lynch responded to Ms. Tobiasz' complaints by talking to the manager of the OTs and having the lock changed on the bathroom door. However, this response did not resolve the problem. The male OTs got copies of the key and also broke the door a few times, and the problem persisted. As Mr. Lynch testified in his oral deposition, "[i]t was always an ongoing issue … It was always a hassle." See, Plaintiff's Plaintiff's SOMF, ¶ 12.

While hanging out in the Holyoke CO, White male OTs would make offensive comments about African Americans and other racial or ethnic minority groups. On one

occasion, a white male OT by the name of Ray Cichy directly inquired of Ms. Hall, "Why do you people get upset when we call you 'niggers' when you say 'nigger' to each other all the time?" When there were news reports of Hispanic or African American children having been killed in Holyoke, white male OTs would make jokes about there being one less that we'll have to worry about later. When a Verizon supervisor of Indian descent purchased a home in the well-to-do predominately white town of Wilbraham, white male OTs made comments, including "Who let him in there?" and "How did he get to live out there?"  White male OTs would make comments about Latino and Black families in Holyoke "living like pigs" and how they hated working in the homes of Latino and Black families in Holyoke and other minority communities. They would also make references to Puerto Rican families as being "nasty," and that all they do is burn things down, and they don't clean up their houses. See, Plaintiff's Plaintiff's SOMF, ¶¶ 14-17.

White male OTs would complain about the music played by Ms. Hall and other African American co-workers, and refer to it as "noise." A White male OT referred to an African American co-worker as someone who was "just hired to fill a quota." An OT referred to a co-worker as "Jew bags" and explained that the term refers to "a Jewish person who hoards all their money." Ms. Hall informed the OT that her son is partly of Jewish descent, and he should be careful with his comments because she found them offensive.

The white male OTs regularly treated Ms. Hall with disrespect and contempt, and the difference between the way they treated Ms. Hall compared to the way they treated her two white male co-workers was glaring. Despite her repeated complaints, OTs were constantly disrupting Ms. Hall's workspace by leaving dirt, mud and debris on her desk, phone and computer, and using her computer and logging her off of her computer. See,

Heisler Affi., Exhibit 2, p. 159; Exhibit 1, ¶ 4.a.; Exhibit 6, p. VZ0123. The OTs **never** used the computers of Ms. Hall's white male CO Tech co-workers without first asking their permission. See, Heisler Affi., Exhibit 13, pp. 175-176.

As when Ms. Tobiasz was a CO Tech in the Holyoke CO, White male co-workers continued to repeatedly use the woman's rest room despite Ms. Hall's repeated complaints and the availability of two separate men's rest rooms. See, Heisler Affi., Exhibit 2, p. 153; Exhibit 4, pp. 34-35; Exhibit 6, p. VZ0123; Exhibit 7, p. 3.

After repeated complaints by Ms. Hall, Verizon managers changed the lock on the women's rest room, as they did after Ms. Tobiasz complained.  As before, many of the male OTs had the key to the new lock, and continued to use the women's rest room. Mr. Lynch himself acknowledged that problems with men using the rest room could have continued after the lock was changed. See, Heisler Affi., Exhibit 2, p. 154; Exhibit 4, p. 35.

As with Ms. Tobiasz, there were occasions when men would walk into the women's rest room when Ms. Hall was in there using the facilities. See, Heisler Affi., Exhibit 4, p. 35.

A white male OT by the name of Brian King came into the Holyoke CO and started yelling at Ms. Hall and berating her for not answering the phone quickly enough when OTs phoned into the CO. Mr. King was being so abusive that another co-worker of Ms. Hall had to intervene and persuade Mr. King to leave the building. See, Heisler Affi., Exhibit 2, p. 135-137; Exhibit 1, ¶ 4.d.; Exhibit 6, p. VZ0124; and Exhibit 7, p. 2.

Answering phone calls from OTs was a shared responsibility between Ms. Hall and her two white male CO Tech co-workers. There was no phone answering pecking order in the office. See, Heisler Affi., Exhibit 2, p. 165-166.

Another OT by the name of Ray Cichy called Ms. Hall and insisted that she give priority to the work he wanted her to do for him over her own work. When Ms. Hall declined to do so, Mr. Cichy stated to Ms. Hall that her job was to serve him and the other OTs. See, Heisler Affi., Exhibit 2, p. 144 &179-180; Exhibit 1, ¶ 4.e.; and Exhibit 6, p. VZ0124.

Ms. Hall's first level and second level supervisors both confirmed that Ms. Hall was 100% correct that her own work had a higher priority than the work requested by the OTs. Mr. Lynch further confirmed that Ms. Hall was entirely justified in refusing to prioritize Mr. Cichy's request and in complaining about his comments to her. See, Heisler Affi., Exhibit 3, pp. 39-40; and Exhibit 4, pp. 41-42.

The OTs next complained directly to union officials about Ms. Hall not answering the phones quickly enough. Ms. Hall was approached by a union steward by the name of Julie Kilbride who told Ms. Hall that the union business manager had asked her to speak to Ms. Hall about the OTs complaints. Ms. Hall explained to Ms. Kilbride that answering the phones was the responsibility of all the CO Techs, not just hers. She also explained the work priorities established by her supervisors and that responding to calls from the OTs was a lower priority. As she was speaking to Ms. Kilbride, the phones in the central office began ringing, and Mike Stawasz ignored the call because he was busy with his own work. See, Heisler Affi., Exhibit 2, pp. 183-184; Exhibit 1, ¶ 4.i.; and Exhibit 6, p. VZ0124-VZ0125.

Brian King **never** entered the Holyoke CO and yelled or screamed at the two white male CO Techs, and he **never** complained to the two white male CO Techs in the office that they were not answering the phones fast enough, even though they also would not answer the phones if they were busy with their own work. See, Heisler Affi.,

10

Exhibit 2, p. 165-166 & 184; Exhibit 4, pp. 42-44; Exhibit 6, p. VZ0124-VZ0125. Ray Cichy **never** stated to Mike Stawasz or Skip Pula that it was **their** job to serve the OTs. See, Heisler Affi., Exhibit 2, p. 147.

Around the time that Ms. Hall was complaining to her supervisors about the conduct and comments of white male OTs in the Holyoke CO, Ms. Hall's car was "keyed" in the fenced in parking lot used by the OTs, and someone with access to the central office spit on her coat where it was always hung up. Personal possessions belonging to Ms. Hall were also taken from her desk. See, Heisler Affi., Exhibit 2, p. 156-157, 159 & 189; Exhibit 4, pp. 35-36; Exhibit 1, ¶ 4.a., b. & c.; Exhibit 6, p. VZ0123-VZ0124; and Exhibit 7, p. 3.

White male co-workers constantly referred to women as "bitches" and frequently used other obscenities in Ms. Hall's presence despite her repeated objections. See, Heisler Affi., Exhibit 1, ¶ 4.f.; Exhibit 6, p. VZ0124; Exhibit 7, p. 2.

During a meeting with Skip Pula and Jack Lynch, Mr. Pula referred to another woman co-worker as a "bitch." When Ms. Hall complained about his use of that term in reference to another woman, Mr. Lynch interjected, "Why, because you're acting like a bitch?" See, Heisler Affi., Exhibit 2, p. 151-152; Exhibit 1, ¶ 4.h.; and Exhibit 7, p. 2.

Skip Pula made repeated offensive and demeaning comments about women co-workers. On one occasion he stated that a woman co-worker was incompetent and should "stick to being a pretty face."     He stated on another occasion that a particular woman co-worker "knows her stuff, for a woman." Mr. Pula would also comment on the physical appearance and outward behavior of other female co-workers, referring to one as a "good-looker" and another as a "tease." See, Heisler Affi., Exhibit 2, pp. 197-198; and Exhibit 7, p. 2.

Ms. Hall often wore Adidas clothing with the Adidas symbol, and on each occasion, Skip Pula would comment, "Do you know what ADIDAS stands for? All Day I Dream About Sex," despite Ms. Hall's repeated objections. <u>See</u>, Heisler Affi., Exhibit 2, pp. 198 & 202-203; and Exhibit 7, p. 2.

When she first started working in Holyoke, she was required for months to log onto her computer using Skip Pula's password "hooters" to access the computer, despite her objections and repeated requests to be assigned her own password. <u>See</u>, Heisler Affi., Exhibit 2, p. 198; and Exhibit 7, p. 2.

Skip Pula repeatedly referred to Ms. Hall and other African Americans as "colored," despite Ms. Hall's objections that she considered it to be an offensive term. <u>See</u>, Heisler Affi., Exhibit 2, p. 148; and Exhibit 7, p. 2.

On multiple occasions when Ms. Hall was working on a latter, Skip Pula would shake the latter despite Ms. Hall's objections and despite his knowledge that she was afraid of heights. <u>See</u>, Heisler Affi., Exhibit 2, pp. 43-45; and Exhibit 7, p. 3.

During the time that she worked in Verizon's Holyoke CO, Ms. Hall was also subjected to repeated instances of unwanted physical touching by Mr. Pula. <u>See</u>, Affidavit of Rhonda Hall submitted in support of the Plaintiff's Opposition to Defendants' Motion for Summary Judgment (hereafter referred to as "Hall Affi."), ¶¶ 2 – 7.

On multiple occasions, Mr. Pula would come up from behind Ms. Hall when she was working and start massaging her neck and shoulders. On each of these occasions, Ms. Hall was startled by his touching her and she was extremely uncomfortable with that sort of physical contact with a male co-worker in her place of work. Ms. Hall would deliberately move away from Mr. Pula when he would attempt to massage her. However, Ms. Hall's obvious discomfort with his physical attention did not deter Mr. Pula

from continuing this conduct. <u>See</u>, Hall Affi., ¶ 3; <u>see also</u>, Heisler Affi., Exhibit 2, pp. 214-215.

On two separate occasions, Mr. Pula stepped on Ms. Hall's shoes with his shoes. On the first occasion, Ms. Hall and Mr. Pula were on opposite sides of a desk. Ms. Hall had worn a new pair of sneakers to work that day, and Mr. Pula reached across the surface of the desk and grabbed both of her arms so that she could not move away from him. He started stepping on each of Ms. Hall's feet and scuffing her sneakers with his shoes. When Ms. Hall strenuously objected to what he was doing, Mr. Pula stated that he wanted her shoes to be as dirty as his. Ms. Hall related to him how upset I was with what he had done, and I insisted that he never do that again. <u>See</u>, Hall Affi., ¶ 4; <u>see also</u>, Heisler Affi., Exhibit 2, pp. 170-172; Exhibit 1, ¶ 4.g.; Exhibit 6, p. VZ0124; and Exhibit 7, p. 2.

Prior to the second incident, Verizon management had begun requiring that CO Techs wear steel-tipped work boots in the workplace. On the first day that Ms. Hall came into work wearing the new boots, Mr. Pula approached her from the front, grabbed both of her shoulders, stomped on the toes of one of her feet, and then stood up with both of his feet on the steel-tipped toes of Ms. Hall's boots in a manner which caused the length of their bodies to come into contact. <u>See</u>, Hall Affi., ¶ 5; <u>see also</u>, Heisler Affi., Exhibit 2, pp. 170-172; Exhibit 1, ¶ 4.g.; Exhibit 6, p. VZ0124; and Exhibit 7, p. 2.

On or about September 5, 2002, Skip Pula approached Ms. Hall with a pair of needle-nosed pliers in his hand and used the needle-nosed pliers to chop off a section of her hair. Ms. Hall had misplaced her own pliers, and Mr. Pula walked up to her and stated that if the pliers were a snake, they would bite her. Ms. Hall retrieved her pliers,

and Mr. Pula walked up to her, grabbed a section of her hair which was hanging loose

with one hand, and with the pliers in his other hand deliberately cut off the section of

hair. <u>See</u>, Heisler Affi., Exhibit 2, pp. 46-47 & 129; Exhibit 1, ¶¶ 6 & 7; and Exhibit 6, p.

VZ0114.

**IV.    Verizon Supervisors and managers were aware that Ms. Hall was being
subjected to a hostile work environment and failed to take immediate and
effective remedial action which was reasonably calculated to either put an
end the hostile work environment or prevent further harassment.**

Employers have an affirmative duty to eradicate 'hostile or offensive' work

environments. <u>Garziano v. E.I. Dupont De Nemours & Co</u>., 818 F.2d 380, 388 (5th Cir.

1987).  In order to fulfill this duty, an employer must take prompt and appropriate

 remedial action which is "reasonably calculated" to end the harassment. <u>Jones v.

Flagship </u>International, 793 F.2d 714, 719-720 (5th Cir. 1986); <u>See also</u>, <u>Tomkins v.

Public Service Electric & Gas Co</u>., 568 F.2d 1044, 1048-9 (3rd Cir. 1977)(holding that

"Title VII is violated . . . [if] the employer does not take prompt and appropriate remedial

action after acquiring . . . knowledge [of the harassment]").  What is appropriate

remedial action will necessarily depend on the particular facts of the case -- the severity

and persistence of the harassment, and the effectiveness of any initial remedial steps.

<u>Waltman v. International Paper CO</u>., 875 F.2d 468, 479 (5th Cir. 1989).

Ms. Hall complained repeatedly to Mr. Lynch about male OTs using the women's

restroom. Mr. Lynch was aware that male OTs were walking in on her when she was

using the rest room. <u>See</u>, Heisler Affi., Exhibit 2, p. 153; and Exhibit 4, pp. 34-35.

Mr. Lynch's response to her complaints was to change the lock on the door. This

was the same response which proved to be so ineffectual after earlier complaints from

Ellie Tobiasz. <u>See</u>, Heisler Affi., Exhibit 2, p. 154; and Exhibit 4, pp. 33-34.

Changing the locks after receiving Ms. Hall's complaints proved to be equally as ineffectual. Male OTs continued to use the women's rest room, and Ms. Hall renewed her complaints to her supervisors. However, no further action was taken by Verizon management. See, Heisler Affi., Exhibit 2, pp. 154-156; and Exhibit 4, pp. 33-34.

Ms. Hall separately complained to Mr. Lynch about her car being keyed in the fenced in parking lot used by the OTs. He did not attempt any manner of investigation. His only response was to advise Ms. Hall to report the incident to the police. See, Heisler Affi., Exhibit 4, pp. 35-37.

Ms Hall requested a meeting with Mr. Lynch and a union representative after she was publicly berated by Brian King because he felt she was not being sufficiently responsive to calls from the OTs. During this meeting, Ms. Hall complained about Mr. King's abusive treatment of her; she complained about her car being keyed in the fenced in parking lot used by the OTs; she complained about someone spitting on her coat; she complained about the OTs continuously fouling her workspace; and she complained about the OTs continued use of the women's rest room. Mr. Lynch's response to Ms. Hall's complaints was to encourage her to "take the high road." See, Heisler Affi., Exhibit 2, pp. 158-160.

The only action taken by Mr. Lynch after hearing the broad range of complaints raised by Ms. Hall was to call the supervisor of the OTs and insist that Mr. King apologize to Ms. Hall. This action by Mr. Lynch was similar to the response of Verizon managers, including Mr. Lynch, to prior complaints about the conduct of OTs in the Holyoke facility. See, Heisler Affi., Exhibit 3, pp. 35-36; and Exhibit 4, pp. 38-39.

As reflected in paragraphs 8 through 11 above, there was a long history of problems with the behavior of OTs in the Holyoke CO, and the standard response of

Verizon managers was to call the OTs supervisors and request that they "control their people." As fully acknowledged by Mr. Lynch, the earlier efforts to control the conduct of the OTs had not resulted in any long-term changes in their behavior, and his response to Ms. Hall's renewed complaints about the OTs treatment of her proved to be equally as ineffectual. See, Heisler Affi., Exhibit 3, pp. 35-36; and Exhibit 4, pp. 52-53.

Following the incident with Brian King, Ms. Hall received the call from Ray Cichy during which he instructed her that her job was to serve the OTs, as recounted in paragraph 26 and 27 above. Ms. Hall complained to Mr. Lynch about this continued harassment from the OTs.  Mr. Lynch told her not to worry about it, and no further action was taken. See, Heisler Affi., Exhibit 2, pp. 145-146.

In the absence of any further managerial action in response to Ms. Hall's ongoing complaints, the harassment from the OTs persisted. As reflected in paragraph 28 above, the OTs next complained to union officials that Ms. Hall was not responding to their needs quickly enough. After being approached by a union representative about the complaints of the OTs, Ms. Hall requested a meeting with Mr. Lynch and Mr. Savaria together with representatives of the union, and this meeting was conducted on August 6, 2002. During the course of this meeting, Ms. Hall complained about the OTs treating her disrespectfully; she complained about racist and anti-Semitic comments and statements made by the OTs; she complained about the OTs occupying and dirtying her workspace and logging her off of her computer; and she complained about ongoing harassment from the OTs in the form of baseless complaints about Ms. Hall not meeting their needs. See, Heisler Affi., Exhibit 8; and Exhibit 9.

During the August 6th meeting, Ms. Hall discussed problems with the overall work environment in the Holyoke CO, and raised certain issues she was having with Skip

Pula, including the two incidents when Skip Pula stepped on her shoes which had occurred prior to August, and his repeated references to sex when she wore Adidas brand clothing. <u>See</u>, Heisler Affi., Exhibit 2, pp. 170-171 & 206.

Ms. Hall's supervisors confirmed that the complaints of the OTs were entirely without merit. However, their response to the battery of issues raised by Ms. Hall during the August 6th meeting was to arrange a conference call with Paul Gazda and Tom Hurley, the first level and second level supervisors of the OTs, respectively, and, in effect, request once again that they "control their people." <u>See</u>, Heisler Affi., Exhibit 3, pp. 38-41; and Exhibit 4, pp. 40-42 & 50-52.

During the course of the conference call, Mr. Savaria explained all the issues that Ms. Hall was having with the OTs in the Holyoke CO. He described the comments which had been made to her, and provided Mr. Hurley with the names of the OTs mentioned by Ms. Hall. Mr. Hurley simply responded that he would discuss these issues with his technicians. There was also an agreement that the OTs would be told to stay out of the Holyoke CO unless absolutely necessary. <u>See</u>, Heisler Affi., Exhibit 3, pp. 38-41; Exhibit 4, pp. 50-52; and Exhibit 9.

Following this conference call, Mr. Hurley only discussed one racial comment made to Ms. Hall with one of his technicians. He did not discuss the issue of racial speech in the Holyoke CO with any other OTs. He did not discuss any gender issues with any of the OTs. Nor did he discuss any issues related to being disrespectful to Ms. Hall, dirtying her work area, or using her equipment with any of the OTs. <u>See</u>, Heisler Affi., Exhibit 10; and Exhibit 11.

Ms. Hall reported that the OTs came into the Holyoke CO less frequently during the remainder of the month of August 2002. However, there is no way of determining

whether the perfunctory steps taken by Verizon managers would have resulted in any long-term improvements in Ms. Hall's work environment because she worked her last day for Verizon on September 5, 2002. <u>See</u>, Heisler Affi., Exhibit 2, p. 182.

On September 5, 2002, the date that Skip Pula deliberately grabbed a section of Ms. Hall's hair and cut it off with a pair of needle nose pliers, Jack Lynch came out to the Holyoke facility to speak with Ms. Hall about what had happened. However, he left Ms. Hall alone with Mr. Pula in the Holyoke CO and returned to Springfield without informing Ms. Hall what action, if any, he was intending to take. <u>See</u>, Hall Affi., ¶ 7.

After Ms. Hall received no further communication from Mr. Lynch, she called him later in the afternoon and asked him why he had left the Holyoke CO and what he was planning to do about what happened. Mr. Lynch stated that he had reassured Mr. Pula that Ms. Hall was upset, but that she would get over it. When Ms. Hall expressed surprise that he would say such a thing, Mr. Lynch responded, "I don't know what you want me to do. He said he's sorry. He admits he was wrong. It's not like I'm going to suspend the guy. What would that prove." Ms. Hall told Mr. Lynch that she couldn't take working in Holyoke anymore. She stated her belief that her co-workers could do anything they wanted to her, and it was no big deal. She started to cry and told Mr. Lynch that I had to get off the phone. <u>See</u>, Hall Affi., ¶ 8; <u>see also</u>, Heisler Affi., Exhibit 2, pp. 65-66.

When she left work that evening, it was clear to Ms. Hall that Mr. Lynch had no intention of doing anything about what had happened to her. <u>See</u>, Hall Affi., ¶ 10.

Ms. Hall spent the next three days calling one Verizon office after another trying to find somebody who would take her concerns seriously. Each office passed her on to a different office and nobody seemed to have the interest, the inclination or the authority

to respond to the issues of physical aggression and harassment in Ms. Hall's workplace. The day after Mr. Pula cut her hair, Ms. Hall went to the Verizon administrative office in Springfield and obtained the phone number for the Verizon Ethics Line. She called the Ethics Line and was advised that her problem was not a matter for the Ethics Line. They referred her to the numbers for Verizon Security and the Employee Assistance Program (EAP). Ms. Hall was advised by Verizon security that the incidents she was complaining about were not security issues and they referred me to the Verizon EEO office. When she called the EAP, Ms. Hall was similarly referred to the Verizon EEO office and also advised to seek professional mental health counseling. See, Hall Affi., ¶ 11.

Feeling that she had exhausted her options, Ms. Hall called Mr. Lynch and requested another meeting with her second level supervisor, George Savaria.  See, Hall Affi., ¶ 12.

At the meeting, Ms. Hall recounted the events that had occurred with Mr. Pula, and I reminded Mr. Lynch and Mr. Savaria about the other incidents involving Mr. Pula and the OTs that had occurred in Holyoke. When she mentioned that she had gone to the office of the Massachusetts Commission Against Discrimination looking for help and recounted the other steps she had taken to get assistance, her supervisors effectively washed their hands of the situation, and told her that they would leave it up to the Verizon EEO office to investigate. In the meantime, Ms. Hall's work situation was left entirely unresolved. No reference was made to whether she would be expected to return to work with Mr. Pula in the Holyoke CO or whether any other options were available to her. See, Hall Affi., ¶ 13; see also, Heisler Affi., Exhibit 12.

For her part, Ms. Hall knew for certain that she could not return to work with Mr. Pula in the Holyoke CO at that time. Based upon the lack of responsiveness to her

numerous prior complaints, she was convinced that nothing would be done to stop any continued harassment and physical aggression toward her if she returned to Holyoke. See, Hall Affi., ¶ 14.

Paul McGovern, an EEO officer for Verizon, was responsible for investigating the complaints raised by Ms. Hall about the treatment she had received in the Holyoke CO. Mr. McGovern had been an employee of Verizon since 1995. See, Heisler Affi., Exhibit 13, pp. 10 & 102.

Mr. McGovern was aware at the outset of his investigation that Ms. Hall had already contacted the Massachusetts Commission Against Discrimination about her complaints. He also became aware that she had filed a formal discrimination complaint with the MCAD while his investigation was still ongoing. See, Heisler Affi., Exhibit 13, p. 64; and Exhibit 14.

Despite the fact that he was already conducting an internal investigation into the treatment of Ms. Hall by her co-workers and supervisors, Mr. McGovern assumed responsibility for simultaneously responding to her formal complaint to the MCAD. See, Heisler Affi., Exhibit 13, p. 64.

Throughout the course of his investigation, Mr. McGovern failed to make any inquiries regarding a number of complaints raised by Ms. Hall which he was aware of at the inception of the investigation or became aware of during the course of the investigation. Mr. McGovern's interview notes do not reflect any inquiries regarding issues raised by Ms. Hall relating to baseless complaints by the OTs about Ms. Hall not being responsive to their needs; unwanted massages by Mr. Pula; her car being "keyed" in the fenced in parking lot; her coat being spat on; her personal possessions being taken from her desk; Mr. Pula referring to her as "colored"; the misuse of her computer

by the OTs; or the OTs use of obscenities in the workplace. <u>See</u>, Heisler Affi., Exhibit 15; and Exhibit 13, pp. 175-176.

After experiencing some frustration communicating with Paul McGovern, Ms. Hall contacted Karen James-Sykes, a Verizon Vice-President of Public Relations, and sent her a summary Ms. Hall had prepared recounting a number of the troubling things that had happened to her while working in the Holyoke CO. <u>See</u>, Hall Affi., ¶ 21.

Ms. James-Sykes forwarded a copy of the summary prepared by Ms. Hall to Mr. McGovern by facsimile dated October 2, 2002. <u>See</u>, Heisler Affi., Exhibit 6, p. VZ0112. When he received this summary from Ms. James-Sykes, the investigation was still ongoing and Mr. McGovern conceded that the contents of the summary were relevant to his investigation. <u>See</u>, Heisler Affi., Exhibit 13, p. 179.

Nevertheless, with the exception of a single e-mail to Thomas Hurley dated October 10, 2002, Mr. McGovern did not conduct any further investigation into those complaints of Ms. Hall's which were brought to his attention for the first time in the summary he received from Ms. James-Sykes. <u>See</u>, Heisler Affi., Exhibit 13, pp. 180-181 & 185-186; and Exhibit 10.

In his e-mail to Mr. Hurley, Mr. McGovern made the following inquiry: "Which techs did you speak to concerning Rhonda Hall's allegations concerning racial speech? Did you address gender issues with them, for example, respect, dirtying of Hall's work area, and use of her equipment without permission?" <u>See</u>, Heisler Affi., Exhibit 10.

Mr. Hurley responded that he had only discussed one racial comment made to Ms. Hall with one of his technicians. <u>See</u>, Heisler Affi., Exhibit 11.

Mr. McGovern was fully aware that a substantial number of Ms. Hall's complaints involved allegations of mistreatment of her by multiple OTs. He was also aware of a

decision by Verizon managers that Mr. Hurley would speak to the OTs working under him about the issues raised by Ms. Hall. In his October 3, 2002 interview with Jack Lynch, Mr. Lynch reported that "Hurley made [a] commitment to keep hIs people out of Holyoke and discuss remarks that Hall reported." In fact, a major assumption guiding the course of Mr. McGovern's investigation was that the multiple issues involving the conduct of the OTs had been effectively addressed by Verizon managers through the implementation of these prior decisions. See, Heisler Affi., Exhibit 115, p. VZ0204; and Exhibit 13, pp. 176-177 & 184.

Having learned from Mr. Hurley that prior decisions to remedy the misconduct of the OTs were never implemented, Mr. McGovern did not engage in any further inquiry about the reason for this lapse. See, Heisler Affi., Exhibit 113, pp. 190-192.

During his deposition, Mr. McGovern acknowledged that in an investigation into whether Ms. Hall was being mistreated in ways which were related to her gender and race, it would have been appropriate to inquire as to whether white male co-workers were being mistreated in the same way. See, Heisler Affi., Exhibit 113, pp. 165-166. However, Mr. McGovern consistently made no inquiries throughout the course of his investigation into whether the white male OTs and Skip Pula were behaving toward other white male co-workers in the same ways that they were behaving toward Ms. Hall. See, Heisler Affi., Exhibit 113, pp. 146, 155, 168-169, 171, 174 & 183.

To the extent that Mr. McGovern did inquire into particular incidents which Ms. Hall found to be offensive and objectionable, and significant number of her complaints were corroborated by co-workers who were interviewed during the course of his investigation. Mr. Lynch confirmed the long history of bad behavior by OTs in the Holyoke CO. See, Heisler Affi., Exhibit 113, p. 172; and Exhibit 15, p. VZ0204. Mr.

Stawasz confirmed that he had heard question posed to Ms. Hall about why "you people get upset when we call you niggers." <u>See</u>, Heisler Affi., Exhibit 113, p. 172; and Exhibit 15, pp. VZ0204. The investigation confirmed that the incident when an OT entered the Holyoke CO and was loudly berating Ms. Hall had been addressed. <u>See</u>, Heisler Affi., Exhibit 113, p. 174. Mr. Stawasz confirmed that OTs had made comments about the death of Hispanics in Holyoke which were "not complimentary." <u>See</u>, Heisler Affi., Exhibit 15, p. VZ0205. Mr. Lynch, Mr. Stawasz and Mr. Pula confirmed that Mr. Pula had stepped on Ms. Hall's shoes. <u>See</u>, Heisler Affi., Exhibit 15, pp. VZ0204 & VZ0205. Mr. Pula and Elizabeth Corse confirmed that Mr. Pula cut her hair with his needle nose pliers. <u>See</u>, Heisler Affi., Exhibit 15, p. VZ0205.

On October 10, 2002, Mr. McGovern issued the findings of his investigation in the form of an Executive Summary constituting a single page. <u>See</u>, Heisler Affi., Exhibit 16.

Despite the fact that he did not inquire about many of the complaints raised by Ms. Hall during his investigation and undeterred by the number of Ms. Hall's complaints which were corroborated by witnesses, Mr. McGovern concluded that his investigation did not substantiate that the actions of Skip Pula and the OTs constituted EEO violations. <u>See</u>, Heisler Affi., Exhibit 16.

In his Executive Summary, Mr. McGovern highlights Mr. Pula's self-servicing claim that he inadvertently cut Ms. Hall's hair with his pliers (while pointedly ignoring Ms. Hall's insistence that his actions were deliberate), even though nobody else familiar with the incident was willing to support this characterization of what happened. Elizabeth Corse, the only other witness to the incident, stated to Mr. McGovern that Pula "cut [a] lock of her hair." While she didn't think his actions were "malicious", she didn't know

what his intentions were. <u>See</u>, Heisler Affi., Exhibit 15, pp. VZ0205. George Savaria, the

second level manager who was ultimately responsible for implementing Mr. McGovern's

recommendation, was far more explicit about what he believed occurred:

> Q:    What was your understanding of what Mr. Pula had done on September 5, 2002?
>
> A:    That he was horsing around and grabbed a hold of her with a short-nose pliers, and grabbed a lock of her hair and cut it.

<u>See</u>, Heisler Affi., Exhibit 3, p. 56.

Even Mr. Pula's factual rendition to Mr. McGovern of what happened on

September 5th is at odds with his claim of inadvertence. Mr. McGovern's notes reflect

that Mr. Pula stated to Ms. Hall that if her pliers were any closer to her they would bite

her. Then "for 'some reason' he went towards her with his own pliers." After purportedly

cutting off multiple strands of her hair by accident, he said nothing to her until he

realized she was upset. <u>See</u>, Heisler Affi., Exhibit 15, pp. VZ0205.

In his Executive Summary, Mr. McGovern attributes the multiple instances of

physical contact with Ms. Hall initiated by Mr. Pula to "kidding around" and being

"playful."  Included among this playful conduct are unwanted massages which Mr.

McGovern failed to investigate, two separate confirmed instances of stepping on Ms.

Hall's feet while grabbing her and holding her in place, and a final confirmed incident of

cutting off a lock of Ms. Hall's hair with a pair of needle-nose pliers. <u>See</u>, Heisler Affi.,

Exhibit 16; <u>see also</u>, Hall Affi., ¶¶ 3-5.

In his Executive Summary, Mr. McGovern inaccurately states that none of the

four witnesses identified by Ms. Hall corroborated her allegations concerning race-

related comments. As reflected in his own interview notes, Mr. Stawasz confirmed that

he had heard the question posed to Ms. Hall about why "you people get mad when we

call you niggers" and that OTs had made comments about the death of Hispanics in Holyoke which were "not complimentary." <u>See</u>, Heisler Affi., Exhibit 16; and Heisler Affi., Exhibit 15, p. VZ0205.

Mr. McGovern next asserts in his Executive Summary that managers took appropriate action in response to Ms. Hall's complaints about the conduct of OTs and addressed issues as they arose. Each of these assertions is flatly contradicted by Thomas Hurley who provided information to Mr. McGovern indicating that prior management decisions intended to remedy the harassing behavior of the OTs had not been implemented. <u>See</u>, Heisler Affi., Exhibit 16; and Heisler Affi., Exhibit 11.

The only formal recommendation contained in Mr. McGovern's Executive Summary is that Mr. Pula receive a written warning. <u>See</u>, Heisler Affi., Exhibit 16.

Despite his understanding that Mr. Pula grabbed ahold of a lock of Ms. Hall's hair and cut it off with his pliers, Mr. Savaria adopted the recommendation of a written warning. <u>See</u>, Heisler Affi., Exhibit 3, pp. 53-54 & 56. A memorandum dated October 22, 2002 was issued to Mr. Pula in which he was simply reminded of Verizon's EEO policies and expectations, and further advised to refrain from unwanted touchings of his peers. <u>See</u>, Heisler Affi., Exhibit 17.

Mr. McGovern closes his Executive Summary with a suggestion that "it may be useful to provide diversity/sensitivity training in the Holyoke CO and the Hatfield garage …" <u>See</u>, Heisler Affi., Exhibit 16.

As of November 2003, over a year after Mr. McGovern issued his findings, no diversity or sensitivity training had taken place in the Holyoke CO. As of the dates of their retirement in November 2003, neither Mr. Savaria nor Mr. Lynch were aware of

any plans to conduct any form of sensitivity or diversity training in the Holyoke CO. See, Heisler Affi., Exhibit 3, p. 63; and Exhibit 4, pp. 8 & 121-122.

Conspicuously absent from Mr. McGovern's findings is any recommendation regarding Ms. Hall's work situation or any reference to her future work assignment. The clear inference to be drawn from Mr. McGovern's silence on this issue is that Ms. Hall was expected to return to her position in the Holyoke CO working side-by-side with Skip Pula. This inference appears to be borne out by Mr. McGovern's subsequent conversation with Ms. Hall. See, Heisler Affi., Exhibit 16.

Ms. Hall called Mr. McGovern in mid to late October 2003 to inquire about the status of his investigation, and he advised her that he did not think that the things that had happened to her constituted an EEO violation. He said he was recommending that there be some sort of training for Verizon employees, but that he could not tell Ms. Hall what if any action was being taken with respect to Skip Pula. Ms. Hall does not recall Mr. McGovern making any reference to her work situation, and as far as she knew, if she were to return to work she would have to resume her CO Tech position in the Holyoke facility working directly with Mr. Pula. No alternatives were suggested or offered to Ms. Hall by Mr. McGovern or anyone else at Verizon. See, Hall Affi., ¶ 22. Mr. McGovern's notes of this conversation reflect that he simply asked Ms. Hall straight away whether she had returned to work yet. See, Heisler Affi., Exhibit 18.

In November 2002, Verizon Health Services Consultant required that Ms. Hall be examined by a consulting physician selected by Verizon. She was examined by Dr. Richard F. Kaplan on December 6, 2002. In a report issued to Verizon's Health Services Consultant, Dr. Kaplan confirmed that Ms. Hall was disabled from returning to her job at Verizon's Holyoke facility. In the Summary and Impression section of his report, Dr.

Kaplan confirmed that Ms. Hall was suffering from "an adjustment disorder with anxiety and depression." He went on to conclude that her psychological difficulties and interrelated physical problems stemmed from the "chronicity of problems" specific to her work situation at Verizon, including the assault upon Ms. Hall by the white male co-worker which triggered her existing symptoms. See, Heisler Affi., Exhibit 19.

In late December 2002, Verizon's Health Services Consultant asked Dr. Kaplan when I would be able to perform my occupational requirements. Dr. Kaplan responded, "Immediately, in a new work situation." Asked whether I was currently able to perform my occupational requirements on a full or part time basis, Dr. Kaplan responded, "Yes. Again, in a new work situation." See, Heisler Affi., Exhibit 20.

Dr. Kaplan's conclusions were entirely consistent with what Ms. Hall's own psychiatrist had stated repeatedly in periodic reports he submitted to recertify her continued eligibility for short term disability benefits.  As early as his first report dated September 27, 2002, Dr. Honeyman stated that the estimated length of Ms. Hall's disability was "unknown at this time – depends on availability of alternative work setting." In referring to any restrictions which might apply to a return to work, Dr. Honeyman consistently requested "consideration of alternative work setting out of current department. He repeated the same prognosis and return to work restrictions in each of two successive reports submitted to Verizon prior to the termination of my short term disability benefits, and in a subsequent letter dated February 11, 2003. See, Heisler Affi., Exhibit 21; Exhibit 22; Exhibit 23; and Exhibit 24.

Despite the consensus among every medical professional who examined or treated Ms. Hall since September 5, 2002 that she was unable to return to work in the Holyoke CO, Ms. Hall received a call on January 9, 2003 from Verizon's Health

Services Consultant advising her that she was not being certified for continued short term disability benefits beyond January 12, 2003, and that she would have to return to her position in Holyoke as of January 13, 2003. Ms. Hall filed a timely appeal of this determination, which was not finally decided until September 2003. See, Hall Affi., ¶ 26; see also, Heisler Affi., Exhibit 25

Soon after Ms. Hall received the January 9th phone call expressing Verizon's expectation that she return to work in Holyoke,  Ms. Hall was served with Verizon's Position Statement prepared and filed by Paul McGovern in response to her complaint to the MCAD. Upon her review of the attachments to Mr. McGovern's Position Statement, Ms. Hall learned for the first time that the only action taken by Verizon as a result of the EEO investigationhad been to give Mr. Pula a mild warning letter in which he was simply reminded of Verizon's EEO policies and expectations, and further advised to refrain from unwanted touchings of his peers. See, Hall Affi., ¶ 23.

Ms. Hall's attorney received a letter from Paul McGovern dated April 10, 2003 in which he offered Ms. Hall a transfer to Verizon's Springfield CO in full settlement of her discrimination claims pending before the MCAD. This correspondence represented the first time since Ms. Hall had left work in early September that Verizon communicated a willingness to have her return to work in a different work setting, as her psychiatrist had been repeatedly urging since transmitting his first Psychiatric Assessment to Verizon in late September. See, Heisler Affi., Exhibit 26.

Ms. Hall was not willing to give up her discrimination claims as a condition to returning to work,  transfer he unconditionally to a CO Tech position in Springfield. In a letter to Mr. McGovern dated April 18, 2003, Ms. Hall's attorney expressed Ms. Hall's gratitude that Verizon was willing to transfer her to a position away from the Holyoke

CO. Ms. Hall's attorney further expressed that she was not prepared to give up her discrimination claims as a condition to retuning to work, but welcomed further dialogue. See, Heisler Affi., Exhibit 27.

On May 1, 2003, Paul McGovern sent to Ms. Hall's attorney in which he offered Ms. Hall a transfer to the Springfield CO without condition. Thus, approximately eight months elapsed before Verizon took a remedial step in the direction urged by every medical professional who had examined and treated Ms. Hall . See, Heisler Affi., Exhibit 28; Exhibit 20; Exhibit 21; Exhibit 22; Exhibit 23; and Exhibit 24.

**VI.    Ms. Hall suffered from substantial work-related impairments which substantially interfered with her major life activities of sleeping, eating, thinking, concentrating, social interaction, and caring for her son, herself and her home.**

The ADA prohibits discrimination in employment against qualified persons with a disability. 42 U.S.C. § 12112(a). Discrimination under the ADA includes "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee, unless ... the accommodation would impose an undue hardship on the operation of the business." 42 U.S.C. § 12112(b)(5)(A). To prevail on such a claim under the ADA, Ms. Hall must establish that she (1) suffered from a disability as defined by the ADA; (2) was otherwise qualified to perform the essential functions of her employment with or without reasonable accommodation; and (3) was subject to an adverse employment action, such as an unreasonable refusal to make an accommodation of her disability. *Carroll v. Xerox Corp.,* 294 F.3d 231, 237 (1st Cir.2002). Verizon argues in its pending motion that the facts in this case could not lead a reasonable jury to find in Ms. Hall's favor on the first and the third of the above elements.

In order to be considered "disabled," Ms. Hall must demonstrate that she suffered from a physical or mental impairment that substantially limited one or more of her major life activities.  42 U.S.C. §12102(2)(A). The First Circuit applies a three-part analysis in considering whether a plaintiff suffered from a disability under §12102(2)(A). *See*, *Carroll*, 294 F.3d at 238; *Bailey v. Georgia-Pacific Corp.*, 306 F.3d 1162, 1167 (1st Cir. 2002).  First, a determination must be made as to whether the plaintiff's alleged condition constitutes a mental or physical "impairment."  The second part of the analysis involves a determination as to whether the activities identified by the plaintiff as having been limited by her condition constitute "major life activities" under the ADA. *Id.*(citations omitted). Third, "tying the two statutory phrases together, [the court] ask[s] whether the impairment substantially limits the activity found to amount to be a major life activity." Id., *citing*, *Lebron-Torres v. Whitehall Labs.,* 251 F.3d 236, 239-40 (1st Cir.2001). The Plaintiff contends that her impairments substantially interfered with the major life activities of sleeping, eating, thinking, concentrating, social interaction, and caring for her son, herself and her home.

An impairment is considered to be "substantially limiting" if it significantly restricts the condition, manner, or duration under which an individual can perform a particular major life activity as compared to an average person in the general population. 29 C.F.R. § 1630.2(j)(1)(i)-(ii). The following factors are considered in determining whether a person is substantially limited in a major life activity: (1) the nature and severity of the impairment; (2) its duration or anticipated duration; and (3) its long-term impact.  29 C.F.R. § 1630.2(j)(2)(i)-(iii); *see also, Carroll*, 294 F.3d at 239. The ADA "addresses substantial limitations on major life activities, not utter inabilities." *Bragdon v. Abbott,* 524 U.S. 624, 641, 118 S.Ct. 2196, 141 L.Ed.2d 540 (1998). The proper analysis under

the applicable EEOC regulations and court decisions requires a comparison between the ability of Ms. Hall to perform the activities of sitting and standing and the ability of the general public to perform the same activities. *See, Gillen,* 283 F.3d at 22.

Whether an impairment is sufficiently severe so as to be "substantially limiting" requires an individualized inquiry into the facts of each case. As the Court expounded in *Sutton v. United Air Lines, Inc.,* 527 U.S. 471, 483, 119 S.Ct. 2139, 144 L.Ed.2d 450 (1999), "[t]he definition of disability also requires that disabilities be evaluated 'with respect to an individual' and be determined based on whether an impairment substantially limits the 'major life activities of such individual.'" *Id., citing,* 42 U.S.C. § 12102(2); *see also* 29 C.F.R. § 1630, App. § 1630.2(j) ("The determination of whether an individual has a disability is not necessarily based on the name or diagnosis of the impairment the person has, but rather on the effect of that impairment on the life of the individual. The admonition of the Eighth Circuit in the *Maziarka* case has particular import here:

> [A] conclusion that a certain condition, or a particular manifestation of a condition, does not substantially limit a particular plaintiff does not foreclose a determination that another individual with the same or analogous condition may be disabled within the meaning of the ADA.

245 F.3d at 679.

The fact that the symptom's of a person's impairment sometimes register at a "normal" level does not mean that they are not disabled under the ADA. This conclusion is particularly evident in a series of cases in which the courts rested their findings on the question of disability upon the plaintiffs' increased levels of impairment during flare-ups of their symptoms or episodic and intermittent manifestations of the plaintiffs' underlying impairments. *See, Maziarka v. Mills Fleet Farm, Inc.*, 245 F.3d 675, 680 (8th Cir.

2001)(flare-ups of irritable bowel syndrome a few days per month on average); *Otting v. J.C. Penney Co.,* 223 F.3d 704 (8th Cir.2000)(epileptic seizures two or three times monthly); *Taylor v. Phoenixville School District*, 184 F.3d 296 (3rd Cir. 1999)(periodic psychotic episodes related to bipolar disorder); *Cehrs v. Northeast Ohio Alzheimer's Research* Center, 155 F.3d 775, 780 -81 (6th Cir. 1998)(intermittent flare-ups of psoriasis): *Barnes v. Northwest Iowa Health* Center, 238 F.Supp. 1053, 1075 (N.D.Iowa 2002)(flare-ups of rheumatoid arthritis approximately six times per year); *Robinson-Scott v. Delta Air Lines, Inc.,* 4 F.Supp. 2d 1183,1187 (N.D.Ga. 1998)(periodic flare-ups of fibromyalgia). As the Third Circuit poignantly observed in *Taylor v. Phoenixville School District*, 184 F.3d 296 (3rd Cir. 1999):

> That [the plaintiff] may not have experienced problems every day does not defeat her claim. Chronic, episodic conditions can easily limit how well a person performs an activity as compared to the rest of the population: repeated  flare-ups  of poor health can have a cumulative weight that wears down a person's resolve and continually breaks apart longer-term projects.

The courts agree that the fact that someone is able to engage in a given major life activity should not count against them in determining whether they are disabled within the meaning of the ADA. "The focus is not on whether the individual has the courage to participate in the major life activity despite her impairment, but, rather, on whether she faces significant obstacles when she does so." *Gillen,* 283 F.3d at 22.  As noted by the court in *Gelabert-Ladenheim v. American Airlines, Inc*, 252 F.3d 54 (1st Cir. 2001), there is no requirement in the ADA that a person be totally disabled from working; indeed, a person cannot be totally disabled because she must be otherwise qualified to work." *Id.* at 59 – 60.  A number of courts and commentators have cautioned against the application of a standard in determining whether a claimant is substantially limited in their ability to perform the major life activity of working which would have the

effect of placing them in an unfair "catch-22" predicament. Adopting a rule that required claimants to demonstrate that they were unable to engage in work "would place deserving ADA plaintiffs in an unenviable 'catch-22': in order to demonstrate that she is disabled, the plaintiff would have to demonstrate why she is unqualified to do the job to which she aspires." *Gillen,* 283 F.3d at 24; *see also,* David Olsky, Note, *Let Them Eat Cake: Diabetes and the Americans with Disabilities Act After Sutton,* 52 Stan. L.Rev. After her final phone conversation with Mr. Lynch on September 5, 2002, Ms. Hall felt totally isolated and vulnerable. She had developed a piercing headache behind her eyes and had a difficult time holding back tears. <u>See</u>, Hall Affi., ¶ 9.

In the days following the haircutting incident, Ms. Hall continued to experience excruciating headaches, and began to experience feelings of deep depression and anxiety. Ms. Hall was psychologically unable to return to work at Verizon on September 6, 2003 and she went out on sick leave. She was prescribed pain medication by her doctor, and she began receiving treatment from a psychiatrist and a licensed psychiatric social worker. Ms. Hall applied for short term disability and between September 2002 and January 13, 2003, Ms. Hall was determined by Verizon's short term disability insurer to be disabled from working for purposes of receiving sickness disability benefits. <u>See</u>, Hall Affi., ¶ 15.

For more than a year or so, Ms. Hall continued to suffer from depression and anxiety. As a result of the depression, she experienced feelings of deep sadness most of the time. She struggled with feelings of worthlessness and the belief that she had lost the power to control her own life. She went through prolonged periods of sleeplessness, and was immobilized by fatigue for long stretches of time. Frequent nightmares and headaches contributed to her sleeping difficulties. Ms. Hall's eating patterns also

fluctuated dramatically and she went through periods of diminished appetite and corresponding weight loss, as well as periods of excessive food consumption and weight gain. Ms. Hall lacked the motivation to accomplish even simple goals which she attempted to establish for myself. During periods when the depression was particularly intense, Ms. Hall couldn't sleep at all, but neither could she summon up the energy to get out of bed. She spent long periods of time in bed unable to face up to performing even the most routine tasks. Ms. Hall was fortunate to have family members who rallied to assist her during this time because she was unable to adequately care for my son, herself or her home. <u>See</u>, Hall Affi., ¶ 16.

The anxiety I was experiencing during this time caused me to have a pervasive sense of dread. I felt nervous much of the time, but I was often entirely unable to identify the source of the nervousness. I was unable to effectively absorb and respond to ordinary stresses of everyday living. I would become uncharacteristically irritable and angry for no good reason, and verbally lash out at the people around me, including my son. I suffered from recurrent severe headaches, as well as abdominal problems and persistent nausea. The persistence of headaches and feelings of anxiety made it difficult for me to concentrate. I was easily distracted and had a difficult time focusing my attention on particular tasks for more than brief periods of time. I didn't venture out of the house much and I avoided contact with friends and family alike. <u>See</u>, Hall Affi., ¶ 17.

A substantial factor contributing to Ms. Hall's depression and anxiety was the ongoing uncertainty about her job situation. She was fearful that she would be required at some point to return to work with Skip Pula and the outside technicians who had shown such contempt for her. Ms. Hall was also fearful that she would have to return to

a position working under supervisors who had demonstrated a total disregard and indifference to her safety and were willing to turn a blind eye to inequitable treatment of her based on her race and gender. <u>See</u>, Hall Affi., ¶ 18.

The medical symptoms of her disabilities were consistently documented by every medical professional who examined or treated her over the course of the next twelve months. In a FMLA Certification Form completed back on September 13, 2002, Ms. Hall's therapist, Linda C. Robinson, LICSW  recorded that she was suffering from a disruption of eating and sleeping, exhaustion, depression and anxiety; headaches, and upset stomach. <u>See</u>, Heisler Affi., Exhibit 29.

Ms. Hall's treating psychiatrist describes similar symptoms in each of the three Psychiatric Assessments he submitted to Verizon's Health Services Consultant. <u>See</u>, Heisler Affi., Exhibit 21; Exhibit 22; and Exhibit 23.

Ms. Hall was treated with Lorazepam for anxiety and insomnia and Zoloft for depression, and she also was prescribed Butalbital for headaches. <u>See</u>, Heisler Affi., Exhibit 19, p. 2. Dr. Kaplan administered a battery of psychological tests, and diagnosed her with and adjustment disorder with mixed anxiety and depressed mood and observed that her illness had negative impacts on her motivation level, ability to concentrate and memory. He went on to conclude that her psychological difficulties and interrelated physical problems stemmed from the "chronicity of problems" specific to her work situation at Verizon, including the assault upon Ms. Hall by the white male co-worker which triggered her existing symptoms. <u>Id.</u>, p. 4.

In a report dated February 11, 2003, Dr. Honeyman, confirmed that Ms. Hall suffered from "[e]lements of an adjustment disorder with anxious mood and possible stress disorder." He further supported Dr. Kaplan's conclusion that her symptoms

stemmed from the work environment and treatment Ms. Hall experienced at the Verizon

Holyoke CO.  Dr. Honeyman concluded that Ms. Hall was not able to return to work

there "given the likelihood of recurrence or exacerbation of these symptoms." See,

Heisler Affi., Exhibit 24.

Dr. Kenneth Jaffe, a Board certified psychiatrist, conducted an impartial

psychiatric examination of Ms. Hall for the Department of Industrial Accidents on

September 30, 2003 and issued a report dated October 2, 2003. Dr. Jaffe also

administered multiple psychological tests which registered results consistent with a

severe level of depression and anxiety. He chronicled the following symptoms of her

disabilities: feeling sad all the time, hard to do anything, poor sleep, fatigue, decreased

appetite and weight loss, irritability, loss of interest in other people, difficulty making

decisions, having to push herself most of the time, feeling more nervous than usual,

feeling afraid for no reason, being easily upset, headaches, feeling weak and getting

tired easily, flushing and nightmares. Dr. Jaffe entered a diagnosis of Major Depressive

Disorder. He concluded that there is a direct causal connection between Ms. Halls

psychiatric condition and multiple incidents of inappropriate behavior which occurred

during her employment with Verizon in the Holyoke CO. sHe also concluded that

working in any position at Verizon which would involve even infrequent contact with

previous co-workers and supervisors would not be in her medical interest. See, Heisler

Affi., Exhibit 30.

The EEOC regulations state that: "To determine the appropriate reasonable

accommodation it may be necessary for the [employer] to initiate an informal, interactive

process with the [employee] in need of accommodation. This process should identify the

precise limitations resulting from the disability and the potential reasonable

accommodations that could overcome those limitations." 29 C.F.R. § 1630.2(*o*)(3). Similarly, the EEOC's interpretive guidelines provide that: "Once a qualified individual with a disability has requested provision of a reasonable accommodation, the employer must make a reasonable effort to determine the appropriate accommodation. The appropriate reasonable accommodation is best determined through a flexible, interactive process that involves both the employer and the [employee] with a disability." 29 C.F.R. Pt. 1630, App. § 1630.9. Once an employer knows of an employee's disability and the employee has requested an accommodation, the employer's obligation to participate in the interactive process has been triggered. *See, Fjellestad v. Pizza Hut of America, Inc.,* 188 F.3d 944, 952 (8th Cir. 1999); *Taylor v. Phoenixville School District,* 184 F.3d 296, 314 (3rd Cir. 1999). In particular, once the employer knows of the disability and the employee's desire for accommodations, the employer has the burden to request additional information that the employer believes it needs in order to fashion a reasonable response. *Taylor,* 184 F.3d at 315. Once the duty to engage in an interactive process is triggered, both parties then have a duty to assist in the search for an appropriate reasonable accommodation and to act in good faith. *Id.* at 312. As stated by the court in *Bultemeyer v. Fort Wayne Community Schools,* 100 F.3d 1281 (7th Cir.1996):

[B]oth parties bear responsibility for determining what accommodation is necessary ... "[N]either party should be able to cause a breakdown in the process for the purpose of either avoiding or inflicting liability. Rather, courts should look for signs of failure to participate in good faith or failure by one of the parties to help the other party determine what specific accommodations are necessary. A party that obstructs or delays the interactive process is not acting in good faith. A party that fails to

communicate, by way of initiation or response, may also be acting in bad faith. In essence, courts should attempt to isolate the cause of the breakdown and then assign responsibility.

Ms. Hall alleges that Verizon failed and refused to make a reasonable accommodation of her disability in two respects:

a)    Verizon failed and refused to allow Ms. Hall to continue on a paid or unpaid leave of absence until Ms. Hall was able to return to work; and

b)    Verizon failed and refused to offer Ms. Hall a transfer on a temporary or permanent basis into a position which would not have brought Ms. Hall into contact with those individuals who contributed to the hostile work environment in Verizon's Holyoke facility and those individuals who failed to take reasonable measures to remedy the hostile work environment.

A requested accommodation is considered to be reasonable if it would not place an undue burden on the employer. There can be no dispute in this case that the accommodations sought by Ms. Hall would not constitute an undue burden as a matter of law. Verizon has expressly waived any defense that providing Ms. Hall with either of the above accommodations would have constituted an undue burden.

However, even if Verizon had not waived any claim of undue burden, the factual record clearly establishes that her requested accommodations would not have placed an undue burden on Verizon. Mr. Savaria expressly acknowledged that there was **no** urgency whatsoever in having Ms. Hall return to work.

No urgency in filling the position in Springfield. By the time of Mr. Savaria's retirement from Verizon in November 2003, the position had not been filled and there were no plans to fill the position.

In early May 2003, Ms. Hall's attorney received a letter from Paul McGovern in which he communicated Verizon's willingness to transfer Ms. Hall unconditionally to a CO Tech position in Springfield. See, Hall Affi., ¶ 27; see also, Heisler Affi., Exhibit 28.

Ms Hall was extremely pleased that Verizon was willing to transfer her to a different work location, but she had serious concerns about the particular position being proposed by Verizon. See, Hall Affi., ¶ 28.

If she were to have taken a position in the Worthington Street office of Verizon, she would have had regular contact with Jack Lynch and George Savaria, who both worked at this location. The fact that the directive Ms. Hall received to report to the Springfield office was sent by Jack Lynch seemed to confirm that she would continue to be subject to his supervision and at least partly dependent upon him to oversee this new work environment. At times Mr. Lynch would have been Ms. Hall's direct supervisor as a result of standard supervisor rotations for weekends, vacations and holidays. See, Heisler Affi., Exhibit 3, pp. 11-14; and Exhibit 4, p. 12. Based upon her experience working in Holyoke, Ms. Hall had no confidence that if she continued to receive discriminatory or retaliatory treatment upon returning to work in this new location that Mr. Lynch or Mr. Savaria would effectively intervene on her behalf. See, Hall Affi., ¶ 29.

There was also a substantial likelihood that Ms. Hall would continue to have contact with Skip Pula if she worked in the Springfield central office. As one of the more experienced CO Techs, he almost certainly would have been called in on a periodic basis to work in the Worthington Street central office, and would have been in that office on a regular basis to pick up supplies and his paycheck. See, Heisler Affi., Exhibit 3, p. 110; see also, Hall Affi., ¶ 30.

Ms. Hall's extreme uneasiness about the transfer proposed by Verizon was exacerbated by several racial incidents in the Springfield area involving Verizon employees in the Spring of 2003 which were grossly mishandled by first and second level supervisors working in Springfield. One particularly egregious incident involved vile white supremacist graffiti on the inside of a Verizon cross box which could only be accessed by Verizon employees. <u>See</u>, Hall Affi., ¶ 31.

In March 2003, Greg Drew, who is an African American male, was working with another African American technician in Springfield, MA. They opened a locked cross box located at 410 Carew Street, and discovered a swastika painted on the inside of the cross box door along with the statement, "Kill all Jews and Niggers !" There was also the statement, "Stanton haz (sic) a Vagina !"  <u>See</u>, Affidavit of Greg Drew submitted in support of the Plaintiff's Opposition to Defendants' Motion for Summary Judgment (hereafter referred to as "Drew Affi."), ¶ 3.

The cross box was always kept locked and only Verizon employees possessed the tool required to open the box. <u>See</u>, Drew Affi., ¶ 4.Mr. Drew and his co-worker, Christopher Winslow, immediately complained about this vile and threatening graffiti to our Verizon supervisor. <u>See</u>, Drew Affi., ¶ 5.

Mr. Winslow also took a photograph of the graffiti which was shared with Verizon management. <u>See</u>, Drew Affi., ¶ 6; and Exhibit 1.Mr. Drew and other African American technicians were exposed to this graffiti every time we opened the cross box. <u>See</u>, Drew Affi., ¶ 7.On a daily basis, Mr. Drew asked his first level supervisor about plans for the removal of the graffiti. On two or three occasions, Mr. Drew went directly to his second level manager, Sally Lynch, and complained that nothing was being done to paint over or remove the graffiti or replace the lock box door. On one of these occasions, Mr. Drew

mentioned to Ms. Lynch that there was an available cross box door in a Verizon equipment yard which could be used to replace the door with the graffiti. Mr. Drew also pointed out on more than one occasion that a temporary measure would be to simply paint over the graffiti so that it was no longer visible. <u>See</u>, Drew Affi., ¶¶ 8 & 9.

After more than a month went by with no action being taken to remove the graffiti, Mr. Drew went to see Thomas Pritchard, a Verizon District Manager in Springfield. He complained to Mr. Pritchard about the apparent unwillingness of Verizon management to respond to our numerous complaints about the graffiti. Mr. Drew offered to replace the cross box door myself, and Mr. Pritchard authorized him to do this. Soon after his meeting with Mr. Pritchard, Mr. Drew replaced the cross box door himself in or around the second week in May 2003. <u>See</u>, Drew Affi., ¶¶ 10 & 11.

Mr. Drew was particularly upset about the unaccountable delay in dealing with the cross box graffiti because there had been multiple prior occasions when he had complained about other racist graffiti in other Verizon equipment boxes and facilities. Some of this other graffiti was directed at Mr. Drew personally, and made references to his race and ancestry in terms which were profoundly offensive and disturbing. On these prior occasions, Mr. Drew encountered similar resistance and delays in effectively dealing with the graffiti. <u>See</u>, Drew Affi., ¶¶ 12.

The lack of response by Verizon supervisors in Springfield to the complaints about the cross box graffiti further confirmed Ms. Hall's fears about working in the Springfield office. The failure of Springfield supervisors to deal with this particularly egregious example of racist and threatening behavior by Verizon employees reinforced her conviction that she would continue to be vulnerable to unchecked harassment or retaliation if she were to accept a transfer to Springfield. <u>See</u>, Hall Affi., ¶34.

Particularly troubling to Ms. Hall was the fact that the vile graffiti on the cross box could only have been written by outside technicians who would be among the outside technicians she would be interacting with if she became a central office technician in the Springfield office. The prospect of facing more discriminatory and possibly retaliatory treatment at the hands of outside technicians who were capable of producing such graffiti was more than Ms. Hall could bear at that time. See, Hall Affi., ¶35.

After receiving Verizon's offer of a transfer to the Springfield office, Ms. Hall discussed her concerns about the proposed transfer with her psychiatrist and therapist at her next appointments with them. Each of them wrote letters advising against a transfer to the Springfield office. In a letter dated May 13, 2003, Dr. Honeyman expressed his belief that Ms. Hall would not be able to manage the level of distress she would likely feel if she were to be transferred into the position in Verizon's Springfield office. Dr. Honeyman correctly noted that such a transfer would require that Ms. Hall continue interacting and having contact with managers and supervisors whose actions and inaction contributed to the hostile work environment she experienced in the Holyoke office. Dr. Honeyman further stated his opinion that Ms. Hall would not be able to manage the distress I would likely feel if I were transferred to the Springfield office. See, Hall Affi., ¶36; see also, Heisler Affi., Exhibit 31.

Ms. Hall's attorney sent a letter to Verizon's EEO officer, Paul McGovern, on May 16, 2003 in which he expressed Ms. Hall's serious reservations about the transfer to Springfield and the reasons for her reservations, citing the lack of action by Verizon supervisors to remove the cross box graffiti as one prominent concern. In this letter, Ms. Hall's attorney highlights the fact that he and Ms. Hall were awaiting receipt of more recent medical reports which would address the proposed transfer. Ms. Hall's attorney

explicitly states that he would contact Mr. McGovern immediately upon receipt of the additional medical information..See, Heisler Affi., Exhibit 32.

During the course of his representation of Ms. Hall with regard to a worker's compensation claim, Attorney Judd Peskin received a letter dated May 13, 2003 from Ms. Hall's treating psychiatrist, Dr. David Honeyman, in which Dr. Honeyman expressed his professional opinion that a proposed transfer of Ms. Hall to Verizon's Springfield office would likely have an adverse impact upon her mental health. See, Affidavit of Judd Peskin submitted in support of the Plaintiff's Opposition to Defendants' Motion for Summary Judgment (hereafter referred to as "Peskin Affi."), ¶ 3.

Attorney Peskin sent a copy of Dr. Honeyman's letter to Verizon's attorney, Matthew F. King, by facsimile on May 20, 2003. See, Peskin Affi., ¶ 4 and Exhibit 1.

Attorney Peskin followed up on his facsimile to Attorney King with a letter to him dated May 21, 2003 in which Mr. Peskin also referred to the conclusions expressed by Dr. Honeyman in his May 13th medical report. See, Peskin Affi., ¶ 5 and Exhibit 2.

Despite the above communications, Ms. Hall received a letter from Jack Lynch dated Tuesday, May 20, 2003 instructing her to report for work in the Springfield office on Monday, May 26, 2002. See, Hall Affi., ¶39; and Heisler Affi., Exhibit 33.

Ms. Hall received the letter from Mr. Lynch on Wednesday, May 21, 2003. Ms. Hall took the letter to her attorney's office, but he was away on business until the following week. Another person in his office assisted Ms. Hall in preparing a brief letter in response to Mr. Lynch which Ms. Hall sent to him by overnight and regular mail. In this letter, Ms. Hall confirmed that she had not abandoned her job, and she reminded him that her medical providers had concluded that she could not return to work in the

Springfield office and that this conclusion had been communicated to Verizon. <u>See</u>, Hall Affi., ¶40; and Heisler Affi, Exhibit 34.

On Thursday, May 22, 2002, Paul McGovern sent Ms. Hall's attorney a letter flatly rejecting Ms. Hall's reasons for underlying her reservations about the proposed transfer, as expressed inMr. Heisler's May 16th letter, and insisted that Ms. Hall report to work on  the following Monday, May 26, 2003 or face termination for job abandonment. <u>See</u>, Heisler Affi, Exhibit 35.

As promised in his May 16th letter, Ms. Hall's attorney sent a follow-up letter to Mr. McGovern dated May 30, 2003 enclosing a copy of the report of Dr. Honeyman dated May 13, 2002 which had previously been provided to Verizon's attorneys by Attorney Peskin.  <u>See</u>, Heisler Affi, Exhibit 36.

Although the position in the Springfield central office was not a viable option for Ms. Hall, she was encouraged that Verizon appeared willing to transfer her to a new position. After her attorney had received the offer of the transfer to the Springfield office from Mr. McGovern in early May 2003, Ms. Hall began investigating other transfer options. In particular, she identified a range of positions which had comparable wage rates and which I believed I was qualified for or could perform with a minimum of training. <u>See</u>, Hall Affi., ¶41.

As part of her independent research into transfer possibilities, Ms. Hall spoke with other Verizon employees about possible alternatives, and she went through the Wage Tables in the union contract which was in effect at the time and highlighted positions which she thought might be appropriate. <u>See</u>, Hall Affi., ¶42 and Exhibit 1.

Ms. Hall did not have an opportunity to share the results of her research with Verizon or suggest alternative transfer options because Verizon abruptly terminated her employment effective May 26, 2003. See, Hall Affi., ¶43.

It would not have placed an undue burden on Verizon to have allowed Ms. Hall to remain on unpaid leave of absence until either: 1) Ms. Hall's health improved enough to enable to return to work in her former CO Tech position or the Springfield CO Tech position; or 2) a transfer position could be identified for her which would not have brought her into regular contact with those individuals who contributed to the hostile work environment in Verizon's Holyoke facility and those individuals who failed to take reasonable measures to remedy the hostile work environment.

Verizon has expressly waived any "undue hardship" affirmative defense to Ms. Hall's claim that she was denied a reasonable accommodation under the ADA. See, Heisler Affi., Exhibit 37, Answers to Interrogatories numbered 14 & 15.

When asked at the conclusion of his oral deposition whether there was any reason why it would have been a burden on his department or Verizon to have allowed Ms. Hall to remain on unpaid leave after May 27th, 2003, George Savaria responded, "No." See, Heisler Affi., Exhibit 3, p. 120.

There was clearly no urgency to fill the Springfield CO Tech position. The Springfield position had been vacant since the Fall of 2002 when the CO Tech in that position was transferred to fill Ms. Hall's position in the Holyoke CO. This transfer was made because the Holyoke CO Tech position was considered to be too vital to be left empty, even on a temporary basis. The Springfield CO Tech position remained vacant for over a year and was still vacant when George Savaria retired from Verizon in

November 2003. The position had never been filled during that time, and there were no plans to fill it as of Mr. Savaria's retirement. <u>See</u>, Heisler Affi., Exhibit 3, pp. 70-72.

Management decisions about setting a date of return for employees on leave is based solely upon information Verizon managers receive from the employee's Doctors. In the case of Ms. Hall, the decision to set May 265, 2003 as her date of return was based entirely on information from her doctor. There was no other criteria used in making the decision about the date set for her return. There was no other business related reason for establishing the date of May 26, 2003 for Ms. Hall's return to work.

Mr. Savaria expressly acknowledged that there was **no** urgency whatsoever in having Ms. Hall return to work other than the fact that Ms. Hall's doctors had previously cleared her to return to work in a different work environment or in a different department..

As reflected in paragraphs 125 through 128, paragraph 130 and paragraph 132 above, Verizon was in possession of information from Ms. Hall's treating psychiatrist stating that she would not be able to manage the stress she would experience if transferred to the Springfield CO Tech position, but her employment was nevertheless terminated due to her failure to report to work in that position on May 26, 2003.

**VI.    Verizon terminated Ms. Hall's employment for an alleged reason which was a mere pretext for retaliation against her for making ongoing requests for a reasonable accommodation.**

The standard for proving a retaliation claim is the same under Title VII and the ADA. A plaintiff asserting a claim of retaliation must make out a prima facie case demonstrating that: (1) she engaged in a protected activity, known to the  employer; (2) she suffered an adverse employment action; and (3) there was a causal connection between the  protected activity and the adverse employment actions. <u>Ramos v. Roche</u>

Products, Inc., 936 F.2d 43, 48 (1st Cir. 1991), *cert. denied*, Rossy v. Roche Products, Inc., 502 U.S. 941, 116 L. Ed. 2d 330, 112 S. Ct. 379; Wright v. Compusa, Inc., 352 F. 3d 472, 478 (1st Cir. 2003).  The First Circuit has described this initial stage as placing a "relatively light burden" on the plaintiff. Greenberg v. Union Camp Corp., 48 F.3d 22, 26 (1st Cir. 1995).

There is no dispute in this case that In cases such as this one, an employee has satisfied the first element of the prima facie case where she complains of alleged sexual harassment or other gender-based discrimination and she reasonably believes her allegations to have some foundation, See, Holland v. Jefferson National Life Ins. Co., 883 F.2d 1307, 1314 (7th Cir. 1989) (where complainant reasonably believes that employer's conduct is discriminatory, a report of sexual harassment is a protected activity under Title VII). A complaint about discrimination does not need to be formally made in order to trigger protection from retaliation:

> the protection afforded by [section 704(a) of the 1964 Civil Rights Act] is not limited to individuals who have filed formal complaints, but extends as well to those … who informally voice complaints to their supervisors.

Rollins v. State of Florida Department of Law Enforcement, 868 F. 2d 397 (11th Cir. 1989).

As to the second element of the prima facie case, a plaintiff must demonstrate that he or she was denied a term, condition or privilege of employment. Connell v. Bank of Boston, 924 F.2d 1169, 1179(1st Cir. 1991), cert. denied, 501 U.S. 1218, 111 S. Ct. 2828, 115 L. Ed. 2d 997 (1991). Under the second element, it is enough to show that the employment action "disadvantages" the person engaging in protected activity. Petitti v. New England Telephone and Telegraph Co., 909 F.2d 28, 33 (1st Cir.1990).

The third element requires a plaintiff to demonstrate a causal connection between the alleged adverse action and her protected activity.  " A showing of [an adverse employment action] soon after the employee engages in an activity specifically protected by section 704(a) of Title VII  is indirect proof of a causal connection between the [adverse employment action] and the activity because it is strongly suggestive of retaliation." Oliver v. Digital Equipment Corp., 846 F.2d 103, 110 (1st Cir. 1988).

A plaintiff may establish a Title VII violation even when a retaliatory motive is not the sole cause of the adverse employment action, or when there were other objectively valid grounds for a discharge. Raniola, 243 F.3d at   A retaliatory motive must be "at least a 'substantial' or 'motivating' factor" behind the adverse action." Mt. Healthy City School District Board of Education v. Doyle, 429 U.S. 274, 287, 50 L. Ed. 2d 471, 97 S. Ct. 568 (1977).  Retaliatory intent may also be shown, in conjunction with the plaintiff's *prima facie* case, by sufficient proof to rebut the employer's proffered reason for the adverse employment action which is alleged to be retaliatory. Reeves v. Sanderson Plumbing Products, Inc., 120 S.Ct. 2097, 2109 (2000); see also, Raniola, 243 F.3d at 625.

**XI.  DISCRIMINATORY ACTIONS OF THE DEFENDANTS OCCURRING OUTSIDE THE APPLICABLE STATUTE OF LIMITATIONS WERE PART OF CONTINUING VIOLATIONS OF THE PLAINTIFF'S RIGHTS UNDER FEDERAL AND STATE DISCRIMINATION LAWS, AND THE PLAINTIFF'S CLAIMS BASED ON THESE VIOLATIONS ARE NOT TIME-BARRED**

The continuing violation doctrine creates an equitable exception to the 300-day limitation period when the unlawful behavior is deemed ongoing. See, e.g., Lawton v. State Mutual Life Assurance Company of America., 101 F.3d 218, 221 (1st Cir. 1996); Sabree v. United Brotherhood of Carpenters and Joiners Local No. 33, 921 F.2d 396, 400-02 (1st Cir. 1990); Jensen v. Frank, 912 F.2d 517, 522 (1st Cir. 1990).  A

continuing violation allows a plaintiff not only to allege otherwise time-barred acts, but more concretely, to receive damages, such as back pay, based on and reaching back to those acts. See, DeNovellis v. Shalala, 124 F.3d 298, 307-08 (1st Cir. 1997) (citations omitted).

Continuing violations may be serial or systemic. See, Pilgrim v. Trustees of Tufts College, 118 F.3d 864, 869 (1st Cir. 1997). A serial violation occurs where a chain of similar discriminatory acts emanating from the same discriminatory animus exists and where there has been some violation within the statute of limitations period that anchors the earlier claims. See, DeNovellis, 124 F.3d at 307.

Applying the above principles the Plaintiff's claims in this case demonstrates that none of her claims are barred by operation of the applicable statute of limitations.

By its nature, a hostile work environment often means that there are a series of events which mount over time to create such a poisonous atmosphere as to violate the law. In the leading Supreme Court cases, the evidence of harassment covered a period of years. Faragher v. City of Boca Raton, 524 U.S. 775, 782, 141 L. Ed. 2d 662, 118 S. Ct. 2275 (1998) (five-year period); Harris v. Forklift System, Inc., 510 U.S. 17, 19, 126 L. Ed. 2d 295, 114 S. Ct. 367 (1993)  (two and a half years); Meritor Sav. Bank, FSB v. Vinson, 477 U.S. 57, 59-60, 91 L. Ed. 2d 49, 106 S. Ct. 2399 (1986) (four years). As a consequence, there is a natural affinity between the hostile work environment theory and the continuing violation doctrine. Thus, a court should not hastily dismiss on timeliness grounds a harassment claim where a continuing violation is alleged. Provenchar v. CVS Pharmacy, 145 F.3d 5, (1st Cir. 1998)

The need to distinguish between serial and systemic violations has been largely eliminated by the Supreme Court's decision resoundingly endorsed the serial violations

concept in its in decision *National Railroad Passenger Corp. v. Morgan,* ___ U.S. ___, 122 S.Ct. 2061, 153 L.Ed.2d 106 (2002). In *Morgan,* the Court held that "consideration of the entire scope of a hostile work environment claim, including behavior alleged outside the statutory time period, is permissible for the purposes of assessing liability, so long as any act contributing to that hostile environment takes place within the statutory time period." *Id.* 122 S.Ct. at 2068. The Court explained that a "hostile work environment claim is comprised of a series of separate acts that collectively constitute one `unlawful employment practice.'" *Id.* 122 S.Ct. at 2074. Thus, "[p]rovided that an act contributing to the claim occurs within the filing period, the entire time period of the hostile environment may be considered by the court for the purposes of determining liability." *Id.*

Much of the conduct which the Plaintiff alleges comprised a hostile work environment  occurred within the 300 day period, and her hostile work environment claim is not barred by the statute of limitations.

## XI.    CONCLUSION

For all the reasons set forth above, the plaintiff respectfully requests that the court deny the Defendant's motion for summary judgment.

Respectfully submitted,

PLAINTIFF RHONDA HALL
By her Attorney,

Dated:  October 25, 2006

    /s/ Hugh D. Heisler
Hugh D. Heisler
BBO # 563925
Heisler, Feldman, McCormick & Garrow, P.C.
1145 Main Street, Suite 508
Springfield, MA 01103
(413) 788-7988

CERTIFICATE OF SERVICE

I, Hugh D. Heisler, hereby certify that a true copy of the foregoing Memorandum of Law was served electronically upon the attorney of record for the Defendants on October 25, 2006.

_____
Hugh D. Heisler