UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

RHONDA HALL,

        Plaintiff,

V.

VERIZON COMMUNICATIONS, INC.,
and VERIZON NEW ENGLAND, INC.

        Defendants.

Civil Action No. 3:05-cv-30002-MAP

**AFFIDAVIT OF RHONDA HALL**

I, Rhonda Hall, being of full age, hereby depose and state:

1. I am the plaintiff in the above-entitled matter, and I make this Affidavit in support of my Opposition to a motion for summary judgment filed by Defendants Verizon Communications, Inc. and Verizon New England, Inc. (hereafter referred to collectively as "Verizon").

2. During the time that I worked in Verizon's Holyoke central office facility, there were repeated instances of unwanted physical touching of me by one of my co-workers, Skip Pula.

3. On multiple occasions, Mr. Pula would come up from behind me when I was working and start massaging my neck and shoulders. On each of these occasions, I was startled by his touching me and I was extremely uncomfortable with that sort of physical contact with a male co-worker in my place of work. I honestly do not recall how directly I expressed to Mr. Pula my objections

to him touching me in that way. I believe I might have told him that I wished he wouldn't do that. I do specifically remember moving away from him when he would attempt to massage me. However, my obvious discomfort with his physical attention did not deter him from continuing this conduct.

    4.    On two separate occasions, Mr. Pula stepped on my shoes with his shoes. On the first occasion, we were on opposite sides of a desk. I had worn a new pair of sneakers to work that day, and Mr. Pula reached across the surface of the desk and grabbed both of my arms so that I could not move away from him. He started stepping on each of my feet and scuffing my sneakers with his shoes. When I strenuously objected to what he was doing, Mr. Pula stated to me that he wanted my shoes to be as dirty as his. I related to him how upset I was with what he had done, and I insisted that he never do that again.

    5.    Prior to the second incident, Verizon management had begun requiring that we wear steel-tipped work boots in the workplace. On the first day I came into work wearing the new boots, Mr. Pula approached me from the front, grabbed both of my shoulders, stomped on the toes of one of my feet, and then stood up with both of his feet on the steel-tipped toes of my boots in a manner which caused the length of our bodies to come into contact.

    6.    I was shocked by this second incident, and I immediately complained to my union steward about this incident and later told my supervisors about what had happened in a meeting at which my union representatives were present.

7. The subsequent incident in September 2002 when Mr. Pula deliberately grabbed a section of my hair and cut it off with a pair of needle nose pliers left me very badly shaken. My supervisor, Jack Lynch, came out to the Holyoke facility to speak with me about what had happened, and I was stunned when he left me alone with Mr. Pula in Holyoke and returned to Springfield without informing me what action, if any, he was intending to take.

8. After I received no further communication from Mr. Lynch, I called him later in the afternoon and asked him why he had left the Holyoke office and what he was planning to do about what happened. Mr. Lynch told me that he had reassured Mr. Pula that I was upset, but that I would get over it. When I expressed surprise that he would say such a thing, he stated to me, "I don't know what you want me to do. He said he's sorry. He admits he was wrong. It's not like I'm going to suspend the guy. What would that prove." I told Mr. Lynch that I couldn't take working in Holyoke anymore. I stated my belief that my co-workers could do anything they wanted to me, and it was no big deal. I started to cry and told Mr. Lynch that I had to get off the phone.

9. After getting off the phone with Mr. Lynch, I felt totally isolated and vulnerable. I developed a piercing headache behind my eyes and had a difficult time holding back tears.

10. When I left work that evening, it was painfully clear to me that Mr. Lynch had no intention of doing anything about what had happened to me. I felt that I was pretty much on my own, and I was convinced that nobody was going to do anything unless I personally took steps to get help.

11. I spent the next three days calling one Verizon office after another trying to find somebody who would take my concerns seriously. Each office passed me on to a different office and nobody seemed to have the interest, the inclination or the authority to respond to the issues of physical aggression and harassment in my workplace. The day after Mr. Pula cut my hair, I went to the Verizon administrative office in Springfield and obtained the phone number for the Verizon Ethics Line. I called the Ethics Line and was advised that my problem was not a matter for the Ethics Line. They referred me to the numbers for Verizon Security and the Employee Assistance Program (EAP). I was advised by Verizon security that mine was not a security issue and they referred me to the Verizon EEO office. When I called the EAP, I was similarly referred to the Verizon EEO office and also advised to seek professional mental health counseling.

12. Feeling that I had exhausted my options, I called Mr. Lynch and requested a meeting with our second level supervisor, George Savaria. I thought that if I explained to Mr. Savaria what had been happening to me in the Holyoke office that he would realize how serious the situation was and would personally intervene to make meaningful changes.

13. At the meeting, I recounted the events that had occurred with Mr. Pula, and I reminded Mr. Lynch and Mr. Savaria about the other things that had been happening to me in Holyoke. When I mentioned that I had gone to the office of the Massachusetts Commission Against Discrimination looking for help and recounted the other steps I had taken to get assistance, my supervisors effectively washed their hands of the situation, and told me that they would leave it up to the

Verizon EEO office to investigate. In the meantime, my work situation was left entirely unresolved.

14.     I knew for certain that I could not return to work with Mr. Pula in the Holyoke office at that time. If I returned to work and the harassment and physical aggression toward me continued, I was convinced that nothing would be done to stop it.

15.     I continued to experience excruciating headaches, and began to experience feelings of deep depression and anxiety. I was prescribed pain medication by my doctor, and I began receiving treatment from a psychiatrist and a licensed psychiatric social worker. I applied for short term disability and my application was approved.

16.     For more than a year or so, I continued to suffer from depression and anxiety. As a result of the depression, I experienced feelings of deep sadness most of the time. I struggled with feelings of worthlessness and the belief that I had lost the power to control my own life. I went through prolonged periods of sleeplessness, and was immobilized by fatigue for long stretches of time. Frequent nightmares and headaches contributed to my sleeping difficulties. My eating patterns also fluctuated dramatically and I went through periods of diminished appetite and corresponding weight loss, as well as periods of excessive food consumption and weight gain. I lacked the motivation to accomplish even simple goals which I attempted to establish for myself.  During periods when the depression was particularly intense, I couldn't sleep at all, but neither could I summon up the energy to get out of bed. I spent long periods of

time in bed unable to face up to performing even the most routine tasks. I was fortunate to have family members who rallied to assist me during this time because I was unable to adequately care for my son, myself or our home.

17. The anxiety I was experiencing during this time caused me to have a pervasive sense of dread. I felt nervous much of the time, but I was often entirely unable to identify the source of the nervousness. I was unable to effectively absorb and respond to ordinary stresses of everyday living. I would become uncharacteristically irritable and angry for no good reason, and verbally lash out at the people around me, including my son. I suffered from recurrent severe headaches, as well as abdominal problems and persistent nausea. The persistence of headaches and feelings of anxiety made it difficult for me to concentrate. I was easily distracted and had a difficult time focusing my attention on particular tasks for more than brief periods of time. I didn't venture out of the house much and I avoided contact with friends and family alike.

18. A substantial factor contributing to my depression and anxiety was the ongoing uncertainty about my job situation. I was fearful that I would be required at some point to return to work with Skip Pula and the outside technicians who had shown such contempt for me and my sensibilities. I was also fearful that I would have to return to a position working under supervisors who had demonstrated such a total disregard and indifference to my safety and were willing to turn a blind eye to inequitable treatment of me based on my race and gender.

19. When I first spoke with Paul McGovern of the Verizon EEO office in September 2002, I recounted to him a number of the things that had happened to

6

me in the Holyoke office, including a detailed description of the haircutting incident, the two incidents of Mr. Pula stepping on my feet, and several of the more troubling incidents with the outside technicians. Mr. McGovern advised me that he would be conducting an investigation, and that he would get back in touch with me.

20. I called Mr. McGovern several times in September, but I could not get any information about the status of the investigation.

21. I recounted my frustration with the lack of communication from Mr. McGovern to a friend who was on the Board of Directors of the Urban League in Boston. He referred me to Karen James Sykes, a Verizon Vice-President of Public Relations who was also an Urban League Board member. I spoke with Ms. Sykes and sent her a summary I had prepared of things that had happened to me while working in the Holyoke office. She told me that the only thing she could do was forward this information to Mr. McGovern.

22. In early October 2002, I had two brief phone conversations with Mr. McGovern about my complaints. I called him back on October 15, 2003, and he advised me that he did not think that the things that had happened to me constituted an EEO violation. He said he was recommending that there be some sort of training for Verizon employees, but that he could not tell me what if any action was being taken with respect to Skip Pula. He made no reference to my work situation, and as far as I knew, if I were to return to work I would have had to resume my CO Tech position in the Holyoke facility working directly with Mr. Pula. No alternatives were suggested or offered to me by anyone at Verizon.

23. It was not until January 2003, when I received Verizon's Position Statement in response to my complaint to the MCAD, that I learned that the only action taken by Verizon had been to give Mr. Pula a warning letter in which he was simply reminded of Verizon's EEO policies and expectations, and further advised to refrain from unwanted touchings of his peers.

24. In November 2002, Verizon required that I be evaluated by a consulting physician selected by Verizon. I was examined by Dr. Richard F. Kaplan on December 6, 2002. In late December 2002, Verizon's Health Services Consultant asked Dr. Kaplan when I would be able to perform my occupational requirements. Dr. Kaplan responded, "Immediately, in a new work situation." Asked whether I was currently able to perform my my occupational requirements on a full or part time basis, Dr. Kaplan responded, "Yes. Again, in a new work situation.

25. Dr. Kaplan's conclusions were entirely consistent with what my own psychiatrist had stated repeatedly in periodic reports he submitted to recertify my continued eligibility for short term disability benefits.  As early as his first report dated September 27, 2002, Dr. Honeyman stated that the estimated length of my disability was "unknown at this time – depends on availability of alternative work setting." He repeated this prognosis in each of two successive reports submitted to Verizon prior to the termination of my short term disability benefits, and in a subsequent letter dated February 11, 2003.

26. Despite the consensus among every medical professional who had examined or treated me that I was unable to return to work in the Holyoke facility, I

8

received a call on January 9, 2003 from Verizon's Health Services Consultant advising me that I was not being certified for continued short term disability benefits beyond January 12, 2003, and I would have to return to my position in Holyoke as of January 13, 2003. I filed a timely appeal of this determination, which was not finally decided until September 2003.

27.     In early May 2003, my attorney received a letter from Paul McGovern in which he communicated Verizon's willingness to transfer me unconditionally to a CO Tech position in Springfield.

28.     I was extremely pleased that Verizon was willing to transfer me to a different work location, but I had serious concerns about the particular position being proposed by Verizon.

29.     If I were to have taken a position in the Worthington Street office of Verizon, I would have had regular contact with Jack Lynch and George Savaria, who both worked at this location. The fact that the directive I received to report to the Springfield office was sent by Jack Lynch seemed to confirm that I would continue to be subject to his supervision and at least partly dependent upon him to oversee this new work environment. At times he would have been my direct supervisor as a result of standard supervisor rotations for weekends, vacations and holidays. Based upon my experience working in Holyoke, I had no confidence that if I continued to receive discriminatory or retaliatory treatment upon returning to work in this new location that Mr. Lynch or Mr. Savaria would effectively intervene on my behalf.

9

30. There was also a substantial likelihood that I would continue to have contact with Skip Pula if I worked in the Springfield central office. As one of the more experienced CO Techs, he almost certainly would have been called in on a periodic basis to work in the Worthington Street central office, and would have been in that office on a regular basis to pick up supplies and his paycheck.

31. My extreme uneasiness about this proposed transfer was exacerbated by several racial incidents in the Springfield area involving Verizon employees in the Spring of 2003 which were grossly mishandled by first and second level supervisors working in Springfield. One particularly egregious incident involved vile white supremacist graffiti on the inside of a Verizon cross box which could only be accessed by Verizon employees.

32. On the inside of the door to the cross box, a Verizon employee had painted a swastika along with the statement, "Kill all Jews and Niggers !" In an apparent attempt at an insult, a Verizon employee had also written, "Stanton haz (sic) a Vagina !"

33. I attended a meeting of African American Verizon employees at the Urban League office which was convened to discuss the racial incidents and other issues relating to race relations at Verizon. African American OTs who were exposed to this graffiti every time they opened the cross box complained to their supervisors in Springfield for over a month, but nothing was done to remove the graffiti. After over a month of inaction by Verizon supervisors and managers, an African American OT by the name of Greg Drew took it upon himself to replace the cross box door and dispose of the door with the graffiti.

10

34. The lack of response by Verizon supervisors in Springfield to the complaints about the cross box graffiti further confirmed my fears about working in the Springfield office. The failure of Springfield supervisors to deal with this particularly egregious example of racist and threatening behavior by Verizon employees reinforced my conviction that I would continue to be vulnerable to unchecked harassment or retaliation if I were to be transferred to Springfield.

35. Particularly troubling to me was the fact that the vile graffiti on the cross box could only have been written by outside technicians who would be among the outside technicians I would be interacting with if I became a central office technician in the Springfield office. The prospect of facing more discriminatory and possibly retaliatory treatment at the hands of outside technicians who were capable of producing such graffiti was more than I could bear at that time.

36. After receiving Verizon's offer of a transfer to the Springfield office, I discussed my concerns about the proposed transfer with my psychiatrist and therapist at my next appointments with them. Each of them wrote letters advising against a transfer to the Springfield office. My psychiatrist stated his opinion that I would not be able to manage the distress I would likely feel if I were transferred to the Springfield office.

37. I am aware that my attorney sent a letter to Verizon's EEO officer, Paul McGovern, on May 16, 2003 in which he expressed my serious reservations about the transfer to Springfield and the reasons for my reservations.

38.     I am also aware that Attorney Judd Peskin sent Verizon's lawyers a copy of the letter prepared by my psychiatrist by facsimile on May 20, 2003. He followed up this letter with a letter on May 21, 2003 in which he again references the conclusions expressed by my psychiatrist.

39.     Despite these communications, I received a letter from Jack Lynch dated Tuesday, May 20, 2003 instructing me to report for work in the Springfield office on Monday, May 26, 2002.

40.     I did not receive the letter from Mr. Lynch until Thursday, May 21, 2003. I took the letter to my attorney's office, but he was away on business until the following week. Another person in his office assisted me in preparing a brief letter in response to Mr. Lynch which I sent to him by overnight and regular mail. In this letter, I confirmed that I had not abandoned my job, and I reminded him that my medical providers had concluded that I could not return to work in the Springfield office and that this conclusion had been communicated to Verizon.

41.     Although the position in the Springfield central office was not a viable option for me, I was encouraged that Verizon appeared willing to transfer me to a new position. After my attorney had received the offer of the transfer to the Springfield office from Mr. McGovern in early May 2003, I began investigating other transfer options. In particular, I identified a range of positions which had comparable wage rates and which I believed I was qualified for or could perform with a minimum of training.

42.     As part of my independent research into transfer possibilities, I spoke with other Verizon employees about possible alternatives, and I went

through the Wage Tables in the union contract which was in effect at the time and highlighted positions which I thought might be appropriate. I am attaching copies of pages of the union contract which I highlighted as Exhibit 1. I highlighted the original pages with a yellow highlighter and the highlighting did not come through on the copies. I have taken the liberty of highlighting the same job categories on the attached copies which I had highlighted on the originals.

43. I did not have an opportunity to share the results of my research with Verizon or suggest alternative transfer options because Verizon abruptly terminated my employment effective May 26, 2003.

44. I further state that the facts set forth in this affidavit are made upon my own personal knowledge and belief and so far as upon belief, I believe those facts to be true.

Signed under the pains and penalties of perjury on this 23rd day of October, 2006.

_____
Rhonda Hall

# AGREEMENT

between

**VERIZON NEW ENGLAND INC.,
TELESECTOR RESOURCES GROUP, INC. and
VERIZON ADVANCED DATA INC.**

and

**INTERNATIONAL BROTHERHOOD
OF ELECTRICAL WORKERS
(AFL–C.I.O.)
LOCALS 2222, 2313, 2320, 2321, 2322,
2323, 2324, 2325, 2326, 2327**

EFFECTIVE AUGUST 6, 2000

General
Plant
Sales

# EXHIBIT G3
# Wage Tables
# Effective 8/4/2002

G114

---

**Wage Table 1**

Contract Work Inspector, Power Follow Thru Inspector,
Staff Assistant-Craft, Telecommunications Assistant, Toll Assigner

Effective 8/4/2002*

| Interval in Months (Cum.) | WEEKLY RATES BY ZONES | |
|---|---|---|
| | 1 | 2 |
| Start | $390.50 | $382.00 |
| 6 (6) | 454.00 | 445.50 |
| 6 (12) | 529.00 | 519.00 |
| 6 (18) | 616.50 | 605.00 |
| 6 (24) | 718.00 | 704.00 |
| 6 (30) | 836.00 | 819.50 |
| 6 (36) | 974.00 | 955.00 |
| 6 (42) | 1,134.50 | 1,112.50 |
| 6 (48) | | |
| Note 1 | 1,321.00 | 1,295.50 |

| Pension Band | 128 | 127 |

Note 1 - Employees will receive maximum rate when designated and assigned provided employee was receiving the rated and assigned rate on Table 2 or upon completion of the Next Step Program as provided for in Article G22A.

*Does not include cost of living allowance provisions of Exhibit G4

G115

## Wage Table 2 *Current*

Central Office Technician, Equipment Installation Technician,
Outside Plant Technician, Splice-Service Technician,
Automotive Equipment Mechanic, Building Equipment Mechanic,
Transmission Technician

Effective 8/4/2002*

| Interval in Months (Cum.) | WEEKLY RATES BY ZONES | |
|---|---|---|
| | 1 | 2 |
| Start | $438.50 | $433.00 |
| 6 (6) | 501.50 | 494.50 |
| 6 (12) | 573.50 | 565.50 |
| 6 (18) | 654.50 | 646.50 |
| 6 (24) | 747.50 | 738.50 |
| 6 (30) | 854.50 | 843.50 |
| 6 (36) | 977.50 | 964.00 |
| 6 (42) Note 1 | 1,116.50 | 1,101.00 |
| Pension Band | 120 | 119 |
| 6 (48) Notes 2, 3, 4 | 1,199.00 | 1,172.50 |
| Pension Band | 123 | 122 |

Note 1 - Maximum progression rate - C.O. Technician, Equipment Installation Technician, Outside Plant Technician, Splice Service Technician, and Facilities Assigners who were assigned permanently to the Estimate Assigner job title as of August 29, 1994.

Note 2 - When rated and assigned as C.O. Technician - Switch E.I Technician - Test, Head Outside Plant Technician, Splice-Service Technician-Journey/Systems, Facilities Assigner, who were assigned permanently to the Estimate Assigner job title as of August 29, 1994, and after not less 6 months at the maximum progression rate

Note 3 - Outside Plant Technician, when assigned as Head Outside Plant Technician will be paid the differential between the Outside Plant Technician maximum rate and the Head Outside Plant Technician rate added to employee's current Outside Plant Technician rate.

Note 4 - Transmission Technician, Building Equipment Mechanic, and Automotive Equipment Mechanic maximum rate.

Note 5 - Splice-Service Technicians who, in addition to their normal occupational duties are designated and assigned by Management for all or part of a day to distribute work assignments and provide incidental direction to other Splice-Service Technicians, all under the direct supervision of the immediate supervisor, shall receive a differential of $10.00 for each day assigned.

Note 6 - Employees who were at the 12 Month rate through the 60 Month rate on the 60 Month Wage Table of the 1998 Labor Agreement are moved to the Wage Step on the new 48 Month Table which corresponds to the associated wage rate on the 60 Month Table. (It will be 12 Months less than their Wage Step on the 60 Month Table.)

*Does not include cost of living allowance provisions of Exhibit G4.

G116

---

## Wage Table 3

Building Specialist

Effective 8/4/2002*

| Interval in Months (Cum.) | WEEKLY RATES BY ZONES | |
|---|---|---|
| | 1 | 2 |
| Start | $370.00 | $369.00 |
| 6 (6) | 436.00 | 435.00 |
| 6 (12) | 514.00 | 512.00 |
| 6 (18) | 605.50 | 603.00 |
| 6 (24) | 713.50 | 711.00 |
| 6 (30) | 840.50 | 837.50 |
| 6 (36) | 989.50 | 986.50 |
| Pension Band | 115 | 115 |

*Does not include cost of living allowance provisions of Exhibit G4

## Wage Table 5

Automotive Mechanic

Effective 8/4/2002*

| Interval in Months (Cum.) | WEEKLY RATES BY ZONES | |
|---|---|---|
| | 1 | 2 |
| Start | $349.00 | $349.00 |
| 6 (6) | 408.50 | 408.50 |
| 6 (12) | 476.50 | 476.50 |
| 6 (18) | 557.50 | 557.50 |
| 6 (24) | 651.50 | 651.50 |
| 6 (30) | 761.50 | 761.50 |
| 6 (36) | 890.00 | 890.00 |
| Pension Band | 111 | 111 |

*Does not include cost of living allowance provisions of Exhibit G4.

G117

## Wage Table 6

Facilities Assigner, Translations Administrator

Effective 8/4/2002*

| Interval in Months (Cum.) | WEEKLY RATES BY ZONES | |
|---|---|---|
| | 1 | 2 |
| Start | $367.50 | $365.00 |
| 6 (6) | 437.00 | 433.00 |
| 6 (12) | 519.00 | 514.50 |
| 6 (18) | 617.00 | 610.50 |
| 6 (24) | 734.00 | 724.50 |
| 6 (30) | 871.50 | 860.50 |
| 6 (36) | 1036.00 | 1021.50 |
| **Pension Band** | **115** | **114** |

*Does not include cost of living allowance provisions of Exhibit G4.

## Wage Table 7

Building Attendant, Garage Attendant, Head Building Attendant

Effective 8/4/2002*

| Interval in Months (Cum.) | WEEKLY RATES BY ZONES | |
|---|---|---|
| | 1 | 2 |
| Start | $338.00 | $338.00 |
| 6 (6) | 391.50 | 391.50 |
| 6 (12) | 452.50 | 452.50 |
| 6 (18) | 524.00 | 524.00 |
| 6 (24) | 606.50 | 606.50 |
| 6 (30) | 702.00 | 702.00 |
| 6 (36) Note 1 | 812.00 | 812.00 |
| **Pension Band** | **108** | **108** |
| **Head Building Attend Note 2** | **858.50** | **858.50** |
| **Pension Band** | **110** | **110** |

Note 1 - Maximum Rate - Building Attendant and Garage Attendant, Building Attendant having a certificate of Competency and Second Class Fireman's License, when designated and assigned by Management.

Note 2 - When designated and assigned by Management

*Does not include cost of living allowance provisions of Exhibit G4.

G118

## Wage Table 8

Customer Service Assistant

Effective 8/4/2002*

| Interval in Months (Cum.) | WEEKLY RATES BY ZONES | |
|---|---|---|
| | 1 | 2 |
| Start | $367.50 | $365.00 |
| 6 (6) | 432.00 | 428.00 |
| 6 (12) | 506.50 | 502.00 |
| 6 (18) | 595.00 | 588.50 |
| 6 (24) | 699.00 | 689.50 |
| 6 (30) | 819.50 | 808.00 |
| 6 (36) | 962.00 | 947.50 |
| **Pension Band** | **114** | **113** |

Note - Customer Service Assistants who, in addition to their normal occupational duties, are designated and assigned by Management to assist in customer appeal matters in the Customer Service Bureau will receive a differential of $15.00 for each day assigned.

*Does not include cost of living allowance provisions of Exhibit G4.

## Wage Table 9

Coin Telephone Collector

Effective 8/4/2002*

| Interval in Months (Cum.) | WEEKLY RATES BY ZONES | |
|---|---|---|
| | 1 | 2 |
| Start | $366.50 | $366.50 |
| 6 (6) | 431.00 | 431.00 |
| 6 (12) | 506.50 | 505.50 |
| 6 (18) | 594.50 | 593.50 |
| 6 (24) | 699.00 | 697.00 |
| 6 (30) | 821.00 | 818.00 |
| 6 (36) | 965.00 | 960.00 |
| **Pension Band** | **115** | **114** |

Note - Coin Telephone Collector designated and assigned to drive a Coin Transport Van registered in excess of 18,000 lbs. gross weight for a week or more shall receive an additional $10.00 per week.

*Does not include cost of living allowance provisions of Exhibit G4.

G119

**Wage Table 10**

Coin Telephone Assistant

Effective 8/4/2002*

| Interval in Months (Cum.) | WEEKLY RATES BY ZONES | |
|---|---|---|
| | 1 | 2 |
| Start | $378.00 | $371.00 |
| 6 (6) | 432.50 | 425.50 |
| 6 (12) | 495.00 | 487.00 |
| 6 (18) | 567.00 | 558.00 |
| 6 (24) | 649.50 | 639.00 |
| 6 (30) | 744.00 | 732.50 |
| 6 (36) | 852.00 | 839.50 |
| 6 (42) | 975.00 | 961.00 |
| 6 (48) | 1,116.50 | 1,101.00 |
| Pension Band | 120 | 119 |

*Does not include cost of living allowance provisions of Exhibit G4.

**Wage Table 13**

Office Assistant

Effective 8/4/2002*

| Interval in Months (Cum.) | WEEKLY RATES BY ZONES | |
|---|---|---|
| | 1 | 2 |
| Start | $307.50 | $303.00 |
| 6 (6) | 361.00 | 354.50 |
| 6 (12) | 424.00 | 415.50 |
| 6 (18) | 498.00 | 486.00 |
| 6 (24) | 585.00 | 569.00 |
| 6 (30) | 687.00 | 665.50 |
| 6 (36) | 807.00 | 779.50 |
| Pension Band | 108 | 107 |

*Does not include cost of living allowance provisions of Exhibit G4.

G120

**Wage Table 15**

Administrative Assistant

Effective 8/4/2002*

| Interval in Months (Cum.) | WEEKLY RATES BY ZONES | |
|---|---|---|
| | 1 | 2 |
| Start | $317.00 | $309.00 |
| 6 (6) | 374.00 | 365.00 |
| 6 (12) | 439.50 | 430.50 |
| 6 (18) | 518.50 | 507.00 |
| 6 (24) | 611.00 | 598.50 |
| 6 (30) | 720.50 | 705.50 |
| 6 (36) | 849.00 | 832.00 |
| Pension Band | 109 | 109 |

*Does not include cost of living allowance provisions of Exhibit G4

**Wage Table 17**

Special Assistant

Effective 8/4/2002*

| Interval in Months (Cum.) | WEEKLY RATES BY ZONES | |
|---|---|---|
| | 1 | 2 |
| Start | $349.50 | $338.50 |
| 6 (6) | 409.00 | 397.00 |
| 6 (12) | 479.00 | 466.00 |
| 6 (18) | 559.50 | 546.50 |
| 6 (24) | 654.00 | 642.00 |
| 6 (30) | 764.50 | 753.50 |
| 6 (36) | 895.00 | 883.50 |
| Pension Band | 111 | 111 |

*Does not include cost of living allowance provisions of Exhibit G4.

G121

## Wage Table 18

Driver B

Effective 8/4/2002*

| Interval in Months (Cum.) | WEEKLY RATES BY ZONES | |
|---|---|---|
| | 1 | 2 |
| Start | $396.50 | $396.50 |
| 6 (6) | 443.50 | 443.50 |
| 6 (12) | 495.00 | 495.00 |
| 6 (18) | 554.00 | 554.00 |
| 6 (24) | 619.50 | 619.50 |
| 6 (30) | 692.50 | 692.50 |
| 6 (36) | 774.50 | 774.50 |
| 6 (42) | 866.50 | 866.50 |
| 6 (48) | 968.50 | 968.50 |
| Pension Band | 114 | 114 |

*Does not include cost of living allowance provisions of Exhibit G4

## Wage Table 19

Driver A

Effective 8/4/2002*

| Interval in Months (Cum.) | WEEKLY RATES BY ZONES | |
|---|---|---|
| | 1 | 2 |
| Start | $511.50 | $499.00 |
| 6 (6) | 564.00 | 550.50 |
| 6 (12) | 622.00 | 608.00 |
| 6 (18) | 685.50 | 671.50 |
| 6 (24) | 756.00 | 741.50 |
| 6 (30) | 833.00 | 818.00 |
| 6 (36) | 919.00 | 903.00 |
| 6 (42) | 1012.50 | 997.00 |
| 6 (48) | 1116.50 | 1101.00 |
| Pension Band | 120 | 119 |

*Does not include cost of living allowance provisions of Exhibit G4

G122

## Wage Table 20

Materiel Assistant
Materiel Attendant
Head Materiel Attendant

Effective 8/4/2002*

| Interval in Months (Cum.) | WEEKLY RATES BY ZONES | |
|---|---|---|
| | 1 | 2 |
| Start | $317.50 | $312.50 |
| 6 (6) | 356.00 | 352.00 |
| 6 (12) | 399.00 | 395.50 |
| 6 (18) | 448.50 | 444.50 |
| 6 (24) | 503.50 | 500.50 |
| 6 (30) | 564.50 | 562.00 |
| 6 (36) | 633.50 | 631.50 |
| 6 (42) | 711.50 | 710.50 |
| 6 (48) Note 3 | 798.50 | 798.50 |
| Pension Band | 107 | 107 |
| 6 (54) Note 1 | 822.00 | 822.00 |
| Pension Band | 111 | 111 |
| Head Materiel Attendant Note 2 | 960.00 | 960.00 |
| Pension Band | 114 | 114 |

Note 1 - Maximum Rate - Materiel Attendant.

Note 2 - Employee shall receive the difference between the Head Materiel Attendant maximum rate and the Materiel Attendant maximum rate added to the employee's current rate when designated and assigned by management.

Note 3 - Maximum Rate - Materiel Assistant - Regular Full Time Materiel Assistants will be canvassed for voluntary transfer to fill a Materiel Attendant Vacancy at their reporting location, prior to posting the vacancy for bid.

*Does not include cost of living allowance provisions of Exhibit G4.

G123