UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

_____
                                              :
RHONDA HALL,                                  :
                                              :
                    Plaintiff,                :
                                              :
V.                                            :     Civil Action No. 3:05-cv-30002-MAP
                                              :
VERIZON COMMUNICATIONS, INC.,                 :
and VERIZON NEW ENGLAND, INC.                 :
                                              :
                    Defendants.               :
_____:

**PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION
TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

**I.    Introduction**

Ms. Hall brings this action for equitable relief and compensatory and punitive

damages against defendants Verizon Communications, Inc. and Verizon New

England, Inc.  (hereafter collectively referred to as "Verizon") under Title VII of the

Civil Rights Act, the Americans with Disabilities Act and the Massachusetts laws

against discrimination for persistent and continuous acts of discrimination against her

on the basis of her race, color, gender and disability.

During the course of her employment for Verizon in its Holyoke,

Massachusetts facility, Ms. Hall was subjected to discriminatory actions and

omissions by the defendant which included the following:  a) Ms. Hall was subjected

to a hostile work environment which included threatening, offensive, demeaning and

assaultive treatment and comments directed at her in whole or in part because she is

an African American woman;  b) Ms. Hall's efforts to complain to Verizon supervisors

and managers about hostile and harassing treatment and comments were trivialized,

dismissed or ignored and these supervisors and managers failed to respond in any meaningful or effective way to racist and sexist actions of Verizon employees; c) Ms. Hall became disabled as a result of the treatment she received as an employee of Verizon and Verizon failed to reasonably accommodate her disability; and d) Ms. Hall's employment was terminated as a direct consequence of the discriminatory and retaliatory treatment to which she was subjected.

Ms. Hall seeks equitable relief designed to assure that the defendants discontinue policies and practices which serve to foster discrimination against African American, female and disabled employees of Verizon.  She also seeks compensation for the grave harm she has suffered and continues to suffer as a result of the discriminatory actions and omissions of the defendants.

The Defendants (hereafter collectively referred to as "Verizon") have moved for summary judgment on each of the Plaintiff's claims. For the reasons set forth below, Verizon is not entitled to an award of summary judgment, and their motion should be denied.

## II.    Factual Background

The Plaintiff has prepared a detailed Statement of Material Facts (hereafter "Plaintiff's SOF") which she has submitted in support of her opposition to the Defendant's Motion for Summary Judgment, and the Plaintiff incorporates those facts into this Memorandum of Law by reference.

## III.    Summary Judgment Standard

Under the Federal Rules of Civil Procedure, summary judgment is appropriate only when all the relevant pleadings and supporting documents, viewed in a light most favorable to the non-moving party, present no genuine issue of material fact,

and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c);

*Barbour v. Dynamics Research Corp.*, 63 F.3d 32, 36 (1st Cir. 1995). All reasonable

inferences which may be drawn from the record before the court are to be indulged in

favor of the nonmoving party. *Oliver v. Digital Equipment Corp.,* 846 F.2d 103, 105

(1st Cir. 1988).

The movant bears the initial burden of proving that no genuine issues of

material fact exist for trial.  *Sands v. Ridefilm Corp.,* 212 F.3d 657, 661 (1st Cir.

2000).  See, *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 -324 (1986). The First

Circuit has defined a "genuine issue of material fact" as that which "might affect the

outcome of the suit under the governing law." In deciding a motion for summary

judgment, "the court must ask 'whether a fair-minded jury could return a verdict for

the plaintiff on the evidence presented." *Lipsett v. University of Puerto Rico*, 864 F.2d

881, 894 (1st Cir. 1988), *quoting, Anderson v. Liberty Lobby, Inc.*, 477 U.S. at 248,

252, 91 L.Ed.2d 202, 106 S.Ct. 2505 (1986)(internal quotations omitted).  In other

words, "[a]n issue is genuine if the evidence is such that a reasonable jury could

return a verdict for the nonmoving party." *Oliver,* 846 F.2d at 105 (citations omitted).

In general, summary judgment is an inappropriate tool for resolving claims of

employment discrimination.  Discrimination cases often involve issues of motivation

and intent which can only be proved through reliance on circumstantial evidence.

Such determinations regarding motivation and intent depend on complicated

inferences from the evidence and are therefore peculiarly within the province of the

jury. *See eg.,  LeBlanc v. Great American Ins. Co.*, 6 F.3d 836, 840 (1st Cir. 1993),

*cert. denied*, 128 L. Ed. 2d 72, 114 S. Ct. 1398 (1994); *Waltman v. International*

*Paper Co.,* 875 F.2d 468 (5th Cir. 1989). Thus, courts should exercise particular

caution before granting summary judgment for employers on such issues of pretext, motive and intent. *Santiago-Ramos v. Centennial P,R, Wireless Corp.,* 217 F. 3d 46, 54 (1st Cir. 2000). The reason for this caution is "because of the availability of seemingly neutral rationales under which an employer can hide its discriminatory intent." *Hodgens v. General Dynamics Corp.*, 144 F.2d 151, 167 (1st Cir. 1998).

**IV.     Throughout the course of her employment in Verizon's Holyoke facility, Ms. Hall was subjected to a hostile work environment based upon her gender and her race.**

Under Title VII, a hostile work environment is one form of disparate treatment on the basis of "race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). Whereas other disparate treatment claims may scrutinize discrete harms such as hiring or discharge, a hostile work environment claim analyses a workplace environment as a whole to discover whether it is "abusive." *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 22, 126 L. Ed. 2d 295, 114 S. Ct. 367 (1993); *see also, Meritor Savings Bank, FSB v. Vinson*, 477 U.S. 57, 64, 91 L. Ed. 2d 49, 106 S. Ct. 2399 (1986). "When the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment, Title VII is violated." *Oncale v. Sundowner Offshore Services.,* 523 U.S. 75, 78, 118 S.Ct. 998, 1001, 140 L.Ed.2d 201 (1998) (internal quotation marks omitted) (quoting *Harris,* 510 U.S. at 21, 114 S.Ct. at 370).

The First Circuit has summarized the factors which must be considered in determining whether a plaintiff has a viable hostile work environment claim under applicable Supreme Court standards: (1) whether she (or he) is a member of a protected class; (2) whether she was subjected to unwelcome sexual harassment; (3)

whether the harassment was based upon sex; (4) whether the harassment was sufficiently severe or pervasive so as to alter the conditions of plaintiff's employment and create an abusive work environment; (5) whether sexually objectionable conduct was both objectively and subjectively offensive, such that a reasonable person would find it hostile or abusive and the victim in fact did perceive it to be so; and (6) whether some basis for employer liability has been established. *O'Rourke v. City of Providence*, 235 F.3d 713, 728 (1st Cir. 2001).

The Defendants do not appear to dispute for purposes of their present motion that the first five factors are satisfied in this case. The thrust of their motion is focused on the last of the factors. However, although the Defendants do not challenge the factual basis for the existence of a hostile work environment, they attempt to portray Ms. Hall's workplace as a fairly benign environment, and in order to place the inadequacy of the Defendants' remedial actions in the proper factual context, it is important to illustrate the pervasiveness of the hostile treatment to which Ms Hall was subjected.

Ms. Hall began working for the Defendants in or around March 1989. In or around January 2000, Ms. Hall was transferred to Verizon's central office facility in Holyoke, Massachusetts (hereafter referred to as the "Holyoke CO") as a Central Office Technician (hereafter referred to as "CO Techs"). The Holyoke CO has four floors, including a basement. There is a room set aside for the outside technicians (hereafter referred to as "OTs") in the basement. The CO Techs work on the first and third floors. There are two men's restrooms in the building; one in the basement and one on the third floor. There is only one women's restroom which is located on the

second floor. There is a fenced in parking lot in the rear of the building. See, Plaintiff's SOMF, ¶¶ 2 and 13.

Ms. Hall's first level supervisor, or "Turf Team Leader," was Jack Lynch. The second level manager responsible for supervising central office technicians and operations in Western Massachusetts was George Savaria. Both Mr. Lynch and Mr. Savaria are white males. Throughout the time that Ms. Hall worked in the Holyoke CO, there were only three Verizon employees assigned to work in the building; Ms. Hall and two other CO Techs, Eugene "Skip" Pula and Mike Stawasz, both of whom are white males. In 1999, there were approximately seventy CO Techs working for Verizon in Western Massachusetts. Only one to ten of these seventy CO Techs were women, and probably none of them were African American. See, Plaintiff's SOMF, ¶¶ 3-5.

Outside technicians (hereafter referred to as "OTs") regularly came into and out of the Holyoke facility. In 2003, there were approximately two hundred OTs working in Western Massachusetts. The vast majority of OTs were white and male. During the time that Ms. Hall worked in the Holyoke CO, there were more than fifty white male outside technicians who would come into and out of the Holyoke CO. According to both Mr. Lynch and Mr. Savaria, the OTs had **no** legitimate business reasons for being in the Holyoke facility, but they were there all the time. See, Plaintiff's SOMF, ¶¶ 6-9.

Prior to August 2002, there had been constant complaints about OTs hanging out in the Holyoke CO. These complaints came from both people in the neighborhood surrounding the Holyoke CO and from CO Techs working in the facility. Problems with the OTs in the Holyoke CO had been ongoing for as long as Mr. Lynch could

6

remember. These problems had existed even prior to February 1989 when Mr. Lynch became the Turf Team Leader for the area encompassing the Holyoke facility. Verizon managers responded to these earlier complaints about the OTs hanging out in the Holyoke CO by calling their second level managers who were expected to "control their own people." Turf Team leaders for the OTs would also be sent to move the OTs out of the Holyoke CO, and calls would be made to "maintenance central" to see if there was work for the OTs to do. See, Plaintiff's SOMF, ¶¶ 10-11.

Prior to Ms. Hall's transfer to the Holyoke CO, a woman by the name of Ellie Tobiasz had worked as a CO Tech in the facility. Ms. Tobiasz had registered complaints to Verizon managers about the OTs conduct in the building. In particular, Ms. Tobiasz had complained about male OTs using the women's restroom. On one occasion, Ms. Tobiasz complained that a male CO walked into the women's restroom while she was in there using the facilities. Mr. Lynch responded to Ms. Tobiasz' complaints by talking to the manager of the OTs and having the lock changed on the bathroom door. However, this response did not resolve the problem. The male OTs got copies of the key and also broke the door a few times, and the problem persisted. As Mr. Lynch testified in his oral deposition, "[i]t was always an ongoing issue … It was always a hassle." See, Plaintiff's SOMF, ¶ 12.

Issues between Ms. Hall and certain of the OTs persisted throughout the two and a half year that she worked in the Holyoke CO. While hanging out in the Holyoke CO, White male OTs would make offensive comments about African Americans and other racial or ethnic minority groups. On one occasion, a white male OT by the name of Ray Cichy directly inquired of Ms. Hall, "Why do you people get upset when we call you 'niggers' when you say 'nigger' to each other all the time?"  When a

7

Verizon supervisor of Indian descent purchased a home in the well-to-do predominately white town of Wilbraham, white male OTs made comments, including "Who let him in there?" and "How did he get to live out there?"  When there were news reports of Hispanic or African American children having been killed in Holyoke, white male OTs would make jokes about there being "one less that we'll have to worry about later." White male OTs would make comments about Latino and Black families in Holyoke "living like pigs" and how they hated working in the homes of Latino and Black families in Holyoke and other minority communities. They would also make references to Puerto Rican families as being "nasty," and that all they do is burn things down, and they don't clean up their houses. See, Plaintiff's SOMF, ¶¶ 14-17.

White male OTs would complain about the music played by Ms. Hall and other African American co-workers, and refer to it as "noise." A White male OT referred to an African American co-worker as someone who was "just hired to fill a quota." An OT referred to a co-worker as "Jew bags" and explained that the term refers to "a Jewish person who hoards all their money." On that occasion, Ms. Hall informed the OT that her son is partly of Jewish descent, and he should be careful with his comments because she found them offensive. See, Plaintiff's SOMF, ¶¶ 18-20.

The white male OTs regularly treated Ms. Hall with disrespect and contempt. Despite her repeated complaints, OTs were constantly disrupting Ms. Hall's workspace by leaving dirt, mud and debris on her desk, phone and computer, and using her computer and logging her off of her computer. As when Ms. Tobiasz was a CO Tech in the Holyoke CO, White male co-workers continued to repeatedly use the woman's rest room despite Ms. Hall's repeated complaints and the availability of two

separate men's rest rooms. As with Ms. Tobiasz, there were occasions when men would walk into the women's rest room when Ms. Hall was in there using the facilities. See, Plaintiff's SOMF, ¶¶ 21-24.

Over time, the OTs behavior toward Ms. Hall became increasingly confrontational as they attempted to cast her in a subservient role. A white male OT by the name of Brian King came into the Holyoke CO on one occasion and started yelling at Ms. Hall and berating her for not answering the phone quickly enough when OTs phoned into the CO. Mr. King was being so abusive that another co-worker of Ms. Hall had to intervene and persuade Mr. King to leave the building. Another OT by the name of Ray Cichy called Ms. Hall and insisted that she give priority to the work he wanted her to do for him over her own work. When Ms. Hall declined to do so, Mr. Cichy stated to Ms. Hall that her job was to serve him and the other OTs. The OTs next complained directly to union officials about Ms. Hall not answering the phones quickly enough. Ms. Hall was approached by a union steward by the name of Julie Kilbride who told Ms. Hall that the union business manager had asked her to speak to Ms. Hall about the OTs complaints. Ms. Hall explained to Ms. Kilbride that answering the phones was the responsibility of all the CO Techs, not just hers. She also explained the work priorities established by her supervisors and that responding to calls from the OTs was a lower priority. As she was speaking to Ms. Kilbride, the phones in the central office began ringing, and Mike Stawasz ignored the call because he was busy with his own work. See, Plaintiff's SOMF, ¶¶ 25, 27 & 29.

Contrary to the protestations of the OTs, answering phone calls from OTs was a shared responsibility between Ms. Hall and her two white male CO Tech co-workers. There was no phone answering pecking order in the office. Ms. Hall's first

level and second level supervisors both confirmed that Ms. Hall was 100% correct that her own work had a higher priority than the work requested by the OTs. Mr. Lynch further confirmed that Ms. Hall was entirely justified in refusing to prioritize Mr. Cichy's request and in complaining about his comments to her. See, Plaintiff's SOMF, ¶¶ 26 & 28.

The difference between the way the OTs treated Ms. Hall compared to the way they treated her two white male co-workers was glaringly apparent. The OTs never used the computers of Ms. Hall's white male CO Tech co-workers without first asking their permission. They never insisted to Mike Stawasz or Skip Pula that it was their job to serve the OTs. They never entered the Holyoke CO and yelled or screamed at either of the two white male CO Techs. The OTs never complained to the two white male CO Techs in the office that they were not answering the phones fast enough, even though they also would not answer the phones if they were busy with their own work. See, Plaintiff's SOMF, ¶¶ 21 & 30.

Around the time that Ms. Hall was complaining to her supervisors about the conduct and comments of white male OTs in the Holyoke CO, Ms. Hall's car was "keyed" in the fenced in parking lot used by the OTs, and someone with access to the central office spit on her coat where it was always hung up. Personal possessions belonging to Ms. Hall were also taken from her desk. See, Plaintiff's SOMF, ¶31.

Ms. Hall's sensibilities as a African American woman were also constantly under assault in the Holyoke CO. When she first started working in Holyoke, she was required for months to log onto her computer using Skip Pula's password "hooters" to access the computer, despite her objections and repeated requests to be assigned her own password. Ms. Hall often wore Adidas clothing with the Adidas symbol, and

on each occasion, Skip Pula would comment, "Do you know what ADIDAS stands for? All Day I Dream About Sex," despite Ms. Hall's repeated objections. White male co-workers constantly referred to women as "bitches" and frequently used other obscenities in Ms. Hall's presence despite her repeated objections. During a meeting with Skip Pula and Jack Lynch, Mr. Pula referred to another woman co-worker as a "bitch."  When Ms. Hall complained about his use of that term in reference to another woman, Mr. Lynch interjected, "Why, because you're acting like a bitch?"  Skip Pula repeatedly referred to Ms. Hall and other African Americans as "colored," despite Ms. Hall's objections that she considered it to be an offensive term. Skip Pula made repeated offensive and demeaning comments about women co-workers. On one occasion he stated that a woman co-worker was incompetent and should "stick to being a pretty face."He stated on another occasion that a particular woman co-worker "knows her stuff, for a woman." Mr. Pula would also comment on the physical appearance and outward behavior of other female co-workers, referring to one as a "good-looker" and another as a "tease." See, Plaintiff's SOMF, ¶¶ 32-37.

From the time that she first started working in the Holyoke CO, Skip Pula was aggressively physical toward Ms. Hall in ways which escalated over time. Mr. Pula would come up from behind Ms. Hall when she was working and start massaging her neck and shoulders. On each of these occasions, Ms. Hall was startled by his touching her and she was extremely uncomfortable with that sort of physical contact with a male co-worker in her place of work. Ms. Hall would deliberately move away from Mr. Pula when he would attempt to massage her. However, Ms. Hall's obvious discomfort with his physical attention did not deter Mr. Pula from continuing this conduct. On multiple occasions when Ms. Hall was working up on a latter, Skip Pula

would shake the latter despite Ms. Hall's objections and despite his knowledge that she was afraid of heights. See, Plaintiff's SOMF, ¶¶ 38-40.

On two separate occasions, Mr. Pula stepped on Ms. Hall's shoes with his shoes. On the first occasion, Ms. Hall and Mr. Pula were on opposite sides of a desk. Ms. Hall had worn a new pair of sneakers to work that day, and Mr. Pula reached across the surface of the desk and grabbed both of her arms so that she could not move away from him. He started stepping on each of Ms. Hall's feet and scuffing her sneakers with his shoes. When Ms. Hall strenuously objected to what he was doing, Mr. Pula stated that he wanted her shoes to be as dirty as his. Ms. Hall related to him how upset I was with what he had done, and I insisted that he never do that again. Prior to the second incident, Verizon management had begun requiring that CO Techs wear steel-tipped work boots in the workplace. On the first day that Ms. Hall came into work wearing the new boots, Mr. Pula approached her from the front, grabbed both of her shoulders, stomped on the toes of one of her feet, and then stood up with both of his feet on the steel-tipped toes of Ms. Hall's boots in a manner which caused the length of their bodies to come into contact. See, Plaintiff's SOMF, ¶¶ 41-42.

On September 5, 2002, Skip Pula approached Ms. Hall with a pair of needle-nosed pliers in his hand and used the needle-nosed pliers to cut off a section of her hair. Ms. Hall had misplaced her own pliers, and Mr. Pula walked up to her and stated that if the pliers were a snake, they would bite her. Ms. Hall retrieved her pliers, and Mr. Pula walked up to her, grabbed a section of her hair which was hanging loose with one hand, and with the pliers in his other hand deliberately cut off the section of hair. See, Plaintiff's SOMF, ¶ 43.

**V.    Verizon Supervisors and managers were aware that Ms. Hall was being subjected to a hostile work environment and failed to take immediate and effective remedial action which was reasonably calculated to either put an end the hostile work environment or prevent further harassment.**

Employers have an affirmative duty to eradicate 'hostile or offensive' work environments. *Garziano v. E.I. Dupont De Nemours & Co.*, 818 F.2d 380, 388 (5th Cir. 1987). An employer will be liable for the actions of non-supervisory employees if the employer "knew or should have known of the charged sexual harassment and failed to implement prompt and appropriate action." *Crowley v. L.L. Bean, Inc*, 303 F.3d 387, 401 (1st Cir. 2002)(citations omitted). The remedial action taken by the employer must be "reasonably calculated" to end the harassment. *Ellison v. Brady*, 924 F.2d 872, 881-882 (9th Cir. 1991); *Jones v. Flagship International*, 793 F.2d 714, 719-720 (5th Cir. 1986). What is appropriate remedial action will necessarily depend on the particular facts of the case -- the severity and persistence of the harassment, and the effectiveness of any initial remedial steps. *Waltman v. International Paper CO.,* 875 F.2d 468, 479 (5th Cir. 1989).

There is no dispute in this case that Ms. Hill complained on multiple occasions about the harassment and offensive behavior she was exposed to in the Holyoke CO. Verizon's response to her initial complaints can be broke into two categories: 1) the complaints were either minimized, trivialized or ignored altogether; or 2) her supervisors merely resorted to remedial measures which had been tried before and were already proven to be ineffectual.

Verizon's response to ongoing problems with men using the women's restroom is emblematic of the second category of inappropriate responses described above. As had Ms. Tobiasz before her, Ms. Hall complained repeatedly to Mr. Lynch

about male OTs using the women's restroom. Mr. Lynch was well aware that male OTs were walking in on her when she was using the rest room. His response to her complaints was to change the lock on the door. This was the same response which proved to be so ineffectual following earlier complaints from Ellie Tobiasz. Changing the locks after receiving Ms. Hall's complaints proved to be equally as ineffectual. Male OTs continued to use the women's rest room, and Ms. Hall renewed her complaints to her supervisors. However, no further action was taken by Verizon management. See, Plaintiff's SOMF, ¶¶ 44-46.

This pattern repeated itself over Ms. Hall's complaints about more overt forms of harassment and abuse by the OTs. As described earlier in this memorandum, Verizon supervisors and managers were painfully aware of a long history of problems with the behavior of OTs in the Holyoke CO. The standard response to these problems by Verizon managers was to call the OTs supervisors and request that they "control their people." As fully acknowledged by Mr. Lynch, these earlier efforts to control the conduct of the OTs had not resulted in any long-term changes in their behavior, and the response to Ms. Hall's renewed complaints about the OTs treatment of her proved to be equally as ineffectual. See, Plaintiff's SOMF, ¶ 50.

After she was publicly berated by Brian King because he felt she was not being sufficiently responsive to calls from the OTs, Ms Hall requested a meeting with Mr. Lynch and a union representative. During this meeting, Ms. Hall complained about a broad spectrum of problems she was having with Mr. King and his fellow OTs. She complained about Mr. King's abusive treatment of her; she complained about her car being keyed in the fenced in parking lot used by the OTs; she complained about someone spitting on her coat; she complained about the OTs

continuously fouling her workspace; and she complained about the OTs continued use of the women's rest room. Mr. Lynch's response to Ms. Hall's complaints was to encourage her to "take the high road." The only action taken by Mr. Lynch after hearing the broad range of complaints raised by Ms. Hall was to call the supervisor of the OTs and insist that Mr. King apologize to Ms. Hall. See, Plaintiff's SOMF, ¶¶ 48-49.

Following the incident with Brian King, Ms. Hall received the phone call from Ray Cichy during which he instructed her that her job was to serve the OTs. Ms. Hall complained to Mr. Lynch about this continued harassment from the OTs. Mr. Lynch told her not to worry about it, and no further action was taken. In the absence of any meaningful managerial action in response to Ms. Hall's ongoing complaints, the harassment from the OTs persisted. The OTs next complained to union officials that Ms. Hall was not responding to their needs quickly enough. After being approached by a union representative about the complaints of the OTs, Ms. Hall requested a meeting with Mr. Lynch and Mr. Savaria together with representatives of the union. During the course of this meeting which was conducted on August 6, 2002, Ms. Hall again described a range of problems with the overall work environment in the Holyoke CO. She raised certain issues she was having with Skip Pula, including the two incidents when Skip Pula stepped on her shoes which had occurred prior to August, and his repeated references to sex when she wore Adidas brand clothing. Ms. Hall complained about the OTs treating her disrespectfully; she complained about racist and anti-Semitic comments and statements made by the OTs; she complained about the OTs occupying and dirtying her workspace and logging her off of her computer; and she complained about ongoing harassment from the OTs in the

form of baseless complaints about Ms. Hall not meeting their needs. See, Plaintiff's SOMF, ¶¶ 51-52.

Although Ms. Hall's supervisors reaffirmed that the complaints of the OTs were entirely without merit, their response to the battery of issues raised by Ms. Hall was to follow a  familiar and by now predictable course of action. Mr. Lynch and Mr. Savaria arranged a conference call with Paul Gazda and Tom Hurley, the first level and second level supervisors of the OTs, respectively, and, in effect, requested once again that they "control their people." During the course of the conference call, Mr. Savaria explained all the issues that Ms. Hall was having with the OTs in the Holyoke CO. He described the comments which had been made to her, and provided Mr. Hurley with the names of the OTs mentioned by Ms. Hall. Following the customary script, Mr. Hurley assured Ms. Hall's supervisors that he would discuss these issues with his technicians. There was also an agreement that the OTs would be told to stay out of the Holyoke CO unless absolutely necessary. See, Plaintiff's SOMF, ¶¶ 54-55.

Following this conference call, however, Mr. Hurley only discussed one racial comment made to Ms. Hall with one of his technicians. He did not discuss the issue of racial speech in the Holyoke CO with any other OTs. He did not discuss any gender issues with any of the OTs. Nor did he discuss any issues related to being disrespectful to Ms. Hall, dirtying her work area, or using her equipment with any of the OTs. See, Plaintiff's SOMF, ¶ 56.

Surely Mr. Hurley's actions were not reasonably calculated to end the harassment of Ms. Hall by his technicians. Similarly, the stubborn reliance by Ms. Hall's direct supervisors on remedial measures which have repeatedly failed in the past does not meet their obligation to take prompt and effective action. The decision

of the First Circuit in *Crowley* is instructive on this point. In upholding a jury's verdict on the plaintiff's hostile work environment claim, the court noted that an employer can "not turn a blind eye towards a measures ineffectiveness over [an earlier period of time], only to reinstitute the same inadequate remedial measure in response to [renewed complaints of harassment]. *Crowley,* 303 F.3d at 404.

Although Ms. Hall reported that the OTs came into the Holyoke CO less frequently during the remainder of the month of August, there is no way in this case of determining whether the previously ineffectual remedial measures taken by Verizon managers would have resulted in any long-term improvements in Ms. Hall's work environment.  This is so because Ms. Hall worked her last day for Verizon less than a month later on September 5, 2002. On that date, Skip Pula deliberately grabbed a section of Ms. Hall's hair and cut it off with a pair of needle nose pliers. As recounted below, the cumulative effect of more than two years of harassment culminating in an incident which can fairly be characterized as an assault followed by a hesitate, weak and ineffectual response by her employer rendered Ms. Hall psychologically incapable of returning to her position in the Holyoke CO.

Despite the assaultive nature of Mr. Pula's action toward her, Ms. Hall was unable to get Mr. Lynch or anyone else at Verizon to respond in a meaningful way to her mounting anxiety about her work environment. After learning about the incident with Mr. Pula on September 5th, Jack Lynch came out to the Holyoke facility to speak with Ms. Hall about what had happened. He left Ms. Hall alone with Mr. Pula in the Holyoke CO and returned to Springfield without informing Ms. Hall what action, if any, he was intending to take. After Ms. Hall received no further communication from Mr. Lynch, she called him later in the afternoon and asked him why he had left the

Holyoke CO and what he was planning to do about what her situation. Mr. Lynch stated that he had reassured Mr. Pula that Ms. Hall was upset, but that she would get over it. When Ms. Hall expressed surprise that he would say such a thing, Mr. Lynch responded, "I don't know what you want me to do. He said he's sorry. He admits he was wrong. It's not like I'm going to suspend the guy. What would that prove." Ms. Hall told Mr. Lynch that she couldn't take working in Holyoke anymore. She stated her belief that her co-workers could do anything they wanted to her, and it was no big deal. She started to cry and told Mr. Lynch that I had to get off the phone. See, Plaintiff's SOMF, ¶¶ 58-59.

When she left work that evening, it was clear to Ms. Hall that Mr. Lynch had no intention of doing anything about what had happened to her. Ms. Hall spent the next three days calling one Verizon office after another trying to find somebody who would take her concerns seriously. Each office passed her on to a different office and nobody seemed to have the interest, the inclination or the authority to respond to the issues of physical aggression and harassment in Ms. Hall's workplace. The day after Mr. Pula cut her hair, Ms. Hall went to the Verizon administrative office in Springfield and obtained the phone number for the Verizon Ethics Line. She called the Ethics Line and was advised that her problem was not a matter for the Ethics Line. They referred her to the numbers for Verizon Security and the Employee Assistance Program (EAP). Ms. Hall was advised by Verizon security that the incidents she was complaining about were not security issues and they referred me to the Verizon EEO office. When she called the EAP, Ms. Hall was similarly referred to the Verizon EEO office and also advised to seek professional mental health counseling. See, Plaintiff's SOMF, ¶¶ 60-61.

Feeling that she had exhausted her options, Ms. Hall called Mr. Lynch and requested another meeting with her second level supervisor, George Savaria.  At the meeting which was held on September 10, 2002, Ms. Hall recounted the events that had occurred with Mr. Pula, and she reminded Mr. Lynch and Mr. Savaria about the other incidents involving Mr. Pula and the OTs that had occurred in Holyoke. When she mentioned that she had gone to the office of the Massachusetts Commission Against Discrimination looking for help and recounted the other steps she had taken to get assistance, her supervisors effectively washed their hands of the situation, and told her that they would leave it up to the Verizon EEO office to investigate. In the meantime, Ms. Hall's work situation was left entirely unresolved. No reference was made to whether she would be expected to return to work with Mr. Pula in the Holyoke CO or whether any other options were available to her. See, Plaintiff's SOMF, ¶¶ 62-63.

For her part, Ms. Hall knew for certain that she could not return to work with Mr. Pula in the Holyoke CO at that time; a knowledge which was later confirmed by every mental health professional she visited over the next twelve months. Based upon the lack of responsiveness to her numerous prior complaints, she was convinced that nothing would be done to stop any continued harassment and physical aggression toward her if she returned to Holyoke. See, Plaintiff's SOMF, ¶64. With no other options, Ms. Hall's desire for meaningful changes in her employment situation which might enable her to return to work rested on the outcome of the upcoming EEO investigation which had been promised.

The facts in this case reveal that there were multiple flaws in the investigation undertaken by Verizon in response to the harassment experienced by Ms. Hall. The

investigation itself barely skimmed the surface of the racial and gender based problems at the Holyoke CO. Whole categories of complaints raised by Ms. Hall were left uninvestigated, and issues of differential treatment of Ms. Hall by her co-workers were left entirely unexplored. The investigator issued a single page of findings which were based on factual inaccuracies and flawed assumptions, and contained two superficial recommendations, one of which was entirely ignored by Verizon management. Most importantly, the investigation ended with results which left Ms. Hall in a state of suspended animation for over eight months which lead to the termination of her employment.

Paul McGovern, an EEO officer for Verizon, was responsible for investigating the complaints raised by Ms. Hall about the treatment she had received in the Holyoke CO. Mr. McGovern had been an employee of Verizon since 1995. Mr. McGovern was aware at the outset of his investigation that Ms. Hall had already contacted the Massachusetts Commission Against Discrimination about her complaints. He also became aware that she had filed a formal discrimination complaint with the MCAD while his investigation was still ongoing. Despite the fact that he was already conducting an internal investigation into the treatment of Ms. Hall by her co-workers and supervisors, Mr. McGovern assumed responsibility for simultaneously responding to her formal complaint to the MCAD. See, Plaintiff's SOMF, ¶¶ 65-67.

Throughout the course of his investigation, Mr. McGovern failed to make any inquiries regarding a number of complaints raised by Ms. Hall which he was aware of at the inception of the investigation or became aware of during the course of the investigation. Mr. McGovern's interview notes do not reflect any inquiries regarding

issues raised by Ms. Hall relating to baseless complaints by the OTs about Ms. Hall not being responsive to their needs; unwanted massages by Mr. Pula; her car being "keyed" in the fenced in parking lot; her coat being spat on; her personal possessions being taken from her desk; Mr. Pula referring to her as "colored"; the misuse of her computer by the OTs; or the OTs use of obscenities in the workplace. See, Plaintiff's SOMF, ¶ 68.

After experiencing some frustration communicating with Paul McGovern, Ms. Hall contacted Karen James-Sykes, a Verizon Vice-President of Public Relations, and sent her a summary Ms. Hall had prepared recounting a number of the troubling things that had happened to her while working in the Holyoke CO. Ms. James-Sykes forwarded a copy of the summary prepared by Ms. Hall to Mr. McGovern by facsimile dated October 2, 2002. When he received this summary from Ms. James-Sykes, the investigation was still ongoing and Mr. McGovern conceded that the contents of the summary were relevant to his investigation. Nevertheless, with the exception of a single e-mail to Thomas Hurley dated October 10, 2002, Mr. McGovern did not conduct any further investigation into those complaints of Ms. Hall's which were brought to his attention for the first time in the summary he received from Ms. James-Sykes. See, Plaintiff's SOMF, ¶¶ 69-71.

In his e-mail to Mr. Hurley, Mr. McGovern made the following inquiry: "Which techs did you speak to concerning Rhonda Hall's allegations concerning racial speech? Did you address gender issues with them, for example, respect, dirtying of Hall's work area, and use of her equipment without permission?" Mr. Hurley responded that he had only discussed one racial comment made to Ms. Hall with one of his technicians. Mr. McGovern was fully aware that a substantial number of Ms.

21

Hall's complaints involved allegations of mistreatment of her by multiple OTs. He was also aware of a decision by Verizon managers that Mr. Hurley would speak to the OTs working under him about the issues raised by Ms. Hall. In his October 3, 2002 interview with Jack Lynch, Mr. Lynch reported that "Hurley made [a] commitment to keep hIs people out of Holyoke and discuss remarks that Hall reported." In fact, a major assumption guiding the course of Mr. McGovern's investigation was that the multiple issues involving the conduct of the OTs had been effectively addressed by Verizon managers through the implementation of these prior decisions. Hoever, having learned from Mr. Hurley that prior decisions to remedy the misconduct of the OTs were never implemented, Mr. McGovern did not engage in any further inquiry about the reason for this lapse. See, Plaintiff's SOMF, ¶¶ 72-75.

During his deposition, Mr. McGovern acknowledged that in an investigation into whether Ms. Hall was being mistreated in ways which were related to her gender and race, it would have been appropriate to inquire as to whether white male co-workers were being mistreated in the same way. However, Mr. McGovern consistently made no inquiries throughout the course of his investigation into whether the white male OTs and Skip Pula were behaving toward other white male co-workers in the same ways that they were behaving toward Ms. Hall. See, Plaintiff's SOMF, ¶ 76..

To the extent that Mr. McGovern did inquire into particular incidents which Ms. Hall found to be offensive and objectionable, a significant number of her complaints were corroborated by co-workers who were interviewed during the course of his investigation. Mr. Lynch confirmed the long history of bad behavior by OTs in the Holyoke CO. Mr. Stawasz confirmed that he had heard the question posed to Ms.

22

Hall about why "you people get upset when we call you niggers." The investigation confirmed the incident when an OT entered the Holyoke CO and was loudly berating Ms. Hall. Mr. Stawasz confirmed that OTs had made comments about the death of Hispanics in Holyoke which were "not complimentary." Mr. Lynch, Mr. Stawasz and Mr. Pula confirmed that Mr. Pula had stepped on Ms. Hall's shoes. Mr. Pula and Elizabeth Corse confirmed that Mr. Pula cut her hair with his needle nose pliers. See, Plaintiff's SOMF, ¶¶ 77.

On October 10, 2002, Mr. McGovern issued the findings of his investigation in the form of an Executive Summary constituting a single page. Despite the fact that he did not inquire about many of the complaints raised by Ms. Hall during his investigation and undeterred by the number of Ms. Hall's complaints which were corroborated by witnesses, Mr. McGovern concluded that his investigation did not substantiate that the actions of Skip Pula and the OTs constituted EEO violations. See, Plaintiff's SOMF, ¶ 78-79.

In his Executive Summary, Mr. McGovern highlights Mr. Pula's self-servicing claim that he inadvertently cut Ms. Hall's hair with his pliers (while pointedly ignoring Ms. Hall's insistence that his actions were deliberate), even though nobody else familiar with the incident was willing to support this characterization of what happened. Elizabeth Corse, the only other witness to the incident, stated to Mr. McGovern that Pula "cut [a] lock of her hair." While she didn't think his actions were "malicious", she didn't know what his intentions were. George Savaria, the second level manager who was ultimately responsible for implementing Mr. McGovern's recommendations, was far more explicit about what he believed occurred:

Q:    What was your understanding of what Mr. Pula had done on September 5, 2002?

A:    That he was horsing around and grabbed a hold of her with a short-nose pliers, and grabbed a lock of her hair and cut it.

Even Mr. Pula's factual rendition to Mr. McGovern of what happened on September 5th is at odds with his claim of inadvertence. Mr. McGovern's notes reflect that Mr. Pula stated to Ms. Hall that if her pliers were any closer to her they would bite her. Then "for 'some reason' he went towards her with his own pliers." After cutting off multiple strands of her hair by accident, he said nothing to her until he realized she was upset. The investigation also revealed that Mr. Pula also admitted to Mr. Lynch that what he had done was "stupid." See, Plaintiff's SOMF, ¶¶ 80-81. A reasonable investigator, much less a reasonable jury, might wonder about why it is that someone who claims to have just accidentally cut someone else's hair would not be immediately apologetic. A reasonable investigator and jury might also conclude that acting in a manner that is "stupid", as opposed to simply careless, might reflect upon the degree of deliberateness of the actors conduct.

In his Executive Summary, Mr. McGovern casually attributes the multiple instances of physical contact with Ms. Hall initiated by Mr. Pula to "kidding around" and being "playful."  Included among this "playful" conduct are unwanted massages which Mr. McGovern failed to investigate, two separate confirmed instances of stepping on Ms. Hall's feet while grabbing her and holding her in place over her strenuous objections, and a final confirmed incident involving severing a lock of Ms. Hall's hair with a pair of needle-nose pliers. See, Plaintiff's SOMF, ¶ 82. A reasonable jury might conclude that even in a fairly permissive workplace environment, there should be limits on the amount of playfulness which is considered acceptable.

In his Executive Summary, Mr. McGovern inaccurately states that none of the four witnesses identified by Ms. Hall corroborated her allegations concerning race-related comments. As reflected in his own interview notes, Mr. Stawasz confirmed that he had heard the question posed to Ms. Hall about why "you people get mad when we call you niggers" and that OTs had made comments about the death of Hispanics in Holyoke which were "not complimentary." Mr. McGovern next asserts in his Executive Summary that managers took appropriate action in response to Ms. Hall's complaints about the conduct of OTs and addressed issues as they arose. Each of these assertions is flatly contradicted by Thomas Hurley who provided information to Mr. McGovern indicating that prior management decisions intended to remedy the harassing behavior of the OTs had not been implemented. See, Plaintiff's SOMF, ¶¶ 83-84.

Mr. McGovern's Executive Summary contains but two recommendations. The first recommendation is that Mr. Pula receive a written warning. Despite his personal understanding that Mr. Pula grabbed ahold of a lock of Ms. Hall's hair and cut it off with his pliers, Mr. Savaria adopted the recommendation of a written warning claiming that he had no choice but to adopt the recommendation of the EEO investigator. See, Plaintiff's SOMF, ¶ 86; and Heisler Affi., Exhibit 3, p. 56. A warning letter dated October 22, 2002 was issued to Mr. Pula in which he was simply reminded of Verizon's EEO policies and expectations, and further advised to refrain from unwanted touchings of his peers. See, Plaintiff's SOMF, ¶ 86.

Mr. McGovern closes his Executive Summary with a suggestion that "it may be useful to provide diversity/sensitivity training in the Holyoke CO and the Hatfield garage …" This remedial measure was not implemented. As of November 2003, over

a year after Mr. McGovern issued his findings, no diversity or sensitivity training had taken place in the Holyoke CO. As of the dates of their retirement in November 2003, neither Mr. Savaria nor Mr. Lynch were aware of any plans to conduct any form of sensitivity or diversity training in the Holyoke CO. Despite his protestation that he was bound to follow the EEO recommendations, Mr. Savaria opted not to implement the one decision which might have resulted in a more tolerant, accepting, and possibly less "playful" work environment for his employees. See, Plaintiff's SOMF, ¶¶ 87-88.

The decision of Verizon managers not to implement Mr. McGovern's second recommendation brings the failure of Verizon to take prompt and appropriate remedial action full circle. During his deposition, Mr. McGovern attempted to justify his failure to follow-up with Mr. Hurley about prior remedial actions which Mr. Hurley had not taken by relying on his recommendation for diversity/sensitivity training:

> Q:    So what basis do you have for concluding that he addressed the other issues that you inquire about in your e-mail to him?
>
> A:    … there was an agreement about what was going to be addressed at the Hatfield garage. It may or may not have been addressed by him. My way of following up on this was to suggest that there be group training done to make sure issues were addressed.

Plaintiff's SOMF, ¶ 86; and Heisler Affi., Exhibit 13, p. 190.  In other words, Verizon managers failed to take remedial action which was intended to rectify the failure of Verizon managers to take remedial action. A jury might reasonably conclude that these compound failures also constitute a failure of Verizon to meet its legal obligations under federal and state anti-discrimination statutes.

Conspicuously absent from Mr. McGovern's findings is any recommendation regarding Ms. Hall's work situation or any reference to her employment future. The clear inference to be drawn from Mr. McGovern's silence on this issue is that Ms. Hall

was expected to return to her position in the Holyoke CO working side-by-side with Skip Pula. This inference appears to be borne out by Mr. McGovern's subsequent conversation with Ms. Hall after the conclusion of his investigation. Ms. Hall called Mr. McGovern in mid to late October 2003 to inquire about the status of his investigation, and he advised her that he did not think that the things that had happened to her constituted an EEO violation. He said he was recommending that there be some sort of training for Verizon employees, but that he could not tell Ms. Hall what if any action was being taken with respect to Skip Pula. Ms. Hall does not recall Mr. McGovern making any reference to her work situation, and as far as she knew, if she were to return to work she would have to resume her CO Tech position in the Holyoke facility working directly with Mr. Pula. No alternatives were suggested or offered to Ms. Hall by Mr. McGovern or anyone else at Verizon.  Mr. McGovern's notes of this conversation reflect that he simply asked Ms. Hall straight away whether she had returned to work yet. She had not. See, Plaintiff's SOMF, ¶¶ 89-90.

Perhaps the greatest flaw in Verizon's response to Ms. Hall's complaints of harassment is that it left the victim of the harassment in a position where she was unable to work unless she left her employment at Verizon. As will be made abundantly clear in the factual discussion below, there is no dispute in this case that Ms. Hall was incapable of returning to her position I the Holyoke facility from the day she left work on September 5, 2002 through the day that Verizon terminated her employment effective May 27, 2003. It is also not disputed, at least for purposes of the pending summary judgment motion, that Ms. Hall's inability to return to work in the Holyoke CO was the direct consequence of the race and gender based harassment she encountered while working there. Lastly there is no dispute that Ms.

Hall would have been able to return to work for Verizon soon after September 5, 2002 had the company taken prompt and appropriate remedial action to have her assigned to a different work environment. Every mental health professional who treated or evaluated Ms. Hall during the relevant time period has attested to this fact.

In November 2002, Verizon Health Services Consultant required that Ms. Hall be examined by a consulting physician selected by Verizon. She was examined by Dr. Richard F. Kaplan on December 6, 2002. In a report issued to Verizon's Health Services Consultant, Dr. Kaplan confirmed that Ms. Hall was disabled from returning to her job at Verizon's Holyoke facility. In the Summary and Impression section of his report, Dr. Kaplan confirmed that Ms. Hall was suffering from "an adjustment disorder with anxiety and depression." He went on to conclude that her psychological difficulties and interrelated physical problems stemmed from the "chronicity of problems" specific to her work situation at Verizon, including the assault upon Ms. Hall by the white male co-worker which triggered her existing symptoms. In late December 2002, Verizon's Health Services Consultant asked Dr. Kaplan when Ms. Hall would be able to perform her occupational requirements. Dr. Kaplan responded, "Immediately, in a new work situation." Asked whether Ms. Hall was currently able to perform her occupational requirements on a full or part time basis, Dr. Kaplan responded, "Yes. Again, in a new work situation." See, Plaintiff's SOMF, ¶¶ 91-92.

Dr. Kaplan's conclusions were entirely consistent with what Ms. Hall's own psychiatrist had stated repeatedly in periodic reports he submitted to Verizon to certify her continued eligibility for short term disability benefits.  As early as his first report dated September 27, 2002, Dr. Honeyman stated that the estimated length of Ms. Hall's disability was "unknown at this time – depends on availability of alternative

work setting." In referring to any restrictions which might apply to a return to work, Dr. Honeyman consistently requested "consideration of [an] alternative work setting out of [her] current department." He repeated the same prognosis and return to work restriction in each of two successive reports submitted to Verizon prior to the termination of Ms. Hall's short term disability benefits in January 2003, and in a subsequent letter dated February 11, 2003. See, Plaintiff's SOMF, ¶ 93.

 Despite the consensus among the only two medical professionals who examined or treated Ms. Hall since September 5, 2002 that she was unable to return to work in the Holyoke CO, Ms. Hall received a call on January 9, 2003 from Verizon's Health Services Consultant advising her that she was not being certified for continued short term disability benefits beyond January 12, 2003, and that she would have to return to her position in Holyoke as of January 13, 2003. Ms. Hall filed a timely appeal of this determination, which was not finally decided until September 2003. The impossibility of complying with the direction of the Verizon Consultant was driven home shortly after she received the phone call expressing Verizon's expectation that she return to work in the Holyoke CO. In or around mid-January, Ms. Hall served with Verizon's Position Statement prepared and filed by Paul McGovern in response to her complaint to the MCAD. Upon her review of the attachments to Verizon's Position Statement, Ms. Hall learned for the first time that the only action taken by Verizon as a result of the EEO investigation had been to give Mr. Pula a mild warning letter. See, Plaintiff's SOMF, ¶¶ 94-95.

 On May 1, 2003, Paul McGovern sent to Ms. Hall's attorney a letter in which he offered Ms. Hall a transfer to a position in the Springfield central office without condition. more than seven months after she had left work in September 2002, and

more than three months after the doctor who conducted an IME concluded that she

could not return to work unless it was in a different work situation. <u>See</u>, Plaintiff's

SOMF, ¶¶ 96-98. Thus, approximately eight months elapsed before Verizon took a

remedial step in the direction urged by every medical professional who had examined

and treated Ms. Hall during that time frame. Verizon has offered no factual

explanation or justification for a delay of this magnitude, and under any definition of

the word "prompt", eight months must be considered too long.

    The unreported decision of the District of Massachusetts in the case of

*Cerqueira v. Corning Net Optix*, No. 03-10306, 2004 U.S. Dist. LEXIS 17308, which

is appended to the Defendants' Memorandum of Law in support of their summary

judgment motion, illustrates the difference between an employer response which

satisfied the "prompt and appropriate" standard and the contrary approach adopted

by the Defendants in this case. In *Cerqueira*, the court found in favor of the employer

on the plaintiff's hostile work environment claim, and, in reaching this conclusion,

relied heavily on the fact that the employer "was quick to volunteer solutions, offering

to move Cerqueira' work station, change his shift, or transfer him to another building:

all such solutions are "reasonably calculated to prevent a reoccurrence." No solutions

were extended to until she had been out of work for close to eight months, three and

a half of which was without pay. Verizon's motion should be denied.

**VI.    Ms. Hall suffered from substantial work-related impairments which substantially interfered with her major life activities of sleeping, eating, thinking, concentrating, social interaction, and caring for her son, herself and her home.**

    The ADA prohibits discrimination in employment against qualified persons with

a disability. 42 U.S.C. § 12112(a). Discrimination under the ADA includes "not making

reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee, unless ... the accommodation would impose an undue hardship on the operation of the business." 42 U.S.C. § 12112(b)(5)(A). To prevail on such a claim under the ADA, Ms. Hall must establish that she (1) suffered from a disability as defined by the ADA; (2) was otherwise qualified to perform the essential functions of her employment with or without reasonable accommodation; and (3) was subject to an adverse employment action, such as an unreasonable refusal to make an accommodation of her disability. *Carroll v. Xerox Corp.,* 294 F.3d 231, 237 (1st Cir.2002). Verizon argues in its pending motion that the facts in this case could not lead a reasonable jury to find in Ms. Hall's favor on the first and the third of the above elements.

In order to be considered "disabled," Ms. Hall must demonstrate that she suffered from a physical or mental impairment that substantially limited one or more of her major life activities. 42 U.S.C. §12102(2)(A). While accepting for purposes of their pending motion that sleeping, eating, thinking, and concentrating, constitute mayor life activities, Verizon argues that the undisputed facts in this case support a conclusion that Ms. Hall's physical and mental impairments do no substantially interfere with these activities. In support of this broad proposition, Verizon cites to a handful of facts which they contend establish as a matter of law that Ms. Hall was not disabled within the meaning of the ADA. None of these facts have any bearing whatsoever on the functions of eating and sleeping, so presumably the Defendants motion does not apply to these major life activites. The facts relied upon by the Defendants include Ms. Hall's attendance at church and the occasional PTA meeting, teaching a Sunday school class, an serving on an advisory board of a nonprofit

31

organization. If, as the Defendants contend, the inability to participate in these basic activities of daily living were the measure of whether someone is disabled, there would hardly be a soul who would qualify for the protections under applicable state and federal law.

The Defendants also rely on the fact that Ms.Hall took a job as a child care worker in August 2003. Surely, the fact that she found a job to support herself and her son three months after Verizon terminated her employment in May 2003 is not determinative as to whether she was disabled at the time of her termination. Nowhere in the applicable case law is there the slightest suggestion that one must be entirely unable to work in order to have a qualifying disability. Indeed, the law is to the contrary.

The fact that someone is able to engage in a given major life activity does not count against them in determining whether they are disabled within the meaning of the ADA. The ADA "addresses substantial limitations on major life activities, not utter inabilities." *Bragdon v. Abbott*, 524 U.S. 624, 638, 118 S.Ct. 2196, 141 L.Ed.2d 540 (1998). Thus, when an impairment results in significant limitations, that impairment is substantially limiting even if the limitations are not insurmountable. Id.  "The focus is not on whether the individual has the courage to participate in the major life activity despite her impairment, but, rather, on whether she faces significant obstacles when she does so." *Gillen v. Fallon Ambulance Service, Inc.,* 283 F.3d 11, 22 (1st Cir. 2002).  As further noted by the court in *Gelabert-Ladenheim v. American Airlines, Inc*, 252 F.3d 54 (1st Cir. 2001), there is no requirement in the ADA that a person be totally disabled from working; indeed, a person cannot be totally disabled because she must be otherwise qualified to work." *Id.* at 59 – 60.

Other than the mere assertion that the plaintiff found a job three months her employment was terminated, the Defendants have offered no facts, undisputed or otherwise, relating to whether Ms. Hall was limited in her ability to work. What they do say is the "Plaintiff has no evidence that she was substantially limited in the alleged major life activities of eating, sleeping, working, thinking or concentrating." This gratuitous exaggeration is patently false, as the recitation of the facts below amply demonstates.

Certain of the symptoms of Ms. Hall's disabilities emerged on the same day as her hair was cut by Mr. Pula. After her final phone conversation with Mr. Lynch on September 5, 2002, Ms. Hall felt totally isolated and vulnerable. She had developed a piercing headache behind her eyes and had a difficult time holding back tears. In the days following the haircutting incident, Ms. Hall continued to experience excruciating headaches, and began to experience feelings of deep depression and anxiety. Ms. Hall was psychologically unable to return to work at Verizon on September 6, 2003 and she went out on sick leave. She was prescribed pain medication by her doctor, and she began receiving treatment from a psychiatrist and a licensed psychiatric social worker. Ms. Hall applied for short term disability and between September 2002 and January 13, 2003, Ms. Hall was determined by Verizon's short term disability insurer to be disabled from working for purposes of receiving sickness disability benefits. See, Plaintiff's SOMF, ¶¶ 99-100.

For more than a year or so, Ms. Hall continued to suffer from depression and anxiety. As a result of the depression, she experienced feelings of deep sadness most of the time. She struggled with feelings of worthlessness and the belief that she had lost the power to control her own life. She went through prolonged periods of

sleeplessness, and was immobilized by fatigue for long stretches of time. Frequent nightmares and headaches contributed to her sleeping difficulties. Ms. Hall's eating patterns also fluctuated dramatically and she went through periods of diminished appetite and corresponding weight loss, as well as periods of excessive food consumption and weight gain. Ms. Hall lacked the motivation to accomplish even simple goals which she attempted to establish for myself.  During periods when the depression was particularly intense, Ms. Hall couldn't sleep at all, but neither could she summon up the energy to get out of bed. She spent long periods of time in bed unable to face up to performing even the most routine tasks. Ms. Hall was fortunate to have family members who rallied to assist her during this time because she was unable to adequately care for my son, herself or her home. See, Plaintiff's SOMF, ¶101.

The anxiety Ms. Hall was experiencing during this time caused her to have a pervasive sense of dread. She felt nervous much of the time, but she was often entirely unable to identify the source of the nervousness. She was unable to effectively absorb and respond to ordinary stresses of everyday living. She would become uncharacteristically irritable and angry for no good reason, and verbally lash out at the people around her, including her son. She suffered from recurrent severe headaches, as well as abdominal problems and persistent nausea.  The persistence of headaches and feelings of anxiety made it difficult for her to concentrate. She was easily distracted and had a difficult time focusing her attention on particular tasks for more than brief periods of time. She didn't venture out of the house much and she avoided contact with friends and family alike. See, Plaintiff's SOMF, ¶102.

34

A substantial factor contributing to Ms. Hall's depression and anxiety was the ongoing uncertainty about her job situation. She was fearful that she would be required at some point to return to work with Skip Pula and the outside technicians who had shown such contempt for her. Ms. Hall was also fearful that she would have to return to a position working under supervisors who had demonstrated a total disregard and indifference to her safety and were willing to turn a blind eye to inequitable treatment of her based on her race and gender. See, Plaintiff's SOMF, ¶103.

The medical symptoms of her disabilities were consistently documented by every medical professional who examined or treated her over the course of the next twelve months. In a FMLA Certification Form completed back on September 13, 2002, Ms. Hall's therapist, Linda C. Robinson, LICSW  recorded that she was suffering from a disruption of eating and sleeping, exhaustion, depression and anxiety; headaches, and upset stomach. Ms. Hall's treating psychiatrist describes similar symptoms in each of the three Psychiatric Assessments he submitted to Verizon's Health Services Consultant. Ms. Hall was treated with Lorazepam for anxiety and insomnia and Zoloft for depression, and she also was prescribed Butalbital for headaches. See, Plaintiff's SOMF, ¶¶ 104-106.

Dr. Kaplan administered a battery of psychological tests, and diagnosed her with and adjustment disorder with mixed anxiety and depressed mood and observed that her illness had negative impacts on her motivation level, ability to concentrate and memory. He went on to conclude that her psychological difficulties and interrelated physical problems stemmed from the "chronicity of problems" specific to her work situation at Verizon, including the assault upon Ms. Hall by the white male

co-worker which triggered her existing symptoms. In a report dated February 11, 2003, Dr. Honeyman, confirmed that Ms. Hall suffered from "[e]lements of an adjustment disorder with anxious mood and possible stress disorder." He further supported Dr. Kaplan's conclusion that her symptoms stemmed from the work environment and treatment Ms. Hall experienced at the Verizon Holyoke CO.  Dr. Honeyman concluded that Ms. Hall was not able to return to work there "given the likelihood of recurrence or exacerbation of these symptoms." See, Plaintiff's SOMF, ¶¶ 106-107.

Dr. Kenneth Jaffe, a Board certified psychiatrist, conducted an impartial psychiatric examination of Ms. Hall for the Department of Industrial Accidents on September 30, 2003 and issued a report dated October 2, 2003. Dr. Jaffe also administered multiple psychological tests which registered results consistent with a severe level of depression and anxiety. He chronicled the following symptoms of her disabilities: feeling sad all the time, hard to do anything, poor sleep, fatigue, decreased appetite and weight loss, irritability, loss of interest in other people, difficulty making decisions, having to push herself most of the time, feeling more nervous than usual, feeling afraid for no reason, being easily upset, headaches, feeling weak and getting tired easily, flushing and nightmares. Dr. Jaffe entered a diagnosis of Major Depressive Disorder. He concluded that there is a direct causal connection between Ms. Hall's psychiatric condition and multiple incidents of inappropriate behavior which occurred during her employment with Verizon in the Holyoke CO. He also concluded that working in any position at Verizon which would involve even infrequent contact with previous co-workers and supervisors would not be in her medical interest. See, Plaintiff's SOMF, ¶108.

The above facts are more than sufficient to generate a disputed factual issue with regard to Ms. Hall disability which should be left for the jury, particularly given the paucity of evidence offered by the Defendants in support of their motion. On the facts presented, no reasonable jury could conclude from the handful of facts relied upon by the Defendants that Ms. Hall could not have disabled The Defendants have not met the bare threshold requirements for obtaining relief under Rule 56, and their motion should be denied.

**VII.    Verizon failed to engage in good faith in an interactive dialogue with Ms. Hall regarding her requests for a reasonable accommodation and failed to provide Ms. Hall with a reasonable accommodation.**

An employer violates the ADA when it fails to "mak[e] reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee," unless the employer can establish that the accommodations would "impose an undue hardship." 42 U.S.C. 12112(b)(5)(A). In support of its current motion for summary judgment, the Defendants primarily rely on the contention that they satisfied their obligation under the ADA by offering Ms. Hall a transfer in May 2003 from the Holyoke CO to a different CO Tech position in the Springfield central office (hereafter referred to as the "Springfield CO"). Their reliance on this contention reflects that they fundamentally misapprehend the nature and scope of Ms. Hall's reasonable accommodation claim. Ms. Hall alleges that Verizon's obligations under the ADA and Chapter 151B to provide a reasonable accommodation was triggered in September 2002 when her treating psychiatrist began requesting on Ms. Hall's behalf that Verizon consider transferring her to an alternative work setting.

Even if the court were to find as part of this motion that the undisputed facts support a conclusion that Verizon's offer of the transfer in May 2003 was reasonable, and Ms. Hall's decision to decline this offer was not, Ms. Hall would still have viable reasonable accommodation claims under both state and federal law for the failure of Verizon to offer any manner of accommodation or engage in any meaningful dialogue with Ms. Hall for the seven month period between September 2002 and May 2003. Thus, the only effect of such a ruling would be to limit Ms. Hall's damages such that they would not extend to include the termination of her employment; admittedly not an inconsequential result for either party, but one which is probably not appropriate for summary judgment. In practical effect, the relief Verizon is seeking is not for judgment on a claim, but rather a preemptive decision capping damages as of the date Verizon first offered the transfer.

To the extent that Verizon might be seeking summary judgment on Ms. Hall's entire reasonable accommodation claim, the motion must be denied. Indeed, for that part of her claim which relates to the period between the end of September 2002 and early May 2003, the undisputed facts would justify summary judgment in favor of the Ms. Hall. Between September and early January 2003, Dr. Honeyman submitted to Verizon three separate Psychiatric Assessments which describe, among other things, his diagnosis of Ms. Hall's mental health conditions and a description of her symptoms. The first of these reports is dated September 27, 2002. In referring to a plan for her return to work and any restrictions that might apply to her return to work, Dr. Honeyman expressly sought Verizon's "consideration of [an] alternative work setting out of [her] department." This goal is repeated in a number of locations within his assessments. When estimating the length of her disability, Dr. Honeyman states

38

that it "depends on [the] availability of [an] alternative work setting." In addition, Dr. Honeyman's estimate of Ms. Hall's return to work date is conditioned on her not returning to her current department. Similar statements are set forth in each of his three reports.

In November 2002, Verizon's Health Services Consultant required that Ms. Hall be examined by a consulting physician selected by Verizon. She was examined by Dr. Richard F. Kaplan on December 6, 2002. In a report issued to Verizon's Health Services Consultant, Dr. Kaplan confirmed that Ms. Hall was disabled from returning to her job at Verizon's Holyoke facility. In late December 2002, Verizon's Health Services Consultant asked Dr. Kaplan when Ms. Hall would be able to perform her occupational requirements. Dr. Kaplan responded, "Immediately, in a new work situation." Asked whether Ms. Hall was currently able to perform her occupational requirements on a full or part time basis, Dr. Kaplan responded, "Yes. Again, in a new work situation."

The above facts clearly establish that Verizon was repeatedly placed on notice throughout the Fall and early Winter that Ms. Hall suffered from a disability and was in need of an accommodation in the form of a job transfer. Once the employer becomes aware of the disability of an employee and her need for accommodation, the employer is expected to engage in a meaningful dialogue with the employee to find the best means of accommodating that disability. *Tobin v. Liberty Mutual Insurance Co.*, 28 F.3d 54, 62 (1st Cir. 2004).  As explained by the Third Circuit in the seminal reasonable accommodations case of *Taylor v. Phoenixville School District,* 184 F.3d 296, 313 (3d Cir.1999):

> What matters under the ADA are not formalisms about the manner of the request, but whether the employee or a representative for the employee provides the employer with enough information that, under the circumstances, the employer can be fairly said to know of both the disability and desire for an accommodation.

An employer's refusal to participate in the process may itself constitute evidence of a violation of the statute. *Calero-Cerezo v. Dept. of Justice*, 355 F.3d 6, 23-24 (1st Cir.2004), *citing Jacques v. Clean-Up Group, Inc.*, 96 F.3d 506, 515 (1st Cir. 1996) ("There may well be situations in which the employer's failure to engage in an informal interactive process would constitute a failure to provide a reasonable accommodation that amounts to a violation of the ADA."). As stated by the court in *Bultemeyer v. Fort Wayne Community Schools,* 100 F.3d 1281, 1285 (7th Cir.1996):

> [C]ourts should look for signs of failure to participate in good faith or failure by one of the parties to help the other party determine what specific accommodations are necessary. A party that obstructs or delays the interactive process is not acting in good faith. A party that fails to communicate, by way of initiation or response, may also be acting in bad faith. In essence, courts should attempt to isolate the cause of the breakdown and then assign responsibility.

In Ms. Hall's case, there was no breakdown because there was no dialogue. Verizon never engaged in any dialogue with Ms. Hall or her doctor, never requested any additional information about her desire or need for a transfer, and never offered any manner of accommodation until early May 2003. Clearly, summary judgment in favor of the Defendants on Ms. Hall's entire reasonable accommodation claim would be inappropriate and should be denied.

However, in the event the court is prepared to give consideration to some form of partial summary judgment on that part of Ms. Hall's reasonable accommodation claim which relates to the time period after the offer of transfer in May 2003, any such relief should also be denied. Rather than supporting an award of summary judgment

for the Defendants, the facts in the record before the court show that: 1) the accommodations sought by the Plaintiff were reasonable; 2) the accommodation offered by the Defendants was not; and 3) the Defendants again failed to engage in good faith in an interactive dialogue that would have enabled the parties to reach an accommodation which met each of their needs.

**A.      The accommodation sought by Ms. Hall was reasonable.**

Ms. Hall alleges that Verizon failed and refused to make a reasonable accommodation of her disability in two respects:

a)      Verizon failed and refused to allow Ms. Hall to continue on a paid or unpaid leave of absence until Ms. Hall was able to return to work in her former CO Tech position or the Springfield CO Tech position; and

b)      Verizon failed and refused to offer Ms. Hall a transfer on a temporary or permanent basis into a position which would not have brought Ms. Hall into contact with those individuals who contributed to the hostile work environment in Verizon's Holyoke facility and those individuals who failed to take reasonable measures to remedy the hostile work environment.

An employer may be obligated to transfer an employee as a reasonable accommodation. The ADA specifically states that "'reasonable accommodation' may include... job restructuring, part-time or modified work schedules, [and] reassignment to a vacant position." Id. S 12111(9)(B). Although the ADA does not obligate employers to "bump" other employees or create new positions, sec. 12111(9) of the ADA requires an employer to reassign a disabled employee to a vacant position for which the employee is otherwise qualified. See, *Gile v. United Airlines, Inc.*, 95 F.3d

492, 499 (7th Cir. 1996); *Hendricks-Robinson v. Excel Corp.*, 154 F.3d 685, 694-95 (7th Cir. 1998); *Dalton v. Subaru-Isuzu Automotive, Inc.*, 141 F.3d 667, 678 (7th Cir. 1998); *DePaoli v. Abbott Laboratories*, 140 F.3d 668, 675 (7th Cir. 1998). The employer is obligated to "identify the full range of alternative positions for which the individual satisfies the employer's legitimate, nondiscriminatory prerequisites" and consider "transferring the employee to any of these other jobs, including those that would represent a demotion." *Dalton*, 141 F.3d at 678.

Courts have similarly recognized that granting or extending paid or unpaid leaves of absence may be accommodations which employers are required to extend to disabled employees if it would not place an undue burden on the employer. *See*, *Criado v. IBM Corp.*, 145 F.3d 437, 443-444 (1st Cir. 1197). Whether the leave request is reasonable turns on the facts of the case. *Id.*

A requested accommodation is considered to be reasonable if it would not place an undue burden on the employer. There can be no dispute in this case that the accommodations sought by Ms. Hall would not constitute an undue burden as a matter of law. In its Supplemental Responses to Plaintiff's Interrogatories, Verizon expressly waived any "undue hardship" affirmative defense to Ms. Hall's claim that she was denied a reasonable accommodation under the ADA. See, Plaintiff's SOMF, ¶ 137. However, even if Verizon had not waived the affirmative defense of undue burden, the factual record clearly establishes that her requested accommodations would not have placed an undue burden on Verizon.

When asked at the conclusion of his oral deposition whether there was any reason why it would have been a burden on his department or Verizon to have allowed Ms. Hall to remain on unpaid leave after May 27th, 2003, George Savaria

42

responded, "No." There was clearly no urgency to fill the Springfield CO Tech position. The Springfield position had been vacant since the Fall of 2002 when the CO Tech in that position was transferred to fill Ms. Hall's position in the Holyoke CO. This transfer was made because the Holyoke CO Tech position was considered to be too vital to be left empty, even on a temporary basis. The Springfield CO Tech position remained vacant for over a year and was still vacant when George Savaria retired from Verizon in November 2003. The position had never been filled during that time, and there were no plans to fill it as of Mr. Savaria's retirement. See, Plaintiff's SOMF, ¶¶ 138-139.  Furthermore, allowing Ms. Hall remain on leave until an appropriate position became available would have entailed no financial expense for Verizon, as Ms. Hall had been on unpaid leave since January 2003.

In support of its present motion, Verizon relies on several cases holding that uniformly applied company policies which authorize the employer to terminate employees who fail to return to work at the expiration of established periods of leave do not violate the ADA. However, there is no evidence of any such uniformly applied Verizon policy anywhere in the record before the court. The mere assertion of the existence of such a policy by counsel in a legal memorandum does not constitute evidence which can serve as the basis for summary judgment. During the course of his oral deposition, George Savaria expressly acknowledged that there was **no** urgency whatsoever in having Ms. Hall return to work other than the fact that Ms. Hall's doctors had previously cleared her to return to work in a different work environment or in a different department. According to Mr. Savaria, Management decisions about setting a date of return for employees on leave are based solely upon information Verizon managers receive from the employee's Doctors. In the case

43

of Ms. Hall, the decision to set May 26, 2003 as her date of return was based entirely on information from her doctor. There were no other criteria used in making the decision about the date set for her return. There was no other business related reason for establishing the date of May 26, 2003 for Ms. Hall's return to work. See, Plaintiff's SOMF, ¶¶ 140-141.

If Mr. Savaria is correct about Verizon's return to work policy, then Verizon will invariably follow the lead of the employee's physicians in making return to work decisions, and uniformly look to the doctors for guidance. There is no dispute in this case that Ms. Hall's doctors had not cleared her to work in the CO Tech position in Springfield. In fact, Verizon was in possession of information from Ms. Hall's treating psychiatrist stating that she would not be able to manage the stress she would experience if transferred to the Springfield CO Tech position. During the course of his representation of Ms. Hall with regard to a worker's compensation claim, Attorney Judd Peskin received a letter dated May 13, 2003 from Ms. Hall's treating psychiatrist, Dr. David Honeyman, in which Dr. Honeyman expressed his professional opinion that a proposed transfer of Ms. Hall to Verizon's Springfield office would likely have an adverse impact upon her mental health. Attorney Peskin sent a copy of Dr. Honeyman's letter to Verizon's attorney, Matthew F. King, by facsimile on May 20, 2003. Attorney Peskin followed up on his facsimile to Attorney King with a letter to him dated May 21, 2003 in which Mr. Peskin also referred to the conclusions expressed by Dr. Honeyman in his May 13th medical report. See, Plaintiff's SOMF, ¶¶ 126-128.

In short, the admissions of Verizon's own manager establish that granting the accommodations sought by Ms. Hall would have placed absolutely no burden on

Verizon, and that Verizon proceeded to terminate Ms. Hall's employment in direct
contravention of the return to work policy articulated by the same manager.

**B.    The accommodation offered by the Defendants was not
reasonable**

Under the standards set forth in the preceding section for determining whether
an employer has a duty to transfer an employee who is no longer able to perform the
essential functions of their current job, "the employer has a duty under the ADA to
ascertain whether he has some job that the employee might be able to fill." *Miller v.
Illinois Dep't of Corrections*, 107 F.3d 483, 487 (7th Cir. 1997). It follows that it would
be unreasonable for an employer to insist upon a transfer into a position where the
employee would be similarly at risk. This is precisely the situation that confronted Ms.
Hall with respect to Verizon's offer of transfer to the Springfield CO.

In early May 2003, Ms. Hall's attorney received a letter from Paul McGovern in
which he communicated Verizon's willingness to transfer Ms. Hall unconditionally to a
CO Tech position in Springfield. Ms Hall was extremely pleased that Verizon was
willing to transfer her to a different work location, but she had serious concerns about
the particular position being proposed by Verizon. If she were to have taken a
position in the Worthington Street office of Verizon, she would have had regular
contact with Jack Lynch and George Savaria, who both worked at this location. The
fact that the directive Ms. Hall received to report to the Springfield office was sent by
Jack Lynch seemed to confirm that she would continue to be subject to his
supervision and at least partly dependent upon him to oversee this new work
environment. At times, Mr. Lynch would have been Ms. Hall's direct supervisor as a
result of standard supervisor rotations for weekends, vacations and holidays. Based

upon her experience working in Holyoke, Ms. Hall had no confidence that if she continued to receive discriminatory or retaliatory treatment upon returning to work in this new location that Mr. Lynch or Mr. Savaria would effectively intervene on her behalf.  There was also a substantial likelihood that Ms. Hall would continue to have contact with Skip Pula if she worked in the Springfield central office. As one of the more experienced CO Techs, he almost certainly would have been called in on a periodic basis to work in the Worthington Street central office, and would have been in that office on a regular basis to pick up supplies and his paycheck.

Ms. Hall's extreme uneasiness about the transfer proposed by Verizon was exacerbated by several racial incidents in the Springfield area involving Verizon employees in the Spring of 2003 which were grossly mishandled by first and second level supervisors working in Springfield. One particularly egregious incident involved vile white supremacist graffiti on the inside of a Verizon cross box which could only be accessed by Verizon employees. In March 2003, Greg Drew, who is an African American male, was working with another African American technician in Springfield, MA. They opened a locked cross box located at 410 Carew Street, and discovered a swastika painted on the inside of the cross box door along with the statement, "Kill all Jews and Niggers !" There was also the statement, "Stanton haz (sic) a Vagina !" The cross box was always kept locked and only Verizon employees possessed the tool required to open the box.. Mr. Drew and his co-worker, Christopher Winslow, immediately complained about this vile and threatening graffiti to our Verizon supervisor. Mr. Winslow also took a photograph of the graffiti which was shared with Verizon management.

Mr. Drew and other African American technicians were exposed to this graffiti every time we opened the cross box. On a daily basis, Mr. Drew asked his first level supervisor about plans for the removal of the graffiti. On two or three occasions, Mr. Drew went directly to his second level manager, Sally Lynch, and complained that nothing was being done to paint over or remove the graffiti or replace the lock box door. On one of these occasions, Mr. Drew mentioned to Ms. Lynch that there was an available cross box door in a Verizon equipment yard which could be used to replace the door with the graffiti. Mr. Drew also pointed out on more than one occasion that a temporary measure would be to simply paint over the graffiti so that it was no longer visible.

After more than a month went by with no action being taken to remove the graffiti, Mr. Drew went to see Thomas Pritchard, a Verizon District Manager in Springfield. He complained to Mr. Pritchard about the apparent unwillingness of Verizon management to respond to our numerous complaints about the graffiti. Mr. Drew offered to replace the cross box door myself, and Mr. Pritchard authorized him to do this. Soon after his meeting with Mr. Pritchard, Mr. Drew replaced the cross box door himself in or around the second week in May 2003. Mr. Drew was particularly upset about the unaccountable delay in dealing with the cross box graffiti because there had been multiple prior occasions when he had complained about other racist graffiti in other Verizon equipment boxes and facilities. Some of this other graffiti was directed at Mr. Drew personally, and made references to his race and ancestry in terms which were profoundly offensive and disturbing. On these prior occasions, Mr. Drew encountered similar resistance and delays in effectively dealing with the graffiti.

The lack of response by Verizon supervisors in Springfield to the complaints about the cross box graffiti further confirmed Ms. Hall's fears about working in the Springfield office. The failure of Springfield supervisors to deal with this particularly egregious example of racist and threatening behavior by Verizon employees reinforced her conviction that she would continue to be vulnerable to unchecked harassment or retaliation if she were to accept a transfer to Springfield. Particularly troubling to Ms. Hall was the fact that the vile graffiti on the cross box could only have been written by outside technicians who would be among the outside technicians she would be interacting with if she became a central office technician in the Springfield office. The prospect of facing more discriminatory and possibly retaliatory treatment at the hands of outside technicians who were capable of producing such graffiti was more than Ms. Hall could bear at that time.

After receiving Verizon's offer of a transfer to the Springfield office, Ms. Hall discussed her concerns about the proposed transfer with her psychiatrist and therapist at her next appointments with them. Each of them wrote letters advising against a transfer to the Springfield office. In a letter dated May 13, 2003, Dr. Honeyman expressed his belief that Ms. Hall would not be able to manage the level of distress she would likely feel if she were to be transferred into the position in Verizon's Springfield office. Dr. Honeyman correctly noted that such a transfer would require that Ms. Hall continue interacting and having contact with managers and supervisors whose actions and inaction contributed to the hostile work environment she experienced in the Holyoke office. Dr. Honeyman further stated his opinion that Ms. Hall would not be able to manage the distress she would likely feel if she were transferred to the Springfield office.

A reasonable jury could conclude from the above facts that Verizons insistence upon transferring Ms. Hall to the Springfield was not reasonable.

**C.    Verizon failed to engage in good faith in an interactive process.**

As noted above, in early May 2003, Ms. Hall's attorney received a letter from Paul McGovern in which he communicated Verizon's willingness to transfer Ms. Hall unconditionally to a CO Tech position in Springfield. Ms. Hall's attorney sent a letter to Mr. McGovern, on May 16, 2003 in which he expressed Ms. Hall's serious reservations about the transfer to Springfield and the reasons for her reservations, citing the lack of action by Verizon supervisors to remove the cross box graffiti as one prominent concern. In this letter, Ms. Hall's attorney highlights the fact that he and Ms. Hall were awaiting receipt of more recent medical reports which would address the proposed transfer. Ms. Hall's attorney explicitly states that he would contact Mr. McGovern immediately upon receipt of the additional medical information.

During the course of his representation of Ms. Hall with regard to a worker's compensation claim, Attorney Judd Peskin received a letter dated May 13, 2003 from Ms. Hall's treating psychiatrist, Dr. David Honeyman, in which Dr. Honeyman expressed his professional opinion that a proposed transfer of Ms. Hall to Verizon's Springfield office would likely have an adverse impact upon her mental health. Attorney Peskin sent a copy of Dr. Honeyman's letter to Verizon's attorney, Matthew F. King, by facsimile on May 20, 2003. Attorney Peskin followed up on his facsimile to Attorney King with a letter to him dated May 21, 2003 in which Mr. Peskin also referred to the conclusions expressed by Dr. Honeyman in his May 13th medical report. See, Plaintiff's SOMF, ¶¶ 126-128.

Despite the above communications, Ms. Hall received a letter from Jack Lynch dated Tuesday, May 20, 2003 instructing her to report for work in the Springfield office on Monday, May 26, 2002. Ms. Hall received the letter from Mr. Lynch on Wednesday, May 21, 2003. Ms. Hall took the letter to her attorney's office, but he was away on business until the following week. Another person in his office assisted Ms. Hall in preparing a brief letter in response to Mr. Lynch which Ms. Hall sent to him by overnight and regular mail. In this letter, Ms. Hall confirmed that she had not abandoned her job, and she reminded him that her medical providers had concluded that she could not return to work in the Springfield office and that this conclusion had been communicated to Verizon.

On Thursday, May 22, 2002, Paul McGovern sent Ms. Hall's attorney a letter flatly rejecting Ms. Hall's reasons underlying her reservations about the proposed transfer, as expressed in Mr. Heisler's May 16th letter, and insisted that Ms. Hall report to work on the following Monday, May 26, 2003 or face termination for job abandonment.

Although the position in the Springfield central office was not a viable option for Ms. Hall, she was encouraged that Verizon appeared willing to transfer her to a new position. After her attorney had received the offer of the transfer to the Springfield office from Mr. McGovern in early May 2003, Ms. Hall began investigating other transfer options. In particular, she identified a range of positions which had comparable wage rates and which I believed I was qualified for or could perform with a minimum of training. As part of her independent research into transfer possibilities, Ms. Hall spoke with other Verizon employees about possible alternatives, and she went through the Wage Tables in the union contract which was in effect at the time

and highlighted positions which she thought might be appropriate. Ms. Hall did not have an opportunity to share the results of her research with Verizon or suggest alternative transfer options because Verizon abruptly terminated her employment effective May 26, 2003.

Verizon's conduct in this case falls well short of the threshold requirements for satisfying an employer's obligations to participate in good faith in an interactive process with a disabled employee. Once the employer becomes aware of the disability of an employee and her need for accommodation, the employer is expected to engage in a meaningful dialogue with the employee to **find the best means of accommodating that disability**. *Tobin*, 28 F.3d at 62 (1st Cir. 2004)(emphasis added). The interactive process "requires a great deal of communication between the employee and employer." *García-Ayala v. Lederle Parenterals, Inc.*, 212 F.3d 638, 648 n.12 (1st Cir. 2000), *citing Criado v. IBM Corp.,* 145 F.3d 437, 444 (1st Cir.1998). Once the employer knows of the disability and the employee's desire for accommodations, the employer has the burden to request additional information that the employer believes it needs in order to fashion a reasonable response. *Taylor,* 184 F.3d at 315. Once the duty to engage in an interactive process is triggered, both parties then have a duty to assist in the search for an appropriate reasonable accommodation and to act in good faith. *Id.* at 312.

The process that occurred in this case stands in stark contrast to the process that the law requires. After failing over a period of seven months to engage in any manner of dialogue with Ms. Hall, Verizon finally did extend an offer of an unconditional transfer in a letter dated May 1, 2003. There was no invitation to discuss the appropriateness of the new job, and there was no opportunity for Ms. Hall

to provide any input into finding the best means of accommodating her disability. A two sentence follow-up letter from Paul McGovern one week later contains a terse directive instructing Ms. Hall to report to the new job sight on a particular date in order avoid the risk of termination. An effort by Ms. Hall's attorney to discuss the appropriateness of the proffered position was flatly rejected. It's fair to say that any communication was entirely one-sided, flowing from Verizon to Ms. Hall. The offer of a transfer was presented as a 'take-it-or-leave-it' proposition. Verizon was in possession of information from Ms. Hall's treating psychiatrist stating that she would not be able to manage the stress she would experience if transferred to the Springfield CO Tech position, but her employment was nevertheless terminated due to her failure to report to work in that position on May 26, 2003.

A reasonable jury could readily find that Verizon did not engage in good faith in an interactive process with Ms. Hall, and summary judgment should be denied.

**VIII.    Verizon terminated Ms. Hall's employment for an alleged reason which was a mere pretext for retaliation against her for making ongoing requests for a reasonable accommodation.**

The standard for proving a retaliation claim is the same under Title VII and the ADA. A plaintiff asserting a claim of retaliation must make out a prima facie case demonstrating that: (1) she engaged in a protected activity, known to the employer; (2) she suffered an adverse employment action; and (3) there was a causal connection between the protected activity and the adverse employment actions. *Ramos v. Roche Products, Inc.*, 936 F.2d 43, 48 (1st Cir. 1991), *cert. denied*, *Rossy v. Roche Products, Inc.*, 502 U.S. 941, 116 L. Ed. 2d 330, 112 S. Ct. 379; *Wright v. Compusa, Inc.*, 352 F. 3d 472, 478 (1st Cir. 2003). The First Circuit has described

this initial stage as placing a "relatively light burden" on the plaintiff. *Greenberg v.*
*Union Camp Corp.*, 48 F.3d 22, 26 (1st Cir. 1995).

The First Circuit has recognized that a disabled employee has satisfied the
first element of the prima facie case if she seeks an accommodation of her disability
from her employer and she has a reasonable belief that she is entitled to such an
accommodation. *See*, *Wright*, 352 F. 3d at 478 (1st Cir. 2003)(requesting an
accommodation is a protected activity under the anti-retaliation provision of the ADA).

As to the second element of the prima facie case, a plaintiff must demonstrate
that he or she was denied a term, condition or privilege of employment. *Connell v.*
*Bank of Boston*, 924 F.2d 1169, 1179(1st Cir. 1991), *cert. denied*, 501 U.S. 1218,
111 S. Ct. 2828, 115 L. Ed. 2d 997 (1991). Under the second element, it is enough to
show that the employment action "disadvantages" the person engaging in protected
activity. *Petitti v. New England Telephone and Telegraph Co.*, 909 F.2d 28, 33 (1st
Cir.1990). This element of the prima facie case is clearly satisfied as Ms. Hall was
terminated from her employment.

The third element requires a plaintiff to demonstrate a causal connection
between the alleged adverse action and her protected activity. " A showing of [an
adverse employment action] soon after the employee engages in an activity
specifically protected under applicable anti-retaliation laws  is indirect proof of a
causal connection between the [adverse employment action] and the activity because
it is strongly suggestive of retaliation." *See, Oliver v. Digital Equipment Corp.*, 846
F.2d 103, 110 (1st Cir. 1988).  This element is clearly satisfied in this case. As
reflected in the facts summarized in the preceding section of this memorandum, Ms.
Hall, with the assistance of her treating psychiatrist and her attorney, was fully

53

engaged in efforts to obtain a reasonable accommodation from Verizon right up to the day of Verizon terminated her employment.

A plaintiff may establish a Title VII violation even when a retaliatory motive is not the sole cause of the adverse employment action, or when there were other objectively valid grounds for a discharge. *Raniola v. Bratton,* 243 F.3d 610 (2d Cir.2001).   A retaliatory motive must be "at least a 'substantial' or 'motivating' factor" behind the adverse action."  *Mt. Healthy City School District Board of Education v. Doyle*, 429 U.S. 274, 287, 50 L. Ed. 2d 471, 97 S. Ct. 568 (1977).  Retaliatory intent may be shown, in conjunction with the plaintiff's *prima facie* case, by sufficient proof to rebut the employer's proffered reason for the adverse employment action which is alleged to be retaliatory. *Reeves v. Sanderson Plumbing Products, Inc.,* 120 S.Ct. 2097, 2109 (2000); *see also, Raniola,* 243 F.3d at 625.

There is compelling evidence in this case that the reason given by Verizon was a mere pretext for retaliation against her. During the course of his oral deposition, George Savaria expressly acknowledged that there was **no** urgency whatsoever in having Ms. Hall return to work other than the fact that Ms. Hall's doctors had previously cleared her to return to work in a different work environment or in a different department. According to Mr. Savaria, Management decisions about setting a date of return for employees on leave are based solely upon information Verizon managers receive from the employee's Doctors. In the case of Ms. Hall, the decision to set May 26, 2003 as her date of return was based entirely on information from her doctor. There were no other criteria used in making the decision about the date set for her return. There was no other business related reason for establishing the date of May 26, 2003 for Ms. Hall's return to work. See, Plaintiff's SOMF, ¶¶ 140-

141. However, there is no dispute in this case that Ms. Hall's doctors had not cleared her to work in the CO Tech position in Springfield. In fact, Verizon was in possession of information from Ms. Hall's treating psychiatrist stating that she would not be able to manage the stress she would experience if transferred to the Springfield CO Tech position.

The facts reflecting that it would not have placed any burden on Verizon to have allowed Ms. Hall to remain on unpaid leave after May 27th, 2003, as reflected in the discussion under Section VII.A. above, may also be relied upon by a reasonable jury in reaching a determination that the reason given for Ms. Hall's termination was a pretext for discrimination. Similarly, the evidence reflecting that Verizon persistently refused to engage in good faith in an interactive process with Ms. Hall regarding her return to work, as discussed in section VII. C. above, also supports a conclusion that Verizon was motivated in part by retaliation against Ms. Hall when it peremptorily terminated her employment without any further consideration of her need for an accommodation.

## IX.    Discriminatory actions of the Defendants occurring outside the applicable statute of limitations were part of continuing violations of the Plaintiff's rights under federal and state discrimination laws, and the Plaintiff's claims based on these violations are not time-barred.

The continuing violation doctrine creates an equitable exception to the 300-day limitation period when the unlawful behavior is deemed ongoing. See, e.g., *Lawton v. State Mutual Life Assurance Company of America*., 101 F.3d 218, 221 (1st Cir. 1996); *Sabree v. United Brotherhood of Carpenters and Joiners Local No. 33*, 921 F.2d 396, 400-02 (1st Cir. 1990); *Jensen v. Frank,* 912 F.2d 517, 522 (1st Cir. 1990).  A continuing violation allows a plaintiff not only to allege otherwise time-

barred acts, but more concretely, to receive damages, such as back pay, based on and reaching back to those acts. *See, DeNovellis v. Shalala,* 124 F.3d 298, 307-08 (1st Cir. 1997) (citations omitted).

By its nature, a hostile work environment often means that there are a series of events which mount over time to create such a poisonous atmosphere as to violate the law. In the leading Supreme Court cases, the evidence of harassment covered a period of years. Faragher v. City of Boca Raton, 524 U.S. 775, 782, 141 L. Ed. 2d 662, 118 S. Ct. 2275 (1998) (five-year period); Harris v. Forklift System, Inc., 510 U.S. 17, 19, 126 L. Ed. 2d 295, 114 S. Ct. 367 (1993)  (two and a half years); Meritor Sav. Bank, FSB v. Vinson, 477 U.S. 57, 59-60, 91 L. Ed. 2d 49, 106 S. Ct. 2399 (1986) (four years). As a consequence, there is a natural affinity between the hostile work environment theory and the continuing violation doctrine. Thus, a court should not hastily dismiss on timeliness grounds a harassment claim where a continuing violation is alleged.  Provenchar v. CVS Pharmacy, 145 F.3d 5, (1st Cir. 1998)

Prior decisions of the First Circuit recognized that continuing violations may be serial or systemic. *See, Pilgrim v. Trustees of Tufts College,* 118 F.3d 864, 869 (1st Cir. 1997). A serial violation occurs where a chain of similar discriminatory acts emanating from the same discriminatory animus exists and where there has been some violation within the statute of limitations period that anchors the earlier claims. *See, DeNovellis,* 124 F.3d at 307. Hoever, the need to distinguish between serial and systemic violations has been largely eliminated by the Supreme Court's decision in *National Railroad Passenger Corp. v. Morgan,* ___ U.S. ___, 122 S.Ct. 2061, 153 L.Ed.2d 106 (2002). In *Morgan,* the Court held that "consideration of the entire scope of a hostile work environment claim, including behavior alleged outside the statutory

time period, is permissible for the purposes of assessing liability, so long as any act contributing to that hostile environment takes place within the statutory time period." *Id.* 122 S.Ct. at 2068. The Court explained that a "hostile work environment claim is comprised of a series of separate acts that collectively constitute one `unlawful employment practice.'" *Id.* 122 S.Ct. at 2074. Thus, "[p]rovided that an act contributing to the claim occurs within the filing period, the entire time period of the hostile environment may be considered by the court for the purposes of determining liability." *Id.*

Much of the conduct which the Plaintiff alleges comprised a hostile work environment occurred within the 300 day period.  Applying the above principles the Plaintiff's claims in this case demonstrates that her hostile work environment claims are not barred by operation of the applicable statute of limitations.

**XI.    CONCLUSION**

For all the reasons set forth above, the plaintiff respectfully requests that the court deny the Defendant's motion for summary judgment.

Respectfully submitted,

PLAINTIFF RHONDA HALL
By her Attorney,

Dated:  October 27, 2006

_____/s/ Hugh D. Heisler_____
Hugh D. Heisler
BBO # 563925
Heisler, Feldman, McCormick &
     Garrow, P.C.
1145 Main Street, Suite 508
Springfield, MA 01103
(413) 788-7988

CERTIFICATE OF SERVICE

I, Hugh D. Heisler, hereby certify that a true copy of the foregoing Memorandum of Law was served electronically upon the attorney of record for the Defendants on October 27, 2006.


/s/ Hugh D. Heisler
Hugh D. Heisler