UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

_____
                                    :
RHONDA HALL,                        :
                                    :
            Plaintiff,              :
                                    :
V.                                  :    Civil Action No. 3:05-cv-30002-MAP
                                    :
VERIZON COMMUNICATIONS, INC.,       :
and VERIZON NEW ENGLAND, INC.       :
                                    :
            Defendants.             :
_____:

**PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION
TO DEFENDANT'S MOTION *IN LIMINE* TO EXCLUDE
EVIDENCE OF CAREW STREET GRAFFITI**

## I.    INTRODUCTION

Among the claims asserted in this matter, plaintiff Rhonda Hall (hereafter

referred to as "Ms. Hall") contends that the defendants (hereafter referred to as

"Verizon") failed to offer her a reasonable accommodation by reassigning her to

another position within the company for which she was qualified. The Defendants

have filed a motion *in limine* to exclude evidence relating to racist and anti-Semitic

graffiti on the inside of a Verizon "cross box" located on Carew Street in

Springfield, Massachusetts (hereafter referred to as "the Carew Street graffiti"). As

expressed in the body of this memorandum below, evidence relating to the Carew

Street graffiti is highly probative as to whether the single job offered to Ms. Hall by

Verizon as an accommodation of her disability was reasonable, and the probative

value of this evidence greatly outweighs any prejudice to the defendants which

might result from the introduction of this evidence.

## II.     FACTUAL BACKGROUND

### A.     Evidence of racist and harassing behavior of Outside Technicians in Holyoke.

Ms. Hall is an African American woman. She began working for the

Defendants in or around March 1989. In or around January 2000, Ms. Hall was

transferred to Verizon's Central Office facility in Holyoke, Massachusetts (hereafter

referred to as the "Holyoke CO") to work as a Central Office Technician (hereafter

referred to as "CO Tech"). Ms. Hall's first level supervisor was Jack Lynch. The

second level manager responsible for supervising central office technicians and

operations in Western Massachusetts was George Savaria. Throughout the time

that Ms. Hall worked in the Holyoke CO, there were only three Verizon employees

assigned to work in the building; Ms. Hall and two other CO Techs, Eugene "Skip"

Pula and Mike Stawasz.  See, Plaintiff's Statement of Material Facts submitted in

support of the plaintiff's Opposition to the defendants' Motion for Summary

Judgment in this matter (hereafter referred to as "Plaintiff's SOMF"), ¶¶ 1-4. The

Plaintiff's SOMF was entered by the court as docket entry number 32.

Outside technicians (hereafter referred to as "OTs") regularly came into and

out of the Holyoke facility. During the time that Ms. Hall worked in the Holyoke CO,

there were more than fifty white male outside technicians who would come into

and out of the Holyoke CO. According to both Mr. Lynch and Mr. Savaria, the OTs

had **no** legitimate business reasons for being in the Holyoke facility, but they were

there all the time. See, Plaintiff's SOMF, ¶¶ 6-9.

Throughout the course of her employment in Verizon's Holyoke facility, Ms.

Hall was subjected to pervasive and persistent harassing and abusive treatment

by white male OTs. While hanging out in the Holyoke CO, white male OTs would

make offensive comments about African Americans and other racial or ethnic minority groups. On one occasion, a white male OT by the name of Ray Cichy stated directly to Ms. Hall, "Why do you people get upset when we call you 'niggers' when you say 'nigger' to each other all the time?"  See, Plaintiff's SOMF, ¶¶ 14-20. The white male OTs regularly treated Ms. Hall with disrespect and contempt. Despite her repeated complaints, OTs were constantly disrupting Ms. Hall's workspace by leaving dirt, mud and debris on her desk, phone and computer, and using her computer and logging her off of her computer. White male OTs repeatedly used the woman's rest room despite Ms. Hall's repeated complaints and the availability of two separate men's rest rooms in the Holyoke facility. See, Plaintiff's SOMF, ¶¶ 21-24. Around the time that Ms. Hall began complaining to her supervisors about the conduct and comments of white male OTs in the Holyoke CO, Ms. Hall's car was "keyed" in the fenced in parking lot used by the OTs, and someone with access to the central office spit on her coat where it was always hung up. Personal possessions belonging to Ms. Hall were also taken from her desk. See, Plaintiff's SOMF, ¶¶ 25, 27, 29 & 31.

Over time, the OTs behavior toward Ms. Hall became increasingly confrontational as they attempted to cast her in a subservient role. They began yelling at her and berating her for not answering the phone quickly enough when OTs phoned into the CO, and they would call Ms. Hall and insist that she give priority to the work they wanted her to do for them over her own work. The OTs complained directly to union officials about Ms. Hall not answering the phones quickly enough. Contrary to the protestations of the OTs, answering phone calls from OTs was a shared responsibility between Ms. Hall and her two white male

CO Tech co-workers. There was no phone answering pecking order in the office.

Ms. Hall's first level and second level supervisors both confirmed that Ms. Hall was

100% correct that her own work had a higher priority than the work requested by

the OTs. Mr. Lynch further confirmed that Ms. Hall was entirely justified in refusing

to prioritize the OTs requests and in complaining about comments they made to

her. See, Plaintiff's SOMF, ¶¶ 26 & 28.

>   **B.    Evidence of inadequate and ineffective response of Verizon Supervisors to complaints about conduct of Outside Technicians in Holyoke.**

Verizon supervisors and managers were painfully aware of a long history of

problems with the behavior of OTs in the Holyoke CO. Prior to August 2002, there

had been constant complaints about OTs hanging out in the Holyoke CO. These

complaints came from both people in the neighborhood surrounding the Holyoke

CO and from CO Techs working in the facility. Problems with the OTs in the

Holyoke CO had been ongoing for as long as Mr. Lynch could remember. These

problems had existed even prior to February 1989 when Mr. Lynch became the

Turf Team Leader for the area encompassing the Holyoke facility. The standard

response to these problems by Verizon managers was to call the OTs supervisors

and request that they "control their people." As fully acknowledged by Mr. Lynch,

these earlier efforts to control the conduct of the OTs had not resulted in any long-

term changes in their behavior, and the response to Ms. Hall's renewed

complaints about the OTs treatment of her proved to be equally as ineffectual.

See, Plaintiff's SOMF, ¶¶ 10-11 & 50.

There is no dispute in this matter that Ms. Hall complained repeatedly about

the harassing conduct of the OTs to her supervisors. See, Plaintiff's SOMF, ¶¶ 44-

49 & 51. As the harassment escalated, Ms. Hall requested a meeting with Mr. Lynch and Mr. Savaria together with representatives of the union. During the course of this meeting which was conducted on August 6, 2002, Ms. Hall again described a range of problems with the overall work environment in the Holyoke CO. She complained about the OTs the disrespectful and harassing treatment of her by the OTs; she complained about racist and anti-Semitic comments and statements made by the OTs; she complained about the OTs occupying and dirtying her workspace and logging her off of her computer; and she complained about ongoing harassment from the OTs in the form of baseless complaints about Ms. Hall not meeting their needs. <u>See</u>, Plaintiff's SOMF, ¶ 52.

Although Ms. Hall's supervisors reaffirmed that the complaints of the OTs were entirely without merit, their response to the battery of issues raised by Ms. Hall was to follow a familiar and by now predictable course of action. Mr. Lynch and Mr. Savaria arranged a conference call with Paul Gazda and Tom Hurley, the first level and second level supervisors of the OTs, respectively, and, in effect, requested once again that they "control their people." During the course of the conference call, Mr. Savaria explained all the issues that Ms. Hall was having with the OTs in the Holyoke CO. He described the comments which had been made to her, and provided Mr. Hurley with the names of the OTs mentioned by Ms. Hall. Following the customary script, Mr. Hurley assured Ms. Hall's supervisors that he would discuss these issues with his technicians. There was also an agreement that the OTs would be told to stay out of the Holyoke CO unless absolutely necessary. <u>See</u>, Plaintiff's SOMF, ¶¶ 54-55.

Following this conference call, however, Mr. Hurley only discussed one racial comment made to Ms. Hall with one of his technicians. He did not discuss the issue of racial speech in the Holyoke CO with any other OTs. He did not discuss any gender issues with any of the OTs. Nor did he discuss any issues related to being disrespectful to Ms. Hall, dirtying her work area, or using her equipment with any of the OTs. See, Plaintiff's SOMF, ¶ 56.

**C.    Evidence of racist behavior of Outside Technicians in Springfield.**

In the Spring of 2003, there were several racial incidents in the Springfield area involving Verizon employees which were grossly mishandled by first and second level supervisors working in Springfield. One particularly egregious incident involved white supremacist graffiti on the inside of a Verizon cross box which could only be accessed by Verizon OTs and their supervisors who worked in the Springfield area. In March 2003, Greg Drew, who is an African American male, was working with another African American OT in Springfield, MA. They opened a locked cross box located at 410 Carew Street, and discovered a swastika painted on the inside of the cross box door along with the statement, "Kill all Jews and Niggers !" There was also the statement, "Stanton haz (sic) a Vagina !"  The cross box was always kept locked and only Verizon employees possessed the tool required to open the box. See, Plaintiff's SOMF, ¶¶ 113-115.

**D.    Evidence of inadequate and ineffective response of Verizon Supervisors to complaints about conduct of Outside Technicians in Springfield.**

Upon discovering the graffiti in the Carew Street cross box, Mr. Drew and Mr. Winslow, immediately complained to their Verizon supervisor. Mr. Winslow

also took a photograph of the graffiti which was shared with Verizon management. See, Plaintiff's SOMF, ¶¶ 116-117.

Mr. Drew and other African American technicians were exposed to this graffiti every time they opened the cross box. On a daily basis, Mr. Drew asked his first level supervisor about plans for the removal of the graffiti. On two or three occasions, Mr. Drew went directly to his second level manager, Sally Lynch, and complained that nothing was being done to paint over or remove the graffiti or replace the lock box door. On one of these occasions, Mr. Drew mentioned to Ms. Lynch that there was an available cross box door in a Verizon equipment yard which could be used to replace the door with the graffiti. Mr. Drew also pointed out on more than one occasion that a temporary measure would be to simply paint over the graffiti so that it was no longer visible. See, Plaintiff's SOMF, ¶¶ 118-119.

After more than a month went by with no action being taken by Verizon supervisors and managers to remove the graffiti, Mr. Drew went to see Thomas Pritchard, a Verizon District Manager in Springfield. He complained to Mr. Pritchard about the apparent unwillingness of Verizon management to respond to numerous complaints about the graffiti. Mr. Drew offered to replace the cross box door himself, and Mr. Pritchard authorized him to do this. Soon after his meeting with Mr. Pritchard, Mr. Drew replaced the cross box door himself in or around the second week in May 2003. See, Plaintiff's SOMF, ¶ 120.

**E.    Evidence that Rhonda Hall would be psychologically unable to perform the essential functions of the only position offered to her as an accommodation of her disability.**

Immediately following an incident in Holyoke when a white male co-worker of Ms. Hall cut off a section of her hair with a pair of needle nose pliers on

September 25, 2003, Ms. Hall was psychologically unable to return to work in the Holyoke Central Office and she went out on sick leave. She began receiving treatment from a psychiatrist and a licensed psychiatric social worker, and she continued to suffer from major depression and anxiety for more than a year. <u>See</u>, Plaintiff's SOMF, ¶¶ 100-102.  Verizon was repeatedly placed on notice throughout the Fall and early Winter that Ms. Hall suffered from a disability and was in need of an accommodation in the form of a job transfer away from the Holyoke Central Office. <u>See</u>, Plaintiff's SOMF, ¶¶ 105-107. After failing over a period of seven months to engage in any manner of dialogue with Ms. Hall, Ms. Hall's attorney received a letter from Paul McGovern in early May 2003, in which he communicated for the first time Verizon's willingness to transfer Ms. Hall without previously stipulated conditions to a CO Tech position in Springfield. There was no invitation to discuss the appropriateness of the new job, and there was no opportunity for Ms. Hall to provide any input into finding the best means of accommodating her disability.  A two sentence follow-up letter from Paul McGovern one week later contained a terse directive instructing Ms. Hall to report to the new job sight on a particular date in order avoid the risk of termination. <u>See</u>, Plaintiff's SOMF, ¶¶ 109 & 131.

Ms Hall was extremely pleased that Verizon was willing to transfer her to a different work location, but she had serious concerns about the particular position being proposed by Verizon. If she were to have taken the position in the Springfield Central Office of Verizon, she would have had regular contact with Jack Lynch and George Savaria, who both worked at this location. The fact that the directive Ms. Hall received to report to the Springfield office was sent by Jack

Lynch seemed to confirm that she would continue to be subject to his supervision and at least partly dependent upon him to oversee this new work environment. At times, Mr. Lynch would have been Ms. Hall's direct supervisor as a result of standard supervisor rotations for weekends, vacations and holidays. Mr. Savaria would have continued to be Ms. Hall's second level supervisor. Based upon her experience working in Holyoke, Ms. Hall had no confidence that if she continued to receive discriminatory or retaliatory treatment upon returning to work in this new location that Mr. Lynch or Mr. Savaria would effectively intervene on her behalf. There was also a substantial likelihood that Ms. Hall would continue to have contact with the man who cut her hair with the pair of pliers. As one of the more experienced CO Techs, he almost certainly would have been called in on a periodic basis to work in the Worthington Street central office, and would have been in that office on a regular basis to pick up supplies and his paycheck. See, Plaintiff's SOMF, ¶¶ 110-112.

The Carew Street graffiti and the lack of response by Verizon supervisors in Springfield to the complaints about the graffiti further contributed to Ms. Hall's fears about working in the Springfield office. The failure of Springfield supervisors to deal with this particularly egregious example of racist and threatening behavior by Verizon employees reinforced Ms. Hall's conviction that she would continue to be vulnerable to unchecked harassment or retaliation if she were to accept a transfer to Springfield. Particularly troubling to Ms. Hall was the fact that the racist graffiti on the cross box could only have been written by outside technicians who would be among the outside technicians with whom she would be working if she accepted the central office position in the Springfield office. The prospect of facing

9

more discriminatory and possibly retaliatory treatment at the hands of outside technicians who were capable of producing such graffiti was more than Ms. Hall could bear at that time. <u>See</u>, Plaintiff's SOMF, ¶¶ 113 & 122-123.

After receiving Verizon's offer of a transfer to the Springfield office, Ms. Hall discussed her concerns about the proposed transfer with her psychiatrist. In a letter dated May 13, 2003, Dr. Honeyman expressed his belief that Ms. Hall would not be able to manage the level of distress she would likely feel if she were to be transferred into the position in Verizon's Springfield office. Dr. Honeyman's letter was transmitted to an attorney for Verizon on May 20, 2003 and was forwarded to Paul McGovern on May 30, 2003. <u>See</u>, Plaintiff's SOMF, ¶¶ 127 & 132. However, in a letter to Ms. Hall dated May 20, 2003, Ms. Hall's former supervisor directed Ms. Hall to return to work on May 26, 2003 in the Springfield Central Office position or be terminated from her employment. As attested to by her psychiatrist, Ms. Hall was psychologically unable to assume the Springfield position, and she advised her supervisor of this fact in a responsive letter to him dated May 21, 2003. Nevertheless, Ms. Hall was fired when she did not show up to work in Springfield as instructed. <u>See</u>, Plaintiff's SOMF, ¶¶ 129-130 & 135.

### F.    Evidence of Verizon's Return to Work Policy

According to George Savaria, Management decisions about setting a date of return for employees on leave are based solely upon information Verizon managers receive from the employee's Doctors. There were no other criteria used in making decisions about an employee's return to work. Mr. Savaria claimed that the decision to set May 26, 2003 as Ms. Hall's date of return was based entirely on information received by Verizon from her doctors. There was no other business

related reason for establishing the date of May 26, 2003 for Ms. Hall's return to work. <u>See</u>, Plaintiff's SOMF, ¶¶ 140-141. According to Mr. Savaria, Verizon will invariably follow the lead of the employee's physicians in making return to work decisions, and uniformly look to the doctors for guidance. There is no dispute in this case that Ms. Hall's doctors had **not** cleared her to work in the CO Tech position in Springfield. In fact, Verizon was in possession of information from Ms. Hall's treating psychiatrist stating that she would not be able to manage the stress she would experience if transferred to the Springfield CO Tech position.

## II.     LEGAL ARGUMENT

In their pending motion *in limine*, the defendants argue that evidence relating to the Carew Street graffiti should be excluded under Federal Rules of Evidence 401 and 402 because it is not relevant to any fact at issue in this case. However, the rules regarding relevancy are quite liberal and provide that "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence " is relevant. Fed.R.Evid. 401; *see also*, *Robinson v. Runyon*, 149 F.3d 507 (6th Cir. 1998). In determining the relevancy of particular evidence, the court should not consider the weight or sufficiency of the evidence and "[e]ven if a district court believes the evidence is insufficient to prove the ultimate point for which it is offered, it may not exclude the evidence if it has even the slightest probative worth." Douglass v. Eaton Corp., 956 F.2d 1339, 1344 (6th Cir.1992). As reflected below, the evidence related to the Carew Street graffiti makes the unreasonableness of a reassignment of Ms. Hall to the CO Tech position in Springfield more probable than it would be without the evidence.

**A.    It was not reasonable for Verizon to reassign Ms. Hall to a work environment in Springfield which closely paralleled the work environment she was forced to leave in Holyoke, and evidence of the Carew Street graffiti is highly relevant to showing the parallels between the two work environments.**

There is no dispute in this case that Verizon was repeatedly placed on notice throughout the Fall and early Winter of 2002-2003 that Ms. Hall suffered from a disability and was in need of an accommodation in the form of a job reassignment away from the Holyoke Central Office. It is well established that under the ADA, the employer's duty reasonably to accommodate a disabled employee includes reassignment of the employee to a vacant position for which she is qualified. See 42 U.S.C. § 12111(9)(B); *see also, Dalton v. Subaru-Isuzu Automotive, Inc.*, 141 F.3d 667, 678 (7th Cir. 1998); *Gile v. United Airlines, Inc.*, 95 F.3d 492, 499 (7th Cir. 1996); *Hendricks-Robinson v. Excel Corp.*, 154 F.3d 685, 694-95 (7th Cir. 1998); *DePaoli v. Abbott Laboratories*, 140 F.3d 668, 675 (7th Cir. 1998). The option of reassignment is particularly important when the employee is unable to perform the essential functions of his or her current job, either with or without accommodation. *Dalton,* 141 F.3d at 677. As part of this requirement, the employer is obligated to "identify the full range of alternative positions for which the individual satisfies the employer's legitimate, nondiscriminatory prerequisites" and consider "transferring the employee to any of these other jobs, including those that would represent a demotion." *Id.* at 678.

In contrast to the required interactive process described in the *Dalton* case, Verizon waited for approximately eight months after Ms. Hall was unable to return to her position in Holyoke to extend a non-negotiable, one-time, take-it-or-leave-it offer of reassignment to a single position in the Springfield Central Office.

Verizon's entire defense to Ms. Hall's reasonable accommodation claim rests on whether reassignment to this single position was reasonable within the meaning of the ADA.[1] "The question of whether a proposed accommodation is reasonable is 'fact-specific' and must be evaluated on a 'case-by-case basis.'" *See eg., Kennedy v. Dresser Rand Co.,* 193 F.3d 120, 122 (2d Cir.1999). The facts in this case will clearly show that Verizon's insistence that Ms. Hall return to work in the CO Tech position in Springfield was **not** reasonable, and evidence relating to the Carew Street graffiti is a critical component of this factual showing.

The evidence in this case clearly shows that Ms. Hall became disabled from working in her former position in the Holyoke Central Office, and that her disability was caused by the abusive treatment she was subjected to while working in that office. These facts were confirmed by three separate psychiatrists who examined Ms. Hall between September 2002 and August 2003, including a psychiatrist designated by Verizon's own benefits coordinator who conducted an IME at Verizon's behest. See, Plaintiff's SOMF, ¶¶ 104-108. Under these circumstances, a jury could readily conclude that it would be unreasonable to force Ms. Hall to take a position in a work environment in Springfield which closely resembled the hostile environment in Holyoke which had caused her disability in the first place. The totality of the evidence, including the evidence of the Carew Street graffiti, highlights the direct parallels which existed between the two work environments.

The evidence shows that white male OTs in Holyoke engaged in racist and abusive behavior toward Ms. Hall. The evidence of the Carew Street graffiti which

---

[1]   In its Supplemental Responses to Plaintiff's Interrogatories, Verizon  expressly waived any "undue hardship" affirmative defense to Ms. Hall's claim that she was denied a reasonable accommodation under the ADA. See, Plaintiff's SOMF, ¶ 137.

will be offered through Greg Drew shows that OTs in Springfield with whom Ms. Hall would have been expected to work were similarly inclined to engage in racist and threatening behavior. The evidence shows that the Verizon supervisors and managers responsible for the OTs in Holyoke failed to take effective remedial action in response to complaints from Ms. Hall about the racist and abusive statements and conduct of the Holyoke OTs. Indeed, the evidence shows that the supervisors and managers of the Holyoke OTs failed to control or restrain the conduct of the Holyoke OTs over a period of many years. The evidence relating to the Carew Street graffiti shows that the Verizon supervisors and managers responsible for the Springfield-based OTs similarly failed to respond in a timely or effective manner to multiple complaints from other African American Verizon employees about the racist conduct of OTs in Springfield.

During the time that Ms. Hall worked in Holyoke, Mr. Savaria and Mr. Lynch had similarly failed to take effective remedial action in response to complaints from Ms. Hall about the racist and abusive statements and conduct of the Holyoke OTs. If she had taken the Springfield CO Tech position, Mr. Savaria would have continued to be Ms. Hall's second level supervisor. At times, Mr. Lynch would have been Ms. Hall's direct supervisor as a result of standard supervisor rotations for weekends, vacations and holidays. There was also a substantial likelihood that Ms. Hall would have continued to have contact with the man who cut her hair with the pair of pliers. As one of the more experienced CO Techs, Mr. Pula almost certainly would have been called in on a periodic basis to work in the Worthington Street central office, and would have been in that office on a regular basis to pick up supplies and his paycheck.

The evidence of the Carew Street graffiti and the apparent indifference of the Springfield supervisors to complaints about the graffiti objectively exemplifies the clear parallels which existed between the abusive work environment in Holyoke which had been responsible for the onset of Ms. Hall's disability and the work environment she would have encountered if she had accepted the single accommodation being offered to her by the defendants. A jury could conclude from this and other relevant evidence that it was not reasonable for Verizon to take Ms. Hall out of one abusive workplace and insist that she step into another work environment which shared many of the same characteristics. In its ruling from the bench on the defendants' motion for summary judgment in this case, the court recognized that the evidence would support such a conclusion by the jury. After reviewing the evidence relating to Verizon's proposed transfer of Ms. Hall to Springfield, the court remarked, "I have a hard time seeing how that's an adequate accommodation." *See,* Transcript of Hearing on Summary Judgment entered as Docket number 44 (hereafter referred to as "Summary Judgment Transcript"), pp. 9-10. The court went on to recount some of the evidence of similarities between the two workplace environments, and observed:

> They tried to send her right back to the place where her doctor said, "She's got a disability. She needs an accommodation. Sure, she can work with a reasonable accommodation. That ain't it." Springfield isn't a reasonable accommodation because she's going right back in the same briar patch, so it sounds like kind of a classic disability case.

Summary Judgment Transcript, pp. 14-15.

Excluding evidence of the Carew Street graffiti would effectively preclude Ms. Hall from showing the full extent of the workplace parallels to the jury, and would deprive the jury of evidence which is highly probative on the issue of the

reasonableness of the single accommodation offered to Ms. Hall by Verizon. The

defendants' motion *in limine* should be denied.

> **B.     It was not reasonable for Verizon to reassign Ms. Hall to a
> position in a work environment she could not tolerate due to her
> psychological disability, and evidence of the Carew Street
> graffiti is directly relevant to the reasons Ms. Hall would have
> been unable to perform the essential functions of the
> Springfield Central Office position.**

A central issue in this case is whether the defendants were justified in

insisting that Ms. Hall accept a reassignment to the Springfield Central Office

position or be terminated. Whether a reassignment to this position constituted a

reasonable accommodation will be determined in part by evidence as to whether

this particular position would have enabled Ms. Hall to overcome the psychological

limitations which prevented her from returning to her previous position in Holyoke.

Rather than supporting a conclusion that this new position would have effectively

accommodated Ms. Hall's disability, the totality of the evidence, including the

evidence relating to the Carew Street graffiti, demonstrates that reassignment to

this position would have exacerbated her symptoms and prevented her from

continuing her employment at Verizon.

Once an employer becomes aware of the disability of an employee and her

need for accommodation, the employer is expected to engage in a meaningful

interactive dialogue with the employee **to find the best means of

accommodating that disability**. *Tobin v. Liberty Mutual Insurance Co.*, 28 F.3d

54, 62 (1st Cir. 2004). "Although there may be occasions where a reasonable

accommodation can be determined without an interactive process, typically the

interactive process will be indispensable." *Smith v. Midland Brake, Inc.*, 180 F.3d

1154, 1172, fn.10 (10th Cir.1999). The burden of "exploring" possible reasonable

accommodations generally lies with the employer because the employer often has

far more information about the full range of accommodations which are available.

*Hansen v. Henderson,* 233 F.3d 521, 523 (7th Cir.2000); *see also*, *Smith*, 180

F.3d at 1173. As explained by the Third Circuit in the seminal reasonable

accommodations case of *Taylor v. Phoenixville School District,* 184 F.3d 296, 315

(3d Cir.1999), "[t]he interactive process, as its name implies, requires the employer

to take some initiative." The *Taylor* court further noted that employers can show

that they have met their duty to make a "good faith effort to seek accommodations"

by taking steps including the following:

> meet with the employee who requests an accommodation, request
> information about the condition and what limitations the employee
> has, ask the employee what he or she specifically wants, show some
> sign of having considered the employee's request, and offer and
> discuss available alternatives when the request is too burdensome.

184 F.3d at 317. The very purpose of the interactive dialogue is to "identify the

precise limitations resulting from the [employee's] disability and the potential

reasonable accommodations that could overcome those limitations." 29 C.F.R. §

1630.2( o)(3); *see also*, *Smith*, 180 F.3d at 1171; *Hendricks-Robinson*, 154 F.3d at

693 (the ADA imposes a duty upon employers "to engage in a flexible, interactive

process with a disabled employee needing accommodation so that, together, they

might identify the employee's precise limitations and discuss accommodations

which might enable the employee to continue working").

    In this case, the conduct of the defendants sharply diverged from the

standards applied by courts in determining whether an employer has engaged in

good faith in the required interactive process. Verizon never engaged in any

dialogue with Ms. Hall or her doctor; never requested any additional information

about her desire or need for a transfer; and there was no opportunity for Ms. Hall to provide any input into finding the best means of accommodating her disability. After failing over a period of seven months to offer Ms. Hall any manner of accommodation, Verizon extended a non-negotiable, one-time, take-it-or-leave-it offer of reassignment to a single position in Springfield in May 2003. There was no invitation to discuss the appropriateness of the new job. Verizon flatly rejected any suggestion that the assigned position would have a negative psychological impact upon Ms. Hall, and refused to await receipt of medical documentation relating to this proposed assignment before issuing an ultimatum that she appear for work in the new position in five days time or face termination. After receiving the promised medical documentation, Verizon ignored the judgment of Ms. Hall's treating psychiatrist that she would be unable to psychologically tolerate the new position.

This case exemplifies an outcome which is all too likely to occur in the absence of good faith involvement of the employer in a meaningful interactive process. Without having explored the nature of Ms. Hall's disability or the limitations that her disability imposed on her ability to return to work, Verizon settled on a convenient accommodation which did not come close to meeting the standard of reasonableness required in such circumstances. If reassignment represents the best means of accommodating the disability of an employee, "the employer has a duty under the ADA to ascertain whether he has some job that the employee might be able to fill." *Miller v. Illinois Dep't of Corrections*, 107 F.3d 483, 487 (7th Cir. 1997). In order to be considered "qualified" for the potential new position, the individual must (1) satisfy the legitimate prerequisites for that alternative position, **and** (2) be able to perform the essential functions of that

position with or without reasonable accommodations. *Dalton*, 141 F.3d at 678.

Under the reassignment provision in the ADA, an "employer must consider the

feasibility of assigning the worker to a different job **in which her disability will not**

**be an impediment to full performance**." *EEOC v. Humiston-Keeling, Inc.*, 227

F.3d 1024, 1028 (7th Cir.2000)(emphasis added); *see also*, *Hansen*, 233 F.3d at

523 (legitimate form of accommodation includes reassignment of a disabled

worker to a job on the employer's roster **that the worker's disability does not**

**prevent her from performing"**)(emphasis added). In this respect, reassignments

are no different than other forms of accommodation. All reasonable

accommodations are intended to serve as "mechanisms to remove barriers or

provide assistance to disabled individuals so that they can perform the 'essential

functions' of employment positions." *Cripe v. City of San Jose*, 261 F.3d 877, 889

(9th Cir.2001).

By definition, if an employee is unable to perform the essential functions of

a particular position, then reassignment to that position would be unreasonable *per*

*se.* It follows that it would be entirely unreasonable for an employer to insist upon a

transfer into a particular position if the employee was unable to perform the

essential functions of that position due to her disability. This is precisely the

situation that confronted Ms. Hall with respect to Verizon's proposed reassignment

of her to the Springfield Central Office. Ms Hall suffered from debilitating

psychological impairments which were caused by the abusive treatment she was

subjected to in the Holyoke Central Office. If the defendants had taken their

responsibilities under the ADA more seriously and entered into a truly meaningful

dialogue with Ms. Hall, they would have learned that what she needed most was to

be placed in a work environment which did not resemble the environment in Holyoke which had caused her so much harm. However, the evidence shows that the work environment in Springfield shared certain negative characteristics with the Holyoke work environment. Contrary to the purpose of reasonable accommodations, these negative characteristics would have been an impediment to full performance of the Springfield Central Office position by Ms. Hall.

As a direct result of her psychological disability, Ms. Hall was unable to return to work in a workplace where she would: 1) continue to have contact with the man who chopped off a section of her hair with a pair of needle nose pliers; 2) continue to have regular contact with the supervisors who failed to take effective remedial action in response to her multiple complaints about abusive treatment in her former position in Holyoke; and 3) once again be exposed to working with OTs who had demonstrated an inclination to engage in racist behavior and were supervised by Verizon supervisors and managers who had a track record of failing to respond effectively to complaints about such behavior. These limitations effectively prevented Ms. Hall from taking the central office position in Springfield, much less fully performing the essential functions of that position. Rather than enabling Ms. Hall to overcome the limitations imposed upon her by her disability, the evidence clearly shows that the single accommodation offered by the defendants would have worsened her mental health condition and impeded her ability to successfully return to gainful employment. The undisputed medical evidence in this case confirms this conclusion. In a letter dated May 13, 2003, Ms. Hall's treating psychiatrist, Dr. David Honeyman, expressed his professional judgment that Ms. Hall would not have been able to manage the level of distress

20

she would likely have experienced if she were to be transferred into the position in Verizon's Springfield office.

As reflected in the above discussion, evidence of the negative characteristics of the Springfield position which was offered to Ms. Hall as the only form of accommodation by the defendants is extremely relevant to the question of whether the defendants' insistence that Ms. Hall accept a reassignment to this position was reasonable. Evidence of the Carew Street graffiti is a critical component of this proof.  Without the evidence relating to the Carew Street graffiti, Ms. Hall would be deprived of the ability to convey to the jury a full understanding or appreciation of the reasons underlying her decision and her psychiatrist's medical judgment that she could not have tolerated working in the Springfield position. The defendants' motion *in limine* should be denied.

**C.    It was not reasonable for Verizon to insist that Ms. Hall comply with a reassignment decision that violated the company's own return to work policy, and evidence of the Carew Street graffiti is directly relevant to proving this violation.**

In support of their pending motion, the defendants rely on court decisions holding that an employee's subjective beliefs about the reasonableness of a proposed accommodation are not determinative. However, these cases do not apply to the factual circumstances in this case, and the defendants' reliance on them is misplaced. In this case, the defendants own return to work policy makes Ms. Hall's subjective state of mind entirely relevant to a determination of the reasonableness of the single accommodation offered by Verizon. The reasonable accommodation provisions in the ADA do not require employers to abandon their legitimate, nondiscriminatory company policies defining job qualifications, prerequisites, and entitlements to intra-company transfers. *See*, *Dalton*, 141 F.3d

at 678; *Aka v. Washington Hospital Center*, 156 F.3d 1284, 1305 (D.C.Cir.1998).

Reassignment decisions would not be considered reasonable if the reassignment

would cause the employer to deviate from important fundamental policies

underlying legitimate business interests. *Smith*, 180 F.3d at 1175-1176. Under the

same reasoning applied in these cases, it would not be reasonable for an

employer to insist upon a reassignment which would violate the employer's own

legitimate, nondiscriminatory return to work policies. This is precisely what

happened in this case.

According to George Savaria, Management decisions about setting a date

of return for employees on leave are based solely upon information Verizon

managers receive from the employee's doctors. There were no other criteria used

by Verizon in making decisions about an employee's return to work. Mr. Savaria

claimed that the decision to set May 26, 2003 as Ms. Hall's date of return was

based entirely on information received by Verizon from her doctors. There was no

other business related reason for establishing the date of May 26, 2003 for Ms.

Hall's return to work. According to Mr. Savaria, Verizon will invariably follow the

lead of the employee's physicians in making return to work decisions, and

uniformly look to the doctors for guidance. However, there is no dispute in this

case that Ms. Hall's treating doctor had **not** cleared her to work in the CO Tech

position in Springfield. In fact, Verizon was in possession of information from Ms.

Hall's treating psychiatrist stating that she would not be able to manage the stress

she would experience if transferred to the Springfield CO Tech position.

In a letter dated May 13, 2003, Dr. Honeyman expressed his professional

medical judgment that Ms. Hall would not be able to manage the level of distress

she would likely feel if she were to be transferred into the position in Verizon's Springfield office. Dr. Honeyman's letter was transmitted to an attorney for Verizon on May 20, 2003 and was forwarded to Paul McGovern on May 30, 2003. Nevertheless, in correspondence from Paul McGovern to Ms. Hall's attorney, Verizon flatly rejected any suggestion that the assigned position would have a negative psychological impact upon Ms. Hall, and refused to await receipt of the medical documentation from Dr. Honeyman relating to the proposed reassignment before issuing an ultimatum that she appear for work in the new position in five days time or face termination. After receiving the promised medical documentation, Verizon ignored the judgment of Ms. Hall's treating psychiatrist that she would be unable to psychologically tolerate the new position.

Evidence relating to Dr. Honeyman's conclusion that Ms. Hall was psychologically unable to assume and retain the Springfield position is clearly relevant to an assessment of whether Verizon acted unreasonably when it insisted on the reassignment of Ms. Hall to the Springfield position in contravention of its own return to work policy. Elements of Ms. Hall's state of mind necessarily had a direct bearing on her psychiatrist's conclusion that she could not tolerate the transfer to the Springfield Central Office position. In particular, Ms. Hall had serious concerns about the particular position being proposed by Verizon. If she were to have taken the position in the Worthington Street office of Verizon, Mr. Savaria would have continued to be Ms. Hall's second level supervisor. In addition, Mr. Lynch periodically would have been Ms. Hall's direct supervisor as a result of standard supervisor rotations for weekends, vacations and holidays. The fact that the directive Ms. Hall received to report to the Springfield office was sent

by Jack Lynch seemed to confirm that she would continue to be subject to his supervision and at least partly dependent upon him to oversee this new work environment. Based upon her experience working in Holyoke, Ms. Hall had no confidence that Mr. Lynch or Mr. Savaria would effectively intervene on her behalf if she continued to receive discriminatory or retaliatory treatment upon returning to work in the new location. There was also a substantial likelihood that Ms. Hall would continue to have contact with the man who cut her hair with the pair of pliers. As one of the more experienced CO Techs, he almost certainly would have been called in on a periodic basis to work in the Worthington Street central office, and would have been in that office on a regular basis to pick up supplies and his paycheck.

The Carew Street graffiti and the lack of response by Verizon supervisors in Springfield to the complaints about the graffiti further contributed to Ms. Hall's fears about working in the Springfield office. The failure of Springfield supervisors to deal with this particularly egregious example of racist and threatening behavior by Verizon employees reinforced Ms. Hall's conviction that she would continue to be vulnerable to unchecked harassment or retaliation if she were to accept a transfer to Springfield. Particularly troubling to Ms. Hall was the fact that the racist graffiti on the cross box could only have been written by outside technicians who would be among the outside technicians with whom she would be working if she accepted the central office position in the Springfield office. The prospect of facing more discriminatory and possibly retaliatory treatment at the hands of outside technicians who were capable of producing such graffiti was more than Ms. Hall could bear at that time.

The expression of the above concerns by Ms. Hall is precisely the type of information from a patient which a psychiatrist would rely upon in rendering a medical judgment about whether the patient had the psychological capacity to perform the functions of a particular job. Contrary to the position taken by the defendants in their pending motion, the concerns voiced by Ms. Hall are not mere expressions of personal preference or subjective belief regarding the reasonableness of an accommodation. Rather, these concerns are expressions by a psychologically impaired individual of the effect that a proposed accommodation would have on her disability. When evaluating the reasonableness of an accommodation offered to an employee whose disability is psychological in nature, the effect that the proposed accommodation would have on the psychological well-being of the employee is a centrally important consideration. This is particularly true when decisions under employer's own return to work policy are supposed to be entirely dependent upon the medical judgments expressed by the employee's own doctors.

Evidence relating to the reasons underlying Ms. Hall's concerns about the Springfield position and her psychiatrist's corresponding conclusion that she would be unable to tolerate this position has a direct bearing on whether or not the sole accommodation offered by Verizon was reasonable. A significant factor in Ms. Hall's inability to tolerate the Springfield position was her reaction to the information about the Carew Street graffiti. In short, Ms. Hall's subjective state of mind, as affected in part by the evidence of the Carew Street graffiti, is highly relevant to proving the objectively unreasonable nature of Verizon's proffered accommodation, and the defendants' motion *in limine* should be denied.

25

**D.    Evidence relating to the Carew Street graffiti is highly probative with regard to the reasonableness of the only accommodation offered to Ms. Hall by Verizon, and its probative value is not substantially outweighed by any prejudice to the defendants which might result from the admission of this evidence.**

In their pending motion *in limine*, the defendants further argue that the probative value of the evidence of the Carew Street graffiti would be substantially outweighed by the danger of unfair prejudice, and should be excluded under Federal Rule of Evidence 403. Rule 403 prohibits the admission of evidence if there is a danger of unfair prejudice, not mere prejudice. See Fed.R.Evid. 403; *see also*, *Robinson*, 149 F.3d at 514. As stated by the court in *Dollar v. Long Mfg., N.C. Inc.*, 561 F.2d 613, 618 (5th Cir. 1977), "[v]irtually all evidence is prejudicial or it isn't material. The prejudice must be unfair." In reviewing motions brought under Rule 403, the court must "look at the evidence in a light most favorable to its proponent, maximizing its probative value and minimizing its prejudicial effect." *Koloda v. General Motors Parts Division,* 716 F.2d 373, 377 (6th Cir. 1983).

In the pending motion, the defendants seems to argue that the evidence of the Carew Street graffiti is unfairly prejudicial simply because it is racially inflammatory. Such an argument is clearly insufficient to exclude the evidence under Rule 403. Testimony concerning racial remarks is certain to be emotionally charged. The emotional content of evidence, however, can "require exclusion only in those instances where the trial judge believes that there is a genuine risk that the emotions of the jury will be excited to irrational behavior, and that this risk is disproportionate to the probative value of the offered evidence." *Morgan v. Foretich,* 846 F.2d 941, 945 (4th Cir. 1988). The highly probative nature of otherwise inflammatory racial remarks has been repeatedly recognized by Courts

of Appeal which have overturned trial court decisions excluding evidence of such remarks under Rule 403. *See*, *Robinson v. Runyon*, 149 F.3d 507, 513 (6th Cir. 1998)(court overturned trial court ruling excluding evidence of a document which contained racially offensive material which was widely circulated in the workplace); *White v. Honeywell, Inc.*, 141 F.3d 1270 (8th Cir. 1998)(court overturned trial court ruling excluding evidence of a racially pejorative comment which was not overheard by the plaintiff made by a supervisor who was not the plaintiff's immediate supervisor and who was deceased at the time of trial); *Abrams v. Lightolier Inc.*, 50 F.3d 1204, 1214 (3d Cir. 1995)(noting that "discriminatory comments by nondecisionmakers, or statements temporally remote from the decision at issue, may properly be used to build a circumstantial case of discrimination") (citations omitted); *Hunter v. Allis-Chalmers Corp.,* 797 F.2d 1417, 1423 (7th Cir. 1986) (evidence of past racial statements and incidents of harassment unrelated to specific disputed action properly admissible to show racial attitudes); *Mullen  v. Princess Anne Volunteer Fire, Inc.*, 853 F.2d 1130 (4th Cir. 1988)(court overturned trial court exclusion of evidence of racial slurs regularly used by white fire fighters in a failure to hire case).

The racially inflammatory nature of the evidence involved in this case is precisely why it is probative of the unreasonableness of the only accommodation offered to Ms. Hall by Verizon. It is precisely the emotional impact on Ms. Hall of the words on the inside of the cross box, and what those words reflected about the attitudes and associated behavior of the Springfield OTs which whom Ms. Hall would be expected to work which attests to their relevance to the issue of the reasonableness of Verizon's proposed accommodation. As noted by the court in

the *Runyon* case, "in nearly every discrimination case there are often instances of extremely offensive remarks, caricatures, and jokes. Those shocking messages, offensive though they may be to the court and to the jury, comprise the signature element of a discrimination case." *Runyon*, 149 F.3d at 515. Similarly, the court in the *Honeywell* case noted:

> In a case where race discrimination is the issue, the introduction of alleged racist remarks is not to be unexpected. The possibility that a jury might be so inflamed by the contents of the remark so as to decide the case based on passion, needs to be balanced against the fact that such remarks are potent evidence of attitude and environment.

141 F.3d at 1276. The court in *Mullen* similarly remarked:

> It would be ironic indeed to conclude that use of the language of prejudice is irrelevant in a civil rights suit. Racial slurs represent the conscious evocation of those stereotypical assumptions that once laid claim to the sanction of our laws. Such language is symbolic of the very attitudes that the civil rights statutes are intended to eradicate.

853 F.2d at 1133. As reflected in the above cases, it is axiomatic that the available evidence in cases involving allegations of racial discrimination, such as this one, is likely to include racially offensive or inflammatory remarks. Thus, in discrimination cases such as this one, "defendants must allege more than merely the racially offensive nature of the evidence in order to establish a danger of unfair prejudice." *Runyon*, 149 F.3d at 515.

Racism is ugly, and we as a society can only hope that thoughtful and considerate people will be properly outraged by the type of sentiments reflected in the graffiti inscribed on the inside of the Carew Street cross box. If a jury were to respond to this evidence by thinking less of the individuals responsible for it, this would be an entirely appropriate reaction. *See, Mullen*, 853 F.2d at 1134-1135 ("a juror may well disapprove of one who harbors discriminatory intent, yet this

disapproval may be directed to a proper element of the controversy") .  If evidence of the Carew Street graffiti prompted the jury to question the priorities of supervisors who allowed this offensive material to remain visible to African American employees for an extended period of time, there would be nothing improper about such a response. It would not be an 'irrational' response from the jury if it were to infer from this evidence that it would be unreasonable to place an African American women in a position where she would have to work with the authors of such graffiti and where she would have to rely upon supervisors with such a track record of indifference should racially offensive treatment persist in the new workplace. Similarly, if the jury were to gain an understanding from this evidence of the reasons why an African American woman who had been subjected to racially offensive and abusive treatment in her previous workplace would be psychologically unable to place herself into a similar work environment, there would be nothing unfair or improper about such a result. Certainly, these are the inferences that the plaintiff hopes the jury will draw from this evidence. Conversely, it is no surprise that the defendants want to avoid having the jury draw such inferences from this evidence. However, the fact that this evidence would be harmful to the defendants' case is certainly not a justifiable basis for keeping it from the jury.

## III.    CONCLUSION

For all the reasons set forth above, the plaintiff respectfully requests that

the defendant's motion *in limine* to exclude evidence of the Carew Street graffiti be

denied.

Respectfully submitted,
PLAINTIFF RHONDA HALL
By her Attorney,

Dated:  May 22, 2007

_____/s/ Hugh D. Heisler_____
Hugh D. Heisler
BBO # 563925
Heisler, Feldman, McCormick &
      Garrow, P.C.
1145 Main Street, Suite 508
Springfield, MA 01103
(413) 788-7988


CERTIFICATE OF SERVICE

I, Hugh D. Heisler, hereby certify that a true copy of the foregoing
Memorandum of Law was served electronically upon the attorney of record for the
Defendants on May 22, 2007.


_____/s/ Hugh D. Heisler_____
Hugh D. Heisler